UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 --------------------------------------------------------------------

LIANG WANG,

                            Plaintiff,                              Index No. _____

            v.

THE PHILHARMONIC-SYMPHONY SOCIETY OF          **COMPLAINT**
NEW YORK, INC., AND ASSOCIATED MUSICIANS
OF GREATER NEW YORK, LOCAL 802, AMERICAN      **JURY TRIAL DEMANDED**
FEDERATION OF MUSICIANS,

                            Defendants.
 --------------------------------------------------------------------

## <u>NATURE OF THE ACTION</u>

1.      Liang Wang ("Wang") is a long tenured member of the orchestra of the

Philharmonic-Symphony Society of New York, Inc. ("the Philharmonic").  This action, in which

he asserts claims against both the Philharmonic and the union to which all tenured Philharmonic

musicians belong—Associated Musicians of Greater New York, Local 802, American Federation

of Musician ("Local 802" or the "Union")—includes a "hybrid § 301/DFR claim".  That is,

pursuant to Section 301 of the Labor Management Relations Act ("LMRA") it asserts breaches

of the collective bargaining agreement ("CBA") by the Philharmonic, and it also asserts breaches

of the duty of fair representation ("DFR") by Local 802.  The action also includes pendent state

law claims against both Defendants.  Wang seeks equitable relief, as well as applicable monetary

damages as against both Defendants.

2.      Wang is one of the world's most acclaimed classical musicians.  As the

Philharmonic's personnel manager, DeAnne Eisch, stated in writing on November 22, 2022:

> Mr. Liang Wang has been employed fulltime as Principal Oboe of
> the New York  Philharmonic since September 4, 2006.  He is a
> tenured and valued member of the Orchestra … Mr. Wang
> possesses the rare level of musicianship and technical ability that

the New York Philharmonic, the oldest and most storied orchestra in the United States, demands.  The Orchestra has 4 tenured oboe positions.  As Principal Oboe, Mr. Wang leads the oboe section and his musical contribution is critical to our success.

3.      In April of 2020, a dispute that had erupted two years earlier regarding Wang's continued employment with the Philharmonic was *resolved* by an arbitration decision against the Philharmonic and in Wang's favor.  For the four subsequent years and until very recently, the Philharmonic was in compliance with the arbitration decision:  it had reinstated Wang, who was performing with the Philharmonic regularly as the orchestra's first oboe.

4.      On April 11, 2024, an article appeared in *Vulture*—the online section of *New York* magazine ("*Vulture*" or "*New York* magazine")—criticizing the 2020 arbitration result, such as by rhetorically asking about Wang [and a second Philharmonic musician whose separate dismissal was also arbitrated in his favor] "why are they back with the orchestra" (the "Article"). The Article created the misimpression that Wang had been fired based on alleged conduct in Vail, Colorado in 2010 involving a person named Cara Kizer, but that was not true: the Philharmonic never accused Wang of misconduct directed against or involving Kizer.

5.      The Article was written by a writer, two years out of college, who did not even claim to have read the *testimony* of the Wang arbitration whose outcome his article criticizes. And if he reviewed the arbitration *decision*, as the Article claims, the author did not review it carefully or responsibly: the decision itself refutes one of the themes of the Article—the incorrect notion that Wang was accused of misconduct in Vail.

6.      On April 13, 2024, two days after the publication of the Article, the Philharmonic suspended Wang (albeit with pay) from performing with the Philharmonic or even rehearsing with the orchestra.

7.      The Philharmonic simultaneously suspended Matthew Muckey ("Muckey"), a musician who had successfully fought his own 2018 termination based on separate allegations, i.e., the allegations by Cara Kizer that were the subject of the recent Article.  While the two musicians were not accused of the same alleged misconduct, their arbitrations took place together—at the request of the Union and the Philharmonic—for reasons of perceived convenience.

8.      The Article that preceded the renewed suspensions by two days made no assertion that had not been raised in and been the subject of the 2019 arbitration.  Moreover, the Philharmonic has not, in announcing the suspensions, otherwise claimed to be aware of any new allegations made against Wang (or Muckey).

9.      The Philharmonic attributed the recent suspensions of Wang and Muckey to a new investigation it announced simultaneously with the suspensions.  Yet, the investigation as described by the Philharmonic is not on its face about Wang (or Muckey) but instead, and as specifically described by the Philharmonic, an "independent investigation into the culture of the New York Philharmonic in recent years."

10.     In sum, although both Wang and Muckey prevailed in the arbitration, although there are no new allegations against either of them, and although the new "investigation" has never been described as about Wang or Muckey in particular—they are the *only* Philharmonic members who have been suspended in connection with the investigation.

11.     The Philharmonic's statements tying the suspensions to the new investigation dishonor the contractually binding nature of the 2020 arbitration decision and are a smokescreen, given that the new investigation is not specifically about Wang or Muckey.  Yet, they are the only two persons suspended based on an investigation that targets no one in particular.

Likewise, Wang and Muckey are the only two Philharmonic musicians who fall into a very specific category:  performers who challenged allegations of purported misconduct against women that the Philharmonic could not sustain in a binding arbitration—which then got renewed attention in a magazine article.

12.     Wang brings this case individually because the Union will not bring it to challenge his suspension.  By letter dated April 26, the Union expressly rejected Wang's request that it take action to protest Wang's suspension.  The Union expressly relied for its inaction on the newly announced investigation.  But in light of the fact that Wang has not been named as a target or specific subject of that investigation, and in light of the result of the binding arbitration, favorable to Wang, this is not a valid reason for the Union to sit on its hands.  The Union also suggested that it could not protest Wang's suspension because he is being paid, even though the suspension is indefinite and plainly has an extremely negative effect on Wang's employment.

13.     The Union's official refusal to act followed a public statement made by its President, *endorsing* the suspension of the Union members it is obligated to protect—a statement evidently based on the Union's President's impression of facts gleaned, not from the record of the arbitration to which the Union was itself a party, but instead from a magazine article.  Shockingly, President Sara Cutler publicly called Wang's suspension a "good" step.

14.     Statements by the Union endorsing the suspension reveal that gender-based considerations played a part in its refusal to aid Wang in opposing the suspension.  In a statement said to have been "vetted by [the Union's] lawyer, Susan Davis, and Sara Cutler at 802 [the Union's President]" the orchestra committee "denounce[d] … conduct" (a reference to the allegations made against Wang and Muckey in the Article) as "an affront to women everywhere."  In other words, even though the Union was fully aware of an arbitration process

that resulted in a binding decision in favor of the Union, Wang and Muckey - suddenly, in the face of cries from an uninformed public for heads to roll because of previously failed allegations made by women, the Union suddenly abandoned its duty of fair representation to Wang and Muckey.

