UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

| | | |
|---|---|---|
| LIANG WANG, | : | |
| | : | Case No. |
| Plaintiff, | : | 1:24-cv-03356 (AS) |
| | : | |
| vs. | : | [rel. 1:24-cv-03348 (AS)] |
| | : | |
| THE PHILHARMONIC-SYMPHONY SOCIETY | : | **ORAL ARGUMENT REQUESTED** |
| OF NEW YORK, INC. AND ASSOCIATED | : | |
| MUSICIANS OF GREATER NEW YORK, LOCAL | : | |
| 802, AMERICAN FEDERATION OF MUSICIANS, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT AND
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, NY 10005
(917) 544-2524
lewis@clm.com
meara@clm.com

*Attorneys for Plaintiff Liang Wang*


*Of Counsel,*
    Alan S. Lewis
    Karen E. Meara

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ...................................................................... iii

PRELIMINARY STATEMENT ................................................................ 1

FACTS ...................................................................................................... 4

ARGUMENT ............................................................................................ 10

I.  WANG HAS SUFFICIENTLY STATED HIS HYBRID CLAIMS—THE
    PHILHARMONIC BREACHED THE COLLECTIVE BARGAING AGREEMENT
    IN SUSPENDING WANG AND THE UNION VIOLATED ITS DUTY OF FAIR
    REPRESENATION IN REFUSING TO GRIEVE THE SUSPENSION ........................ 10

    A.  Wang Has Stated a Claim that the Philharmonic Breached the Collective
        Bargaining Agreement ........................................................................ 11

        i.    The Breaching Conduct .......................................................... 11

        ii.   Wang's Suspension Breaches Two Sections of the CBA ......................... 13

        iii.  Under the Specific Circumstances of Wang's Suspension, Calling the
              Suspension "Paid Administrative Leave" Does Not Alter the Character
              of the Suspension as Discipline, Subjecting It to the Requirements and
              Limitations of the CBA........................................................... 14

        iv.   Defendants' Contention that the Arbitration Award Did Not Require
              Wang's Reinstatement as a Performer, and Only Reinstatement of Pay,
              Is Belied by the Philharmonic's Conduct in the Wake of the Arbitration
              Award.......................................................................... 18

        v.    Wang's Right to Be a Performing Member of the Orchestra—in the
              Absence of Just Cause to Deprive Him of that Right—Is Also
              Reflected in Both Key Terms of His Individual Employment
              Agreement and Provisions of the CBA................................... 19

              a.    Even Employees at Will Being Paid During Arbitrarily
                    Imposed Employment Discipline Suffer a Legally Cognizable
                    Adverse Employment Action..................................... 19

              b.    The Right to Perform Is Implicit in the CBA ............... 19

c.    Wang's Right to Perform Is Implicit in His Individual Agreement ................................................................. 20

B.    Wang Has Stated a Duty of Fair Representation Claim Against the Union ........ 23

i.    Wang Pled a Clear Breach of the Union's Duty of Fair Representation .. 24

a.    Wang's Grievance Has Merit........................................ 25

b.    Local 802 Was Aware of Wang's Grievance .............................. 26

c.    Local 802's Refusal to Act on the Grievance Was at Best Arbitrary and at Worst, Discriminatory or in Bad Baith .............. 26

ii.   Wang Has Plausibly Alleged a Causal Connection Between the Union's Refusal to Act and His Injuries ................................... 33

II.   WANG HAS PLAUSIBLY PLED CLAIMS AGAINST BOTH DEFENDANTS UNDER STATE AND LOCAL HUMAN RIGHTS LAWS, WHICH CLAIMS ARE NOT PREEMPTED BY WANG'S LMRA CLAIM ................................ 34

A.    Introduction ................................................................... 34

B.    Standard for Motion to Dismiss ....................................... 35

C.    Wang Has Stated Claims Against Both the Union and the Philharmonic Under the New York State Human Rights Law and the New York City Human Rights Law ........................................................ 36

D.    Wang's Discrimination Claims Are Not Preempted ............................. 39

E.    Defendants' Other Arguments in Opposition to the Discrimination Claims Are Unavailing ................................................................ 42

III.  BECAUSE THE MATERIAL FACTS ARE ALL UNDIPUSTED AND BECAUSE DEFENDANTS RELY ON INCORRECT LEGAL THEORIES TO RESIST WANG'S  HYBRID CLAIMS, HE IS ENTITLED TO SUMMARY JUDGMENT ON HIS HYBRID CLAIMS ......................................................... 44

A.    The Undisputed Facts ......................................................... 44

B.    Defendants' Cannot Succeed in Avoiding Summary Judgment by Claiming that the Suspension Was Non-Actionable or by Arguing that the Union Acted Reasonably ................................................................... 46

CONCLUSION ........................................................................... 47

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allis-Chalmers Corp. v. Lueck*,
    471 U.S. 202 (1985)...........................................................................................40, 42

*Alston v. Int'l Ass'n of Firefighters, Loc. 950*,
    998 F.3d 11 (1st Cir. 2021).........................................................................................30

*Arar v. Ashcroft*,
    585 F.3d 559 (2d Cir. 2009).......................................................................................10

*Ayers v. Bloomberg, L.P.*,
    203 A.D.3d 872 (2022) ........................................................................................36, 37

*Barr v. United Parcel Service, Inc.*,
    868 F.2d 36 (2d Cir. 1989).........................................................................................33

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................10

*Biberaj v. Pritchard Industries, Inc.*,
    2009 WL 10738222 (S.D.N.Y. Sept. 28, 2009).........................................16, 28, 32

*Bormann v. AT & T Commc'ns, Inc.*,
    875 F.2d 399 (2d Cir. 1989 .......................................................................................22

*Boykin v. Key*Corp,
    521 F.3d 202 (2d Cir. 2008).......................................................................................35

*Brown v. Daikin Am. Inc.*,
    756 F.3d 219 (2d Cir. 2014).......................................................................................42

*Bryant v. Verizon Communications, Inc.*,
    550 F.Supp.2d 513 (S.D.N.Y. 2008).........................................................................40

*Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union*
    638, 227 F.3d 29 (2d Cir. 2000).................................................................................24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)). .................................................................................................44

*Cooper v. Franklin Templeton Investments*,
    2023 WL 3882977 (2d Cir. June 8, 2023) ...........................................................35, 36

*Creaven v. Erickson*,
  2023 WL 4247213 (2d Cir. June 29, 2023) .................................................20

*DelCostello v. International Broth. of Teamsters*,
  462 U.S. 151 (1983).........................................................................10, 23

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003)...................................................................................39

*Doe v. Columbia*,
  831 F.3d 46 (2d Cir. 2016)......................................................................39

*Dumas v. New United Motor Mfg., Inc.*,
  2011 WL 5006462 (N.D. Cal. Oct. 20, 2011)....................................16, 17

*In re Enterprise Wire Co.*,
  1966 BNA LA 359  (Daugherty, Mar. 28, 1966)...................................18

*Farah v. Emirates and Emirates Severance Plan*,
  2024 WL 1374762 (S.D.N.Y. Mar. 31, 2024) ................................36, 37

*Feldleit v. Long Island Rail Rd.*,
  723 F. Supp. 892 (E.D.N.Y. 1989) .........................................................17

*Ganguly v. Charles Schwab & Co.*,
  2004 WL 213016 (S.D.N.Y. Feb. 4, 2004), aff'd, 142 F. Appx. 498
  (2d Cir. 2005).........................................................................................13

*George v. Nw. Airlines, Inc.*,
  351 F. Supp. 2d 310 (E.D. Pa. 2005) ....................................................17

*Good Samaritan Med. Ctr. v. NLRB*,
  858 F.3d 617 (1st Cir. 2017)...................................................................30

*Hardwick v. Sunbelt Rentals, Inc.*,
  719 F. Supp. 2d 994 (C.D. Ill. 2010), aff'd, 430 F. Appx. 536 (7th Cir. 2011)................26, 27

*Int'l Ass'n of Machinists and Aerospace Workers*,
  378 F.3d 269 (2d Cir.2004).....................................................................24

*Joseph v. Leavitt*,
  465 F.3d 87 (2d Cir. 2006)......................................................15, 16, 17

*Kaczmarcysk v. Dutton*,
  414 F. Appx. 354 (2d Cir. 2011)...........................................................23

*Littlejohn v. City of New York*,
  795 F.3d 297  (2d Cir. 2015)  ...........................................................38, 39

*Livadas v. Bradshaw*,
    512 U.S. 107 (1994)............................................................................41

*Luppo v. Waldbaum*,
    131 A.D. 2d 443 (2d Dept 1987) ....................................................13

*Maidman v. O'Brien*,
    473 F. Supp. 25 (S.D.N.Y. 1979) ..............................................13, 26

*Middleton v. City of Tucson*,
    2018 WL 1581628 (D. Ariz. Mar. 31, 2018) (per *Middleton v. City of Tucson*,
    2017 WL 3034911, at *1 (D. Ariz. July 18, 2017) ................................17

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
    715 F.3d 102 (2d Cir. 2013).............................................................37

*Mock v. T.G. & Y. Stores Co.*,
    971 F.2d 522 (10th Cir.1992) ...........................................................24

*Moore v. Roadway Express, Inc. and Local 707*,
    2008 WL 819049 (E.D.N.Y. Mar. 25, 2008)......................................24

*Muldrow v. City of St. Louis, Missouri*,
    144 S. Ct. 967 (2024).................................................................12, 15

*Nelson v. HSBC Bank USA*,
    929 N.Y.S.2d 259 (2d Dept., Sept. 13, 2011) ....................................37

*Osby v. City of New York*,
    633 Fed.Appx. 12 (2d Cir. 2016).......................................................39

*Pardovani v. Crown Building Maintenance Co.*,
    2020 WL 2555280 (S.D.N.Y. May 20, 2020) ....................................12

*Patricia v. Delford Indus., Inc.*,
    660 F. Supp. 1429 (S.D.N.Y. 1987).....................................................25

*Pennington v. D'Ippolito*,
    855 F. App'x 779 (2d Cir. 2021) ......................................................44

*Pothen v. Stony Brook University*,
    211 F. Supp.3d 486 (E.D.N.Y. 2016) ................................................42

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000).....................37

*Roenick v. Flood, et al.*,
    2021 WL 2355108 (S.D.N.Y. June 9, 2021) .....................................36

*Rothschild v. Title Guar. & Trust Co.,*
   204 N.Y. 458 (1912) .................................................................22

*Samuels v. Air Transport Local 504,*
   992 F.2d 12 (2d Cir.1993)..........................................................29

*Sanchez v. S&P Global, Inc.,*
   2023 WL 8372990 (S.D.N.Y. Dec. 4, 2023) ...............................21, 22

*Sanozky v. Int'l Ass'n of Machinists,*
   415 F.3d 279 (2d Cir. 2005).......................................................26, 27

*Sethi v. Narod,*
   12 F. Supp. 3d 505 (E.D.N.Y. 2014) ...........................................15

*Sim v. New York Mailers' Union Number 6,*
   166 F.3d 465 (2d Cir. 1999).......................................................24, 28

*Spellacy v. Air Line Pilots Ass'n-Int'l,*
   156 F.3d 120 (2d Cir. 1998).......................................................24

*Streit v. Amdocs, Inc.*
   307 F. Appx. 505 (2d Cir. 2009)..................................................14

*Swierkiewicz v. Sorema N. A.,*
   122 S.Ct. 992, 534 U.S. 506 (U.S., 2002)....................................35

*Thomas v. Little Flower for Rehab. & Nursing,*
   793 F. Supp. 2d 544 (E.D.N.Y. 2011) .......................................25, 29, 32

