UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------

LIANG WANG,

                    Plaintiff,

    v.

THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC., AND ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN FEDERATION OF MUSICIANS,

                    Defendants.

--------------------------------------------------------------------

1:24-cv-03356-AS

[rel. 1:24-cv-03348-AS, 1:24-cv-03987-AS]

**DEFENDANT THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC.'S RESPONSE TO LOCAL RULE 56(a)(1) STATEMENT OF PLAINTIFF LIANG WANG AND STATEMENT OF ADDITIONAL MATERIAL UNDISPUTED FACTS**

      Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant "The Philharmonic-Symphony Society of New York, Inc. a/k/a The New York Philharmonic Orchestra" (the "Society") submits the following Response to the Local Rule "56(a)(1)" Statement ("56.1 Statement") of Plaintiff Liang Wang ("Wang") (ECF 37) in connection with Wang's motion for partial summary judgment. The Society also provides its Statement of Additional Material Undisputed Facts below.

### RESPONSES TO WANG'S NUMBERED PARAGRAPHS

      1.    Wang has been employed since 2006 by Defendant, The Philharmonic-Symphony Society of New York ("the Philharmonic"). He has long been a tenured member of the orchestra and held the prestigious position of principal oboe. Complaint of Liang Wang dated May 1, 2024 (Doc. No. 1) ("Compl.") ¶19; Declaration of Liang Wang in Support of Motion for Partial Summary Judgment ("Wang Decl.") ¶1, Ex. A.

**Response**:  Portions of this statement are not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Wang has been employed since 2006 by the Society and that he holds a tenured position with the Orchestra as Principal Oboe.

2.      Wang is now, and has been at all relevant times, a member in good standing of the union that represents all musicians in the orchestra, Defendant Associated Musicians of Greater New York, Local 802, American Federation of Musicians ("Union" or "Local 802").  Compl. ¶¶19, 75.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Wang is a member in good standing of Local 802.

3.      Defendant Local 802 is a "labor organization" within the meaning of 29 U.S.C § 152 and is the exclusive bargaining representative between members of the orchestra, including Wang, and the Philharmonic.  Compl. ¶¶20, 76.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Local 802 is a "labor organization" within the meaning of 29 U.S.C § 152 and is the exclusive bargaining representative between members of the orchestra, including Wang, and the Philharmonic.

4.      The Philharmonic and the Union are parties to a collective bargaining agreement entitled "Trade Agreement" with an effective date of September 21, 2020 through September 20, 2024 (the "CBA").  Compl. ¶31; Wang Decl. Ex. I, Article II.

**Response**:  Admits.

5.      Mr. Wang is a "musician" as that term is used in the CBA.  Compl. ¶89.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Wang is a "musician" as that term is used in the CBA.

6.      In 2018, the Philharmonic undertook an investigation into specific allegations of misconduct by a musician named Cara Kizer against another musician, Matthew Muckey, relating to alleged events that occurred in Vail, Colorado in 2010 (the "Vail Investigation"). Compl. ¶¶26, 28.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that the Philharmonic undertook an investigation into specific allegations of misconduct by a musician named Cara Kizer against another musician, Matthew Muckey, relating to alleged events that occurred in Vail, Colorado in 2010, which Wang refers to as the "Vail Investigation."

7.      Wang was a witness in the Vail Investigation and was *not* accused by the Philharmonic of misconduct directed at Kizer in Vail or anywhere.  Compl. ¶¶15, 25, 30.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Wang was interviewed as a witness during the 2018 investigation of Kizer's allegations against Muckey and the Society did not accuse Wang of misconduct directed at Kizer in Vail or anywhere.

8.    During the Vail Investigation, a separate individual accused Wang of misconduct that allegedly occurred years before the events of 2010 that gave rise to Kizer's accusation against Muckey.  Wang denied the allegations.  Compl. ¶34.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that during the 2018 investigation, a an individual other than Ms. Kizer accused Wang of misconduct, and Wang denied the allegations.

9.    At the conclusion of the Vail Investigation, the Philharmonic terminated Muckey. The Philharmonic also terminated Wang for wholly separate reasons.  Compl. ¶30; *see* Declaration of Alan S. Lewis ("Lewis Decl.") Ex. E.

**Response**:  The Society does not dispute that at the conclusion of the 2018 investigation, the Society terminated Muckey and Wang based on separate allegations of misconduct.

