UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK

------------------------------------------------------------------ X

LIANG WANG,                                          :
                                                    :    Case No.
                              Plaintiff,            :    1:24-cv-03356 (AS)
                                                    :
              vs.                                   :    [rel. 1:24-cv-03348 (AS)]
                                                    :
THE PHILHARMONIC-SYMPHONY SOCIETY                   :    **ORAL ARGUMENT REQUESTED**
OF NEW YORK, INC. AND ASSOCIATED                    :
MUSICIANS OF GREATER NEW YORK, LOCAL                :
802, AMERICAN FEDERATION OF MUSICIANS,              :
                                                    :
                              Defendants.           :

------------------------------------------------------------------ X


### PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT


CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, NY 10005
(917) 533-2524
lewis@clm.com
meara@clm.com

*Attorneys for Plaintiff Liang Wang*


*Of Counsel,*
    Alan S. Lewis
    Karen E. Meara

<u>**TABLE OF CONTENTS**</u>

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

I.  Defendants Admit Every Material Fact, Including that the Philharmonic Has Barred Wang from the Workplace for Six Months and Counting, the Suspension Was Imposed Because of the Publication of a Magazine Article About Old Allegations the Philharmonic Failed to Prove in an Arbitration, and that No New Allegations of Misconduct Against Wang Existed When the Suspension Was Imposed ............................ 2

II.  Defendants Fail to Meet Their Burden to Create a Triable Issue of Fact ................................ 6

III.  The Philharmonic Had No Authority Under the CBA to Remove Wang from All Philharmonic Activity.  Defendants' Contrary Claim Is Conclusory and Not Grounded in Any Provision of the CBA ...................................................................... 10

    A.  There Is No Dispute that the Award Was Final and Binding ........................................... 10

    B.  The Philharmonic Violated the CBA When It Removed Wang from All Philharmonic Activity Without Just Cause or a Legitimate Pretext to Place Him on "Paid Administrative Leave" ........................................................ 11

IV.  The CBA, as It Has Been Consistently Interpreted by the Parties, Includes a Right to Perform, Notwithstanding Defendants' Sudden Claims to the Contrary ............................... 14

V.  Defendants Do Not Dispute that Wang's Individual Agreement Requires Solos, that His Solos Were Canceled, and that He Has Not Been Paid ......................................... 15

VI.  The Union Breached Its Duty of Fair Representation to Wang ................................. 16

    A.  The Union's Refusal to Take Up Wang's Grievance or Otherwise Object to His Indefinite Removal from All Philharmonic Activity Under the Circumstances Was at Best Arbitrary and at Worst, Discriminatory and in Bad Faith ................ 17

VII.  There Is a Clear Causal Connection Between the Union's Actions (and Inactions) and Wang's Harm ................................................................................ 20

VIII.  Even if the Court Were to Deny Wang's Motion at this Juncture, It Should Reject Defendants Invitation to Grant Them Summary Judgment, *Sua Sponte* ........................ 20

CONCLUSION ................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alston v. Int'l Ass'n of Firefighters, Loc. 950,*
    998 F.3d 11 (1st Cir. 2021) ..................................................................................8

*Bellmore-Merrick Cent. High Sch. Dist., Town of Hempstead v. Bellmore-Merrick United*
    *Seconday Tchrs., Inc.,*
    85 Misc. 2d 282 (Sup. Ct., Nassau Cty. 1975) ...............................................12, 15

*Biberaj v. Pritchard Industries, Inc.,*
    2009 WL 10738222 (S.D.N.Y. Sept. 28, 2009) .................................................18

*Cappelli v. Jack Resnick & Sons, Inc.,*
    2014 WL 4188084 (S.D.N.Y. Aug. 22, 2014) ...................................................18

*Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers,*
    34 F.3d 1148 (2d Cir.1994)................................................................................16

*Hicks v. Baines,*
    593 F.3d 159 (2d Cir. 2010) .........................................................................7, 12

*Jaramillo v. Weyerhaeuser Co.,*
    536 F.3d 140 (2d Cir. 2008) ...............................................................................6

*Little v. City of New York,*
    487 F. Supp. 2d 426 (S.D.N.Y. 2007)..................................................................8

*Maidman v. O'Brien,*
    473 F. Supp. 25 (S.D.N.Y. 1979)......................................................................11

*Oakland University,*
    2019 BNA LA 51 (Scales, 2019) .......................................................................13

*Ramey v. Dist. 141 Int'l Ass'n of Machinists & Aerospace Workers,*
    378 F.3d 269 (2d Cir. 2004) .........................................................................18, 19

*Scotto v. Almenas,*
    143 F.3d 105 (2d Cir. 1998) ...........................................................................6, 8

*Spellacy v. Air Line Pilots Ass'n-Int'l,*
    156 F.3d 120 (2d Cir. 1998) ..............................................................................19

*Tennessee Valley Auth. v. Salary Pol'y Emp. Panel,*
    1989 WL 241715 (E.D. Tenn. Sept. 20, 1989) ................................................13

*Thomas v. Little Flower for Rehab. & Nursing,*
  793 F. Supp. 2d 544 (E.D.N.Y. 2011) ............................................................................. 18

*United Nurses and Allied Professionals, Local __,*
  2021 BNA LA 193 ............................................................................................11, 13, 16

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,*
  363 U.S. 574 (1960) ....................................................................................... 12, 15

*Weinstock v. Columbia Univ.,*
  224 F.3d 33 (2d Cir. 2000) ................................................................................. 7, 9

## Statutes & Other Authorities

29 USC 185(b) ......................................................................................................... 19

Fed. R. Civ. P. 56(c)(1) ...............................................................................................6

Fed. R. Civ. P. 56(e)(2) ...............................................................................................2