15.     What makes the Defendants' treatment of Wang profoundly cynical is their *knowledge* that the public outrage directed against Wang, to which they yielded by throwing Wang under the bus, did not make a whit of sense.  The Article that triggered the tsunami of negative public reaction was almost entirely about the allegation of Cara Kizer, a former probationary musician with the Philharmonic, that in the summer of 2010 she had purportedly been drugged and sexually assaulted in Vail, Colorado, where she and other Philharmonic musicians were present to perform a series of concerts.  *But fully known to the Philharmonic and the Union*, after the Philharmonic's lengthy investigation of Kizer's allegation, it did *not* accuse Wang of any misconduct in relation to Kizer/Vail.  As the Philharmonic's lawyer expressly acknowledged in 2019:

> Mr. Lewis is right. We don't say that [Wang] engaged in
> misconduct in Vail.

16.     Yet, when the Article created the misperception that Wang had been fired based on an accusation that he was somehow involved in alleged misconduct in Vail directed against Kizer, the Philharmonic and the Union, rather than correcting that misperception, chose to ally themselves with the gathering mob by furthering the misperception.

17.     To the extent that orchestra members expressed their distress to the Philharmonic about what they read in the Article, the Philharmonic had a vastly better alternative:  it could have explained that suspending Wang based on the already arbitrated facts would be unlawful, and that *the perception* created by the Article that the arbitration involved a claim of misconduct

*by Wang* directed at Cara Kizer in Vail was simply and utterly incorrect.  It could have explained that the Philharmonic had previously decided, after a lengthy internal investigation, that it had no basis to even accuse Wang of misconduct involving Cara Kizer, much less to terminate him on such a basis, and declined to suspend him now.

18.     Likewise, the Union could have stepped up to fulfill its clear and solemn duty to Wang, by protesting his suspension by the Philharmonic.  But the Philharmonic and the Union chose instead to be profiles in cowardice, rather than courage, yielding to demands for Wang's ouster from a woefully uninformed public ready to demand retribution based on an understanding gleaned from nothing more than a single magazine article.

## THE PARTIES

19.     Plaintiff Liang Wang is the married father of two children, each under two years old, and lives with his family in New Jersey.  He is one of the most world's most accomplished classical musicians.  He is the first oboe of the Philharmonic and has been employed in that capacity since 2006.  He is a tenured member of the orchestra, and, from the moment he was hired by the Philharmonic, a member of the Union.

20.      Defendant Local 802 is a "labor organization" within the meaning of 29 U.S.C § 152, and represents the members of the Philharmonic, including Wang, in all matters relating to the negotiation of the orchestra members' terms of employment by the Philharmonic.  Local 802's primary office is at 322 West 48th Street, #1308, New York, New York 10036.

21.     Defendant Philharmonic is a New York State not-for-profit corporation and operates an orchestra that is widely considered to be one of the world's great cultural institutions.  Its principal place of business is 10 Lincoln Center Plaza, New York, New York 10023.

**JURISDICTION AND VENUE**

22.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1332 and 28

U.S.C. § 1343 as the cause of action presents a federal question.  In particular, pursuant to 29

U.S.C. § 185, Mr. Wang states a hybrid claim under section 301 of the LMRA for breach of the

CBA by the Philharmonic, and breach by Local 802 of its DFR to Mr. Wang.  The Court also has

jurisdiction of the action pursuant to 28 U.S.C. § 1332(a)(1) in that the plaintiff is a citizen of a

different state than Defendants and the amount in controversy exceeds $75,000.

23.      This Court also has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367(a) and the principles of pendent jurisdiction.

24.     Venue is proper in the United States District Court for the Southern District of

New York pursuant to 29 USC § 185(a) and 28 U.S.C. § 1391(b).  Defendants each maintain an

office within the judicial district, and a substantial part of the events giving rise to the actions

alleged herein have taken place within this judicial district.

**BACKGROUND**

25.     In 2010, while the Philharmonic was in Vail, Colorado to perform a series of

concerts, a probationary player, Cara Kizer, accused a Philharmonic member, Matthew Muckey,

of assaulting her.[1]  Wang was a witness in that he was one of several others, along with Muckey

and Kizer, who had been together in the hours before the alleged assault.  Wang cooperated with

local law enforcement by providing the limited information that he had, such as observations

about the friendly interaction between Kizer and Muckey before the alleged assault.  The

Colorado prosecutor declined to bring charges against Muckey, and the Philharmonic, through its

---

[1] To our knowledge, Kizer has never claimed to *remember* a non-consensual sex act with Muckey.  The
essence of her public statements (and statements to the police) appears to be that she does not *remember*
consenting to sex with Muckey and professes her firmly held, but entirely speculative *belief* that she
*would not have* consented.

counsel, expressly stated at the time that it would not "inject itself" into the allegations made by Kizer given that "the police department has closed the investigation as the District Attorney did not find the level of evidence sufficient to file charges."

26.     In late 2017, the Philharmonic received an email that purported to be from someone with the same name as a then New York Times reporter—that referred to the events involving Kizer and Muckey in Vail in 2010.  The email made no mention of Wang.

27.     Jess Bennett—i.e., the New York Times reporter with that name—*did not send the email* (which was not sent from a New York Times email account) and almost certainly, it was Cara Kizer who sent or caused it to be sent.  No other known person had a motive to seek attention from the Philharmonic to what was, by then, a dispute of eight years earlier in which the Colorado authorities had declined to prosecute and into which the Philharmonic had previously declined to "inject" itself.

28.     The Philharmonic, unaware that the Jess Bennett email was fake, decided to undertake an investigation of the subject of the email that it had declined to undertake 8 years earlier, hiring former Judge Barbara Jones and her law firm.

29.      While the investigation was described as independent, as to Wang there were two aspects that undermined its fairness.  First, while Wang answered questions from Judge Jones about such topics as Kizer's interaction with Muckey in 2010, Judge Jones *never* told Wang what alleged misconduct by him (if any) was the focus of her investigation as to him.   Second, Judge Jones did not respond to requests from Wang's counsel to speak with her during the pendency of her investigation.

30.     At the conclusion of that investigation, the Philharmonic terminated Muckey and Wang, although Wang was *not* accused by the Philharmonic of any misconduct involving Vail/Kizer.[2]

31.     Article XV of the CBA between the Philharmonic and the Union expressly provides that, in the case of termination of a member, the Union may demand arbitration of the dismissal pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Society.  Such rules require joint selection of a neutral third party to arbitrate the dispute.  Article XV of the CBA further provides as follows:

> The decision of the Arbitrator shall be **final and binding** upon the Society, the Union and the individual Orchestra member involved…

32.     Article VII of the CBA further provides that the Philharmonic may discipline members, but only for violations of rules or "for other just cause."

33.      The By-Laws of the American Federation of Music, which are expressly incorporated into the CBA, provide that all members have "the right of fair representation by the union in all matters relating to the collective bargaining agreement."