*Tomney v. Int'l Ctr. for Disabled,*
   357 F. Supp. 2d 721 (S.D.N.Y. 2005)........................................36, 39, 41

*Torre v. Charter Communication*
   493 F. Supp. 3d 276 (S.D.N.Y. 2020)........................................12

*United Steelworkers v. Rawson,*
   495 U.S. 362 (1990)..................................................................28

*Vaca v. Sipes*
   386 U.S. 171 (1967)..................................................................10, 23, 33

*Vaughn v. Air Line Pilot Ass'n, Int'l,*
   604 F.3d 703 (2d Cir.2010)........................................................24

*Vega v. Hempstead Union Free School Dist.,*
   801 F.3d 72 (2d Cir. 2015).........................................................39

*White v. White Rose Food, a Div. of DiGiorgio Corp.*,
    237 F.3d 174 (2d Cir. 2001)..................................................................10, 23, 24

*Whitehurst v. 1199SEIU United Healthcare Workers E.*,
    928 F.3d 201 (2d Cir. 2019)....................................................................40, 41

*Winston v. Mediafare Entm't Corp.*,
    777 F.2d 78 (2d Cir.1985).............................................................................23

*Yearwood v. New York Presbyterian Hosp.*,
    2013 WL 4713793 (S.D.N.Y. Aug. 20, 2013)..........................................27, 28

*Young v. U.S. Postal Service*,
    907 F.2d 305 (2d Cir.,1990)...........................................................10, 23, 24, 27

**Statutes**

Labor Management Relations Act § 301 .................................................... *passim*

NYC Admin. Code § 8–107(1).................................................................37

NYS Exec. L. § 296 ..........................................................................35, 36

NYS Exec. L. § 300 ...............................................................................36

**Other Authorities**

Fed. R. Civ. P. 56(a) ............................................................................44

Liang Wang submits this memorandum of law (i) in opposition to Defendants' motions to dismiss; and (ii) in support of Wang's cross motion for summary judgment on his hybrid claim (the Union's breach of its duty of fair representation and the Philharmonic's violation of Section 301 of the Labor Management Relations Act ("LMRA")).

## PRELIMINARY STATEMENT

Wang, the principal oboe of the New York Philharmonic, brought this suit on May 1, 2024—19 days after he was abruptly suspended by the Philharmonic based on nothing more than the recent publication of a magazine article critical of a 2020 employment-related arbitration in which Wang *prevailed* against the Philharmonic.  Wang also sues his union, which unreasonably declined to grieve the suspension.  Wang not only opposes both Defendants' motions to dismiss, he also cross-moves for partial summary judgment on his hybrid claim, *viz*, his suspension violates the collective bargaining agreement between the Philharmonic and the Union, and the Union violated its duty of fair representation to Wang in arbitrarily refusing to grieve the suspension.  For the reasons described below, Defendants' motions must be denied, and Wang's cross motion must be granted.

More than four years ago, Wang prevailed at an employment-related arbitration in which the Philharmonic was the adverse party, and thus Wang was fully restored to his position in the orchestra.  Between April of 2020, when he was restored, and April of 2024, all was well: there had been no new allegations against Wang of any kind since his return, and the Philharmonic was about to feature Wang in series of career defining solos.   Then, on April 12, 2024, a magazine article was published about an alleged sexual assault against Cara Kizer in 2010, in which the author *incorrectly* suggested that the Philharmonic had previously discharged *Wang* for purportedly drugging Kizer.  The story caused an uproar, and although the Philharmonic

*knew* that: (a) the story was about an arbitration in which Wang *prevailed;* and (b) the article's suggestion that Wang had been accused by the Philharmonic of drugging Kizer was entirely inaccurate—the Philharmonic suspended him *anyway.*  Looking for a way to rationalize the suspension after it was imposed, the Philharmonic tried to explain the suspension as a function of two new "investigations."  However, those investigations cannot credibly explain Wang's suspension for two reasons: the investigations were not commenced for the purpose of investigating Wang in particular and *did not even exist* when the Philharmonic suspended Wang. Although the Philharmonic had thus suspended Wang without even any pretense of legitimate reason, Wang's union not only refused to protest the suspension but went so far, through the public statement of its President, to *endorse* the suspension.

Unable to challenge these facts, Defendants found their defense in an argument that is both hyper technical and wrong.   They contend that because Wang continues to receive a salary, his suspension is somehow beyond the power of the Union to grieve or a court to remedy.  But as demonstrated below, the notions that Wang has not been subjected to cognizable discipline and/or that the Union had "discretion" to abandon its duty to challenge the suspension are wrong as matter of law.  The circumstances of Wang's suspension bear no resemblance to the typical circumstances in which a paid suspension can be interpreted as a temporary, *non-actionable* "paid administrative leave."  That is, leave with pay has been held to be non-actionable when a new accusation of misconduct is made *before* the imposition of "administrative leave" and the leave is imposed to permit an investigation into that accusation; but here, as noted above, there was no accusation against Wang, much less an investigation of him, at the time he was suspended, with the subsequently announced investigations merely conceived as a *post-hac* rationalization.

As explained below, the legal conclusion that Wang's suspension *is* actionable not only requires the denial of Defendants' motions to dismiss the hybrid claims, but also, given the undisputed and damning facts, the granting of Wang's partial motion for summary judgment.

Defendants' motions to dismiss Wang's state law discrimination claims must likewise be denied. Echoing their arguments in support of dismissal of the hybrid claim, Defendants argue that Wang has failed to plead that he has been subjected to an adverse employment action. However, it is a well settled point of employment law, including under federal labor law, that suspension, in the absence of any legitimate basis, is a cognizable employment sanction, which Defendants concede.

Defendants' preemption arguments are similarly unavailing. The rights Wang seeks to vindicate via New York City and New York State discrimination law—the right to equal treatment in the workplace regardless of gender—flow not from the collective bargaining agreement, but from city and state law which afford broader anti-discrimination protection than does the collective bargaining agreement. Thus, Wang's discrimination claims turn not on how the Court will interpret the collective bargaining agreement, but on whether the Philharmonic and the Union discriminated against Wang on the basis of gender. For similar reasons, Wang's individual contract claim is not preempted.

Wang does not contest the dismissal of his third claim (Injunction) and ninth and tenth claims (*prima facie* tort). Otherwise, Defendants' remaining arguments have no merit. The Court should therefore deny each of Defendants' remaining motions and grant summary judgment to Plaintiff on his first and second claims for relief.

## FACTS

Liang Wang is a highly acclaimed musician who has been employed, since 2006, as principal oboe in the orchestra of the Philharmonic. Compl. ¶¶1, 2. In 2018, the Philharmonic terminated Wang based on alleged misconduct that purportedly occurred 12 years earlier, in 2006. Compl. ¶30. Wang grieved his termination under the Union's collective bargaining rules, and Local 802 submitted Wang's grievance, simultaneously with that of another musician (Matthew Muckey) to arbitration. Although Wang and Muckey's grievances were heard at the same time for the Philharmonic's convenience, as the arbitrator explained, Wang and Muckey's terminations and the arbitration hearing as to each concerned "wholly independent events." Declaration of Olivia R. Singer dated June 5, 2024, (Singer Decl."), Ex. F at 2; Declaration of Alan Lewis ("Lewis Decl.") Ex. E at 2. After hearing extensive testimony and receiving other evidence, the arbitrator ruled that the Philharmonic had terminated both musicians without just cause (the "Arbitration Award"). Compl. ¶¶34, 35. Under the terms of the collective bargaining agreement between the Philharmonic and the Union (the "CBA"), the Award is "final and binding" on all parties to this action. Compl. ¶31; Declaration of Liang Wang dated July 29, 2024 ("Wang Decl.") Ex. I at XV.

Pursuant to the Award, the Philharmonic reinstated Wang and made him whole, by paying him back wages, restoring him to payroll and benefits, and restoring him to regular Philharmonic activity, including performance and rehearsal. Compl. ¶¶3, 36; Wang Decl. ¶11. From the date of Wang's initial reinstatement in April 2020 through April 12, 2024, the Philharmonic honored its obligation to treat the Award as final and binding per Article XV of the CBA, by refraining from taking adverse employment action against Wang on the basis of issues adjudicated in the arbitration. Compl. ¶¶3, 36; Wang Decl. ¶11. During that period, as it had

from 2006 through 2018, the Philharmonic also honored other key contractual obligations: (i) the obligation to refrain from subjecting Wang to discipline without just cause, (*see* Declaration of Harold Z. Robbins dated June 5, 2024 ("Robbins Decl.") Ex. B at Article VII; Singer Decl., Ex. A at Article VII); (ii) the obligation to employ Wang 52 weeks a year (*id.* at Article III(A)), including its implicit requirement that Wang be scheduled commensurate with the scheduling of other tenured musicians in good standing; and (iii) the obligations to schedule Wang for "a minimum of 6 solo performances every three seasons" and to "use its best efforts" to both "raise [Wang's] profile" and "provide additional solo opportunities" pursuant to Wang's individual agreement with the Philharmonic.  Compl. ¶55.  Wang Decl., Ex. A.  Under his individual agreement, Wang is entitled to extra compensation from the Philharmonic for solos performed during concertos.  *Id.*

On April 12, 2024, New York Magazine published an article in its online magazine, *Vulture,* criticizing the arbitration decision and asking rhetorically "why are [Wang and Muckey] back with the orchestra" (the "Article").  Compl. ¶37; *see* Singer Decl., Ex. B; Robbins Decl., Ex. D; Lewis Decl. Ex. I).  The Article's main subject concerned an alleged sexual assault against a musician named Cara Kizer that purportedly occurred in Vail, Colorado in 2010. Compl. ¶7.  By the time of the Article's publication, Kizer's allegations had been well-known to the Philharmonic for 14 years. Compl. ¶25.  The Philharmonic was fully aware of Kizer's allegations against Muckey when she made them in 2010, and declined to take any action against Muckey.  Then, in 2018, the Philharmonic changed course and fired Muckey based on Kizer's 2010 accusation against him.  During the resulting arbitration, Kizer testified, as did expert witnesses, one of whom testified that there was no evidence corroborative of Kizer's supposition that she had been drugged, and the expert opined that based on the known facts there were other

valid alternative explanations for why Kizer did not remember a portion of the evening in question other than her speculation that she was drugged. Compl. ¶¶7, 34. The Article conveyed the clear but false impression that Wang had also been terminated over Kizer's Vail allegations, but as all parties to the arbitration knew (including the Union and the Philharmonic) that simply was not true. Compl. ¶¶4, 30. Notably, the Article contained no new allegations, or facts relating to those allegations, that had not been fully vetted by the arbitrator. Comp. ¶ 49.

Following the Article's publication, the backlash from an uninformed (and misled) public was swift and harsh. Compl. ¶39. Some voices in the classical music community called for the immediate suspension of both Wang and Muckey based on how the Article portrayed Kizer's allegations. Compl. ¶39. Leadership of the Union charged with protection of Wang and Muckey's due process rights abandoned Wang and instead piled on; The New York Times reported that Local 802's President, Sara Cutler, said "that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being 'are good first steps but they can't be the last.'" Compl. ¶47; Singer Decl., Ex. E; Lewis Decl. Ex. J. The Orchestra Committee, an elected body of five orchestra members that, "together with the Union," is supposed to represent members "in matters of collective bargaining," including reviewing certain grievances (Singer Decl., Ex. A, Article XI, Article XV; Robbins Decl., Ex. B, Article XI, Article XV) also made public statements, including, for example, their purely speculative "belief" that the Article's allegations against Wang (and Muckey) were not "isolated incidents." Compl. ¶45; Lewis Decl., Ex. J.