10.    Article VII of the CBA provides that the Philharmonic may only discipline musicians "for just cause."  Compl. ¶32; Wang Decl. Ex. I, Article VII.

**Response**:  The Society refers to the document for its contents, and does not dispute that Article VII (E)(7) of the CBA states that the Society may take disciplinary measures in the event of the violation of any of the rules set forth in Article VII(E)(1)-(6) or "for other just cause."

11.    Article XV of the CBA between the Philharmonic and the Union expressly provides that, in the case of termination of a member, the Union may demand arbitration of the dismissal pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Society.  Such rules require joint selection of a neutral third party to arbitrate the dispute.  Article XV of the CBA further provides as follows:

> The decision of the Arbitrator shall be ***final and binding*** upon the
> Society, the Union and the individual Orchestra member involve….

Compl. ¶31; Wang Decl. Ex. I.

**Response**: The Society refers to the document for its contents. The Society does not dispute that Article XV(B) of the CBA includes the quoted language above.

12.    Local 802 grieved Wang's 2018 termination. Compl. ¶34.

**Response**: This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d). Without waiver of this objection, the Society does not dispute that Local 802 filed a grievance in connection with Wang's 2018 termination.

13.    Local 802 also grieved Muckey's 2018 termination. Compl. ¶31.

**Response**: This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d). Without waiver of this objection, the Society does not dispute that Local 802 filed a grievance in connection with Muckey's 2018 termination.

14.    Both grievances were submitted to arbitration pursuant to Article XV of the CBA then in effect. For reasons of convenience, the parties agreed to have a single arbitrator adjudicate the two otherwise distinct grievances. Compl. ¶31.

**Response**: This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d). Without waiver of this objection, the Society does not dispute that both grievances were submitted to arbitration pursuant to Article XV of the CBA then in effect, and the parties agreed to have a single arbitrator adjudicate the two grievances.

5

15.     The parties jointly selected Richard I. Bloch, as the neutral third party, and the arbitration was held over the course of eight months during 2019.  Twenty-two witnesses testified over 20 days, including Wang.  Compl. ¶34; Lewis Decl. ¶13.

**Response**: This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that the parties selected Richard I. Bloch as the neutral third-party arbitrator, the arbitration was held over the course of eight months during 2019, and twenty-two witnesses testified over 20 days, including Wang.

16.     In April 2020, arbitrator Bloch issued a decision determining that the Philharmonic had failed to meet its burden to show it had just cause to terminate Wang (or Muckey), and ordered both musicians reinstated and made whole, including restoration of seniority and all benefits, and back pay.  Compl. ¶35.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Arbitrator Bloch issued a confidential decision that sustained Muckey's and Wang's grievances, finding that "[t]he charges against Matthew Muckey and Liang Wang have not been supported by clear and convincing evidence. Nothing in this opinion should be read as concluding that all doubt has been removed concerning the actions of the grievants in this matter."  Arbitrator Bloch held that the Society failed to meet its "burden to provide evidence that clearly and convincingly supports the charges."  As stated in the confidential Award, Arbitrator Bloch ordered Plaintiff and Mr. Wang "to be reinstated and made whole for all contractual benefits lost, including full back pay and seniority.  Requests for additional remedies are denied."

finding that the Society failed to meet its "burden to provide evidence that clearly and convincingly supports the charges" and ordered Muckey "to be reinstated and made whole for all contractual benefits lost, including full back pay and seniority.  Requests for additional remedies are denied." (*See* Declaration of Howard Z. Robbins ("Robbins Decl.") ¶ 4.)

17.    The Philharmonic paid Wang all withheld wages and reinstated him (and Muckey), not only by restoring his salary and benefits, but also by restoring him to the performance and rehearsal schedule, commensurate with his peers.  Compl. ¶36; Wang Decl.  ¶11.

**Response**: This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that it paid Wang all withheld salary and benefits and reinstated him as a member of the Orchestra, including by scheduling him for performances and rehearsals; however, the Society is unable to respond further because Wang does not provide any detail about what the phrase "commensurate with his peers" means in this context, or provides any factual support for this contention.

18.    Since Wang's reinstatement in 2020 through April 12, 2024, Wang was performing, rehearsing and participating in other Philharmonic activities regularly, commensurate with his peers.  Compl. ¶38; Wang Decl. ¶11.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that from Wang's reinstatement in 2020 through April 12, 2024, paid performed, rehearsed and participated in the Society's activities on a regular basis; however, the Society is unable to respond further because Wang does not provide

any detail about what the phrase "commensurate with his peers" means in this context, or provides any factual support for this contention.