## INTRODUCTION

Defendants' submissions in opposition to summary judgment reveal that there are no material factual disputes standing in the way of Wang's motion. As Defendants' submissions make clear, their reasons for opposing summary judgment boil down to the notion that, so long as the Philharmonic continues to pay a tenured musician, it has carte blanche to indefinitely suspend him, without giving *any* reason grounded in the musician's alleged misconduct and without any legal recourse available to him during his suspension of unspecified and unknown duration. But to the contrary, the CBA does *not* give the Philharmonic such arbitrary and unchecked power over the careers of the unionized members of its orchestra, as is evidenced by Defendants' longstanding course of conduct. While the Philharmonic and the Union could in theory have agreed in the CBA to drastically alter the generally accepted definition of a cognizable employment sanction such as to make it limited only to circumstances in which salary is also withheld, the Philharmonic and the Union are unable to point to any provision of the CBA that does that. Thus, the Philharmonic and the Union pivot to the even more dubious notion that Wang has not been suspended, but only placed on "paid administrative leave" for the purpose of an investigation into "whether the misconduct occurred." *See, e.g.,* ECF#50 at 11-12. The fatal problem with this argument is that Wang was suspended from all Philharmonic activities, including entering its workplace, not as the result of a claim of misconduct, but instead, as the Philharmonic puts it elsewhere, because of "negative attention brought by the Article" published in New York magazine about a previous accusation that had been adjudicated in a binding arbitration in Wang's favor. ECF#50 at 17. In short, the suspension is nothing but renewed punishment for the old allegations of misconduct rejected by the arbitrator in 2020. This is a patently impermissible action under the CBA, a conclusion which the Philharmonic fails to defeat with its absurd position that, although it concededly cannot take action against an employee based on claims of alleged misconduct rejected by an arbitrator, it can somehow make an end run around that principle by citing instead how the public initially reacted to a new magazine article about the very same previously arbitrated matter. In the end, the conclusion is

compelling that Wang has suffered a cognizable employment harm, imposed without pretense of a lawful basis, and that summary judgment should therefore be awarded to Wang on his hybrid claim.

**I.**     **Defendants Admit Every Material Fact, Including that the Philharmonic Has Barred Wang from the Workplace for Six Months and Counting, the Suspension Was Imposed Because of the Publication of a Magazine Article About Old Allegations the Philharmonic Failed to Prove in an Arbitration, and that No New Allegations of Misconduct Against Wang Existed When the Suspension Was Imposed**[1]

Defendants do not meaningfully dispute any fact material to the motion's resolution. They concede that: (1) as of April 12, 2024, Wang was a tenured member of and principal oboe for the orchestra and in good standing (ECF#48,¶¶1,2;#52,¶¶1,2); (2) although the Philharmonic attempted to terminate Wang's employment in 2018 over allegations that Wang vigorously disputed, Wang (with the Union's support) prevailed in a binding arbitration (the "Award") (ECF#48,¶¶16;#52,¶16); (3) the Philharmonic then fully restored Wang to the performance and rehearsal schedule (as well as the payroll) (ECF#52,¶17;#48,¶18); and (4) both prior to 2018 and after the Award, Wang regularly performed and rehearsed with the orchestra (ECF#52,¶18;#48,¶18). They also admit that: (5) the Philharmonic never accused Wang of misconduct in connection with allegations made by Cara Kizer against Muckey (the "Vail Allegations"), which in any event were adjudicated against the Philharmonic in the same arbitration. (ECF#52,¶7;#48,¶7); *see also id.* at ¶16.

Nor do Defendants dispute that: (7) Wang's employment status completely changed *just one day* after New York Magazine's April 12, 2024 online publication of the article titled: "A Hidden Sexual-Assault Scandal at the New York Philharmonic: two musicians were fired for sexual misconduct. Why are they back with the orchestra?" The Article focused on the Vail Allegations, (ECF#52,¶20;#48,¶20) including the subsequent police investigation, the Philharmonic's decision to terminate Muckey over that allegation eight years later, and the arbitration that ended in Muckey and Wang's favor. *See* ECF#39-

---

[1] Defendants object that Wang's citations to his complaint are "inadmissible" because the complaint is not verified. Nevertheless, they admit most statements that cite to the complaint. Although the court would be well within its authority to grant the motion notwithstanding that technical defect, *see* Fed. R. Civ. P. 56(e)(2), in an abundance of caution, Wang submits a motion to amend for the limited purpose of adding a verification.

9 (Lewis Decl. Ex. I). The Article's text and graphics gave the clear but false impression that not only Muckey, but also Wang had been accused of misconduct relating to and had been terminated because of the Vail Allegations, *id.*, a misimpression repeated in follow up stories by other media outlets, including the New York Times (*id.* Ex. J).

On April 13, 2024, Wang's counsel was told by the Philharmonic's counsel, by phone, that Wang should not report to performances or rehearsals until told otherwise. ECF#52,¶22. The reason stated was to provide the Philharmonic time to deal with public relations relating to the Article. *Id.* (admitting "Robbins referred to the Article when communicating this decision [to bar Wang from performances and rehearsals] and did not specify any reason for the decision other than strong reactions to the Article. Robbins implied that the Philharmonic needed a few weeks to deal with public relations issues relating to the Article before again restoring Wang to his position."); *see also* ECF#48,¶22 (Union neither admitting nor denying). However, it quickly became apparent that what had been *presented* by Robbins as a temporary non-assignment was something much more calcified; the Philharmonic publicly announced on April 18, 2024 that Wang (and Muckey) would not perform "for the time being" and that "a decision about their future with the New York Philharmonic will be made in due course." (ECF#52,¶30; #48,¶30)(admitting content of April 18, 2024 announcement). That announcement also indicated that the Philharmonic had engaged a lawyer to investigate "the culture of the New York Philharmonic in recent years." ECF#52,¶30;#48,¶30. The following day, the Philharmonic informed musicians that it had retained a second investigator to "investigate new allegations of sexual harassment, violence and/or abuse alleged to have been committed by any musicians employed by the Philharmonic." (ECF#52,¶31;#48, ¶31)(admitting quoted language was sent to musicians on April 19, 2024). Earlier that week, the Philharmonic's CEO was quoted in the New York Times stating that the Article "prompted a lot of strong feelings." ECF#39-10. While Defendants dispute some of Wang's characterizations of these documents, they do not dispute their existence or their contents.