34.      Mr. Wang petitioned Local 802 to protest his termination, which filed a grievance on his behalf.  Under the terms of the CBA, the matter was submitted to arbitration. Richard I. Bloch, one of the most respected and experienced labor arbitrators in the nation, was jointly selected by the parties, and over the course of eight months during 2019, presided over the resulting arbitration—at which Wang testified.  The  Kizer/Vail incident dominated the

---

[2] As to Wang, his termination and resulting arbitration principally concerned different events at a different time (several years before 2010).  The arbitrator's reasons for reinstating Wang were compelling, and in any event the Philharmonic could have challenged the arbitration decision in court, but did not.  Moreover, there is no basis to believe that anybody *has ever made a report to law enforcement accusing Wang* of a crime.  Mr. Wang is constrained from elaborating further because of the confidentiality of the arbitration proceedings.

arbitration hearing—because it was the principal basis given by the Philharmonic for its termination of Muckey.

35.     In April 2020, arbitrator Bloch issued a decision in which he explained in detail why the evidence did not establish that Wang [or Muckey] had committed any misconduct, and resultantly, he ordered both musicians reinstated and made whole, including restoration of seniority and all benefits, and back pay.

36.     Complying with the arbitration decision, the Philharmonic fully reinstated both musicians and paid them all withheld wages.  Wang rejoined the orchestra as a regular performer [as did Muckey].  During the four succeeding years, as had been the case during the entire 12 years that preceded Wang's 2018 termination, *no* complaints of any kind were made by anyone to the Philharmonic about Wang.  Nor has Wang been the subject or target of a regulatory or law enforcement action or investigation.

37.     On April 11, 2024, New York Magazine published an article online bearing the headline "A Hidden Sexual-Assault Scandal at the New York Philharmonic:  two musicians were fired for sexual misconduct.  Why are they back with the orchestra?"

38.     As to Wang, the Article conveyed the false notion that not only Muckey, but Wang as well, had been accused of misconduct against Cara Kizer.  As an example of the misperception that the Article created, the Violin Channel reported on its website, as follows:

> On April 12, 2024, investigative reporter Sammy
> Sussman published an article  in Vulture, a part of New York
> Magazine, outlining *allegations of misconduct by Matthew Muckey
> and Liang Wang against former NY Philharmonic horn
> player, Cara Kizer,* in 2010.

39.     While Wang has *never* been accused of misconduct against Kizer, the contrary perception triggered the modern-day equivalent of a witch hunt, complete with proverbial

pitchforks aimed at Wang.  For example, an "open letter to local 802 AFM regarding allegations of sexual misconduct by New York Philharmonic Musicians Matthew Muckey and Liang Wang" appeared on the internet, calling for both of them to be "put on immediate suspension" and stating that a failure to take such action would be to appear to "endorse illegal, unethical, and bigoted behavior."

40.     The next day, April 12, the Philharmonic's CEO emailed the members of the orchestra about the Article.  Rather than correcting its false suggestion that the Philharmonic had previously terminated *Wang* for misconduct against Kizer, Ginstling instead referred to the Article as "distressing" and noted "limitations on what we can say."

41.     On April 13, the Philharmonic prohibited both musicians from participating in performances or even rehearsals, *with no end date on that suspension*.  In an email sent that day to the orchestra, CEO Ginstling wrote that "for the time being, Matthew Muckey and Liang Wang will not be at rehearsals or performances."

42.     Since April 13, 2024, Mr. Wang has not performed in any concerts of the Philharmonic, which as of the date of this Complaint, is at least 10 concerts including the Spring Gala with Gustavo Dudamel that he was scheduled to perform in on April 24, 2024.

43.     Also, unless Mr. Wang is reinstated, he will not be able to rehearse for upcoming concerts, including the Philharmonic's tour in China which is scheduled in June 2024 and the tour in Vail which is scheduled in July 2024.

44.     On April 15, CEO Ginstling acknowledged, in remarks quoted in the New York Times, that the arbitration decision reinstating Mr. Wang to the orchestra was made "through binding arbitration", emphasizing that "binding is the key word."  Nevertheless,  Ginstling

suggested that the Philharmonic would continue to suspend Mr. Wang indefinitely because the Article had "prompted a lot of strong feelings."

45.     That New York Times article also quoted the Philharmonic's orchestra committee, a division of the Union that "represents players," as stating that "we believe Cara" [based on a magazine article] and, without a scintilla of evidence, asserting "we don't believe these are isolated incidents involving …Liang Wang."

46.     In this respect, the orchestra committee relied on the wildly speculative and false notion that there were unknown "incidents … involving Wang" as well as the false notion that to "believe Cara [Kizer]"—who did not accuse Wang—could somehow justify Wang's suspension.

47.     The New York Times article also quoted the statement of Sara Cutler, the Union's President, in which she *endorsed* both suspensions, calling the removal of Wang and Muckey "good first steps" which "can't be the last."  In calling for these negative employment consequences for Union Members that Local 802 is supposed to represent, Cutler emphasized gender, and endorsed negative employment consequences based on claims made in a magazine article: "As a woman … I am horrified by what was in the story."

48.     Had Cutler actually read the record of the arbitration in which her own Union successfully fought Wang's 2018 termination, she would know that her stated reason for publicly endorsing Wang's suspension—"what was in the story" (the accusation of misconduct against Kizer)—was never an accusation against Wang, and that therefore, it could not fairly make Wang's ouster "good" from any perspective, particularly from that of his own Union.

49.     On April 18, CEO Ginstling sent an email to the entire New York Philharmonic Community.  In it, he described the content of Kizer's accusations as having been "*revealed* in the *New York* magazine article"—a statement that was misleading in that Kizer's allegations

were not newly "revealed" to the Philharmonic.  Instead, there was *nothing* in the retelling of Kizer's claims that had not been raised by the Philharmonic in connection with its own previous investigation, and then vetted by the arbitrator in the 20-day hearing that took place over the course of 2019.

50.      In that same email, Mr. Ginstling advised that a law firm had been engaged "to launch an independent investigation into the culture of the New York Philharmonic in recent years."  He has also stated that, during this investigation, Mr. Wang [and Mr. Muckey] would not be assigned to any Philharmonic activity.  But since neither Mr. Wang nor Mr. Muckey are the subject of any new accusations, the only conclusion that can be drawn is that the two have been suspended based on accusations already adjudicated in their favor, in a thorough and binding arbitration.

51.      Wang has not only been suspended from performing and told to stay away from rehearsals but has also been prohibited by the Philharmonic from so much as entering David Geffen Hall (where the Philharmonic performs and rehearses) without pre-approval.

52.      The Philharmonic, by tying suspensions of only Mr. Wang [and Muckey] to the new investigation, is using that investigation as an *excuse* to suspend Mr. Wang in defiance of the arbitration award.  It is simply not permissible to base a suspension or other negative employment consequence on the investigation of events already extensively investigated and then adjudicated in a binding arbitration (as is the case here).