Although the Philharmonic was bound by the CBA to treat the Arbitration Award as final and binding (Compl. ¶31; Singer Decl., Ex. A, Article XV; Robbins Decl.; Ex. B, Article XV) and then-CEO Gary Gintsling publicly accepted as much (Compl. ¶44; Singer Decl., Ex. E), the Philharmonic caved almost instantly to what it perceived to be public outrage at Wang and

Muckey's continued employment and at the Philharmonic and the Union's purported failure to keep women safe from men caused by the Article.  Compl. ¶40.  Just one day after its publication, Wang was told that he was indefinitely barred from performances and rehearsals. Compl. ¶41; Wang Decl. Ex. B. Muckey was simultaneously suspended.  Compl. ¶41; Wang Decl. Ex. B.  The New York Times, reporting on the suspensions, quoted Gintsling as stating that the Article had "prompted a lot of strong feelings." Compl. ¶44; Lewis Decl. Ex J; Singer Decl., Ex. E.

On April 18, 2024, the Philharmonic issued a statement to the Philharmonic community (the "Gintsling Post") announcing, among other things, that "[f]or the time being, musicians Matthew Muckey and Liang Wang are not being assigned to any Philharmonic activity as we work through this process…."  Gintsling went on to suggest that Wang's future with the orchestra was in doubt: "and a decision about their future with the New York Philharmonic will be made in due course." Compl. ¶50; Wang Decl. Ex. C; Singer Decl., Ex. C.

In the same post, Gintsling announced the Philharmonic's engagement of a law firm "to launch an independent investigation into the culture of the New York Philharmonic in recent years" (the "Cultural Review").  Compl. ¶50; Wang Decl. Ex. C; Singer Decl., Ex. C.  A day later, the Philharmonic announced retention of a second law firm "to investigate new allegations of harassment, violence and/or abuse alleged to have been committed by any musicians employed by the Philharmonic" (the "Levy Investigation" and together with the Cultural Review, the "Investigations").  Wang Decl., Ex. D.  The investigations were consistently described, in these and subsequent communications, as broad, open-ended inquiries not focused on Wang in particular or any other musician.  *See* Robbins Decl., Ex E (describing Levy Investigation); Wang Decl., Ex. C, D;  Compl. ¶53.  Nor was there any suggestion that the

Philharmonic was aware of any new allegations against Wang when announcing the Investigations. Compl. ¶¶49, 50; Wang Decl., Ex. D (Philharmonic email dated April 19, 2024 announcing Levy investigation). The Union has similarly characterized the Investigations as not targeting any member of the orchestra, or any specific allegation. *See, e.g.*, Union MOL at 5 (describing Levy charge as "to determine whether there were any additional allegations against any musician" and the Jenner and Block charge as "an independent investigation into its workplace culture"); Singer Decl., Ex. I, April 29, 2024 letter, Susan Davis to Alan Lewis ("the NY Philharmonic engaged an investigator to determine whether there were any new or different allegations of sexual misconduct by any members of the Orchestra, including your client").

In the following days, the Philharmonic communicated to Wang the various ways in which his suspension would be all encompassing:  Beginning on May 8, Wang was scheduled to perform a series of solos considered perhaps the most important piece of music for the oboe. The series of solos was long scheduled, but just a few weeks before those solo performances, the Philharmonic canceled them (Compl. ¶58; Wang Decl. ¶12; Lewis Decl., Ex. A); Wang was then barred from the Philharmonic's main building, except with advance permission obtained from the Philharmonic's counsel (Compl. ¶51; Lewis Decl. Ex. B); when Wang asked to attend, in person or by Zoom, a May 29th meeting about the "Cultural Assessment" to which all other orchestra members had been invited, Wang's request was denied, with his request for an explanation rebuffed.  *See* Lewis Decl., Ex. C.   To date, the Philharmonic has yet to offer a coherent explanation as to why Wang (and Muckey) have been singled out for suspension. Compl. ¶60.   Notably, in its motion, the Philharmonic *does not claim that Wang was under investigation when he was suddenly suspended*.

Although Union leadership had already publicly expressed its clear bias against Wang, (Compl. ¶¶45, 47; Singer Decl., Exs. E, F) Wang's attorneys nevertheless attempted to use the CBA's grievance procedures. By letter, they demanded that the Union take action to enforce the Arbitration Award and to otherwise grieve his suspension given that it was imposed without even any pretense of just cause. Compl. ¶63; Singer Decl., Ex. H; Lewis Decl. Ex. G. The Union refused, offering outlandish excuses. Compl. ¶12. Singer Decl., Ex. I; Lewis Decl. Ex. H. First, Local 802 argued that the Philharmonic had no continuing obligations under the Arbitration Award, notwithstanding that it was final and binding with respect to the accusations adjudicated therein. Singer Decl., Ex. I. Second, Local 802 suggested that "new allegations" *could* hypothetically be made, in which case those as yet unknown and purely hypothetical allegations might somehow retroactively justify Wang's suspension—while carefully dancing around that fact it *did not and could not identify any new allegations or circumstances*. Singer Decl., Ex. I. Third, it argued that the Philharmonic has no obligation under the CBA to schedule musicians, as long as they were getting paid—a breathtaking claim from a labor organization that represents musicians who pursue careers with world-class institutions like the Philharmonic not only or even primarily for the paycheck, but also to perform at the highest levels. Compl. ¶64; Singer Decl., Ex. I. And finally, the Union claimed it was just awaiting the results of the Investigations before deciding how to act, while completely sidestepping the elephant in the room, namely that Wang had been singled out for suspension even though Wang had not been identified as the subject of the Investigations, any more than any other member of the orchestra. Compl. ¶12; Singer Decl., Ex. I.

In sum, Defendants both took the position that the Philharmonic could sideline a world class musician indefinitely for no reason at all (other than the publication of a mistake-filled

magazine article) and in clear violation of a final and binding arbitration award and other requirements of the CBA, on the chance it might later come up with some *post hoc* rationalization during broad, organization-wide investigations.  And inasmuch as they took this outrageous stance against only the two male orchestra and union members who had prevailed in binding arbitration against allegations made by women, and were then singled out for suspension immediately after the public airing of some of the same allegations, and after the Union and the Philharmonic came under attack for purportedly not taking allegations by women seriously enough, Defendants' actions give rise to a permissible inference of discriminatory intent.  Compl. ¶¶131-132, 146, 156-158, 173-174.  *See also* Compl. ¶¶14, 47 (describing gendered public statements by union representatives).

## ARGUMENT[1]

I.    **WANG HAS SUFFICIENTLY STATED HIS HYBRID CLAIMS—THE PHILHARMONIC BREACHED THE COLLECTIVE BARGAINING AGREEMENT IN SUSPENDING WANG AND THE UNION VIOLATED ITS DUTY OF FAIR REPRESENATION IN REFUSING TO GRIEVE THE SUSPENSION**

The elements of a Section 301/duty of fair representation claim under Section 301 of the Labor Management Relations Act are that the employer "breached a collective bargaining agreement" and "that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178-179 (2d Cir. 2001).  *See also Vaca v. Sipes* 386 U.S. 171, 177 (1967); *Young v. U.S. Postal Service*, 907 F.2d 305, 307 (2d Cir.,1990); *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 165 (1983).

---

[1]Defendants have also moved to dismiss Muckey's hybrid claims, and Mucky is likewise moving for partial summary judgement on his hybrid claims.  Wang expressly incorporates by reference all factual assertions and legal arguments made by Muckey that are pertinent to arguments made by Wang in this memorandum of law.

A complaint is sufficient if it contains sufficient factual matter to state a plausible claim for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all inferences in favor of the plaintiff. *See, e.g., Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir. 2009) ("construe[ing] all reasonable inferences … in the light most favorable to the plaintiff").

Wang's complaint, including his hybrid claims, is easily sufficient to satisfy these standards. Contrary to the arguments advanced by Defendants, the Complaint is sufficient to allege both the Philharmonic's breach of the Collective Bargaining Agreement as well as the Union's breach of its duty of fair representation.

### A.    Wang Has Stated a Claim that the Philharmonic Breached the Collective Bargaining Agreement

#### i.    The Breaching Conduct

*As the Complaint pleads*, when, on April 13, 2024, the Philharmonic suspended Wang indefinitely, it breached the collective bargaining agreement because the suspension: (a) did not *purport* to be supported by just cause; and (b) violated the Philharmonic's separate obligation under the CBA to respect the 2020 arbitration decision as final and binding.

The Philharmonic does not meaningfully dispute that in suspending Wang, just one day after the publication of the magazine article, the article was itself the reason for the suspension. Comp. 37-44; *see, also, e.g.*, Wang Decl., Ex. B; Singer Decl., Ex. E (New York Times article, quoting then CEO Ginstling as stating that the Article "prompted a lot of strong feelings" and confirming that Wang had been barred from Philharmonic activity). *See also* Phil MOL at 2 (listing "publication of the article" as a circumstance excusing the Philharmonic from using "best efforts" to raise Wang's profile); Union MOL at 4 (describing Wang's suspension as a response to the "Vulture article" and as well as vague "concerns expressed" by unspecified "members of

11

the Orchestra"). *See also* Singer Decl., Ex. C (Ginstling statement reinforcing that Wang (and Muckey) were "not being assigned to any Philharmonic activity" because of the "specifics" in the "New York Magazine article").

Thus, only about 24 hours after the publication of the Article, Wang went from performing regularly as the principal oboe of one of the finest classical music orchestras in the world to indefinite suspension, not even permitted to attend rehearsals. This was not because of anything he did or was accused of doing, but because of how the Philharmonic reacted to a magazine article. Compl. ¶41.

Rather than challenge this fact, Defendants, in seeking dismissal, rely on the notion that Wang's suspension—now in its fourth month—is not actionable because Wang has, to date, been paid salary during the suspension. *See* Philharmonic Memorandum of Law In Support of Motion to Dismiss, dated June 5, 2024 ("Phil. MOL") at 2, 8; Local 802, AFM Memorandum of Law In Support of Motion to Dismiss, dated June 5, 2024 (Union MOL") at 8, 13. However, even mere scheduling changes that are well short of complete suspension and *with pay* can constitute actionable employment discipline, depending on the employer's *reason* for imposing the change in schedule. *See, e.g.*, *Muldrow v. City of St. Louis, Missouri,* 144 S. Ct. 967 (2024) (change in terms and conditions of employment, including to a position with less prestige, is an adverse employment action); *Torre v. Charter Communication* 493 F. Supp. 3d 276 (S.D.N.Y. 2020) (finding significant reduction of on-air time "adverse" in unique setting of broadcast news channel) *Pardovani v. Crown Building Maintenance Co.*, 2020 WL 2555280, at *5 (S.D.N.Y. May 20, 2020) (suspension with pay can be an adverse action).

In any event, Wang has been subjected to much worse than a change in his schedule or assignment to different work duties: he has been barred from performing or rehearsing with the

orchestra at all, from setting foot in David Geffin Hall, and the Philharmonic canceled his long-scheduled solo performances to which the Philharmonic had committed, in writing. The Philharmonic even barred Wang from attending, by Zoom, a meeting of the "investigation into the culture of the Philharmonic".  Lewis Decl., Ex. C.  Together, the fashion in which the Philharmonic has treated Wang since the publication of the Article constitutes a cognizable harm to Wang within the Collective Bargaining Agreement, which does *not* remotely authorize the imposition of long and indefinite suspensions based on mere speculation or inchoate fears triggered by magazine articles.  Furthermore, because Wang had a right to perform and to be separately paid for solo performances, but which opportunity the Philharmonic withdrew as part of Wang's suspension, it is incorrect that the Philharmonic has *fully* paid Wang that which is contractually due to him.