19.    On April 12, 2024, New York Magazine published an article online bearing the headline "A Hidden Sexual-Assault Scandal at the New York Philharmonic:  two musicians were fired for sexual misconduct.  Why are they back with the orchestra?" (the "Article").  The "two musicians" referred to are Muckey and Wang.  Compl. ¶37; Lewis Decl. ¶14, Ex. I.

**Response**:  Admits.

20.    The Article's focus was the alleged sexual assault of Cara Kizer in Vail, Colorado, in 2010.  Kizer's allegation was a subject of the binding arbitration, which the Article criticized. *Id.*

**Response**:  The Society refers to the Article for its contents.  The Society does not dispute that the Article focused on the alleged sexual assault of Kizer in Vail, Colorado in 2010, and the alleged assault was a subject of the binding arbitration. Wang's characterization of the Article as "criticiz[ing]" the arbitration is not a "fact" to which a response is required under Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

21.    Notably, the Article contained no new allegations, or no new facts relating to those allegations, that had not been fully vetted by the arbitrator.  Compl. ¶49.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

22.    On April 13, Wang's counsel, Alan S. Lewis, received a telephone call from Howard Z. Robbins, attorney for the Philharmonic, instructing that Wang should not come to rehearsals or performances until told otherwise.  Robbins referred to the Article when communicating this decision and did not specify any reason for the decision other than strong

reactions to the Article.  Robbins implied that the Philharmonic needed a few weeks to deal with public relations issues relating to the Article before again restoring Wang to his position.  Neither on April 13, nor subsequently, has the Philharmonic ever claimed that Wang was suspended for a reason that could constitute just cause.  Lewis Decl. ¶2.

> **Response**: The Society admits the first three sentences of the paragraph 22, but the Society disputes the last sentence of paragraph 23, which implies that Wang was ever "suspended" because Wang has not provide admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  The Society does not dispute that he has, at all times, Wang has been placed on paid leave pending investigations.  (*See* ECF 39-3.)

23.    On April 13, Gary Ginstling, who was at that time President and CEO of the Philharmonic, emailed members of the orchestra.  The email read in full:

> Dear NY Phil Colleagues,
>
> Please note that for the time being, Matthew Muckey and Liang Wang will not be at rehearsals or performances.
>
> Thank you,
>
> Gary

Compl. ¶41, Wang Decl. Ex. B.

> **Response**: The Society refers to the document for its contents, but does not dispute that the document includes the quoted language above.

24.    In an article published by the New York Times on April 15, 2024, titled "The Philharmonic Sidelines 2 Players It Tried to Fire for Misconduct" (the "April 15ᵗʰ Article"), it was reported as follows:

> *The Philharmonic said* that the players — the principal oboist, Liang Wang, and the associate principal trumpet, Matthew Muckey —

> would *not appear as the orchestra deals with the fallout from a New York magazine article* published on Friday.

Lewis Decl. Ex. J (emphasis added).

> **Response**:  The Society refers to the document for its contents, but does not dispute that the document includes the quoted language above.  The Society objects to the quoted language as hearsay offered for the truth of the matter, which does not constitute admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

25.    The April 15th Article also quotes Ginstling as acknowledging that the decision reinstating Mr. Wang (and Muckey) to the orchestra was made "through binding arbitration", with Ginstling then emphasizing that "binding is the key word."  Compl. ¶44; Lewis Decl. Ex. J.

> **Response**:  The Society refers to the document for its contents, but does not dispute that the following language appeared in the April 15th Article: "'The determination was through binding arbitration:' Mr. Ginstling said. 'Binding is the key word.'" (*See* ECF 39-10.)

26.    The April 15th Article also quotes the Philharmonic's orchestra committee, a division of the Union that pursuant to Section XI of the CBA represents "musicians" (as that term is defined therein), Wang Decl. Ex. I, as stating that "we believe Cara" and asserting "we don't believe these are isolated incidents involving … Liang Wang."  Compl. ¶45; Lewis Decl. Ex. J.