The totality of communications Wang or his counsel received from the Philharmonic after April 12, 2024 regarding his suspension/leave are not disputed:

- April 13: the phone call from Robbins to Lewis described above (ECF#52,¶22);

- April 17: an email from Robbins to Lewis stating:

  Please note that the New York Philharmonic is changing its program and Mr. Wang will not be appearing in the concerts where he was to be a soloist beginning May 8." (Lewis Decl. ¶3, Ex. A);

- April 19: an email from Robbins to Lewis stating:

  Also, to add a detail to my prior communication that Mr. Wang should not report to rehearsals or performances until further notice, I would like to clarify that this means they should not come into David Geffen Hall. If your client would like access to the building for some reason, please contact me about making such arrangements. (*Id.* ¶4, Ex. B);

- May 21, 2024: an email from Robbins to Lewis stating

  your client, Mr. Wang, remains on a paid leave pending the completion of the Philharmonic's ongoing investigation into allegations of sexual harassment or otherwise inappropriate conduct by musicians or other current employees of the Philharmonic. As that investigation has not yet been completed, the Philharmonic will not be sending Mr. Wang to China or to China (sic) to perform given that the Philharmonic must soon finalize rosters and logistics for both trips. I will contact you following completion of the investigation. (Lewis Decl. ¶5, Ex. C).

The Philharmonic further admits that

  it did not provide a written statement to Wang or his counsel that he was placed on 'paid leave pending the completion' of the Society's investigation focused on misconduct by any musician and any current employee prior to May 21, 2024. (ECF#52,¶40).

- On May 28, 2024: Robbins emailed Wang's counsel that Wang "should not attend that meeting tomorrow" in response to the request that Wang be able to attend a meeting for orchestra members regarding Jestin's "cultural assessment." ECF#52,¶42. Although Lewis subsequently asked Robbins to "provide a reason," Robbins did not reply to that email. *Id.*

- Lewis heard nothing further from Robbins on Wang's continued indefinite removal or the investigations that purportedly justified it until July 9, 2024, when Robbins informed Lewis by email that Levy wanted to speak with Wang about her investigation. *Id.*

None of these contemporaneous communications explained to Wang or his counsel why—other than reactions to the Article—Wang had been singled out for "paid leave" during an investigation whose

broadly stated scope was new allegations of misconduct by *any* Philharmonic employee, and, in fact, prior to the existence of such investigation. Defendants admit that, other than Muckey, no other members of the Orchestra were placed on leave. ECF#48,¶41;#52,¶41.

There is also no dispute as to the content of Union communications to the public and with Wang in the immediate aftermath of Wang's banishment from performance and rehearsal. The only dispute is over how each side characterizes those communications. *See, e.g.,* ECF#48,¶¶27, 33-36. On April 15, 2024, the New York Times reported that Union President Sara Cutler "said in a statement on Monday that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being 'are good first steps but they can't be the last.'" ECF#48,¶27. On April 17, 2024, Wang's counsel wrote to the Union's counsel, expressing objection to Cutler's statement, requesting a meeting to discuss options for responding to the tsunami of reactions to the Article (including the Philharmonic's decision to indefinitely bar Wang from performance and rehearsal), and detailing some of the history Wang believed relevant to that discussion. Lewis Decl. ¶9, Ex.E. Among other things, Wang noted that, unlike members of the public or the orchestra who were not privy to the arbitration record, the Union was well aware that the Article was misleading in many important respects, particularly as to Wang. On April 18, the Union responded that (i) it "strenuously disagreed" with Wang's characterization of Cutler's statements, (ii) it would not otherwise respond to his "allegations"; (iii) the Union "owes a duty to all members of the bargaining unit;" (iv) the Philharmonic advised the Union that "Mr. Wang is being paid in full during this period;" and (v) Wang should contact a specific Union representative "if, nonetheless, he objects to the Philharmonic's action." ECF#39-6. On April 19, 2024, Wang demanded that the Union (i) "immediately demand Wang's reinstatement to his position … and commence a legal action, if [the Philharmonic] does not," and (ii) "cease and desist from making any further statements endorsing Mr. Wang's removal, suspension or non-assignment." ECF#39-7. Finally, by letter dated April 26, the Union advised that it would take no action, characterizing the Philharmonic's actions as

"taking Mr. Wang off the schedule," and the 2020 arbitration award as having been "fully complied with" in 2020.  The Union stated that

> the [2020 arbitration] award does not give Mr. Wang a guarantee of lifetime employment regardless of whether new allegations of wrongdoing or different circumstances arise. In any event, the collective bargaining agreement mandates that members of the Orchestra be "employed" for 52 weeks each year; it does not guarantee that members are placed on the schedule for any or all performances or rehearsals.
>
> Additionally, on April 17, 2024, the NY Philharmonic engaged an investigator to determine whether there were any new or different allegations of sexual misconduct by any members of the Orchestra, including your client.  Local 802 has determined to await the outcome of that investigation before determining how to proceed here.

Finally, the Union argued that its leadership had made no statements endorsing Wang's "removal, suspension or non-assignment." Lewis Decl. at Ex. H.