53.      Although the scope of the investigation, described by the Philharmonic as "the culture of the New York Philharmonic in recent years" does not purport to be a new investigation or reinvestigation *of Wang* [or Muckey], the Philharmonic singled them out for adverse employment actions by suspending them, and only them, in a fashion that tied the suspensions to

the investigation.  That is, in connection with a broad investigation that does not target anyone in particular, the Philharmonic has irrationally and improperly targeted a narrow class of its orchestra for suspension based on the investigation:  men who have prevailed against claims made by women.

54.    While Mr. Wang's suspension is with pay, the Philharmonic's indefinite suspension of performing or rehearsing with the orchestra is a violation of Wang's individual employment agreement, the CBA, and the reinstatement mandate of the arbitration decision.

55.    The Philharmonic, in addition to having the contractual duty to pay Wang his agreed-upon salary, has a contractual obligation to provide Wang with opportunities to perform with the Philharmonic, and further, to raise his profile as a performing musician, which includes his performance of solos.  This has always been the parties' understanding, and the Philharmonic expressed it, in writing, in a document signed by then Executive Director Matthew VanBesien on March 6, 2013.  Specifically, the Philharmonic stated in a "Letter of Agreement" as follows:

> The Society considers you a premiere member of the orchestra and will use its best efforts to raise your profile and is committed to schedule a minimum of 6 solo performances every three seasons and will use its best efforts to provide additional solo opportunities.

56.    The letter concludes by describing Mr. Wang as "a valued member of this remarkable orchestra."  The Letter of Agreement provides that "all applicable terms and conditions" of the CBA "shall apply."

57.    In a subsequent letter signed by the Philharmonic's current CEO, stating Wang's salary for the current year and reiterating his status as first oboe, the Philharmonic stated it was also acting in continued "accordance with letter of agreement dated March 6, 2013."

58.    Consistent with the Philharmonic's contractual obligation to provide solo opportunities, Wang had been scheduled to perform a series of solos with the orchestra

beginning on May 8, 2024.  The Mozart concerto that Wang was scheduled to perform is considered perhaps the most important piece of music for the oboe, and Wang was asked to perform it 18 months ago.  He has devoted his career to mastering this piece.  From all over the world, Wang's friends and family made plans to attend these solo concertos.  Mr. Wang's past students, who now live all over the world, were also planning to attend.

59.     Wang's suspension constitutes a breach of the terms of his employment agreement between himself and the Philharmonic.  That agreement incorporates the CBA, and as explained above, specifically requires the Philharmonic to "use its best efforts to raise [Wang's] profile" as a performer, including but not limited to the use of its best efforts to provide "solo opportunities" as a performer with the Philharmonic.  Wang's suspension, even with pay, expressly violates these contractual provisions, and has been implemented without a scintilla of just cause or procedural due process.

60.     When the Philharmonic abruptly suspended Wang from the orchestra on April 13, 2024, it did so without giving him any reason for the suspension and without end date.  Since Wang is not the subject of any new accusations, the only conclusion that can be drawn is that Wang has been suspended based on accusations already adjudicated in his favor, in a thorough and binding arbitration.  In this fashion, the suspension violates Article XV of the CBA, which requires that "The decision of the Arbitrator shall be final and binding upon the Society, the Union and the individual Orchestra member."

61.     The Philharmonic's disparate treatment of Liang and Muckey Matthew VanBesien—making them the only two persons to be suspended, ostensibly until the conclusion of the new investigation, is in contrast to every other member of the Philharmonic.  The distinction between the suspended members of the orchestra and the others involves gender: the

only suspended members are men who overcame accusations of past misconduct asserted by

women (and which resurfaced in a magazine article).

62.     Thus, Wang's suspension also violates New York State Human Rights Law and

the New York City Human Right Law (hereinafter NYSHRL and NYCHRL), in that Wang is a

member of a protected class, he was eminently qualified to perform as the Philharmonic's first

oboe, the suspension is an adverse employment action, and the adverse action occurred under

circumstances giving rise to an inference of discrimination.

63.     In spite of the Union president's public endorsement of Wang's suspension,

Wang nevertheless approached the Union and demanded it take action to protest and remedy his

suspension, as is required of the Union under its duty of fair represenation.  But by the

responsive letter of its counsel dated April 26, 2024, the Union refused to take any action on

Wang's behalf—pointing to the Philharmonic's investigation as the Union's reason for not

protesting Wang's suspension—even though the investigation is not about Wang in particular.

The Union also took the position that Wang had suffered no adverse employment action because

he is being paid during his suspension.  But Wang's suspension was an adverse employment

action as a matter of law, and as explained above, was a direct violation of the CBA and Wang's

individual employment agreement with the Philharmonic.

64.     The CBA reinforces that the obligations owed by the Philharmonic to Wang (and

other musicians) includes performance and not just the payment of salary and other monetary

benefits.  The musicians, after all, are performers at the pinnacle of their field, who audition for

the privilege of performing with one of the greatest orchestras in the world.  In any event, the

CBA not only requires the musicians to be paid, it expressly requires them to be "employed" for

all 52 weeks of the year, refers to the musicians' "basic work week" and describes as "vacation"

nine of the 52 basic work weeks.   Musicians of the caliber hired by the Philharmonic specifically go there to perform, not merely to be paid while their instruments (and skills) gather dust.

65.       Consistent with the conclusion that Wang's rights under the CBA are violated by his indefinite paid suspension, provisions of the Union's by laws (a document that is expressly incorporated by reference in its entirety into the CBA) state that the members of the Union are to be afforded "the opportunity to develop [their] talents and skills" and that their "work will be fulfilling."  But when, as here, a world class musician like Liang Wang is told to stay away from performances and rehearsals, indefinitely, that deprives him of his ability to have "fulfilling … work" and to develop his "talents and skills."

66.       Hence, when in recent days the Philharmonic instructed Mr. Wang and the entire orchestra that Wang would not be allowed to perform, it violated various provisions of the CBA and Wang's own individual agreement.

67.       The Union also rationalized its refusal to provide representation to Wang in connection with his suspension on the ground that the CBA does not afford Philharmonic members with any rights whatsoever to be "placed on the schedule for any …performance." That is an appalling statement for the Union to make—not only as to Wang, but with respect to all members of the orchestra.  The statement reveals only the extraordinary distance the Union will go to avoid performing its contractual duty to Wang, especially in light of the above-mentioned provisions of the Union's by laws that recognize that it is the mission of the Union to protect members' ability to obtain fulfilling work and develop their talent and skills.  For the Union, sworn to uphold the rights of the musicians of the New York Philharmonic orchestra, to make the statement that the Philharmonic may prohibit tenured musicians from indefinitely

performing for or rehearsing with the orchestra, as long as they are paid, is a shocking violation of the Union's obligation to advocate for the musicians who entrust it with the protection not only of their salaries, but of their careers with the orchestra as performers.