### ii.     Wang's Suspension Breaches Two Sections of the CBA

By placing Wang on indefinite suspension, the Philharmonic breached the CBA in two distinct ways.  First, it violated the CBA's requirement at Section XV to treat the Arbitration Award as "final and binding."  Compl. ¶¶31, 60.  Under both federal and State law, arbitration awards have the same *res judicata* and collateral estoppel effect as decisions of a court.  *See, e.g., Maidman v. O'Brien,* 473 F. Supp. 25, 29 (S.D.N.Y. 1979); *Luppo v. Waldbaum*, 131 A.D. 2d 443 at 445 (2d Dept 1987).  A party who had a full and fair opportunity to make its case in arbitration is not entitled to a do-over, including on "factual disputes resolved by an arbitrator".  *Maidman,* 475 F. Supp. at 30  (relying on factual findings of arbitrator to dismiss federal securities claim as barred by collateral estoppel).  Here, the Arbitration Award disposed of the Philharmonic's claims against Wang (and Muckey).  The Philharmonic is on record admitting it *cannot* now revisit the outcome of that now four-year-old decision.  Compl. ¶¶44, 95.  The

Article, on its face, does not even purport to include any allegations that were not vetted in the Arbitration proceedings.  The Philharmonic was therefore barred from taking any adverse employment action against Wang on the basis of the Article's contents.  *Ganguly v. Charles Schwab & Co.*, 2004 WL 213016, at *6-7 (S.D.N.Y. Feb. 4, 2004), aff'd, 142 F. Appx. 498 (2d Cir. 2005) (finding federal claims precluded where fully litigated in a binding arbitration).  Yet, as the Philharmonic admits, that is exactly what it has done.  In so doing, the Philharmonic flagrantly violated the CBA's requirement that it treat the Arbitration Award as final and binding.  *See, e.g., Streit v. Amdocs, Inc.* 307 F. Appx. 505, 508-09 (2d Cir. 2009) (dismissing complaint on basis of prior arbitration of same claim).

Wang's suspension also violates Section VII of the CBA, which provides that the Philharmonic may only take disciplinary measures against orchestra members for "just cause." Here, a one-sided magazine article about old, fully arbitrated allegations, cannot amount to just cause—regardless of the Philharmonic's CEO's statement to the orchestra that it engendered "strong feelings" among readers.

### iii.    Under the Specific Circumstances of Wang's Suspension, Calling the Suspension "Paid Administrative Leave" Does Not Alter the Character of the Suspension as Discipline, Subjecting It to the Requirements and Limitations of the CBA

Rather than pretend that the Philharmonic had just cause to suspend Wang, Defendants attempt to recast the Philharmonic's actions barring Wang from all Philharmonic activity as not a "suspension" but rather "paid leave pending investigation"—and therefore not employment discipline (whose imposition must always satisfy the just cause requirement of the CBA).  *See, e.g.,* Phil MOL at 1 (describing the Union's decision not to grieve Wang's suspension as "appropriate" because "no grievable event has occurred"); Union MOL at 10 (describing Wang as having "experienced no adverse employment action").  That self-serving fig leaf of a legal

14

conclusion is as dubious as it is absurd. Rebranding the Philharmonic's breaches as commonplace paid administrative leave pending an investigation grossly mischaracterizes every aspect of the Philharmonic's panicked decision to sideline Wang, and the factual and legal context in which it occurred.

Defendants appear to concede that Wang's suspension, *if "disciplinary"* in character, would unambiguously violate the CBA, given that *discipline* requires misconduct constituting just cause, and here, the Philharmonic did *not* claim to base the suspension on any alleged misconduct by Wang. Notably, Defendants do not appear to make the claim that a suspension with pay can never be an adverse employment action, which would in any event be incorrect. *See, e.g., Muldrow,* 144 S. Ct. 967 (holding that transfer to a different unit with the same pay and benefits but less prestige amounted to an adverse employment action in the context of a Title VII discrimination claim). *See also Sethi v. Narod*, 12 F. Supp. 3d 505, 525 (E.D.N.Y. 2014) (holding that plaintiff's suspension with pay was adverse where no evidence that the defendant applied reasonable disciplinary procedures). *Pardovani,* 2020 WL 2555280, at *5 (denying summary judgment where employee was suspended during investigation into *his* complaint rather than a complaint about him).

On the other hand, "an employee does not suffer a materially adverse change in the terms and conditions of employment *where the employer merely enforces its preexisting disciplinary policies in a reasonable manner*." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). (emphasis added). However, even, "[p]aid suspension during an investigation" is "adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies." *Id*. at 92, n.1.

15

The Philharmonic, attempting to hang its hat on the notion that Wang's suspension is not *disciplinary,* does so only by making the *grossly misleading* statement that it "plac[ed] Wang on paid leave pending the ongoing investigations."   Phil MOL at 2.  But *there were no* investigations of any alleged misconduct by Wang when the Philharmonic placed Wang on paid suspension, and even the investigations that were *subsequently* commenced - after the imposition of suspension - were *not* commenced for the purpose of investigating any known misconduct by Wang. *See* Wang Decl., Ex. C (April 19 email re: Levy investigation looking at "any musician."); Singer Decl., Ex. I (describing the Philharmonic's investigation into misconduct "by any members of the Orchestra").

To apply the Second Circuit's holding in *Joseph v. Leavitt,* when the Philharmonic suspended Wang, it was not applying any of its "preexisting disciplinary policies" because the Philharmonic had no policy that permits suspension of a musician under the circumstances *as they actually existed when the suspension was imposed on Wang*:  no pending investigation into misconduct by the Wang at the time suspension was announced, and instead only an unfavorable magazine article about him.  Moreover, the CBA—the legal framework that shapes and constrains the Philharmonic's existing employment policies—did not permit it to suspend a tenured musician based on a magazine article about a subject already adjudicated in the musician's favor in an arbitration that was final and binding as to the Philharmonic—but that is exactly what the Philharmonic did to Mr. Wang. To again apply the teaching of *Joseph*, Wang's "[p]aid suspension during an investigation" is an "adverse" action because suspending Wang *without* basing that suspension on any claim of misconduct by him or investigation of him is an "action[] beyond" the Philharmonic employees' "normal exposure to disciplinary policies."

16

The Union fares no better in latching on to the "paid administrative leave" charade. The Union, having grieved Wang's previous termination, knew that, at the time the recent suspension was imposed on April 13, 2024, that there were no new claims of misconduct against Wang not adjudicated in his favor in the binding arbitration. In nevertheless suggesting that the Article unearthed *new* claims of misconduct by Wang, the Union is simply guilty of misrepresentation. *See, e.g., Biberaj v. Pritchard Industries, Inc.*, 2009 WL 10738222, at *7 (S.D.N.Y. Sept. 28, 2009) ("Although a union does not breach the duty of fair representation through mere negligence or errors in judgment, a blatantly inaccurate rendering of the facts underlying a grievance seems to cross the line into arbitrariness or bad faith.").

Unsurprisingly, each and every case cited by Defendants for the notion that paid administrative leave is not discipline—whether in the 301/DFR or discrimination law context— involved a specific new allegation of wrongdoing that triggered an employee-specific investigation, and not (a) allegations that had been previously adjudicated in binding arbitration or (b) an investigation that was not specific to an employee or incident. *See, e.g., Joseph v. Leavitt*, 465 F.3d 87 (FDA employee under criminal and employer investigation for assaulting girlfriend); *Feldleit v. Long Island Rail Rd.*, 723 F. Supp. 892 (E.D.N.Y. 1989) (employee placed on paid leave while under investigation for making sexually harassing phone call to his supervisor); *George v. Nw. Airlines, Inc.*, 351 F. Supp. 2d 310 (E.D. Pa. 2005) (airline employee placed on paid leave while under investigation for giving over 150 discounts to friends and family); *Dumas v. New United Motor Mfg., Inc.*, 2011 WL 5006462, (N.D. Cal. Oct. 20, 2011) (employee placed on paid leave while under investigation for missing 9 days of work without explanation); *Middleton v. City of Tucson*, 2018 WL 1581628 (D. Ariz. Mar. 31, 2018) (per

*Middleton v. City of Tucson*, 2017 WL 3034911, at *1 (D. Ariz. July 18, 2017), employee was "placed on administrative leave for abuse of confidential police computer information").

By any stretch of the imagination, the circumstances of Wang's suspension bears little resemblance to a justifiable "paid administrative leave" as that term is understood by employers, unions and courts.

> **iv.    Defendants' Contention that the Arbitration Award Did Not Require Wang's Reinstatement as a Performer, and Only Reinstatement of Pay, Is Belied by the Philharmonic's Conduct in the Wake of the Arbitration Award**

In April of 2020, after Wang and the Union prevailed in the arbitration against the Philharmonic, it not only reinstated Wang's salary and paid him back pay, but restored Wang *to the rehearsal and performance schedule* commensurate with the scheduling of his peers. *See* Compl. ¶¶36, 41 (noting that upon his reinstatement, Wang "rejoined the orchestra as a regular performer"); Wang Decl. ¶ 11. Even the Union grudgingly concedes that taking away Wang's "right to rehearse and perform" would require the occurrence of "subsequent events" warranting such action. Union MOL at 8. The Court should not now credit Defendants' weak and self-serving attempts to pretend "reinstatement" means anything other than what its long-standing course-of-conduct demonstrates. *See In re Enterprise Wire Co.*, 1966 BNA LA 359 (Daugherty, Mar. 28, 1966) (listing "has the company applied its rules, orders and penalties evenhandedly and without discrimination to all employees" as a factor to be considered in "just cause" determinations). In short, Wang's forced "leave" or suspension is a violation of the final and binding nature of the Arbitration Award.

     **v.**    **Wang's Right to Be a Performing Member of the Orchestra—in the Absence of Just Cause to Deprive Him of that Right—Is Also Reflected in Both Key Terms of His Individual Employment Agreement and Provisions of the CBA**

To the extent Defendants argue that the Philharmonic satisfies its contractual obligations even if it *never* allows Wang to perform, so long as it pays him, that argument is belied by well-established legal authority in the employment context, by certain provisions of the CBA, and by the terms of Wang's individual employment agreement.

     **a.**    **Arbitrarily Imposed Paid Leave Can Be Adverse**

First, as explained above, employees – unionized or not -- suffer a cognizable harm, *even if they continue to be paid*, if subjected to scheduling changes whose imposition is "beyond an employee's normal exposure to disciplinary policies." *See supra* at I.A.iii.  Thus, Defendants' strained efforts to interpret "discipline" (undefined in the CBA) as strictly limited to discipline accompanied by financial sanctions makes no sense, and is contradicted by Defendants' governing documents.

     **b.**    **The Right to Perform Is Implicit in the CBA**

Second, Section III(A) of the CBA obligates the Philharmonic to employ members of the orchestra 52 weeks per year.  While Wang does not read that section to require the Philharmonic to schedule him for every performance or even for any specific performance, he (and no doubt every other tenured member of the orchestra) reasonably interprets that provision to require the Philharmonic to regularly schedule him to rehearse and perform, commensurate with the scheduling of other members. This conclusion is particularly strong, given Section VII of the CBA's prohibition on "disciplinary measures" imposed without just cause.  Had the parties to the CBA intended to limit the just cause requirement to measures that negatively affect *financial* compensation, it would have said so—but it does not.  In any event, the Philharmonic's

19

performance of its obligations under Article III(a) are hardly "undisputed" as it contends.  Thus, the Philharmonic's argument that the CBA in general or Section III(A) in particular allows the Philharmonic to single out a musician for complete removal from the schedule indefinitely for any reason or no reason at all, so long as he is paid, flies in the face of reasonable contract interpretation, not to mention past practice, and therefore must be rejected as a matter of law. Even the Union stops short of fully endorsing this notion.