> **Response**:  The Society refers to the document for its contents, but does not dispute that the following language appears in the April 15th Article: "The orchestra committee, which represents players, said in a statement that it is 'the overwhelming sentiment from the orchestra that we believe Cara' and that 'we don't believe these are isolated incidents involving Matt Muckey and Liang Wang.'" (*See* ECF 39-10.)

27.     The April 15th Article also reported that Union President Sara Cutler, "said in a statement on Monday that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being 'are good first steps but they can't be the last'" and also said "As a woman ... I am horrified by what was in the story."  Compl. ¶44; Lewis Decl. Ex. J.

**Response**:  The Society refers to the document for its contents, but does not dispute that the April 15th Article contains the quoted language above.

28.     The April 15th Article also quoted Lewis as saying: "The Philharmonic decided that it would be best for Liang and the other musician to take a couple of weeks off while the Philharmonic manages the firestorm that the distorted article ignited."  Lewis Decl. Ex. J.

**Response**:  The Society refers to the document for its contents, but does not dispute that the April 15th Article contains the quoted language above.

29.     On April 17, Robbins, notified Lewis by email stating "Please note that **the New York Philharmonic is changing its program and Mr. Wang will not be appearing in the concerts where he was to be a soloist beginning May 8.**"  Lewis Decl. Ex. A (bold in original).

**Response**:  The Society refers to the document for its contents, but does not dispute that the email contains the quoted language above; however, the bolded texted above is not bolded in the cited evidence.

30.     On April 18, Ginstling sent an email to the entire New York Philharmonic Community that read in full as follows:

> Dear New York Philharmonic Community,
>
> The details revealed in the New York magazine article are horrifying to me personally, and, while not yet a year into my tenure as President and CEO of the New York Philharmonic, I am deeply concerned about not only the specifics but broader issues of institutional culture. Therefore, I have taken the following immediate steps:

1. At my direction, the Philharmonic has engaged Katya Jestin, co-managing partner of the law firm Jenner & Block, to launch an independent investigation into the culture of the New York Philharmonic in recent years. Katya has extensive experience handling sexual misconduct investigations and related matters involving extremely sensitive interviews. I am empowering Katya to look at everything and to leave no stone unturned, including any new allegations as they are reported. I pledge to share the recommendations with our board, our staff and our musicians as well as with the general public. More details on the process will be coming shortly.

2. For the time being, musicians Matthew Muckey and Liang Wang are not being assigned to any Philharmonic activity as we work through this process, and a decision about their future with the New York Philharmonic will be made in due course.

3. The New York Philharmonic is preparing to seek changes to its audition and tenure review policies and procedures to provide more transparency, oversight and equity to the process. We look forward to working with Local 802 and our musician colleagues on these changes. Nothing is more important than the culture of our orchestra and the safety of our musicians and staff, and it is only through this process that we will build the kind of vibrant and inclusive culture we all want.

Thank you,

Gary Ginstling

Compl. ¶¶49, 50; Wang Decl. Ex. C.

**Response**: The Society does not dispute that Ginstling sent an email to the entire New York Philharmonic Community that included the quoted language above, however, the cited evidence (Wang Decl. Ex. C, ECF 38-3) is a Facebook post, not an email.

31.    On April 19, 2024, Ginstling emailed the Philharmonic's musicians, notifying them that the Philharmonic had retained attorney Tracey Levy, to "investigate new allegations of sexual harassment, violence and/or abuse alleged to have been committed by any musicians employed by

the Philharmonic." Thus, the Levy investigation did not exist at the time the Philharmonic suspended Wang. Wang Decl. Ex. D.

**Response**: As to the first sentence of paragraph 31, the Society does not dispute that Ginstling emailed the Philharmonic's musicians on April 19, 2024 and refers to the email for its contents. The Society does not dispute that the email, in part, states: "The New York Philharmonic has retained an investigator to investigate new allegations of sexual harassment, violence and/or abuse alleged to have been committed by any musicians employed by the Philharmonic." (*See* ECF 38-4.) As to the second sentence of paragraph 31, Wang has failed to substantiate this statement admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d) supporting his assertion that the Philharmonic "suspended" him. The April 19 email from Ginstling makes no reference to Wang or a "suspension." By sharp contrast, the undisputed evidence demonstrates that the Society informed Wang that it would continue to pay him but would not assign him to rehearse or perform for the time being and that the Philharmonic placed Plaintiff on paid administrative leave pending investigation. *See, e.g.,* ECF 39 ¶ 2 (On April 13, 2024, Society Counsel advised Plaintiff Counsel "Wang was not to report to performances or rehearsals for the time being"); ECF 38-2 (4/13/24 Email from Society CEO to Orchestra) ("Please note that for the time being Matthew Muckey and Liang Wang will not be at rehearsals or performances"); ECF 39-1 (4/17/24 Email from Society Counsel to Plaintiff Counsel) ("Please note that the New York Philharmonic is changing its program and Mr. Wang will not be appearing in the concerts where he was to be a soloist beginning May 8."); ECF 38-3 (4/18/24 Posting by Society CEO to Philharmonic Community) ("At my direction, the Philharmonic has engaged Katya Jestin, co-managing partner of the law firm Jenner &