Just as there is no factual dispute as to the content of the relevant communications by and between the parties in the days and weeks after the Article was published, there is no factual dispute over the governing contractual documents and their contents. ECF#48,¶¶4,5,43-49;#52,¶¶4,5,43-49. The parties' dispute is legal—how to understand those documents, and whether Wang's individual contract is enforceable. Notably, the CBA does not define "just cause," "employ," or "discipline" and does not even mention "paid administrative leave" or "suspension." It is also silent as to the circumstances under which discipline may be imposed, beyond a narrow set of circumstances not relevant here. ECF #38-1.

## II.  Defendants Fail to Meet Their Burden to Create a Triable Issue of Fact

On a motion for summary judgment, the non-moving parties, "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial…." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citation omitted). Defendants must cite to "particular parts of materials in the record" or show "that the materials cited [by Plaintiff] do not establish the absence … of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1). Defendants "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.

1998), as "unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted); *accord Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Defendants have failed to meet this burden.

In its opposition papers, the Philharmonic admits that Wang's removal and banishment was because of public outcry over the previous day's Article. ECF#52,¶22;#50 at 6. But aware that neither the content of a magazine article nor public reaction to it could be a valid reason for indefinitely preventing a world class musician from performing or practicing with his orchestra, the Philharmonic attempts to manufacture another basis—and does so without providing admissible evidence. Specifically, Robbins states he was asked by the Philharmonic CEO "to retain an investigator … because the Society became aware … that there were individuals who wanted to share additional allegations of misconduct by Mr. Wang and Mr. Muckey that were not discussed in that article." ECF#51,¶5. But this statement fails to defeat summary judgment for two reasons.

*First,* and as neither the Philharmonic nor the Union dispute, Wang was never told that the suspension—originally very clearly imposed based on the Article, and before there was any new investigation—had at some point been converted into a different form of suspension or leave based on the notion that, as Robbins puts it, "individuals wanted to share" something about Wang. This supports the conclusion that the *actual* reason why the Philharmonic suspended Wang was the reaction to the Article, and not anything else. Moreover, the Philharmonic's own course of conduct further undermines the notion that what Robbins vaguely described as something "individuals wanted to share" truly became the reason for Wang's (and Muckey's) suspensions. Indeed, in 2018, when Wang and Muckey were *actually* the targets of purported information that "individuals wanted to share" with the investigator then engaged by the Philharmonic (Barbara Jones), Wang and Muckey continued to perform on a regular basis with the Philharmonic right up until the moment that the Philharmonic accused each of them of misconduct. In short, it is inarguably the *publicity* about the 2019 arbitration

events, not that some individuals expressed a wish to confidentially say something to the Philharmonic about Wang, that led to the suspension.

*Second*, the purported reason Robbins suddenly proffers for how the suspension was supposedly transformed from one based on the Article into one based on a private investigation does not rest on any admissible evidence. The Philharmonic is asking the Court to accept the CEO's out-of-court statement as paraphrased by Robbins for its truth—the essence of inadmissible hearsay. Moreover, Robbins professes no first-hand knowledge of what the Society "became aware of" and therefore this aspect of his Declaration is inadmissible double hearsay, regardless of whether the statement was offered for some reason other than the truth of the matter asserted (which it is not). *Little v. City of New York*, 487 F. Supp. 2d 426, 438 (S.D.N.Y. 2007) ("an attorney's affirmation that is not based on personal knowledge of the relevant facts is to be accorded no weight on a motion for summary judgment").

Additionally, Robbins' carefully worded statement (so vague it could easily be referring to the orchestra committee's speculative April 15th statement to the New York Times rather than any credible new accusation by an individual with first-hand knowledge) is insufficient to create a dispute of fact as to whether the Philharmonic had the kind of specific basis to justifiably place Wang on "paid leave pending investigation" (after he had already been suspended based on the Article). *Scotto*, 143 F.3d at 114 (conclusory statements are insufficient to create a triable issue of fact). *See also* III.b below. Moreover, the undisputed contemporaneous communications between the parties do not support the notion that Robbins' conclusory, inadmissible and after-the-fact, third-hand report of "individuals" with unspecified "allegations" was the real reason for the already-imposed suspension, and instead, the circumstances strongly suggest an after-the-fact attempt to manufacture the hint of just cause (without actual facts). *Cf. Alston v. Int'l Ass'n of Firefighters, Loc. 950*, 998 F.3d 11 (1st Cir. 2021) (employee placed on leave immediately after he threatened to "go postal" at work).

The Union's efforts to belatedly justify its failure to object to the Philharmonic's mistreatment of Wang are similarly vague and conclusory, and thus fall short of the specificity needed to create a

triable issue of fact. The Union's President, Sara Cutler, asserts that she "became aware" that an unspecified number of orchestra members represented by the Union "had expressed safety concerns" after reading the Article. Cutler also attests that some union members expressed—to someone, somewhere, sometime—the "belief that the allegations against [Wang] and Muckey in the article were not isolated incidents." The "isolated incidents" clearly refer to the April 15 New York Times article, quoting the orchestra committee's speculative expressions of belief in the immediate wake of publication of the Vulture article. Both statements indicate that the Union did not have the kind of specific, non-conclusory, information that could counter Wang's evidence that the Philharmonic lacked any basis to suspend him, place him on administrative leave, or otherwise subject him to disparate treatment compared to other tenured orchestra members. Rather, Cutler's statements underscore that the Union's refusal to act rests on hearsay, emotion and speculation triggered by an article about allegations that were fully adjudicated in favor of Wang and Muckey. *Weinstock*, 224 F.3d at 41 (unsupported allegations insufficient to create a triable issue of fact).