68.    The devastating consequences for Wang of the Philharmonic's meritless suspension and Union's cowardly response are compounding by the day.

69.    On April 15, 2024, the Taipei Music Academy and Festival informed Mr. Wang that it was being pressured to cancel Mr. Wang's participation in the festival, and did so.

70.    On April 17, 2024, the ARD International Music Competition notified Mr. Wang that it was suspending its collaboration with Mr. Wang, who was scheduled to serve on the jury for the 2024 competition.  ARD cited as a reason for the suspension the fact that "the Philharmonic had released you from your duties."

71.    On April 19, 2024, the Manhattan School of Music publicly announced the suspension of Mr. Wang as a member of MSM's precollege faculty.  Upon information and belief, MSM's decision was influenced in large part by the Philharmonic's suspension and the Union's traitorous act of endorsing the suspension.

72.    On April 29, 2024, Mr. Wang heard from Marc Neikrug, the director of the Santa Fe Chamber Music Festival, and composer of the arrangement of the Mozart Oboe Concerto Mr. Wang had been scheduled to perform on May 8.  Neikrug was commissioned by the Philharmonic to write the piece expressly for Wang to perform.  However, in light of the Philharmonic's decision to suspend Wang and cancel the performance, Neikrug concluded that he had no choice but to find "another place for his piece." He specifically attributed his decision, not to any fault of Wang's, but to the damage to Wang's reputation caused by the Philharmonic's

actions: "I believe, due to the press generated by the orchestra's actions, it will be impossible for you to play the concerto."

73.   On April 30, 2024, the Chinese American Arts Council informed Mr. Wang that it was cancelling his contract as Artistic Director to the Council in connection with New York Chinese Film Festival, motivated in part by the Philharmonic's decision to publicly suspend Mr. Wang.

## FIRST CLAIM FOR RELIEF

### HYBRID §301/DFR CLAIM:
### Breach of Duty of Fair Representation
### (as to Defendant Union)

74.   Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

75.   Mr. Wang is a member in good standing of Local 802.

76.   Under federal labor law, Defendant Union is the sole representative of its members in dealings with the Philharmonic.

77.   As such, Defendant Union owes each of its members, including Mr. Wang, a DFR.

78.   In addition, Article 10 of the bylaws of the American Federation of Musicians expressly states that all members of the AFM have the right to fair representation in all matters relating to collective bargaining with an employer.

79.   The Philharmonic breached the CBA by suspending Mr. Wang without just cause and in violation of the terms of a 2020 Arbitration Decision.

80.   By letter, Mr. Wang demanded that the Union seek enforcement of the 2020 Arbitration Decision, including an end to Wang's indefinite suspension and full reinstatement to his position in the orchestra.

81.    Rather than demanding Mr. Wang's reinstatement to his position as Principal

Oboe and continued enforcement of the 2020 Arbitration Award, the Union instead refused, in

writing, to so represent Mr. Wang and thereby breached its DFR.  That refusal and ongoing

failure to act to enforce Mr. Wang's rights was arbitrary, discriminatory and in bad faith under

the circumstances, as the Union was a party to and thus bound by the 2020 Arbitration Award,

and also privy to the extensive Arbitration hearing record which made clear that the

Philharmonic failed to establish good cause for terminating Wang in 2018.

82.    Moreover, in a further breach of the Union's DFR, the President of the Union

made public statements endorsing Mr. Wang's suspension instead of defending Mr. Wang's right

to be reinstated to his position under the CBA and the binding Arbitration Award.  Such

statements were made at best arbitrarily and at worst, in bad faith, as the President knew, or

should have known that there was no valid basis to endorse Wang's suspension given the factual

context in which it arose (e.g., a misleading and one-sided article regarding subjects adjudicated

in the binding arbitration) and the CBA's requirements.

83.    As of the date of this complaint, the Union has failed to seek an end to Wang's

suspension which is contrary to the Arbitration Award or otherwise seek any remedy resulting

from Mr. Wang's unfair and improper suspension by the Philharmonic.

84.     There is a causal connection between the Union's breach of its duty to Mr. Wang

and the Philharmonic's continuing indefinite suspension of Mr. Wang, and its associated harms

to Mr. Wang.

85.    The Union's beach of its DFR proximately caused and will continue to cause

significant actual damages to be suffered by Mr. Wang, including but not limited to reputational

harms, emotional harm, loss of business opportunities and the incurring of attorneys' fee and other costs and expenses necessary to prosecute these claims.

86.     Other members of the Union are also harmed by the Union's actions for which Wang seeks relief, in that the Union took the position, contrary to the interests of all of its members who are tenured players with the Philharmonic, that so long as the Philharmonic does not withhold salary it can arbitrarily suspend its world class musicians from performing or even rehearsing, indefinitely.

87.      Based upon the foregoing, Mr. Wang is entitled to the following relief:

    a.     a declaratory judgment declaring that the Union's conduct breached its DFR to Mr. Wang;

    b.     economic damages in an amount to be determined at trial;

    c.     compensatory damages in an amount to be determined at trial; and

    d.     attorneys' fees, costs and disbursements in an amount not presently capable of ascertainment.

<u>**SECOND CLAIM FOR RELIEF**</u>

**HYBRID 301/DFR:**
**Breach of Collective Bargaining Agreement**
**(as to Defendant Philharmonic)**

88.     Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

89.     Mr. Wang has been employed fulltime as Principal Oboe for the Philharmonic since 2006, and as such, is a "musician" as that term is used in the CBA.

90.     On April 13, 2024, the Philharmonic suspended Mr. Wang (with pay) from performing or rehearsing with the orchestra, and gave no reason or end date.

91.     Under the CBA and Mr. Wang's individual employment agreement, an indefinite suspension, even with pay, is an adverse employment action.

92.     The Philharmonic had no just cause to indefinitely suspend Mr. Wang.

93.     The suspension closely followed the publication of an article that questioned the Philharmonic's compliance with a four-year old final and binding Arbitration Award that found Wang had been terminated without just cause and ordering his reinstatement with full benefits.

94.     The content of the Article focused on events that occurred in 2010 in Vail, Colorado.  Wang was never accused of wrongdoing in connection with those events, as the Philharmonic was well aware, and those events were fully vetted in the Arbitration.

95.     Shortly after the suspension, the Philharmonic's CEO publicly acknowledged the final and binding nature of the Arbitration Award.

96.     Yet in the same interview he separately implied that the suspensions were warranted because the Article had "prompted a lot of strong feelings."

97.     On April 18, 2024, the Philharmonic issued a public statement to the Philharmonic community announcing a broad investigation into workplace culture and also announcing Wang and Muckey's suspensions.

98.     The Philharmonic has not, in its public statements or in its private statements to Wang's attorney, claimed to be aware of any new allegation or complaint against Wang.

99.     On these facts, the only inference to be drawn is that the Philharmonic had no just cause to suspend Wang, and that the suspension was a capitulation to pressure from a misinformed public to violate the final and binding nature of the 2020 Arbitration Award.