The CBA also incorporates by reference the bylaws of the American Federation of Musicians. Compl. ¶ 65. Those bylaws, in turn, declare that it is the mission of the federation, not only to ensure that its musician members are "fairly compensated," but also to ensure they have "the opportunity to develop [their] talents and skills" and that their "work will be fulfilling." *Id.* Wang Decl. Ex. H. By incorporating these bylaws, the CBA further recognizes that performance, not just payment, is among the rights of musicians under the CBA.

### c.    Wang's Right to Perform Is Implicit in His Individual Agreement

Third, Wang's individual agreement reflects the parties' understanding that public *performance* with the orchestra is as much a part of the employment relationship between the orchestra and its members, as is the contractual right to specified financial compensation. Indeed, Wang's individual agreement obligates the Philharmonic to use its best efforts to raise Wang's profile and to schedule him for at least 6 solo performances every three years, and to use best efforts to provide him with additional solo opportunities.  *See* Wang Decl., Ex. A.  Indeed, the suspension was imposed just weeks prior to a series of solo performances, to have started on May 8 and which were scheduled over 18 months earlier.  Compl. ¶¶41, 58.

To be sure, while a "best efforts" clause is not a guarantee of success, it does impose on the promisor an obligation to try.  *Creaven v. Erickson*, 2023 WL 4247213 (2d Cir. June 29,

2023) (vacating grant of summary judgment for defendant on breach of "best efforts" clause where defendant failed to identify *any* evidence that it had used "best efforts"). And the requirement to schedule solos was not qualified by any "best efforts" language. *See* Compl. ¶55; Wang Decl., Ex A. Here, the Philharmonic completely removed Wang from the rehearsal and performance schedule and cancelled his long-anticipated solos. In so doing it not only failed to use any effort at all to raise Wang's profile, it completely undermined it; soon after word of Wang's suspension became public, multiple other entities followed the Philharmonic's lead and made him a pariah. *See* Compl. ¶¶69-73. In any event, by removing Wang's scheduled solos from the Philharmonic's calendar, the Philharmonic is in clear breach of its obligation to schedule Wang for 6 solos every three years. Compl. ¶¶55, 59.

As explained below, the individual agreement is itself enforceable, even though Wang did not sign it and the agreement calls for signatures. But separate and apart from the question of whether it is enforceable on its own, the fact that the Philharmonic drafted the language in the individual agreement that speaks of certain rights Wang has to *publicly* perform, underscores that *the opportunity to perform*, and not merely to be paid, is at the heart of the employment relationship between the Philharmonic and the orchestra members.

In any event, notwithstanding that Wang never signed the individual agreement, it is enforceable, as explained below.

Notably, the Philharmonic fails to identify a single case in which a signing party to an agreement was permitted to escape the agreement based on the other party's failure to sign it where, as here (i) the terms were reduced to writing long ago and both parties had since been performing the terms in good faith (*see* Wang Decl., Ex. A (individual agreements dated 2013 and Sept 2023, respectively), (ii) the party that did not sign (Wang) sought to enforce against the

party that did (the Philharmonic) (id.), and (iii) it was only in the context of litigation that the party who signed the agreement, performed it and accepted the other party's performance suddenly sought to abandon the agreement.

Sanchez, the only case cited by the Philharmonic, is certainly not such a case.  In Sanchez, the party who signed (the employer) sought to enforce against the party who did not (the employee), and the employer had been put on notice more than once in advance of the litigation that the employee questioned the enforceability of the agreement.  *Sanchez v. S&P Global, Inc*., 2023 WL 8372990, at *2 (S.D.N.Y. Dec. 4, 2023).  Moreover, Sanchez involved a release of legal claims, and as this Court pointed out, settlement agreements are subject to more "stringent scrutiny" than "ordinary contract claims" because courts require evidence that a release of legal claims is "knowing and voluntary." *Id.* (quoting *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989)).

Not only does the Philharmonic fail to cite a single similar case in which a party in its position was able to avoid contractual performance, but it is also equitably estopped from evading its obligations under the individual agreement.  "When a party with full knowledge … of his [or her] rights …  freely does what amounts to a recognition or adoption of a contract … or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, [that party] acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Bernard v Citibank*, N.A., 151 N.Y.S.3d 87, 93, (2d Dept., June 16, 2021) (quoting *Rothschild v. Title Guar. & Trust Co.,* 204 N.Y. 458 (1912) and finding mortgage agreement enforceable under estoppel principles even though otherwise void).  Here, there is no question the Philharmonic signed the 2023-2024 agreement (*see* Wang Decl., Ex. A); Both parties performed under its terms and both parties

accepted the other's performance (Compl. ¶¶36, 58 (pleading Wang has performed regularly over the past four years and that the Philharmonic had scheduled solos for Wang)); Wang Decl., Ex. A (individual agreement term runs from Sept. 18, 2023-Sept. 15, 2024)); and the first time the Philharmonic attempted to repudiate the agreement was when it filed its papers in this action, nine months into the agreement's one-year term. In other words, the Philharmonic "has represented [the agreement] to be valid" and may not now assert "that it is void, to the injury of those who have acted in reliance upon the representation." *Bernard,* 151 N.Y.S.3d at 93. (contract enforceable under estoppel principles even though otherwise void). The Philharmonic is thus equitably estopped from evading its obligations under the individual agreement.[2]

**B.    Wang Has Stated a Duty of Fair Representation Claim Against the Union**

In addition to proving that the Philharmonic breached the CBA, Wang must also show "that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178-179 (2d Cir., 2001). *See also Vaca v. Sipes* 386 U.S. 171, 177 (1967); *Young v. U.S. Postal Service*, 907 F.2d 305, 307 (2d Cir.,1990) ("Union's breach is a prerequisite to consideration of the merits of plaintiff's claim

---

[2] A final, alternative basis for holding the Philharmonic to its performance obligations under the individual agreement is that it "intended to be bound." To be sure, while the language in the individual agreement requiring signatures of both parties is a factor that is sometimes decisive, it is not automatically dispositive. That is, the four factors governing whether parties to an agreement intended to be bound are: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir.1985). Although the first factor can *sometimes* be dispositive on very different facts (*see, e.g., RKG Holdings v.* Gottlieb,182 F.3d 901 (stopping after first factor where plaintiff sought to enforce terms that had been presented as a proposal in a letter that expressly stated the counterparty's intent not to be bound until a partnership agreement was in place)), "[n]o single factor is decisive." *Kaczmarcysk v. Dutton*, 414 F. Appx. 354 at *355 (2d Cir. 2011). Here, it is reasonable to treat the second and third factors—that the parties have each already performed the agreement and the agreement contains all of the material terms of the parties' individual agreement—as dispositive.

against her former employer); *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151,

165 (1983). The duty of fair representation -- inferred from unions' exclusive authority under

the National Labor Relation Act at 29 USC § 159 to represent all members of a bargaining unit --

requires unions to fairly represent all of its members "without hostility or discrimination toward

any" and avoiding "arbitrary conduct." *Vaca*, 386 U.S at 177 (citations omitted). The duty

applies to enforcement of the terms of collective bargaining agreements, including enforcement

of arbitration awards. *Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union* 638, 227

F.3d 29, 33–34 (2d Cir. 2000).

### i.    Wang Pled a Clear Breach of the Union's Duty of Fair Representation

To prevail on a claim for breach of a union's duty of fair representation[3] ("DFR") the

employee must show that the union's actions were arbitrary, discriminatory and/or in bad faith,

and that there is a causal connection between the union's breach and the plaintiff's injury. *White

v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178-179 (2d Cir., 2001). In the

specific context of a union's refusal to press an employee's meritorious grievance, a plaintiff can

demonstrate a DFR breach by showing that (1) the employee's grievance had merit, (2) the union

was aware of the grievance and (3) that the union's actions in failing to process the grievance

were arbitrary. *See, e.g., Young.*, 907 F.2d at 308. A plaintiff can also prevail on a breach of

DFR claim by showing that the union acted in bad faith or in a discriminatory manner. *Spellacy

v. Air Line Pilots Ass'n-Int'l*, 156 F.3d 120 (2d Cir. 1998). A Union acts in bad faith if it acts

with an "improper intent, purpose or motive," *Id.* at 126 (quoting *Mock v. T.G. & Y. Stores Co.*,

---

[3] The duty of fair representation is also enshrined in the American Federation of Music's 2023 Bylaws at
Article 10, Section (1)(4). *See* Ex. G to the Wang Decl.

971 F.2d 522, 531 (10th Cir.1992)), and "with fraudulent, deceitful or dishonest action." *Sim v. New York Mailers' Union Number 6*, 166 F.3d 465, 472 (2d Cir. 1999).

A union's inaction is discriminatory when it "favors some of its members at the expense of others without legitimate purpose." *Moore v. Roadway Express, Inc. and Local 707*, 2008 WL 819049, at *4 (E.D.N.Y. Mar. 25, 2008) (*citing Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers,* 378 F.3d 269, 277 (2d Cir.2004); *see also Vaughn v. Air Line Pilot Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010); *Patricia v. Delford Indus., Inc*., 660 F. Supp. 1429, 1432 (S.D.N.Y. 1987) (denying summary judgment for the union where it flip flopped on grieving Plaintiff's termination and there were disputed issues of fact as to why it failed to notify her of special meeting called for members' vote on her grievance).   "Although the cases addressing the duty of fair representation use strong language with respect to the wide discretion afforded to union determinations, there is no heightened pleading standard for a breach of the duty of fair representation cause of action." *Thomas v. Little Flower for Rehab. & Nursing*, 793 F. Supp. 2d 544, 549 (E.D.N.Y. 2011) (denying motion to dismiss breach of DFR claim where plaintiff alleged union was dishonest in its representations regarding her grievance).

### a.      Wang's Grievance Has Merit

As described above, in spite of having prevailed in a binding arbitration, Wang was indefinitely suspended *one day* after a magazine article about the arbitration result of four years ago.  And the suspension was not based on any new claims of misconduct or even based on the existence of any investigation specific to Wang.  *See supra* at I.A.iii.  The focus of the parties' dispute here is whether Wang's suspension is actionable, and here, given that Wang's suspension was not the product of any claim of misconduct by him, his claim easily has substantial merit.

**b.      Local 802 Was Aware of Wang's Grievance**

There is no question that the Union was aware of Wang's suspension.  Immediately, as soon as the fact of the suspension became public, the Union's President publicly endorsed the suspension.   Compl. ¶ 13, 47, 82; Singer Decl., Ex. E.  Moreover, Wang's attorneys also made a written request to Local 802 that it take action to grieve the suspension and enforce the Arbitration Award on Wang's behalf, but the Union refused (the "Refusal Letter").  Compl. ¶63; Singer Decl., Exs. H, I.

**c.      Local 802's Refusal to Act on the Grievance Was at Best Arbitrary and at Worst, Discriminatory or in Bad Baith**

Local 802's refusal to protest or grieve Wang's suspension was arbitrary, and worse, explicitly and publicly hostile to Wang.

The Union refused to take up Wang's valid grievance.  Compl. ¶¶63, 81.  Singer Decl., Ex. I.  In the Refusal Letter, the Union took the outrageous position that the Arbitration Award imposed no continuing obligations on the Philharmonic.  *See* Singer Decl., Ex. I; Union MOL at 10-11;  This mischaracterization is echoed in its motion papers.  *See* Union MOL at 11 (arguing that the Union "had a reasonable basis not to seek enforcement" because "the Philharmonic fully complied with the Award at the time of issuance.")   For the reasons discussed *supra* at I.A.iv., that is wrong as a matter of law.  *See, e.g., Maidman;* 473 F. Supp 25 (arbitration awards have res judicata and estoppel effect).