Block, to launch an investigation into the culture of the New York Philharmonic…For the time being, musicians Matthew Muckey and Liang are not being assigned to any Philharmonic activity as we work through this process…"); ECF 39-3 (5/21/24 Email from Society Counsel to Plaintiff Counsel) ("Please note that your client, Mr. Wang, remains on *paid leave pending the completion of the Philharmonic's ongoing investigation . . .*") (emphasis added).  A determination as to whether Plaintiff's placement on paid administrative leave constitutes discipline under the CBA is a legal rather than factual issue.  Moreover, Plaintiff's unsupported supposition that the Levy investigation did not exist at the time of his "suspension" is not a "fact" which requires a response under Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  The April 19, 2024 email cited in support of paragraph 31 simply states that the Society retained an investigator, and it  does not indicate the date of such retention.

32.     On April 19, 2024, Robbins emailed further direction to Lewis as follows:

> … [T]o add a detail to my prior communication that **Mr. Wang should not report to rehearsals or performances until further notice, I would like to clarify that this means they should not come into David Geffen Hall.**  If your client would like access to the building for some reason, please contact me about making such arrangements.

Compl. ¶51; Lewis Decl. Ex. B (bold in original).

**Response**:  The Society refers to the document for its contents, but does not dispute that the email contains the quoted language above; however, the bolded texted above is not bolded in the cited evidence**.**

33.     On April 17, 2024, Lewis sent a letter to Local 802 counsel Susan Davis requesting a meeting with Local 802 or its counsel in light of President's Cutler's public statement.  The letter

stated that "[b]y endorsing Liang[] Wang's suspension in the statement made to the New York Times, based on a misimpression gained from a flawed magazine article – and about a matter in which the Union has both *full access to the actual facts* and a *clear legal duty to Mr. Wang* as a union member – the Union has done a grave disservice to Mr. Wang and his reputation." Compl. ¶63; Lewis Decl. ¶9, Ex. E; Singer Decl. Ex. F.

> **Response**: The Society refers to the document for its contents, but does not dispute that Mr. Lewis, counsel for Wang, sent a letter to Local 802 counsel Susan Davis, which includes the quoted language above.

34.    On April 18, 2024, Davis sent a letter to Lewis identifying an employee of the Union as the specific person to whom Wang's request for the Union to protest the suspension should be made.  Compl. ¶63; Lewis Decl. ¶10, Ex. F; Singer Decl. Ex. G.

> **Response**:  The Society refers to the document for its contents, but does not dispute that Ms. Davis sent a letter to Mr. Lewis identifying an employee of the Union as the specific person to "reach out to" if Wang "objects to the Philharmonic's action," and disputes that the letter refers to a "suspension," which it does not.

35.    On April 19, 2024, Lewis sent a letter to Davis and the Union representative identified in the April 18th Davis letter, demanding that the Union seek enforcement of the Arbitration Award and/or otherwise take action in connection with the Philharmonic's indefinite suspension of Wang.  Compl. ¶63; Lewis Decl. ¶11, Ex. G; Singer Decl. Ex. H.

> **Response**:  The Society refers to the document for its contents, but does not dispute that Mr. Lewis sent Ms. Davis and Dan Point a letter on April 19, 2024.  The Society disputes the Society placed Wang on "indefinite suspension," which is not supported by the undisputed record evidence.  (*See, supra,* Society's Response to ¶ 31.)

36.    By reply letter of Davis to Lewis dated April 26, 2024, Local 802 rejected Wang's request to enforce the Arbitration Award or otherwise protest or grieve his suspension.  Among other things, Davis stated that "the NY Philharmonic engaged an investigator to determine whether there were any new or different allegations of sexual misconduct by any members of the Orchestra, including your client.  Local 802 has determined to await the outcome of that investigation before determining how to proceed."  Compl. ¶63; Lewis Decl. ¶12, Ex. H; Singer Decl. Ex. I.