As Wang argued in his opening brief, a union's duty to protect members from an employer's arbitrary or discriminatory imposition of disciplinary procedures has never been interpreted to allow a union to disclaim protection of its members based on public pressure. Notably, in the Union's April 26 letter informing Wang's counsel that it would take no action until after the Philharmonic's investigation was complete, the Union does not indicate it undertook *any* investigation into whether the Philharmonic had "more," that is, a valid basis to single out Wang for paid leave at that time. The Union's moving papers are similarly devoid of any indication it conducted even the most rudimentary of due diligence before deciding to "wait until the investigation was over."

Nor does the Union allege facts suggesting any legitimate basis for "safety concerns." In fact, the Union admits Wang was never accused of wrongdoing in connection with Vail, that it prevailed in the arbitration of the Vail allegations, and that Wang and Muckey had been performing regularly with the Philharmonic since their reinstatement in 2020. ECF#46,¶¶7,12,16,18. The only circumstance that

changed between the Union's 2018 decision to advocate for Wang's reinstatement and April 13, 2024, when Wang was removed indefinitely from all Philharmonic activity, is the publication of the Article and the reactions it engendered among readers.

**III.    The Philharmonic Had No Authority Under the CBA to Remove Wang from All Philharmonic Activity.  Defendants' Contrary Claim Is Conclusory and Not Grounded in Any Provision of the CBA**

The Philharmonic violated multiple terms of the CBA and Wang's individual agreement when it removed him indefinitely from all Philharmonic activity, one day after the Article was published. *See* ECF#40 at 13-23. In opposition, Defendants pretend that slapping the label "paid leave pending investigation" on Wang's current employment status ends the discussion, without support for that notion in the CBA. That is, Defendants' opposition papers cite to no language in the CBA that supports the Philharmonic's invocation of carte blanche power to remove musicians from all Philharmonic activity, they do not even try to counter Wang's arguments on the *res judicata* effect of the arbitration decision, and offer no coherent explanation grounded in the CBA for why Wang could fairly be singled out for "paid leave" during an investigation that they admit was not described as focused on Wang when the investigation was commenced (which was after Wang had already been suspended). Defendants fail to identify even a single case demonstrating that the imposition of "paid leave pending investigation" has been applied under remotely comparable circumstances.

**A.    <u>There Is No Dispute that the Award Was Final and Binding</u>**

Wang argues that, because he was sidelined in response to public pressure generated by an article that questioned the outcome of the arbitration, the Philharmonic's actions were a violation of the CBA's requirement to treat the Award as binding. Defendants take the outrageous position that, although the Philharmonic *was* bound by the Award, its obligations ceased in 2020 when it reinstated Wang. ECF#50 at 12;#46 at 14. But as Wang explained in his opening brief, arbitration awards have *res judicata* effect, meaning the Award prohibited the Philharmonic from taking adverse employment action against Wang on the basis of allegations previously adjudicated, a prohibition that continues *in perpetuity. See, e.g.,*

10

*Maidman v. O'Brien*, 473 F. Supp. 25, 29 (S.D.N.Y. 1979). Neither Defendant meaningfully challenges this point. Thus, at a minimum, the Philharmonic violated Article XV of the CBA when it used outrage triggered by an Article that it admits is focused on fully arbitrated allegations of wrongdoing, as an excuse to remove Wang from the Philharmonic.

### B. The Philharmonic Violated the CBA When It Removed Wang from All Philharmonic Activity Without Just Cause or a Legitimate Pretext to Place Him on "Paid Administrative Leave"

Wang also argued in his opening brief that, if his removal was not based on the subjects of the arbitration—which would be a violation of the final and binding Award—it was a violation of the CBA's prohibition on discipline without just cause (ECF#40 at 14-19), because the Philharmonic had no basis to either suspend him with pay or place him on paid administrative leave.

Defendants strenuously object to Wang's characterization of his removal from Philharmonic activity as a "suspension" or "disciplinary," and insist he is merely on paid leave pending investigation. But that is mere semantics. What matters is what the Philharmonic *did* to Wang and Muckey, not what label the Defendants affix to Wang and Muckey's excommunication.

Defendants' repeated protests that the Philharmonic never labeled Wang's removal a "suspension" (*see, e.g.,* ECF#46 at 10; #50 at 13-14) are thus not relevant to the legal analysis. They simply beg the question as to what predicate is required under the CBA before the Philharmonic can place a musician on indefinite "paid leave," and whether the Philharmonic met that requirement under the circumstances. Notwithstanding Defendants' objections to Wang's reliance on *Joseph*, Defendants effectively admit the CBA does not give the Philharmonic carte blanche to place a musician on paid leave for any reason or no reason. *See* ECF#50 at 14 (arguing it had "reasons" other than the Article for Wang's "continued" paid leave); ECF#46 at 15 (same). As is clear from every one of the cases relied on by Defendants, paid administrative leave is appropriately imposed only in cases where there are credible, specific allegations of wrongdoing that warranted removal from the workplace during a non-pretextual investigation to see "whether the misconduct occurred." *United Nurses and Allied Professionals,*

*Local __*, 2021 BNA LA 193 at \*7. Finally, Defendants nowhere point to any provision in the CBA, or any past course of conduct that would support their now strained reading. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580–82 (1960) (where CBA is ambiguous or silent, arbitrator may look to past practices); *Bellmore-Merrick Cent. High Sch. Dist., Town of Hempstead v. Bellmore-Merrick United Secondary Tchrs., Inc.*, 85 Misc. 2d 282, 286, (Sup. Ct., Nassau Cty. 1975) (looking to "long-standing conduct of the parties" to enforce implicit provision).