100.    Article XV of the CBA required the Philharmonic to treat the Arbitration Decision as final and binding.

101.   Article VII of the CBA prohibits the Philharmonic from taking disciplinary action against Wang without just cause.

102.   The CBA requires the Philharmonic to employ Mr. Wang 52 weeks per year.

103.   Mr. Wang's individual employment agreement requires the Philharmonic to "raise [Wang's] profile" and provide Wang with "solo opportunities".

104.   The Philharmonic breached the CBA and Mr. Wang's individual employment agreement with the Philharmonic by placing Mr. Wang on indefinite suspension from rehearsals and performances, including, but not limited to, long-scheduled and contractually required solo performances, without cause, and in violation of the final and binding Arbitration Award that compelled his full reinstatement.

105.   The Philharmonic's breach was intentional and in bad faith in that the Philharmonic knew that its decision to suspend Wang was contrary to the CBA's provision making the previous arbitration result binding, and would have devastating consequences for Wang's reputation and his current and future ability to continue his career as a premier musician.

106.   The Philharmonic's continued breach has already had devasting consequences on Wang's reputation, his professional relationships and his professional opportunities.  As a direct result of the indefinite suspension, Mr. Wang has been, and continues to be irreparably harmed. To date, five separate collaborating organizations and individuals have informed Mr. Wang that they are either suspending or terminating their professional relationships with him as a result of his indefinite suspension and related action.

107.   At least one of those terminations amount to a permanent loss of a professional opportunity in the form of a promised solo of a Mozart Oboe Concerto that was specifically written for Mr. Wang.

108.     In the face of the Union's breach of its DFR, Mr. Wang is entitled to bring this claim against the Philharmonic directly.

109.     Based upon the foregoing, Mr. Wang is entitled to the following relief:

   a.     a declaratory judgment that the Philharmonic has violated the 2020 Arbitration Award and breached the CBA;

   b.     economic damages in an amount to be determined at trial;

   c.     compensatory damages in an amount to be determined at trial; and

   d.     attorneys' fees, costs and disbursements in an amount not presently capable of ascertainment.

## THIRD CLAIM FOR RELIEF

### INJUNCTIVE RELIEF
### (as to Defendant Philharmonic)

110.     Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

111.     Mr. Wang has been and continues to be irreparably harmed by the baseless suspension imposed by the Philharmonic that bars him indefinitely from rehearsals, performances, and long-scheduled solos.

112.     Mr. Wang is likely to succeed on the merits of his claims.

113.     The balance of equities weighs in Mr. Wang's favor.

114.      Mr. Wang is entitled to injunctive relief preliminarily and permanently lifting the Philharmonic's suspension announced on April 13, 2024.

## FOURTH CLAIM FOR RELIEF

### BREACH OF EMPLOYMENT AGREEMENT
### (as to Defendant Philharmonic)

115.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

116.    Mr. Wang is a tenured musician of the Philharmonic, with a lifetime appointment, absent dismissal for just cause.

117.    Mr. Wang and the Philharmonic are parties to an agreement which memorializes his compensation and other terms unique to him as the Principal Oboe of the Philharmonic.

118.    Language incorporated by reference into Mr. Wang's annual agreement for the 2023-2024 Season provides that the Philharmonic will provide Wang with opportunities to perform with the Philharmonic, including performance of solos, and raise his profile as a performing musician.

119.    As of April 13, 2024, the Philharmonic removed Mr. Wang from the schedule of performances for the remainder of the season and publicly announced his indefinite suspension from performances and rehearsals.

120.    Moreover, the Philharmonic publicly stated that Wang's future with the Philharmonic is uncertain.

121.    Mr. Wang's indefinite suspension from his high-profile position as Principal Oboe of one of the finest cultural institutions in the world and from all performances and rehearsals is an egregious breach of his employment agreement.

122.    To date, Mr. Wang has missed 10 concerts that, but for the unwarranted suspension, he was scheduled to and would have performed in, including the Spring Gala with Gustavo Dudamel on April 24, 2024.

123.     Under the current suspension, Wang is also barred from rehearsing for and performing in the China tour scheduled for June 2024 or the Vail tour scheduled for July 2024, which would have entitled Mr. Wang to additional compensation.

124.     The Philharmonic's breach of the individual employment agreement has caused and will continue to cause Mr. Wang economic damages, in an exact amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**

**DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**
**(as to Defendant Philharmonic)**

125.     Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

126.     The New York Human Rights Law § 296 prohibits discrimination in employment on the basis of sex.  Section 296(1)(a) specifically prohibits discrimination by employers on the basis of an individual's sex "in compensation or in terms, conditions or privileges of employment."

127.     Mr. Wang is a male and thus a member of a protected class for purposes of § 296.

128.     Mr. Wang's qualifications as Principal Oboe are exceptional, as has been repeatedly acknowledged by the Philharmonic.

129.      Mr. Wang has been indefinitely suspended, without cause or explanation, and in clear violation of (i) the terms of his employment, which expressly require that he be given opportunities to perform and excel as a musician, and (ii) the 2020 Arbitration Award, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

130.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent announcement that it would be conducting a broad investigation of workplace culture.  In announcing the "broad investigation" the Philharmonic also announced that Wang (and Muckey) would not be assigned to Philharmonic activity during the pendency of the investigation, without further explanation.

131.    No other Philharmonic musicians were similarly suspended during the pendency of the investigation.  In other words, the only individuals targeted in the Philharmonic's April 13, 2024 suspension announcement were men who had been vindicated and reinstated via binding arbitration in connection with past allegations of purported misconduct against women.

132.    Upon information and belief, the Philharmonic has never placed a tenured female Philharmonic musician on indefinite suspension during the pendency of an investigation or otherwise.

133.    Indefinite suspension, even with pay, creates material harm to an esteemed classical musician whose success and reputation depends not on whether he or she merely received a paycheck, but on his or her ability to perform with the orchestra.

134.    Every performance and rehearsal Mr. Wang has missed and continues to miss as a result of the suspension, including, but not limited to, long-scheduled solo performances, is materially harming him now and in the future.

135.    The unlawful suspension has caused severe reputational harm to Mr. Wang, resulting in past and future lost professional opportunities beyond the Philharmonic.

136.    As a direct and proximate result of the Philharmonic's discriminatory conduct, Mr. Wang has suffered, and continues to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages,

including, but not limited to, reputational harms and severe emotional distress, for which Wang is entitled to an award of damages.

## SIXTH CLAIM FOR RELIEF

**DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**
**(as to Defendant Union)**

137.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

138.    The New York Human Rights Law § 296 prohibits discrimination in employment on the basis of sex.  Section 296(1)(c) specifically provides that labor organizations are prohibited from "discriminat[ing] in any way against any of its members" on the basis of the member's sex or other protected status.