The Union's authorities cited for the proposition that refusal to enforce an arbitration award is not necessarily a breach are entirely distinguishable:   in both *Sanozky* and *Hardwick*, for example, the union's bargaining power was constrained because the employers were in various stages of business contraction (bankruptcy and plant closure, respectively), and even so, the unions took extensive steps to assist the grievant employees, and the employees did not

26

follow union advice.  *Sanozky v. Int'l Ass'n of Machinists,* 415 F.3d 279 (2d Cir. 2005) (refusal

to enforce award reasonable in context of employer bankruptcy, employee's refusal to accept

negotiated compromise of four-day suspension, and real risk of job loss if enforcement pursued).

*Hardwick v. Sunbelt Rentals, Inc.*, 719 F. Supp. 2d 994 (C.D. Ill. 2010), aff'd, 430 F. Appx. 536

(7th Cir. 2011) (employee resigned against union advice, in effect removing himself from

guarantee of job at alternate location after plant closure making chance of success in enforcement

slim).  Here, there is nothing diluting the Union's bargaining power or undermining the

enforceability of the Arbitration Award.  Nor has Wang taken any action contrary to Union

advice that would make the Award harder to enforce.  Thus, this case bears no resemblance to

*Sanozky* or *Hardwic*k.

A more analogous case is *Yearwood*, in which a union agreed to initiate arbitration for an

employee but then refused to follow it through, without any indication it had made a "good-faith

determination not to pursue plaintiff's claim for lack of merit."  *Yearwood v. New York*

*Presbyterian Hosp.*, 2013 WL 4713793, at *4 (S.D.N.Y. Aug. 20, 2013) (dismissal denied where

pleading alleged employer took adverse employment action without cause and union agreed

grievance had merit.)

Here, the Union clearly agreed Wang's 2018 grievance had merit, inasmuch as it pursued

arbitration and prevailed in Wang's favor, Compl. ¶34—and cannot dispute that the 2020 Award

is final and binding.  Compl. ¶31.  Wang has plead, and the documentary evidence confirms, that

the Philharmonic has suspended Wang solely because a magazine article criticized (unfairly) the

outcome of that binding Award (notwithstanding the Philharmonic's transparent *post hoc* attempt

to dress the suspension up as a "leave pending investigation.")  Under these circumstances, the

Union had an absolute and unambiguous duty to demand that the Philharmonic not use the

matters adjudicated in the arbitration (directly or as the arbitration is recounted in the Article) as

an excuse to again remove Wang from performing with the orchestra, four years later.  *See, e.g.,*

*Young*, 907 F.3d at 308 (refusal to press a meritorious grievance in a timely manner is a breach

of the DFR.  But it refused to do so and has offered no evidence of "good faith determination"

(*Yearwood,* 2013 WL 4713793), only obfuscation in a feeble attempt to escape the

incontrovertible fact that the Philharmonic had no legitimate basis to suspend Wang (or place

him on "paid administrative leave).

The Union's deliberate misreading of the CBA's "final and binding" requirement cannot

be fairly characterized as a "reasonable interpretation" of the CBA (*see* Union MOL at 10) or a

"mistake in judgment" and thus *Scales* and *Rawson*, respectively, lend defendants no aid.  In

*Rawson*, for example, the Supreme Court held that mere negligence by a union carrying out a

bargaining agreement obligation to inspect a mine that later caught fire and killed workers did

not amount to a breach of the DFR.  *United Steelworkers v. Rawson*, 495 U.S. 362 (1990).  Wang

has not merely pled that the Union was negligent, but rather that it intentionally misrepresented

the true nature of the facts to evade its obligation to act on Wang's meritorious claim, full well

knowing there is no legitimate basis for his suspension.

Even if the Union's initial refusal to demand a reversal of Wang's suspension could be

described as only panicked (*see, e.g., Yearwood,* 2013 WL 4713793) (decision on merit of claim

must rest on good faith)), its continued acquiescence in the Philharmonic's singling out of Wang

for suspension and mischaracterizing what it is doing is both in bad faith and discriminatory.

*See, e.g. Sims*, 166 F.3d at 472; *Biberaj*, 2009 WL 10738222, at *7.

The Union's rationalization for standing aside, that the CBA "does not guarantee that

members are placed on the schedule for any …  performances or rehearsals," Singer Decl., Ex. I,

28

simply mischaracterizes what has occurred. The Philharmonic has not merely changed its *schedule*, but it has indefinitely suspended Wang from participating in any performances or rehearsals. Notably, the Union stopped short of endorsing the Philharmonic's position that the CBA entitles it to "declin[e] to schedule [Wang] for work" or place him on "paid leave" for any reason or no reason—an extreme reading of the CBA that impinges not only on Wang's rights but creates *negative precedent for his colleagues in the orchestra*. Phil MOL at 9. In its careful parsing, the Union states that the Arbitration Award is not a lifetime guarantee of employment, that no musician is entitled to be scheduled for "all" performances or "any" performance. Union MOL at 6. As discussed *supra* at I.A.iv, these unremarkable points are not in dispute. But the Union stopped short of saying the Philharmonic has the right to remove a musician from the performance schedule forever or indefinitely without a reason that concerns the employee's conduct. By that omission, the Union concedes that the Philharmonic needs a reason to indefinitely remove a musician from the orchestra. Had the Philharmonic provided a facially legitimate reason for the suspension—as opposed to simply reacting to a magazine article—the Union would have had a degree of discretion in considering whether to bring a grievance to challenge that reason. The problem for the Union, here, is that it declined to grieve a suspension imposed without an even arguably facially legitimate reason for the suspension.

The Union fares no better in arguing that it had discretion not to grieve the suspension because of the pending investigations. Singer Decl., Ex. I; Union MOL at 10, Compl. ¶¶12, 63. But as discussed at length *supra* at I.A.iii, the investigations did not even exist when the Philharmonic suspended Wang and, when the Philharmonic did announce them—after the imposition of suspension—it defined them very broadly as not focused in particular on Wang or any other specific member of the orchestra. Under these circumstances, the Union's attempt to

shield its inaction behind the Investigations is at best arbitrary. *Thomas v. Little Flower for Rehabilitation & Nursing,* 793 F.Supp.2d 544, 548 (E.D.N.Y.,2011) ("A union acts arbitrarily in failing to initiate or process a grievance when it 'ignores or perfunctorily presses a meritorious claim.'") (quoting *Samuels v. Air Transport Local 504,* 992 F.2d 12, 16 (2d Cir.1993)).

Finally, the Union argues it is simply balancing Wang's (and Muckey's) interests with the interests of other members. *See, e.g.*, Union MOL at 11. But the Union does not identify the other specific members who have a direct interest in Wang's suspension that is contrary to Wang's interest. Taken to its logical conclusion, if a Union can decline to protect an arbitrarily disciplined employee because other union members dislike or fear what they imagine the employee might have done or been accused of (i.e., based on a magazine article), the duty of fair representation becomes an illusion, with its provision dependent on the presence or absence of public pressure. Here, the Union points to no investigation it or anyone else conducted to inform its exercise of discretion not to represent Wang, and instead simply yielded to the impression created by the magazine article about the 2020 arbitration decision. This is a particularly outrageous basis for the Union's exercise of its discretion, here, because it represented Wang during the arbitration and knows many of the impressions created by the Article about the arbitration—i.e., that Wang was accused of drugging Cara Kizer—are simply wrong.

Unsurprisingly, the cases cited by the Union in support of the notion it reasonably declined to grieve Wang's suspension provide no support for that notion because the underlying facts bearing on union discretion are not remotely comparable. In *Alston*, for example, the plaintiff-employee was understandably placed on leave because he had threatened to "go postal," and other employees' "perceived threats to their safety" were reasonable under the circumstances. *Alston v. Int'l Ass'n of Firefighters, Loc. 950*, 998 F.3d 11 (1st Cir. 2021). *See*

*also Good Samaritan Med. Ctr. v. NLRB*, 858 F.3d 617 (1st Cir. 2017) (where new employee accused of repeated verbal belligerence during orientation and brought trainer/existing union member to tears, union reasonably supported new employee's temporary removal).

To be sure, some individuals have understandably expressed generalized dismay at the details in what is a one-sided and misleading Article. But as discussed at length above, the Article's "revelations" were not news to the Union. It knew the Article does not tell the whole story, that its insinuation that Wang was terminated in 2018 over the Kizer allegations is blatantly false, and that the Kizer allegations were fully vetted in the arbitration. In that light, neither Defendant has any legitimate reason to believe Wang presents a risk to the safety of other members that would warrant suspending him out of a balancing of other members' competing interests.

Here, the Union has done something even worse than failing to grieve the unreasonable suspension of its member—its representatives have publicly endorsed Wang's arbitrary treatment.

The New York Times reported on April 15, 2024 that Local 802's President, Sara Cutler, said "that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being 'are good first steps but they can't be the last.'" Singer Decl., Ex. E; Compl. ¶47. While the Union protests that Wang has taken Cutler's statements out of context, Union MOL at 12, the specific language in the Times story speaks for itself and the Union does not claim it ever objected to the Times that Cutler's statement had been taken out of context. By her statement, Cutler publicly supported Wang's current indefinite suspension and possible future removal from Philharmonic activity. She did so not because Wang did anything to warrant it, but because a reporter questioned the outcome of the Arbitration Award that Cutler's own Union helped secure. To

then publicly question continued compliance with that Award and pretend the allegations against Wang were something Cutler was suddenly "faced with" (Union MOL at 11) is disingenuous in the extreme and the epitome of a breach of the DFR.  *See, e.g. Biberaj,* 2009 WL 10738222, at *7 (blatant misrendering of the facts in bad faith).

Alternatively, the Union claims Cutler's statement is not relevant because "she was not acting in a representational capacity."  To the contrary, she made a public statement in her capacity as President of Local 802, endorsing the decision of an employer that is a party to a collective bargaining agreement with Local 802 to bar a member in good standing covered by the CBA from his workplace.  And she did so within two days of the removal, indicating the Union failed to make even the most cursory inquiry a reasonable Union leader would take before forming, much less publicly expressing, an opinion on a potential grievance.  *See, e.g. Thomas v. Little Flower for Rehabilitation & Nursing*, 793 F.Supp.2d 544, 548 (E.D.N.Y.,2011) ("a 'minimal investigation' can constitute a breach of the duty of fair representation, an allegation of a failure to perform any investigation alleges a breach").  Clearly Cutler was acting "in a representational capacity" and she acted in a manner that was unwarrantedly hostile.

Statements from the orchestra committee also indicate prejudice against Wang; the committee was quoted by the New York Times as speculating that the Article's allegations are not "isolated incidents."  In other words, on the basis of a slanted magazine article, the committee that is supposed to fairly represent all union members made clear, without a scintilla of facts, that it now holds the purely speculative preconceived assumption that there must be other incidents involving Wang.  It made itself judge and jury - and rendered a verdict without evidence.  And now, the Union disingenuously leans on this hostile and unfair statement to

excuse its own decision to acquiesce in Wang's suspension.  *See* Union MOL at 11 ("orchestra members' stated concerns about other instances of sexual misconduct by Wang").

### ii.  Wang Has Plausibly Alleged a Causal Connection Between the Union's Refusal to Act and His Injuries

The Union also challenges the existence of a causal connection between its refusal to grieve Wang's suspension and his injuries, but its argument is fundamentally flawed because it is limited to focusing on the injuries Wang's suffered as a result of the suspension and it ignores the injuries Wang has suffered *because the Union failed to grieve the suspension*.  That is. Wang's "action is based on the employer's alleged breach of contract plus the union's alleged wrongful failure to afford him *his contractual remedy of arbitration*." *Vaca v. Sipes,* 386 U.S. 171, 196 (1967) (emphasis added).