**Response**:  The Society refers to the document for its contents, and admits that Ms. Davis sent a letter to Mr. Lewis, dated April 26, 2024.  The Society disputes that Local 802 rejected Wang's request to enforce the Arbitration Award or otherwise protest or grieve his suspension, but does not dispute that Local 802 stated, among other things, that "the NY Philharmonic engaged an investigator to determine whether there were any new or different allegations of sexual misconduct by any members of the Orchestra, including your client.  Local 802 has determined to await the outcome of that investigation before determining how to proceed here."  The Society does not dispute that the letter also noted as follows, in material part:  "The award certainly does not give Mr. Wang a guarantee of lifetime employment regardless of whether new allegations of wrongdoing or different circumstances arise." (*See* ECF 39-8, ECF 20-9.)

37.    To date the Union has taken no steps to enforce the Arbitration Award in connection with Wang's ongoing suspension, to challenge Wang's suspension on that basis or based on the absence of just cause, or otherwise to demand that Wang be reinstated.  Compl. ¶¶12, 63, 81, 83.

**Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Local 802 has not enforced the Arbitration Award in

connection with Wang's ongoing placement on leave with pay, and incorporates its response to paragraph 36, as though fully set forth herein.

38.    By declining to take any steps to protest Wang's suspension, the Union deprived Wang of the rights he has by virtue of the CBA, including a right to arbitration of his grievance for wrongful termination before a neutral arbitrator.  By refusing to take any action for Wang, the Union left Wang with only one legal option to challenge his unlawful suspension—the initiation of this lawsuit, which requires him to fully bear the cost of his representation by himself—as contrasted with funding by the Union of Union counsel in an arbitration.

**Response**:    This statement is argument and contains legal conclusions and characterizations that do not constitute "facts" as to which a response is required under Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  This statement is also not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  The Society disputes the characterization of "Wang's suspension" and incorporates its response to paragraph 31, as though fully set forth herein.

39.    On May 21, 2024, Robbins sent Lewis an email that read in full:

> Please note that your client, Mr. Wang, remains on a paid leave pending the completion of the Philharmonic's ongoing investigation into allegations of sexual harassment or otherwise inappropriate conduct by musicians or other current employees of the Philharmonic.  As that investigation has not yet been completed, the Philharmonic will not be sending Mr. Wang to China or to China to perform given that the Philharmonic must soon finalize rosters and logistics for both trips.  I will contact you following completion of the investigation.

Lewis Decl. ¶5, Ex. C.

**Response**:  The Society refers to the document for its contents, and does not dispute that the email contains the quoted language above.

40.    The May 21st email was the first writing known to Wang in which the Philharmonic characterized Wang's suspension as "paid leave pending the completion" of the Philharmonic's investigation focused on misconduct by any musician and any current employee. Lewis Decl. ¶6.

> **Response**:  This statement constitutes hearsay offered for the truth of the matter, which does not constitute admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that it did not provide a written statement to Wang or his counsel that he was placed on "paid leaving pending the completion" of the Society's investigation focused on misconduct by any musician and any current employee prior to May 21, 2024. The Society disputes the characterization in paragraph 40 that Wang was placed on "suspension," and incorporates its response to paragraph 31, as though fully set forth herein.

41.    Wang and Muckey are the only two members of the Philharmonic barred from rehearsals, performances, meetings, and other Philharmonic activity during the pendency of the Levy investigation and the "cultural assessment."  Compl. ¶53.  Neither the cultural assessment or Levy investigation were in existence, at the time that the Philharmonic suspended Wang.  *See* supra ¶31, Compl. ¶50,

> **Response**:  The statements are not supported by citations to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Wang and Muckey are the only two members of the Society that have been placed on leave with pay pending the ongoing investigations, and does not dispute that the investigations commenced after April 13, 2024, which was the date Wang and Muckey were initially placed on leave with pay.

42.    On May 28, 2024, Lewis emailed Robbins to request that Wang be permitted to attend a meeting for orchestra members described as an update on the Jenner and Block "cultural assessment".    Robbins replied, "Mr. Wang should not attend that meeting tomorrow."    Lewis replied:

> I respectfully ask that you provide a reason for prohibiting Mr. Wang from attending. If necessary he would agree to listen and not speak and to sit anywhere he is directed. In the alternative and at minimum, the Philharmonic should provide Zoom access to the meeting so that Mr. Wang may listen. He is as justifiably interested in the Philharmonic's culture as any other member of the orchestra.