Defendants offer not a single non-speculative, non-conclusory basis to justify singling out Wang (and Muckey) for excommunication pending an investigation that has, at all times prior to Defendants' submission of their opposition briefs, been described as focused on misconduct by *any* employee. The best the Philharmonic can muster is that it continued Wang's paid leave indefinitely because "the Society received reports of allegations regarding additional incidents of alleged misconduct involving Wang (and Muckey)". ECF#50 at 14. As discussed *supra*, that vague statement could as easily refer to second or third or fourth-hand rumors as to credible, specific, allegations. Even if it were not based on double hearsay, it is woefully insufficient to create a triable dispute of fact as to whether the Philharmonic had the necessary pretext to continue singling Wang out for paid leave. *Hicks*, 593 F.3d at 166 (conclusory allegations alone cannot defeat summary judgment).

The Union's arguments are equally unavailing. It points to the public statements of belief of members of the orchestra committee (that "these were not isolated incidents") and the expressions of safety concerns by an unspecified number of unidentified orchestra members who learned of the Vail allegations for the first time from the Article. Like the Philharmonic's "evidence," these second and third-hand expressions of belief, attested to by a union officer who does not claim to have any first-hand knowledge, are vague, speculative and conclusory, and certainly not sufficient to counter Wang's undisputed evidence that he was placed on "paid leave" because of a magazine article, the backlash that ensued, and Defendants' desire to assuage criticism of their past action and inaction.

Defendants do not cite a single case in which paid administrative leave was imposed under even remotely comparable circumstances. Instead, they engage in tautology—"since administrative leave with pay is not a "disciplinary measure" under the CBA, the just cause requirement is not implicated." ECF#45 at 2. But as just discussed, both parties to the CBA admit they interpret it to require a legitimate pretext before the employer can subject an employee to paid administrative leave. The cases Defendants cite are not to the contrary.  They stand for the undisputed proposition that *properly invoked* paid leave is non-actionable—a point Wang does not contest—but do not address, let alone refute, Wang's argument that *improperly invoked* paid leave is disciplinary *in character* and, in any event, a violation of the CBA. *See, e.g.*, *United Nurses and Allied Professionals, Local __*, 2021 BNA LA 193 (no dispute as to validity of pretext for paid leave, only as to whether overtime was owed); *Oakland University*, 2019 BNA LA 51 (Scales, 2019) (no dispute as to validity of reason for leave, only as to right to higher pay); see also *Tennessee Valley Auth. v. Salary Pol'y Emp. Panel*, 1989 WL 241715, at *3 (E.D. Tenn. Sept. 20, 1989) (similar).

In the absence of a legitimate pretext to place Wang on paid leave, the Philharmonic's actions amount to a suspension without just cause. The Union does not even attempt to argue that the Philharmonic had just cause. The Philharmonic argues that it did have just cause, citing to "the impact of the Article on the workplace," the unspecified second or third hand "new allegations" against Wang, and the new investigations. It also cites to two arbitration decisions holding that employers may discipline employees when there is a nexus between an employee's conduct and harms to the employer's business, including employees' refusal to come to work. *See* ECF#50 at 16. But these arguments miss the point. As the undisputed facts show, it was the "impact of the Article" about old adjudicated (and inaccurately reported) allegations, (not "new allegations" or any "conduct" by Wang) that caused the Philharmonic to come under public criticism, and an unspecified number of employees to express "safety concerns." Respectfully, the CBA does not give the Philharmonic the right to banish its members based on emotional reactions to a flawed Article, without more, and the Philharmonic's

13

opposition does not credibly claim to have more. The Court must therefore find, as a matter of law, that the Philharmonic violated the CBA's prohibition against imposing discipline without just cause.

**IV.    The CBA, as It Has Been Consistently Interpreted by the Parties, Includes a Right to Perform, Notwithstanding Defendants' Sudden Claims to the Contrary**

As Wang argued previously, multiple sections of the CBA and Wang's individual agreement guarantee not only the right to receive pay and benefits, but also a right to showcase and hone his talents through regular performance absent special circumstances. *See* ECF#40 at 18-23.

For example, CBA Section III(A) requires the Philharmonic to employ musicians 52 weeks a year. While Wang has never argued that Section III(A) requires the Philharmonic to schedule him or any other musician for all performances or any specific performance, he does argue that Section III(A) requires the Philharmonic to schedule tenured musicians regularly, at levels similar to the scheduling of other orchestra members in good standing. Indeed, by its course of conduct, the parties would seem to have interpreted Section III(A) in precisely that manner. *See* ECF#48 at 18;#52 at 18 (each admitting Wang performed "regularly"). Defendants do not otherwise address this argument head on, and instead avoid it by claiming they don't know what "commensurate with his peers" means. Respectfully, the Court should find that Defendants admit that Wang has, at all relevant times, been scheduled with a frequency that is comparable to the levels at which other tenured musicians have been scheduled—the clear meaning of "commensurate with his peers" when read in the context of the complete 56.1 statement, and Wang's opening brief. *See, e.g.,* ECF#40 at 19.

Defendants take the shocking position that the CBA does not impose obligations on the Philharmonic to schedule musicians or otherwise include a "right to perform." ECF#50 at 16;#46 at 12, 14. For the reasons cited in Wang's opening brief at 18-23, that is simply wrong. Defendants point to no provision in the CBA supporting this narrow reading that is contrary to the parties' longstanding course of conduct. Nor do they cite any cases that support it under remotely comparable circumstances or otherwise. Instead, they resort to subterfuge, notwithstanding their admissions that Wang's

"reinstatement" under the Award included reinstatement to the performance and rehearsal schedule. *See* ECF#50 at 12 (quoting Award's "additional remedies are denied" in support of the notion that "nothing in the Award required the Society to schedule Wang" thereafter, falsely implying such relief had been sought and rejected); ECF#48 at 3 (same).