139.    Mr. Wang is a male and thus a member of a protected class for purposes of § 296.

140.    Mr. Wang is a member in good standing of Local 802 and highly qualified to fulfill his position of first oboe in the orchestra.

141.    Mr. Wang has been indefinitely suspended by the Philharmonic, without cause or explanation, and in clear violation of (i) the terms of his employment, which expressly require that he be given opportunities to perform and excel as a musician; and (ii) the outcome of the 2020 arbitration, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

142.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent announcement that it would be conducting a broad investigation of workplace culture.  In announcing the "broad investigation" the Philharmonic also announced that Wang (and Muckey) would not be assigned to Philharmonic activity during the pendency of the investigation, without further explanation.

28

143.     Rather than represent Mr. Wang fairly by demanding that the Philharmonic reinstate Mr. Wang, as it would any other employee who had been indefinitely suspended in violation of a final and binding arbitration award and in the absence of just cause, the Union, instead, rejected Mr. Wang's requests and demands to so represent him.

144.     The Union rejected similar requests and demands from Mr. Muckey.

145.     Union President Sara Cutler went so far as to publicly endorse the Philharmonic's actions, calling the suspensions "a good first step."

146.     In other words, when called upon to defend two male union members who had defeated previous allegations made by women, who had been singled out for suspension in the face of resurfaced allegations that were adjudicated in the men's favor in a final and binding arbitration, the Union instead threw them under the bus.

147.     Upon information and belief, the Union has never before endorsed an employer's indefinite suspension of a tenured female musician during the pendency of an investigation or otherwise and never before refused to object to a member's suspension inconsistent with honoring a favorable final and binding arbitration award in the Union's and the employee's favor.

148.     Indefinite suspension, even with pay, creates material disadvantages for a musician whose future success depends not on whether he or she merely received a paycheck, but on his ability to perform with his orchestra.

149.     The Union's discriminatory conduct towards Mr. Wang, that is, its failure to fight against and instead its traitorous public endorsement of Mr. Wang's suspension has proximately caused Mr. Wang to suffer, and to continue to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic

damages, including, but not limited to, reputational harms and severe emotional distress, for which Plaintiff is entitled to an award of damages.

## SEVENTH CLAIM FOR RELIEF

### DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
(as to Defendant Philharmonic)

150.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

151.    Section 8–107(1)(a) of the NYCHRL makes it unlawful for an employer, because of an employee's gender, "to discriminate against such person in compensation or in terms, conditions or privileges of employment."

152.    The Philharmonic is an employer and Mr. Wang is the Philharmonic's employee as those terms are used in the NYCHRL.

153.    Mr. Wang is a male and thus a member of a protected class for purposes of the NYC Human Rights Law.

154.    Mr. Wang's qualifications as Principal Oboe are exceptional, as has been repeatedly acknowledged by the Philharmonic.

155.    Mr. Wang has been indefinitely suspended, without cause or explanation, and in clear violation of (i) the terms of his employment, which expressly require that he be given opportunities to perform and excel as a musician and (ii) the 2020 Arbitration Award, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

156.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent announcement that it would be conducting a broad investigation of workplace culture.  In announcing the "broad investigation" the Philharmonic also announced that Wang

(and Muckey) would not be assigned to Philharmonic activity during the pendency of the investigation, without further explanation.

157.    No other Philharmonic musicians were similarly suspended based on the pendency of the investigation.  In other words, the only individuals targeted in the Philharmonic's April 2024 suspension announcement were men who had been vindicated and reinstated via binding arbitration in connection with past allegations of purported misconduct against women.

158.    Upon information and belief, the Philharmonic has never placed a tenured female Philharmonic musician on indefinite suspension during the pendency of an investigation or otherwise.

159.    Indefinite suspension, even with pay, creates material harm to an esteemed classical musician whose success and reputation depends not on whether he or she merely received a paycheck, but on his or her ability to perform with the orchestra.

160.    Every performance and rehearsal Mr. Wang has missed and continues to miss as a result of the suspension, including, but not limited to, long-scheduled solo performances, is materially harming him now and in the future.

161.    The unlawful suspension has caused severe reputational harm to Mr. Wang, resulting in past and future lost professional opportunities beyond the Philharmonic.

162.    As a direct and proximate result of the Philharmonic's discriminatory conduct, Mr. Wang has suffered, and continues to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages, including, but not limited to, reputational harms and severe emotional distress, for which Wang is entitled to an award of damages.

**EIGHTH CLAIM FOR RELIEF**

**DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW**
**(as to Defendant Union)**

163.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

164.    The NYCHRL at NYC Admin. Code 8-107(1)(c) makes it unlawful for a labor organization "to discriminate in any way against any of its members" on the basis of a members' gender.

165.    The Union is a labor organization, and Mr. Wang is one of its members as those terms are defined in Section 8-107(1)(c).

166.    Mr. Wang is a male and thus a member of a protected class for purposes of the NYCHRL.

167.    Mr. Wang is a member in good standing of Local 802 and highly qualified to fulfill his position of first oboe in the orchestra.

168.    Mr. Wang has been indefinitely suspended by the Philharmonic, without cause or explanation, and in clear violation of (i) the terms of his employment, which expressly require that he be given opportunities to perform and excel as a musician; and (ii) the outcome of the 2020 arbitration, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

169.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent announcement that it would be conducting a broad investigation of workplace culture.  In announcing the "broad investigation" the Philharmonic also announced that Wang (and Muckey) would not be assigned to Philharmonic activity during the pendency of the investigation, without further explanation.

170.     Rather than represent Mr. Wang fairly by demanding that the Philharmonic reinstate Mr. Wang, as it would any other employee who had been indefinitely suspended in violation of a final and binding arbitration award and in the absence of just cause, the Union, instead, rejected Mr. Wang's requests and demands to so represent him.

171.     The Union rejected similar requests and demands from Mr. Muckey.

172.     Union President Sara Cutler went so far as to publicly endorse the Philharmonic's suspensions, calling them "a good first step."

173.      In other words, when called upon to defend two male union members who had been singled out for suspension in the face of resurfaced allegations from women that were adjudicated in the men's favor in a final and binding arbitration, the Union instead threw them under the bus.

174.     Upon information and belief, the Union has never before endorsed an employer's indefinite suspension of a tenured female musician during the pendency of an investigation or otherwise and never before refused to act on behalf of an employee against whom negative employment consequences were imposed that are contrary to a final and binding arbitration award in the Union's and the employee's favor.

175.     Indefinite suspension, even with pay, creates material harm to a musician whose future success depends not on whether he or she merely received a paycheck, but on his ability to perform with his orchestra.

176.     The Union's discriminatory conduct towards Mr. Wang, that is, its failure to fight against and instead its traitorous public endorsement of Mr. Wang's suspension has proximately caused Mr. Wang to suffer, and to continue to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic

damages, including, but not limited to, reputational harms and severe emotional distress, for which Plaintiff is entitled to an award of damages.