The causal connection element is satisfied by union conduct that "seriously undermine[d] the arbitral process." *Barr v. United Parcel Service, Inc.,* 868 F.2d 36, 43 (2d Cir. 1989).  Here, the Union's breaching conduct has more than undermined the arbitral process—it has deprived Wang entirely of his "contractual remedy of arbitration." *Vaca v. Sipes*, 386 U.S. at 196. Indeed, the very existence of the grievance process, including arbitration when necessary, and  intermediary steps that could have resolved the dispute short of arbitration, was dependent on the Union's taking up the grievance in the first instance.  Its refusal to do so had the causal effect of depriving Wang of all of the benefits of grievance and arbitral process.  Plainly, an arbitral process that allows for employees' claim to be heard before a neutral labor arbitrator is a valuable right for employees like Wang. Here, had the Union grieved the suspension, the filing of that grievance by the Union would have enabled Wang to have his meritorious grievance against Philharmonic resolved through interim steps in the grievance process or heard in an arbitration, at which the Union would have been legally responsible for the cost of its

representation at the arbitration.   But only because the Union did not grieve the suspension,

Wang has had to bear all of the costs of challenging the Philharmonic's suspension on his own,

and is restricted to raising his claims in court—a forum that has many disadvantages relative to

the arbitration forum the Union itself contracted for in its agreement with the Philharmonic.

To be sure, a union's failure to file a futile grievance causes no harm, but that can hardly

be said here, particularly at the motion to dismiss stage of the case, given the strength of Wang's

claim that his suspension was not supported by just cause and was a cognizable sanction

inconsistent with the binding arbitration decision.

## II.    WANG HAS PLAUSIBLY PLED CLAIMS AGAINST BOTH DEFENDANTS UNDER STATE AND LOCAL HUMAN RIGHTS LAWS, WHICH CLAIMS ARE NOT PREEMPTED BY WANG'S LMRA CLAIM

### A.    **Introduction**

Wang has plausibly stated his claims against both Defendants for discrimination on the

basis of gender.  As the complaint pleads, up until the moment of his suspension, Wang was in

good standing with the orchestra and the Union: he had not been accused of any misconduct

since returning to the orchestra four years ago, which was about to feature him in a series of

concerts with significant solos.  Compl. ¶¶36, 58.  By then suddenly suspending Wang (and

Muckey), one day after the Article's publication, the Philharmonic singled out Wang (and

Muckey) in a fashion that failed to fairly apply its normal disciplinary policies.  Compl. ¶¶79, 92,

93, 99.  Under its normal application of its policies, the Philharmonic simply does not, and never

had until now, indefinitely suspended a member of the orchestra without a claim of misconduct

having been lodged *before* the suspension.  The Union, by suddenly announcing its support for

and refusing to protest the suspensions, likewise departed from its own policies, under which it

had previously *never* acquiesced in, much less publicly endorsed, suspensions without at least a

specific accusation being proffered as part of the reason for the suspension. Compl. ¶¶14, 18.

The circumstances in which both Defendants mistreated Wang (and Muckey) plausibly supports Wang's claim that gender was a factor in Defendants' abandonment of their standard policies and selective treatment of Wang.  Inherent in the hue and cry that arose in the wake of the article which recounted Cara's Kizer's sexual assault allegation was the idea that sexual assault accusations made by women against men should be believed, almost automatically.  The implication of the article and of the statements made by persons affiliated with each Defendant was that a male arbitrator had unreasonably failed to take this approach in his refusal to credit sexual assault accusations of women against men.  Defendants' sudden decisions to throw Wang (and Muckey) under the bus cannot reasonably be understood as anything other than Defendants' overreaction, in a manner that was biased against men, to criticisms that it had not in the past been sufficiently responsive to claims made by women of the kind by Kizer.  Should there be any doubt that considerations of gender factored into Wang's disparate treatment, public statements made by persons affiliated with both the Union and the Philharmonic eliminate any such doubt.  In short, the Philharmonic and the Union were both urged to essentially always give women, but not men, the benefit of the doubt, and that is at least part of the reason why each Defendant departed from its usual policies in their unprecedented mistreatment of Wang in the wake of the article.  Compl. ¶14, 44, 45, 46, 47.

   **B.**    **Standard for Motion to Dismiss**

To survive a motion to dismiss, an employment discrimination claim "need not allege specific facts establishing a prima facie case of discrimination." *Boykin v. Key*Corp, 521 F.3d 202, 212 (2d Cir. 2008) (citation omitted).  *See also Swierkiewicz v. Sorema N. A.*, 122 S.Ct. 992, 999, 534 U.S. 506, 515 (U.S., 2002) (holding that there is no heightened pleading standard for employment discrimination claims); *Cooper v. Franklin Templeton Investments*, 2023 WL

3882977 (2d Cir. June 8, 2023) ("at the pleadings stage of an employment discrimination case, a plaintiff has a minimal burden of alleging facts suggesting an inference of discriminatory motivation").

    **C.**    **Wang Has Stated Claims Against Both the Union and the Philharmonic Under the New York State Human Rights Law and the New York City Human Rights Law**

The New York State Human Rights Law ("NYSHRL") prohibits discrimination in employment on the basis of sex. Compl at 138 (citing NYSHRL, NYS Exec L. § 296). That prohibition extends to labor organizations. *Id.* § 296(1)(c) (unions are prohibited from "discriminating in any way against its members").  To plead a claim of employment discrimination under NYSHRL, a plaintiff must allege that (1) he is a member of a protected class, (2) he was qualified to hold the position, (3) he suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Ayers v. Bloomberg, L.P.*, 203 A.D.3d 872 (2022).  The law was amended in 2019 to clarify that it is intended to be construed more "liberally" than similarly worded federal civil rights laws like Title VII.  (NYS Exec. L. § 300).  *See, e.g., Cooper*, 2023 WL 3882977 (quoting § 300).  *Farah v. Emirates and Emirates Severance Plan*, 2024 WL 1374762, at *5 (S.D.N.Y. Mar. 31, 2024) (finding plaintiff met Title VII's pleading requirements and therefore also met requirement for NYSHRL and NYCHRL, which are less stringent).  Contrary to the Philharmonic's urging, (*see* Phil MOL at 14) Wang is not required to plead a prima facie case at the motion to dismiss stage.  *See Cooper*, 2023 WL 3882977; *Roenick v. Flood, et al.,* 2021 WL 2355108 (S.D.N.Y. June 9, 2021) ("a plaintiff must 'plausibly allege that (1) the employer took adverse action against him and (2) his … sex, … was a motivating factor in the employment decision"). The key issue, both under the NYSHRL and NYCHRL, is whether "the adverse

employment decision was motivated at least in part by an 'impermissible reason.'" *Tomney v. Int'l Ctr. for Disabled,* 357 F. Supp. 2d 721, 741 (S.D.N.Y. 2005), (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000)).

The New York City Human Rights Law, Section 8–107(1)(a) of the NYC Administrative Code, makes it "an unlawful discriminatory practice … [f]or an employer or an employee or agent thereof, because of the … gender … of any person, … to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin. Code § 8–107(1)(a). Similarly, subsection (c) makes it unlawful for "labor organizations" like the Union "to discriminate in any way against any of its members." Like the NYSHRL, the City law requires that it be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 262 (2d Dept., Sept. 13, 2011) (citation omitted); *Farah*, 2024 WL 1374762, at *5 (City and State HRL's have more liberal pleading standard than Title VII, and a Plaintiff meeting Title VII's standard necessarily meets NYSHRL and NYCHRL's requirements). *See also Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109–10 (2d Cir. 2013) (discussing NYCHRL standard). To prevail on a claim under the NYCHRL, "the plaintiff must establish that she or he was subject to an unfavorable **employment** change or treated less well than other employees on the basis of a protected characteristic." *Ayers,* 203 A.D.3d 872 (finding P stated a claim for age discrimination).

There is no question that the Complaint satisfies these elements. It alleges that Wang is: (i) male, and thus a member of a protected class (Compl. ¶127); (ii) highly qualified for his job as principal oboe (Compl ¶¶2, 128); and (iii) suffering an adverse employment action (*see, e.g.,* Compl ¶¶6, 10, 129). The Complaint makes various plausible factual allegations that easily

permit an inference of discrimination, of which the following are examples.  First, for their

actions, each of the Defendants expressly relied on the Article—which itself contained gendered

references hostile to men (*e.g., Singer* Decl at E ("are women safe when we go on tour?").

Second, there was no rational, gender-neutral reason for both Defendants to immediately portray

Wang and Muckey's suspensions as based *on the Investigations* (as they each did) because the

Investigations *did not exist* when the suspensions were issued and, when they were finally

announced, neither was described as an investigation of Wang or Muckey.  Compl. ¶ 41, 50.

Third, representatives of the Union fed the narrative that women are to be believed but men are

not through the statements of its President (Compl. at 47). Fourth, shortly after the Article's

publication the Orchestra Committee also made a series of gendered public statements indicating

women are to be believed but men are not, and worse, one should assume "these are not isolated

incidents," (Compl. ¶¶14, 45 (e.g. calling the Article "an affront to women everywhere," stating

"we believe Cara" and stating "we believe these are not isolated incidents" )).  Fifth, both the

Philharmonic, by suspending Wang, and the Union, by not objecting to the suspension, acted in

response to these types of feelings about issues of gender  (Compl. ¶¶14, 53, 146, 173).

    These allegations more than satisfy Wang's pleading burden.  "An inference of

discrimination can arise from circumstances including, but not limited to, … invidious comments

about others in the plaintiff's protected group; or the more favorable treatment of employees not

in the protected group; or the sequence of events leading to" the adverse employment action.

*Littlejohn v. City of New York*, 795 F.3d 297, 312  (2d Cir. 2015)  (internal quotation marks

omitted).  The Orchestra Committee's public statements suggesting that its understanding of

Kizer's allegations (as understood based on the committee's reading of the article) should be

credited, whereas the worst assumptions should be made about Wang and Muckey ("these are

not isolated incidents"), is an invidious comment directed at another "from Plaintiff's protected group." Wang has also plead that he and Muckey have been treated worse than other members of the orchestra, which includes each and every woman, by being singled out for suspension without pretext during the Investigations.  Compl. ¶53.  Finally, the events surrounding Wang's suspension—i.e., the publication of the Article, the "strong feelings" it engendered, and the Defendants' decisions made in the context of calls for women to be believed and men to be assumed guilty certainly gives rise to a permissible inference of discriminatory intent.

Wang's burden to plead and prove discriminatory intent is "minimal," *Littlejohn,* 795 F.3d at 312, and is satisfied by conduct that is merely "in part" discriminatory."  *Osby v. City of New York*, 633 Fed.Appx. 12, 13 (2d Cir. 2016) (discrimination plaintiffs need only plead "that the employer took adverse action against her at least in part for a discriminatory reason" (citations and quotations omitted).  *Tomney*, 357 F. Supp. 2d 721 (accord).  *See Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) (allegation that university took a biased approach to evaluating a claim of sexual assault in favor of the female accuser and against the male accused to assuage public criticism plead a plausible inference of discriminatory motive.).  *See also*; *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)(Stating that in Title VII context "[A] plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that '. . . sex . . . was *a motivating factor* for any employment practice'" rather than a "but for" cause) (quoting  *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101 (2003) and adding emphasis).