Lewis received no response from Robbins.  Lewis Decl. ¶¶7, 8.

**Response**:  The Society refers to the document for its contents, and does not dispute that Mr. Lewis emailed Mr. Robbins on May 28, 2024, and the documents contain the quoted language above.  The Society does not dispute that Mr. Robbins did not directly reply to the email from Mr. Lewis quoted above.

43.    The CBA acknowledges that musicians may have individual agreements with the Philharmonic.  Wang Decl. Ex. I, e.g., Article III(C)(2).

**Response**:  The Society refers to the document for its contents, but does not dispute that the CBA acknowledges that musicians may have individual agreements with the Society.

44.    Wang has an individual agreement, signed by the Philharmonic with a term of September 18, 2023 to September 15, 2024.  Wang Decl. Ex. A.

**Response**:  The Society refers to the document for its contents, but does not dispute that Wang was provided an individual agreement covering the term of September 18, 2023 to September 15, 2024 that was signed by the Philharmonic.

45.    That 2023-2024 individual agreement incorporates by reference an agreement dated March 2013 (together, the "Individual Agreement").  *Id.*

**Response**:  The Society refers to the document for its contents, but does not dispute that the 2023-2024 individual agreement to which Wang refers incorporates by reference an agreement dated March 2013.

46.    The Individual Agreement includes the following language:

> The Society considers you a premiere member of the orchestra and will use its best efforts to raise your profile and is committed to schedule a minimum of 6 solo performances every three seasons and will use its best efforts to provide additional solo opportunities.

*Id.*

**Response**:  The Society refers to the document for its contents, but does not dispute that the March 6, 2013 individual agreement between Wang and the Society includes the quoted language above.

47.    The Individual Agreement also provides that Wang is to receive "additional remuneration" for "solo concerto appearances."  *Id.*

**Response**:  The Society refers to the document for its contents, but does not dispute that the March 6, 2013 individual agreement between Wang and the Society states that Wang may receive "additional renumeration for any solos which may be performed."

48.    Throughout the term of the Individual Agreement up until April 13, 2024, the Philharmonic had been performing its obligations under the Individual Agreement by, (i) paying Wang at the rate specified in the Individual Agreement, and (ii) placing Wang on the schedule for solo concerto performances, including a series of solo performances of the Mozart oboe concerto that had been scheduled to begin starting on May 8, 2024.

**Response**:   This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

49.     Wang continues to be paid at the rate specified in the Individual Agreement. Wang Decl. ¶11.

**<u>Response</u>**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d) because paragraph 11 of Wang's declaration does not support the statement in this paragraph.  Without waiver of this objection, in the event Wang intends to rely upon paragraph 12 of his declaration for this statement, the Society does not dispute that Wang continues to be paid at the rate specified in the March 6, 2013 individual agreement between Wang and the Society.

50.     All of Wang's previously scheduled solo appearances during the period from April 13, 2024 through the present have been cancelled, including three concerto appearances.  Compl. ¶58; Wang Decl. ¶12.

**<u>Response</u>**: This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).  Without waiver of this objection, the Society does not dispute that Wang has not been assigned to perform during his paid leave pending investigations, which began on April 13, 2024, including three concerto appearances during that time.

51.     Wang has not been paid for the cancelled concerto appearances that have been on the schedule for over a year.  Wang Decl. ¶11.

**<u>Response</u>**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d) because paragraph 11 of Wang's declaration does not support the assertion in this statement.

52.     On April 29, 2024, Marc Neikrug, the director of the Santa Fe Chamber Music Festival, and composer of the arrangement of the Mozart Oboe Concerto Mr. Wang had been

scheduled to perform on May 8, notified Mr. Wang that he had no choice but to find "another place for his piece."  Compl. ¶72.

    **Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

53.    On April 15, 2024, the Taipei Music Academy and Festival informed Mr. Wang that it was canceling Mr. Wang's participation in the festival.  Compl. ¶69.