Where a CBA is silent or ambiguous, courts and arbitrators routinely look to course of conduct to interpret rights and obligations. *United Steelworkers of Am.*, 363 U.S. at 580–82; *Bellmore-Merrick Cent. High Sch. Dist., Town of Hempstead,* 85 Misc. 2d at 286.  Here, the parties admit that Wang has been scheduled regularly, at levels reasonably similar to other tenured musicians during his employment at the Philharmonic. Moreover, Defendants concede that the Philharmonic needed a reason to place Wang on paid leave—effectively admitting that the CBA does not allow the Philharmonic to remove a musician from the performance and rehearsal schedule, even with pay, for long periods without a valid reason. On that record, the Court must reject, as a matter of law, Defendants' argument that "paid leave" without justification is consistent with the rights conferred in the CBA.

**V.    Defendants Do Not Dispute that Wang's Individual Agreement Requires Solos, that His Solos Were Canceled, and that He Has Not Been Paid**

Wang argues that the Philharmonic violated the CBA when it cancelled his long-scheduled solos and failed to pay him for those solos during his purported "paid administrative leave." As to the first of those claims, Defendants have no response. The Philharmonic admits that "Wang has not been assigned to perform" since April 13, 2024, "including three concerto appearances during that time." ECF#52,¶50. It does not otherwise address that point, and neither does the Union. Wang's individual agreement required the Philharmonic to schedule him for six concerto solos every three years. ECF#52,¶46;#48,¶46). And as Wang alleged and the Philharmonic does not substantively dispute, until April 13, 2024 the Philharmonic fully *performed* its obligations as set forth in Wang's written individual agreement by paying Wang the rate specified and scheduling him for the required solos.  Respectfully, the Court must find, as a matter of law, that by cancelling the solos, which were required under Wang's

individual agreement, in the absence of a legitimate reason to do so, the Philharmonic is liable for a breach of that agreement.

Even if the Philharmonic had legitimately placed Wang on paid administrative leave (which it did not), he was entitled to be paid for those long-scheduled concertos. *See, e.g., United Nurses and Allied Professionals, Local __,* 2021 BNA LA 193 (Ryan, 2021) (grievant was entitled to overtime pay, not just base pay, during non-disciplinary paid leave in the absence of clear past practice otherwise). To the extent the Philharmonic now argues Wang failed to exhaust the grievance procedures available to him, that argument carries no weight, as the Union made clear by its public statements and private actions it would take no action on Wang's behalf prior to the end of the "investigations", and thus any further attempts to grieve specific aspects of his removal would have been futile. *Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers,* 34 F.3d 1148 (2d Cir.1994) (exhaustion of remedies not required where doing so would have been futile).

## VI.    The Union Breached Its Duty of Fair Representation to Wang

Wang argues that the Union breached its duty of fair representation when it refused to take up his valid grievance or otherwise intervene when the Philharmonic barred Wang (and Muckey), but no other musicians, from all orchestra activity one day after publication of the Vulture article. ECF#48,¶¶22,41. The Union not only failed to act, but its President quickly issued a statement to the New York Times endorsing Wang's removal and suggesting further action was required. ECF#48,¶27. The sequence of events was so short that the Union could not possibly have conducted any investigation prior to issuing that statement. *Id* (indicating less than 48 hours elapsed between Wang's removal and Cutler's statement). The Union's actions were particularly objectionable given that it had participated, on Wang's behalf, in the arbitration in which Wang (and Muckey) ultimately prevailed. ECF#48,¶¶12-16. It is no stretch to infer on these undisputed facts that Union leadership had concluded just a few years earlier that (i) Wang's grievance had merit and (ii) Wang's interest in being reinstated in no way conflicted with any other member's interests in working in a safe environment. Moreover, Union

leadership had unique access to all the facts (i.e., the complete arbitration record), in a way that members of the public did not. Among other things, it knew that the Philharmonic had not accused Wang of wrongdoing related to the Vail allegations, and that, in any event, the arbitrator had found that the evidence fell "substantially short" of supporting Cara Kizer's purely speculative hypothesis that she had been drugged in Vail.

The Union seeks to excuse its inaction on the theory that the Philharmonic did not engage in any grievable conduct. But as explained in Section III *supra*, that is simply wrong. Therefore, the only questions before this Court as to the DFR portion of the hybrid claim are (i) did the Union act in a manner that was arbitrary, discriminatory, or in bad faith, and, if so (ii) is there a causal connection between the Union's breaching conduct and Plaintiff's injuries? Respectfully, the answer to both of those questions must be yes.

**A. The Union's Refusal to Take Up Wang's Grievance or Otherwise Object to His Indefinite Removal from All Philharmonic Activity Under the Circumstances Was at Best Arbitrary and at Worst, Discriminatory and in Bad Faith**

The Union does not seriously contest any of the underlying facts that indicate its actions (and inaction) violated its duty of fair representation to Wang, notwithstanding its disingenuous attempt to recharacterize them. *See, e.g.*, ECF#46 at 15. It admits its CEO was quoted describing Wang's removal as "a good first step," admits it declined to take any action on Wang's grievance until an investigation that was not specific to Wang was completed, admits that Wang and Muckey were the only ones singled out for "paid leave," points to no evidence indicating it made even the slightest attempt to assess the merit of Wang's grievance before deciding to "wait and see," admits that Wang's removal flowed from "release of the Vulture article," and now, seeking a post-hoc rationalization, points not to anything Wang did or did not do, but only to orchestra members' reactions to the outcome (filtered through the Vulture article) of a binding arbitration decided in Wang's favor. On those facts, there is no question the Union breached its duty.