## NINTH CLAIM FOR RELIEF

### (Against the Philharmonic for *Prima Facie Tort*)

177.     Plaintiff incorporates by reference and repeats and realleges each and every allegation set forth above as if set forth in full herein.

178.     The Philharmonic agreed that a decision after arbitration would be final and binding.

179.     The Philharmonic publicly affirmed that the Arbitration Award, which determined that the pre-arbitration allegations did not constitute just cause to terminate Mr. Wang and ordered the Philharmonic to reinstate Mr. Wang was final and binding.

180.     Specifically, as reported in the New York Times, the Philharmonic's President and CEO, Gary Ginstling, stated that, "[t]he determination was through binding arbitration … Binding is the key word."

181.     Notwithstanding that, as reported in *The New York Times* article, Mr. Ginstling, "noted that the Philharmonic faced constraints because of the 2020 ruling…."  And that "his hands are tied by a 'binding arbitration that required the orchestra to readmit both players," the Philharmonic intentionally, and without just cause or excuse, has suspended Mr. Wang based upon the 2010 allegations.

182.     The Philharmonic, in contumacious disregard of the Award, intentionally removed Mr. Wang from the Philharmonic.

183.     The Philharmonic's refusal to abide by the Award is without justification.

184.      As a result of the Philharmonic's acts, Mr. Wang has sustained damage to his reputation as well as to his professional musical career, has been removed from other rehearsals

concerts and projects, and lost opportunities with various music societies and symphonies, who have subsequently canceled or retracted invitations, offers and/or contracts, among other damages.

185.    Specifically, as of the date of this Complaint, Mr. Wang was removed from the following rehearsals, concerts and projects as a result of the suspension:

a.    On April 15, 2024, the Taipei Music Academy and Festival informed Mr. Wang that it was being pressured to cancel Mr. Wang's participation in the festival, and did so.

b.    On April 17, 2024, the ARD International Music Competition notified Mr. Wang that it was suspending its collaboration with Mr. Wang, who was scheduled to serve on the jury for the 2024 competition.  ARD cited as a reason for the suspension the fact that "the Philharmonic had released you from your duties."

c.    On April 19, 2024, the Manhattan School of Music publicly announced the suspension of Mr. Wang as a member of MSM's precollege faculty.  Upon information and belief, MSM's decision was influenced in large part by the Philharmonic's suspension and Union's traitorous act of endorsing the suspension.

d.     On April 29, 2024, Mr. Wang heard from Marc Neikrug, the director of the Santa Fe Chamber Music Festival, and composer of the arrangement of the Mozart Oboe Concerto Mr. Wang had been scheduled to perform on May 8.  Neikrug was commissioned by the Philharmonic to write the piece expressly for Wang to perform.  However, in light of the Philharmonic's

decision to suspend Wang and cancel the performance, Neikrug concluded that he had no choice but to find "another place for his piece."  He specifically attributed his decision, not to any fault of Wang's, but to the damage to Wang's reputation caused by the Philharmonic's actions:  "I believe, due to the press generated by the orchestra's actions, it will be impossible for you to play the concerto."

e.   On April 30, 2024, the Chinese American Arts Council informed Mr. Wang that it was cancelling his contract as Artistic Director to the Council in connection with New York Chinese Film Festival, motivated in part by the Philharmonic's decision to publicly suspend Mr. Wang.

f.   other opportunities related to Wang's skills as a world class musician.

186.   Mr. Wang  has sustained monetary damages in an exact amount to be determined at trial.  Based upon the foregoing, Mr. Wang is entitled to the following relief:

a.   economic damages in an exact amount to be determined at trial; and

b.   punitive damages in an exact amount to be determined at trial.

### TENTH CLAIM FOR RELIEF

**PRIMA FACIE TORT**
**(as to Defendant Union)**

187.   Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

188.   In 2018, Local 802, at Mr. Wang's request, took up Mr. Wang's grievance against the Philharmonic for termination without just cause.  The grievance was submitted to a neutral arbitrator in accordance with the CBA, and Local 802 and Mr. Wang prevailed in the arbitration.

The final and binding Arbitration Award directed Mr. Wang's full reinstatement as Principal Oboe.

189.    When the Philharmonic violated that Award by indefinitely suspending Mr. Wang under circumstances that could only be interpreted as relating to events that were fully vetted in the Arbitration and moreover did not involve new allegations against Wang, the Union refused and failed to seek his reinstatement and enforcement of the Arbitration Award.

190.    The Union's President went so far as to publicly support the suspension.  For example, the New York Times reported that Sara Cutler "said in a statement on Monday that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being 'are good first steps but they can't be the last.'"

191.    The Union's actions were intentional and malicious as demonstrated by the Union President's duplicitous and injurious statements implying that the Philharmonic had cause to suspend Mr. Wang when she knew it did not.

192.    The Union had no basis to make such statements except to harm Mr. Wang.

193.    As a result of the Union's statements and actions, Mr. Wang has suffered, and continues to suffer devastating harm to his reputation and his career as a professional musician. He has been suspended or terminated from participation in music festivals and competitions, lost teaching positions and lost a once-in-a-lifetime opportunity to perform the Mozart Oboe Concerto arranged by Marc Niekrug.

194.    Mr. Wang has sustained monetary damages in an exact amount to be determined at trial.

195.    Based on the foregoing, Mr. Wang is entitled to the following relief:

    a.    Economic damages in an exact amount to be determined at trial; and

       b.     Punitive damages in an exact amount to be determined at trial.

WHEREFORE, Mr. Wang is entitled to judgment against Defendants as follows:

1.      Declaring that the Union has breached its DFR to Mr. Wang;

2.      Declaring that the Philharmonic has breached the CBA and Mr. Wang's individual employment agreement;

3.      Pending the final adjudication of Wang's other claims, granting a preliminary injunction by ordering the Philharmonic to restore Mr. Wang to his typical performance schedule as first oboe, rescheduling cancelled solos and otherwise making Mr. Wang whole by fulfilling all contractual terms;

4.      Granting a permanent injunction, enjoining the Philharmonic from any further suspension of Wang as a performing member of the orchestra based on the events already adjudicated in the arbitration or based on the pendency of a mere investigation;

5.      Awarding compensatory damages in an amount to be proven at trial;

6.      Awarding punitive damages for arbitrary treatment;

7.      for prejudgment interest;

8.      for post-judgment interest;

9.      for reasonable attorneys' fees incurred by Wang in connection with this suit; and

10.     for such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Dated: New York, New York
      May 1, 2024

            CARTER LEDYARD & MILBURN LLP

      By:       */s/ Alan S. Lewis*
            Alan S. Lewis
            Karen E. Meara
            28 Liberty Street, 41st Floor
            New York, NY 10005
            lewis@clm.com
            meara@clm.com
            (917) 533-2524

            *Attorneys for Plaintiff Liang Wang*