### D.     Wang's Discrimination Claims Are Not Preempted

Contrary to Defendants' arguments, Wang's discrimination claims are not preempted by Section 301 of the LMRA.  A state law claim is preempted only when its resolution is

"substantially dependent upon or inextricably intertwined with analysis of the terms of a CBA…." *Whitehurst v. 1199SEIU United Healthcare Workers E*., 928 F.3d 201, 206 (2d Cir. 2019) ("Whitehurst") (internal quotations omitted).  Thus, when "a plaintiff covered by a CBA asserts legal rights *independent* of that agreement, preemption does not occur." *Id*.

Here, Wang's right not to be placed on indefinite suspension, based on his gender, is a right that is derived entirely from state law and would exist whether or not he was a unionized employee protected by substantial labor law rights or instead an at-will employee not a member of a union. That is, even assuming that the Philharmonic could prevail on its contention that it did not need just cause to suspend Wang under the CBA, it nevertheless could not suspend Wang for a reason based on gender without violation New York's anti-discrimination statutes. *See Bryant v. Verizon Communications, Inc*., 550 F.Supp.2d 513, 529 (S.D.N.Y. 2008) ("[t]he right to be free from such discrimination arises from state law, not from the CBA, and it is a non-negotiable right.") (internal citation omitted).    Notably, the Philharmonic and the Union do not dispute that, if Wang were an at will employee indefinitely suspended because of his gender, such suspension would run afoul of state anti-discrimination laws.  But by then arguing that an otherwise meritorious discrimination claim by Wang is preempted by the CBA, the Philharmonic and the Union are essentially arguing that they have contracted, through the CBA, out of liability for what otherwise would be a valid discrimination claim under state law. But the Supreme Court has rejected the notion that employers can contract out of such liability.  "Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985).

To be sure, there are instances in which a state law claim is "inextricably intertwined" with a CBA.  For example, in *Whitehurst,* although the Second Circuit affirmed the dismissal of

the plaintiff's discrimination claim on pre-emption grounds, the reasons for that conclusion involved a factual context entirely different than this case.  As the Court explained, "[c]rucially, then, Whitehurst only alleges discriminatory treatment occurring *after* her termination."  Thus, because the question of "what post-termination rights Whitehurst had, if any—is inextricably intertwined with the CBA" her claim was preempted.  By contrast, Wang's discrimination claim does not depend on "post-suspension" discriminatory conduct, nor on any question other than a narrow one that exists entirely outside of the CBA:  under state anti-discrimination law, is an employer permitted to put an employee on paid but indefinite suspension for reasons grounded in gender?  The answer to that question is no, regardless of the extent to which the CBA between the Defendants requires just cause for a paid suspension.

In any event, even if there were some potential overlap between Wang's hybrid claim and his discrimination claims, the Court could avoid any need to interpret the CBA by first adjudicating the hybrid claim.   For example, if the Court were to grant judgment to Wang on his hybrid claim (which would necessary determine that Wang's suspension was a cognizable harm under the CBA) the assessment of the discrimination claims would merely require only a determination of whether the suspension was a function of discriminatory intent—a pure state law question that would not take the Court back to any need to interpret the CBA.  *See, e.g., Tomney,* 357 F. Supp. 2d 721 (on summary judgment, first evaluating plaintiff's 301/DFR hybrid claims, and then evaluating her NYSHRL and NYCHRL claims with a focus on proof of discriminatory motive.)

Ultimately Wang seeks to vindicate two distinct and independent sets of rights—those that flow from his agreements with his employer and his union under federal labor law, and those that flow from City and State anti-discrimination laws, which are independent of his contractual

rights.  *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) ("the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.").   Wang does not ask this Court to allow state law to dictate "the meaning intended by the parties" to the CBA "in adopting a particular contract phrase" or to do anything that could undermine federal "interests in interpretive uniformity and predictability" of labor disputes under federal law.  *Allis Chalmers*, 471 U.S. at 211.  Defendants, by contrast, essentially ask the Court to allow them "to exempt themselves from whatever state labor standards they disfavor[ ]."  *Id*. at 212.  Phil MOL at 13-15; Union MOL at 15-17.

### E.    Defendants' Other Arguments in Opposition to the Discrimination Claims Are Unavailing

Defendants argue that Wang failed to plead that similarly situated comparators were treated more favorably than he was.  Union MOL at 19; Phil MOL at 17-18.  However, that is patently wrong.  Wang plead that he and Muckey were the only two musicians singled out for suspension both in the wake of publication of the Article and later, in connection with the Investigations.  Compl. ¶ 11, 61, 131, 146.  He also pleads that, inasmuch as the Article contained previously adjudicated allegations and no new allegations, the Article gave the Philharmonic and the Union no basis to treat him any differently than any other musician in good standing, including female musicians in good standing.  Compl. ¶10.   In other words, the Article was not "material" for purposes of the similarly situated analysis.  *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (what "constitute[s] 'all material respects' will vary from case to case").  "'Whether two employees are similarly situated … presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss."  *Pothen v. Stony Brook University*, 211 F. Supp.3d 486, 495–96 (E.D.N.Y. 2016) (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 229–30.

Significantly, Defendants do not dispute that: (a) the Philharmonic has *never* suspended a musician without first receiving a report of misconduct before the suspension; (b) the Article created the (false) impression of a past accusation of misconduct against Wang by Kizer; (c) "strong feelings" about Wang were generated by the article which feelings were in turn a function of Wang's and Kizer's genders; and (d) the Philharmonic gave weight to those gender based "strong feelings" when it decided to impose the suspension. Together, all of these facts, which are generally undisputed, but at the very least plausible, create a legally permissible inference of discrimination and therefore require denial of the motion to dismiss based on any purported pleading deficiency.

The Philharmonic fares no better with its misleading contention that Wang was "under investigation." Phil MOL at 17. As noted above, the suspension was imposed before any decision was made to commence an investigation. Notably, Defendants each effectively admit that the orchestra's other musicians in good standing were "similarly situated" with respect to the investigations at the time of the suspension, but only Wang and Muckey—the only two men accused in an article of past misconduct against women—were suspended.

Finally, the Union argues in cursory fashion that *Martin v Curran* is fatal to Wang's "state law claims" without specifying which state law claims it means. Union MOL at 17-18. To the extent the Union intends that argument to extend to Wang's NYSHRL and NYCHRL claims, respectfully, it must be rejected. *Langford v. Int'l Union of Operating Engineers*, Loc. 30, 765 F. Supp. 2d 486 (S.D.N.Y. 2011) (holding that *Martin v Curran* only applies to tort and contract claims, not statutory claims). In sum, all of Defendants' challenges to the viability of Wang's discrimination claims fail, at least at this stage of the case, and should therefore be rejected.

43

**III.    BECAUSE THE MATERIAL FACTS ARE ALL UNDIPUSTED AND BECAUSE DEFENDANTS RELY ON INCORRECT LEGAL THEORIES TO RESIST WANG'S  HYBRID CLAIMS, HE IS ENTITLED TO SUMMARY JUDGMENT ON HIS HYBRID CLAIMS**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Though the movant bears a burden on a summary judgment motion, once the movant has demonstrated the absence of a genuine issue of material fact, the burden shifts to the party opposing summary judgment to show the opposite.  *Pennington v. D'Ippolito*, 855 F. App'x 779, 781 (2d Cir. 2021).  *Id.*  The non-moving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Defendants will be unable to satisfy that burden.

A.    **The Undisputed Facts**

There are no material facts relevant to Wang's hybrid claim that are in dispute, as is apparent from Defendants' motion papers.  That is, Defendants must concede, all of the following:

(1)    Wang is as a tenured member of the orchestra and a member of the bargaining unit covered by the collective bargaining agreement, and therefore *cannot be subjected to discipline without proof of misconduct constituting just cause.*

(2)    On April 13, 2024—one day after the negative magazine article about Wang was published online by New York Magazine, the Philharmonic suspended him, indefinitely.

(3)    The magazine article repeated old allegations, which had long been well known to the Philharmonic and which were part of the arbitration hearing that concluded in 2020 in Wang's favor.

44

(4)    Wang's recent suspension was not based on any misconduct by him.

(5)    The Philharmonic is currently conducting two investigations, one of which is a review of the Philharmonic's "workplace culture" and the second is the appointment of a lawyer to receive and examine any allegations of misconduct by any Philharmonic employees reported by anyone.

(6)    The Philharmonic did *not* make its April 13, 2024 decision to suspend Wang because of or based on the investigations:  both investigations were commenced and conceived by the Philharmonic *after* it carried out its decision to suspend Wang and neither investigation was initiated for the purpose of investigating any known or alleged misconduct *by Wang*.

(7)    The suspension is *indefinite and all-encompassing* in that it: (a) prevents Wang from playing in *any* Philharmonic concerts; (b) prohibits Wang from joining the Philharmonic for any rehearsals; (c) prohibits Wang from attending any meetings of the orchestra; (d) prohibits Wang from so much as entering David Geffen Hall (the Philharmonic's home) for any purpose without advance clearance by the Philharmonic's lawyers; (e) prohibited Wang from performing with the Philharmonic on its summer tours in China and Colorado; and (f) indefinitely resulted in the cancelation of Wang's performance of certain long scheduled orchestra solos.

(8)    On Monday, April 15, 2024, Sara Cutler, the Union's President, *without having conducted any investigation* into the cause or basis of Wang's recent suspension, publicly *endorsed* the suspension by calling it a "good first step[]" which "can't be the last."

45

(9)     A few days later, the Union formally refused to grieve or otherwise take action

with regard to the suspension by pointing to the pending "investigations"—first

announced by the Philharmonic *after* the suspension.

**B.     Defendants' Cannot Succeed in Avoiding Summary Judgment by Claiming that the Suspension Was Non-Actionable or by Arguing that the Union Acted Reasonably**

Defendants premise their motion to dismiss arguments on the notions that Wang's

suspension is not actionable because of his continuing receipt of salary and that the Union acted

reasonably in both publicly endorsing the suspension and in awaiting the result of

"investigations" before decision whether to challenge the suspension. But just the incorrectness

of those arguments requires denial of Defendants' motions to dismiss, their incorrectness

likewise requires the granting of Wang's summary judgment motion.  That is, given that

Defendants concede the material facts and will rest on same legal arguments to forestall

summary judgment, the incorrectness of those arguments will doom Defendants' opposition to

summary judgment.

But because the Philharmonic did not purport to base the suspension on just cause,

cannot impose the suspension in contravention of the binding 2020 arbitration decision, and

because it has no policies that permit indefinite suspensions based on mere magazine articles, the

suspensions constitute discipline, albeit arbitrarily imposed discipline, under well-established

law.  The Union's additional argument—that it was purportedly reasonable for it to await the

result of investigations that were *not specifically about Wang*, before taking any action to protest

what it seems to concede was an otherwise inarguably improper suspension, also lack merit.

Thus, just as the making of those incorrect arguments dooms Defendants' motions to

dismiss, Defendants likewise cannot forestall summary judgment on the hybrid claims with those

same arguments.  Respectfully, Wang's motion for summary judgment in his hybrid claims should be granted, incorporating into this Section III all the arguments and factual references in the Facts and Section I above.

## **CONCLUSION**

For all of the reasons stated, Defendants' motions to dismiss should be denied and Wang's motion for partial summary judgment should be granted.

Dated: New York, New York
       July 29, 2024

                                    Respectfully submitted,

                                    CARTER LEDYARD & MILBURN LLP

                        By:        */s/ Alan S. Lewis*
                                    Alan S. Lewis
                                    Karen E. Meara
                                    28 Liberty Street, 41st Floor
                                    New York, NY 10005
                                    (917) 544-2524
                                    lewis@clm.com
                                    meara@clm.com

                                    *Attorneys for Plaintiff Liang Wang*