    **Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

54.    On April 17, 2024, the ARD International Music Competition notified Mr. Wang that it was suspending its collaboration with Mr. Wang, who was scheduled to serve on the jury for the 2024 competition.  ARD cited as a reason for the suspension the fact that "the Philharmonic had released you from your duties."  Compl. ¶70.

    **Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

55.    On April 19, 2024, the Manhattan School of Music publicly announced the suspension of Mr. Wang as a member of MSM's precollege faculty.  Compl. ¶71.

    **Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

56.    On April 30, 2024, the Chinese American Arts Council informed Mr. Wang that it was cancelling his contract as Artistic Director to the Council in connection with New York Chinese Film Festival.  Compl. ¶73.

    **Response**:  This statement is not supported by a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and Local Civil Rule 56.1(d).

**THE SOCIETY'S STATEMENT OF ADDITIONAL MATERIAL UNDISPUTED FACTS**

57.    Wang did not sign the individual agreement between himself and the Society covering the period of September 18, 2023 through September 15, 2024, and which states in material part:  "This Agreement, when signed below by all parties, will be binding upon Society and Musician for 2023-24 Season."  (*See* ECF 38-1.)

58.    In 2018, the Society engaged Judge Barbara Jones to investigate allegations of sexual misconduct involving Matthew Muckey relating to events that allegedly occurred in 2010 with Cara Kizer, which included, as summarized in the confidential Arbitration Award by Arbitrator Richard I. Bloch (the "Award"), "22 interviews, including those of the grievants and the complainants, as well as review[ed] extensive documentary evidence during the course of her investigation that spanned some six months in early 2018."  (*See* Robbins Decl. ¶ 2.)

59.    As stated in the confidential Award, based on Judge Jones's investigation and her report, the Society terminated Plaintiff based on its conclusion that he "committed multiple sexual assaults against two former probationary musicians of the Philharmonic, Cara Kizer, in 2010, and [another female musician], in 2008" and terminated Mr. Wang based on the "report that…, also a former Philharmonic musician, had reported being raped by Mr. Wang in 2006." (*See* Robbins Decl. ¶ 3.)

60.    Arbitrator Bloch sustained Mr. Muckey's and Mr. Wang's grievances, finding that "[t]he charges against Matthew Muckey and Liang Wang have not been supported by clear and convincing evidence. Nothing in this opinion should be read as concluding that all doubt has been removed concerning the actions of the grievants in this matter." Arbitrator Bloch held that the Society failed to meet its "burden to provide evidence that clearly and convincingly supports the charges."  As stated in the confidential Award, Arbitrator Bloch ordered Plaintiff and Mr. Wang

"to be reinstated and made whole for all contractual benefits lost, including full back pay and seniority. Requests for additional remedies are denied." (*See* Robbins Decl. ¶ 4.)

61.     On or about April 17, 2024, the Society retained an investigator, Tracey Levy, to consider allegations of workplace misconduct involving the Society's orchestra members because the Society became aware, shortly following publication of the Article on April 12, 2024, that there were individuals who wanted to share additional allegations of misconduct by Wang and Muckey that were not discussed in the Article. (Robbins Decl. ¶ 5.)

62.     The April 12, 2024 *Vulture* magazine article (the "Article") did not address allegations of misconduct concerning any other orchestra member. (*See* ECF 39-9.)

63.     The investigation regarding allegations of workplace misconduct involving orchestra members conducted by Tracey Levy remains ongoing. (*See* Robbins Decl. ¶ 6.)

64.     Pursuant to the workplace misconduct investigation, Ms. Levy interviewed Wang on August 9, 2024, and she provided Wang (at his request) an opportunity to produce additional evidence for her consideration. (*See* Robbins Decl. ¶ 6.)

65.     Ms. Levy was scheduled to interview Wang on September 10, 2024, but due to the unavailability of the Local 802 representative who Wang requested to be present, the interview is scheduled to be held on September 27, 2024. (*See* Robbins Decl. ¶ 6.)

66.     It is the Society's understanding that the investigation regarding allegations of workplace misconduct conducted by Ms. Levy is near completion. (*See* Robbins Decl. ¶ 6.)

Dated: New York, New York
       September 18, 2024

*/s/ Howard Z. Robbins*
Howard Z. Robbins (Lead Trial Counsel)
Joshua S. Fox
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone: 212.969.3000
Facsimile: 212.969.2900
hrobbins@proskauer.com
jfox@proskauer.com

*Attorneys for Defendant The Philharmonic-Symphony Society of New York, Inc.*