17

From the moment President Sara Cutler expressed public support for Wang's removal from the orchestra it was clear that the Union had taken a position on Wang's grievance before he could even raise it, and without even the pretext of having conducted any due diligence. That alone makes the Union's refusal to act arbitrary. *Thomas v. Little Flower for Rehab. & Nursing*, 793 F. Supp. 2d 544, 548 (E.D.N.Y. 2011) ("a 'minimal investigation' can constitute a breach of the duty of fair representation, an allegation of a failure to perform any investigation … alleges a breach"). Having already made up its mind that it would prioritize the speculative and vague concerns of members of its bargaining unit based on reading an article over other members' rights to due process and fair treatment, the Union has since contorted itself into pretzels with its outrageous characterizations of the facts and the law to try to inoculate itself from this litigation, beginning with the April 26, 2024 letter of Susan Davis. ECF #39-8. Once again, giving no indication it had conducted even a cursory investigation, the Union took the breathtaking positions that the Award contained no continuing obligations, that musicians have no right to perform, and that hypothetical unspecified "new allegations" justified Wang's non-assignment. *Id.*; Cf. *Cappelli v. Jack Resnick & Sons, Inc.*, 2014 WL 4188084, at *6 (S.D.N.Y. Aug. 22, 2014) (dismissing breach of DFR claim where union determined *after investigation* that the plaintiff's claims lacked merit) (emphasis added); *Biberaj v. Pritchard Industries, Inc.*, 2009 WL 10738222, at *7 (S.D.N.Y. Sept. 28, 2009) ("a blatantly inaccurate rendering of the facts underlying a grievance seems to cross the line into arbitrariness or bad faith"). In other words, rather than stand up for Wang when he was singled out for removal based solely on emotional reactions to an article, the Union cheered the Philharmonic on. That was not only arbitrary, but discriminatory as to Wang. *Ramey v. Dist. 141 Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269 (2d Cir. 2004).

Moreover, although it might have been appropriate to "await the results" when paid leave has been properly invoked based on an actual accusation, Wang's grievance is that here it was invoked without legitimate pretext. *See supra*. The Union did not address that fundamental question before it gave itself permission to "await the results," and does not address it in its opposition. Its failure to even

consider that question reveals its cowardly decision to placate the lynch mob calling for Wang's proverbial scalp. *See Ramey*, 378 F.3d at 269 (affirming breach of DFR where Union favored one category of workers over another and "neutral" justification was pretextual).

To the extent the Union now leans on the orchestra committee's speculative belief that the Vail allegations were "not isolated incidents," those "additional … acts" (ECF#48 at 27, ¶¶2-4) are nothing more than a second-hand recounting of some of the initial outrage and fears expressed by a small but vocal subset of individuals who learned of the Vail allegations for the first time and were misled as to certain details, including that Wang was not accused in relation to Vail. But as the Union well knew, its own leadership had just a few years earlier determined that Wang's return to the orchestra would not infringe on other members' right to a safe workplace. Nothing Wang has done has changed that calculation, and the Union cannot rely on inchoate fears or rumor to escape its duty of fair representation.

Finally, the Union spends a great deal of its brief doubling down on its position that the Philharmonic has no obligation under the CBA's "employ" requirement or otherwise to schedule musicians for performances and rehearsals. *See, e.g.*, ECF#46 at 14. As discussed earlier, that position is belied by the parties' longstanding course of conduct, and its admission that the Philharmonic needed a reason to remove Wang from the schedule. But more importantly, even if there were no implicit right to perform, federal law requires equal treatment under the CBA without favoritism towards some members of the bargaining unit over others. 29 USC 185(b).  Here, the Philharmonic singled Wang and Muckey out for "paid leave" during an investigation into misconduct by "any musician," without any legitimate pretext to do so, yet the Union has acquiesced in this discriminatory treatment. *Ramey,* 378 F.3d at 269; *Cf. Spellacy v. Air Line Pilots Ass'n-Int'l,* 156 F.3d 120 (2d Cir. 1998) (no DFR breach where no disparate treatment of blue and orange class pilots).

**VII.    There Is a Clear Causal Connection Between the Union's Actions (and Inactions) and Wang's Harm**

There can be no question that, had the Union objected to the Philharmonic's unlawful actions in mid-April, or reassured its membership that nothing in the arbitration record or otherwise supported the notion that members faced any cognizable risks from continuing to work alongside Wang, or commenced the grievance process on Wang's behalf, Wang would have continued to perform with the Philharmonic, and would not have incurred the expenses of this litigation. The Union does not seriously dispute this point, and instead simply argues that there was no DFR breach in the first instance. To the extent it argues there's no causal connection between Cutler's statements and Wang's harm, that misses the point; Wang does not argue that Cutler's public statements were an independent breach separate from the Union's decision to "wait and see", but rather, Cutler's statements support the conclusion that the Union failed to fairly evaluate and respond to Wang's grievance. Thus, the Union's protests as to representative capacity are not only wrong, (*see* ECF#40 at 31-32) but irrelevant.

**VIII.    Even if the Court Were to Deny Wang's Motion at this Juncture, It Should Reject Defendants Invitation to Grant Them Summary Judgment, S*ua Sponte***

To the extent the Court concludes that summary judgment is premature, we respectfully request that the Court reject Defendants' invitation to grant them summary judgment, and instead order tailored discovery on the factual issues it finds to be in dispute.

<u>**CONCLUSION**</u>

For all of the reasons stated, Defendants' motions to dismiss should be denied and Wang's motion for partial summary judgment should be granted.[2]

Dated: New York, New York
        October 30, 2024

---

[2] Wang incorporates by references the arguments advanced by Muckey in support of his similar motion for partial summary judgment.

Respectfully submitted,

CARTER LEDYARD & MILBURN LLP

By:    _____/s/ Alan S. Lewis_____
Alan S. Lewis
Karen E. Meara
28 Liberty Street, 41st Floor
New York, NY 10005
(917) 544-2524
lewis@clm.com
meara@clm.com

*Attorneys for Plaintiff Liang Wang*

21