UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------

LIANG WANG,

                     Plaintiff,

       v.

THE PHILHARMONIC-SYMPHONY SOCIETY OF
NEW YORK, INC., AND ASSOCIATED MUSICIANS
OF GREATER NEW YORK, LOCAL 802, AMERICAN
FEDERATION OF MUSICIANS,

                   Defendants.

-----------------------------------------------------------------------

Index No. 1:24-cv-03356 (AS)

[rel. 1:24-cv-03348(AS)]

**AMENDED VERIFIED
COMPLAINT**

**JURY TRIAL DEMANDED**

## NATURE OF THE ACTION

1.     Since 2006 Liang Wang ("Wang") has held the position of first oboe in the orchestra of Defendant Philharmonic-Symphony Society of New York, Inc. ("the Philharmonic") and has likewise long been a member of Defendant Associated Musicians of Greater New York, Local 802, American Federation of Musician ("Local 802" or the "Union"), the union to which all tenured Philharmonic musicians belong.  Wang initially sued both Defendants on May 1, 2024, and by this amended complaint, Wang now adds new claims arising from subsequent conduct by both Defendants.[1]  Like Wang's original complaint, this amended complaint asserts claims arising under contract law, labor law and statutory prohibitions against gender-based discrimination.

2.     The applicable labor agreement between the Union and the Philharmonic provides that tenured musicians may not be terminated or otherwise disciplined without "just cause."

---

[1] Per the Court's rules, a redline showing all differences between the original complaint and this amended complaint is attached as Exhibit A.

3.    On April 13, 2024, the Philharmonic suspended Wang from the orchestra without claiming to base the suspension on just cause, and soon thereafter the Union declined Wang's request to grieve the suspension.  While there was *no* investigation of Wang in existence at the time the Philharmonic suspended him, a short period of time into the suspension, the Philharmonic commenced investigations and communicated the suggestion to the Philharmonic community that the decision whether to reinstate or terminate Wang would be a function of whether the investigations yielded just cause to terminate him.  On October 15, 2024, the Philharmonic told Wang that it would terminate him (with reduced salary paid until September 21, 2025).  Yet, the Philharmonic did *not* assert just cause for the termination, instead coming up with a novel interpretation of the collective bargaining agreement under which tenured musicians can be terminated without just cause as long as they are given sufficient notice of their termination, and labeled as non-reengagement. Again, the Union rejected Wang's request to grieve the Philharmonic's action. The Philharmonic's breaching conduct was so unprecedented that, had the Union pushed back, there can be little doubt the Union would have prevailed either *via* a negotiated resolution or through binding arbitration.

4.    Thus remarkably, neither when it suspended Wang in April 2024, nor when it announced Wang's termination in October 2024, did the Philharmonic accuse Wang of a*ny* misconduct.  As to the April 2024 suspension, the Philharmonic imposed it one day after the release of a misleading magazine article – and did so because of the public relations firestorm generated by that magazine article, a firestorm that culminated in calls by a public - familiar only with the article but not the underlying facts - for Wang to be cast out.  Likewise, in October 2024, despite having just completed two investigations, the Philharmonic did not even purport to base the termination on the outcome of those investigations or otherwise on purported just cause.

Instead, the Philharmonic had its "Executive Advisor" send Wang a curt letter which relied on a lawyerly (and incorrect) interpretation of a contract provision in the Collective Bargaining Agreement ("CBA"), that had never been invoked.  In the Philharmonic's fevered imagination, this provision gave the Philharmonic carte blanche to permanently discharge tenured musicians without any accusation of misconduct, much less something that could meet the CBA's just cause standard, so long as the termination was labeled a "non-re-engagement."

5.      A sacrosanct duty of a union as exclusive employee representative is to protect members injured by such blatantly impermissible employer conduct.  No union faithful to its obligation to protect worker rights obtained through collective bargaining would surrender to the suspension and then permanent discharge of its own member in these circumstances.  But here, that is exactly what the Union did.  Shockingly, after both the April suspension and the October termination, the Union rationalized its surrender to flagrant breaches of the CBA by pointing to the same media firestorm and subsequent witch hunt that the Philharmonic originally cited as the reason for the April suspension.  While that would be unacceptable under any circumstances, here, it is particularly abhorrent, given that the Union, by the public statement of its own President among other things - helped to create the very fear of Wang within the Philharmonic community that the Union then improperly relied upon as its excuse to refuse to challenge the Philharmonic's flagrant breaches of the CBA.

6.      On May 1, 2024, less than three weeks after his April suspension, Wang filed a Complaint against both the Philharmonic and the Union, based on the suspension itself and the Union's refusal to grieve his suspension (the "Original Complaint"). Specifically, the Original Complaint included hybrid § 301/DFR claims asserted pursuant to Section 301 of the Labor Management Relations Act ("LMRA"): breach of the CBA by the Philharmonic, and breach of

the duty of fair representation ("DFR") by Local 802.  The Original Complaint also included pendent state law claims against both Defendants.

7.    Wang now files the Amended Complaint to add new claims against both Defendants arising from his termination by the Philharmonic on October 15, 2024, and the Union's refusal to grieve his termination on or about November 5, 2024.  The new claims include hybrid § 301/DFR claims, claims arising under Title VII for discrimination based on gender, as well as pendent state law claims.

## THE PARTIES

8.    Plaintiff Liang Wang is the married father of two young children and lives with his family in New Jersey.  He is one of the most world's most accomplished classical musicians. He is the first oboe of the Philharmonic and has been employed in that capacity since 2006.  He is a tenured member of the orchestra, and, from the moment he was hired by the Philharmonic, a member of the Union.

9.    Defendant Local 802 is a "labor organization" within the meaning of 29 U.S.C § 152, and represents the members of the Philharmonic, including Wang, in all matters relating to the negotiation of the orchestra members' terms of employment by the Philharmonic.  Local 802's primary office is at 322 West 48th Street, #1308, New York, New York 10036.

10.    Defendant Philharmonic is a New York State not-for-profit corporation and operates an orchestra that is widely considered to be one of the world's most important cultural institutions.  Its principal place of business is 10 Lincoln Center Plaza, New York, New York 10023.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 as the causes of action present federal questions.  In particular, pursuant to 29

U.S.C. § 185, Mr. Wang states a hybrid claim under section 301 of the LMRA for breach of the

CBA by the Philharmonic, and breach by Local 802 of its DFR to Mr. Wang. Wang also states a

federal claim for discrimination under Title VII of the Civil Rights Act of 1964 as amended. The

Court also has jurisdiction of the action pursuant to 28 U.S.C. § 1332(a)(1) in that the plaintiff is

a citizen of a different state than Defendants and the amount in controversy exceeds $75,000.

12.    This Court also has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367(a) and the principles of pendent jurisdiction.

13.    Venue is proper in the United States District Court for the Southern District of

New York pursuant to 29 USC § 185(a), 42 USC 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

Defendants each maintain an office within the judicial district, and a substantial part of the

events giving rise to the actions alleged herein have taken place within this judicial district.

## BACKGROUND

### *Wang's Employment by the Philharmonic*

14.    Wang is one of the world's most acclaimed classical musicians. As the

Philharmonic's personnel manager, DeAnne Eisch, stated in writing on November 22, 2022:

> Mr. Liang Wang has been employed fulltime as Principal Oboe of the New York
> Philharmonic since September 4, 2006. He is a tenured and valued member of the
> Orchestra … Mr. Wang possesses the rare level of musicianship and technical ability that
> the New York Philharmonic, the oldest and most storied orchestra in the United States,
> demands. The Orchestra has 4 tenured oboe positions. As Principal Oboe, Mr. Wang
> leads the oboe section and his musical contribution is critical to our success.

15.    The terms and conditions of Wang's employment with the Philharmonic are

embodied in the CBA between the Philharmonic and the Union, and his individual employment

agreement.

16.    The CBA makes clear that orchestra members cannot be fired or otherwise

sanctioned at will, but instead, that their employment is a continuing *right* that cannot be

infringed without just cause.  Essential to this right is Union representation of employees in the event that employment sanctions are imposed that even arguably violate the CBA.  Only the Union can grieve such a termination and trigger binding arbitration - contemplated by the CBA as the agreed upon forum for the adjudication of disputes between employer and employee/Union over the rights and procedures set forth in the CBA, including the existence of purported just cause.

17.    Wang has been a member in good standing of the Union since he was hired in 2006.

*2018 Termination and Reinstatement*

18.    The public relations firestorm that led the Philharmonic to first suspend and later terminate Wang had its origins in events from 2018 and earlier.

19.    In 2010, while the Philharmonic was in Vail, Colorado to perform a series of concerts, a probationary player, Cara Kizer, accused a Philharmonic member, Matthew Muckey, of assaulting her.[2]  Wang was a witness.  Like several others, he had been in the presence of Muckey and Kizer in the hours before the alleged assault.  Wang cooperated with local law enforcement by providing the limited information that he had, such as his observations of the affectionate interactions between Kizer and Muckey before the alleged assault.   The Colorado prosecutor declined to bring charges against Muckey, and the Philharmonic, through its counsel, expressly stated at the time that it would not "inject itself" into the allegations made by Kizer

---

[2] To our knowledge, Kizer has never claimed to *remember* a non-consensual sex act with Muckey.  The essence of her public statements (and statements to the police) appears to be that she did not *remember* having sex with Muckey, and thus has no memory of communicating or not communicating her lack of consent – combined with her stated position that she *would not have* consented to sex with Muckey.

given that "the police department has closed the investigation as the District Attorney did not

find the level of evidence sufficient to file charges."

20.     In 2018, the Philharmonic suddenly decided to revisit Kizer's by then eight-year-

old allegations, hiring former Judge Barbara Jones and her law firm to investigate.  At the end of

the investigation the Philharmonic terminated *Muckey* over the Vail allegations.  Although the

subjects of the questions Jones asked Wang included Kizer's accusation against Muckey, when

the investigation concluded and the Philharmonic terminated *Wang*, it did not accuse or

terminate him for any wrongdoing against Kizer.

21.     During the 2018 investigation a woman made an unrelated allegation of sexual

misconduct against Wang about their over decade-old first sexual encounter.  It was undisputed

that the woman who belatedly accused Wang of misconduct engaged in consensual sexual

relations with him one day after the encounter that was the subject of the Philharmonic's stated

concern, that she stayed in communication with Wang for years and occasionally engaged in

voluntary sexual relations with him, and that she only first made her allegation many years after

the fact.  The reason given by the Philharmonic when it ultimately decided to fire Wang over that

relationship was *strictly limited* to what the Philharmonic surmised had occurred in that long-ago

first encounter.  But the undeniable and undisputed facts, including mutual voluntary

participation in a sporadic but years' long sexual relationship, utterly doomed the Philharmonic's

effort to terminate Wang.

22.     The manner in which the Philharmonic investigated the relationship between

Wang and that person revealed its bias against Wang.  That is, Judge Jones asked Wang if he had

ever "had sex" with the person in question, but Judge Jones did *not* ask him whether he had

committed any form of misconduct in his relationship with her. Thus, the first time Wang

learned the nature of the Philharmonic's accusation about his purported conduct in 2006 that it would use as its excuse to fire him was *when the Philharmonic fired him* based on that purported misconduct.  Because Wang was fired based on an accusation that was not made known to him when Jones questioned him or otherwise during the investigation, he had no opportunity to refute the allegation (of which he was kept ignorant) during the investigation.[3]  As explained below, in 2024, the Philharmonic did something very similar when, in purporting to give Wang a chance to present his perspective on matters being investigated by Levy,  it did not identify for Wang the nature of alleged misconduct that it was investigating involving a long term girlfriend from a decade earlier.  Thus, not once but twice, the Philharmonic has thus pretended to conduct a fair investigation by offering Wang a chance to tell his "side of the story" – but in each case, the Philharmonic's investigator deliberately withheld from Wang the essence of the most serious allegation it was investigating.

23.    Article VII is the provision of the CBA providing that the Philharmonic may discipline members for violations of rules or "for other just cause."  The term "discipline" encompasses any suspension or termination for purported misconduct.

24.    When it fired Wang and Muckey in 2018, the Philharmonic relied on Article VII of the CBA, claiming the Jones investigation gave it "just cause" to do so.

25.    Article XV of the CBA between the Philharmonic and the Union expressly provides that, in the case of termination of a member, the Union may demand arbitration of the dismissal pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration

---

[3] The arbitrator's reasons for reinstating Wang were compelling, and in any event the Philharmonic could have challenged the arbitration decision in court, but did not.  Moreover, there is no basis to believe that anybody *has ever made a report to law enforcement accusing Wang* of a crime.

Society.  Such rules require joint selection of a neutral third party to arbitrate the dispute.  Article XV of the CBA further provides:

> The decision of the Arbitrator shall be ***final and binding*** upon the Society, the Union and the individual Orchestra member involved…

26.    Mr. Wang petitioned Local 802 to protest his 2018 termination, and Local 802 filed a grievance on his behalf.  Under the terms of the CBA, the matter was submitted to arbitration.  Richard I. Bloch, one of the most respected and experienced labor arbitrators in the nation, was jointly selected by the parties, and over the course of eight months during 2019, presided over the resulting arbitration.  Wang testified both as a witness to the Vail allegations, and in his own defense against the allegation made against him.  He vigorously denied that he had engaged in misconduct and ultimately, the arbitrator agreed that the Philharmonic failed to show it had just cause to fire Wang.

27.    In April 2020, arbitrator Bloch issued a decision in which he explained in detail why the evidence did not establish that Wang [or Muckey] had committed any misconduct, and resultantly, he ordered both musicians reinstated and made whole, including restoration of seniority and all benefits, and back pay.

28.    Complying with the arbitration decision, the Philharmonic fully reinstated both musicians, paying them all withheld wages and benefits and restoring them to the rehearsal and performance calendar, without incident.  During the four succeeding years, as had been the case during the entire 12 years that preceded Wang's 2018 termination, *no* complaints of any kind were made by anyone to the Philharmonic about Wang.  Nor has Wang been the subject or target of a regulatory or law enforcement action or investigation – ever.

*The Vulture Story, reactions and immediate fallout*

29.    On April 12, 2024, New York Magazine published an article online bearing the headline "A Hidden Sexual-Assault Scandal at the New York Philharmonic:  two musicians were fired for sexual misconduct.  Why are they back with the orchestra?" The purported "sexual-assault" referenced in the Article's title was the allegation of such conduct in 2010 in Vail Colorado, made by Kizer.

30.    Thus, as to Wang, the Article did not report on Judge Jones's investigation of the 2006 incident that culminated in Wang's 2018 termination and then his vindication in the ensuing arbitration and return to the orchestra.  Instead, thematically focused on Cara Kizer, the Article conveyed the false notion that not only Muckey, but Wang as well, had been accused of misconduct against Kizer.  As an example of this widespread perception of the Article, the Violin Channel reported on its website, as follows:

> On April 12, 2024, investigative reporter Sammy
> Sussman published an article  in Vulture, a part of New York
> Magazine, outlining *allegations of misconduct by Matthew Muckey*
> *and Liang Wang against former NY Philharmonic horn*
> *player, Cara Kizer,* in 2010.

31.    While Wang has *never* been accused of misconduct against Kizer, the contrary perception triggered the modern-day equivalent of a witch hunt, complete with proverbial pitchforks aimed at Wang.  For example, an "open letter to local 802 AFM regarding allegations of sexual misconduct by New York Philharmonic Musicians Matthew Muckey and Liang Wang" appeared on the internet, calling for both of them to be "put on immediate suspension" and stating that a failure to take such action would be to appear to "endorse illegal, unethical, and bigoted behavior."

32.    The public relations firestorm unleashed by the Article was intense.  Both the Philharmonic and the Union came under substantial criticism for allegedly having failed to take

seriously women's claims of sexual misconduct and having purportedly failed to take harsher action against male musicians accused of such misconduct.

33.     Both the Philharmonic and Local 802 – parties to the confidential arbitration – knew that the Article contained falsehoods leveled against Wang but did not attempt to correct misperceptions among Wang's colleagues or in its public statements.  For example, both Defendants knew that contrary to the perception created by the Article, Wang had never been accused by Kizer of misconduct, or by the Philharmonic of misconduct involving Kizer.  They also knew that the arbitration decision correctly describes the issue in Wang's case as resulting from "a single uncorroborated claim *registered many years after the event*" involving someone who also admitted to occasionally "participating in consensual sex" with Wang after the event.

34.     But the Philharmonic and the Union, knowing all of these facts and how the Article was not remotely a fair representation of the facts concerning why Wang was fired and reinstated, did nothing to correct the misperception of Wang that it knew the Article had created in the Philharmonic community.  Notably, the Article asked "are women safe  . . .?",  but although Defendants knew that neither Wang nor Muckey posed any threat to female musicians or anyone else and that the Article was particularly misleading as to Wang, chose instead to fan the flames by their subsequent irresponsible words and actions.

35.     Thus, on April 13, 2024 the Philharmonic's CEO emailed the members of the orchestra about the Article.  Rather than correcting its false suggestion that the Philharmonic had previously terminated *Wang* for misconduct against Kizer, Ginstling instead referred to the Article as "distressing" and noted "limitations on what we can say."

36.      Also on April 13, 2024, counsel for the Philharmonic advised Wang's counsel that Wang was prohibited from participating in performances or even rehearsals, *with no end*

*date on that suspension*.  The only reason provided for the indefinite suspension was to let the firestorm over the Article calm down.  Later that day, CEO Ginstling emailed the orchestra to advise that "for the time being, Matthew Muckey and Liang Wang will not be at rehearsals or performances."

37.    For a year – since April 13, 2024 – Mr. Wang has been barred from performing in any concerts of the Philharmonic, attending rehearsals, or even showing up at David Geffen Hall without obtaining prior approval.

38.    On April 15, CEO Ginstling acknowledged, in remarks quoted in the New York Times, that the arbitration decision reinstating Mr. Wang to the orchestra was made "through binding arbitration", emphasizing that "binding is the key word."  Nevertheless, Ginstling suggested that the Philharmonic would continue to bar Mr. Wang from the Philharmonic because the Article had "prompted a lot of strong feelings."

39.    There is nothing in the CBA that gives the Philharmonic the right to suspend or terminate a musician because of "strong feelings" generated by a magazine article.

40.    The "strong feelings" to which Gintsling alluded were apparent on social media and in the press, where a small but vocal contingent of the broader classical music community (necessarily ignorant of the evidence adduced in the confidential arbitration favorable to Wang and Muckey) reacted to the Article with gendered statements that, for example,: a)  included calls for the men to be fired and for the women of the orchestra to go on strike until they were; b) questioned whether female musicians would be safe so long as the men remained in the orchestra; and, c) implied that accusations made by women should be presumptively believed but men's denials should be presumptively rejected.  Some such statements were made by representatives of the orchestra and by Local 802 leadership.

41.     For example, the April 15, 2024 New York Times article quoted the Philharmonic's orchestra committee, a division of the Union that "represents players," as stating "we believe Cara" [based on a magazine article] and, without a scintilla of evidence, asserting "we don't believe these are isolated incidents involving …Liang Wang."

42.     In this respect, the orchestra committee relied on the wildly speculative notion that Wang had committed misconduct comparable to the "incident[]" that was the subject of the Article as well as the indefensible and illogical notion that to "believe Cara [Kizer]"—who did not accuse Wang—could somehow justify Wang's suspension.

43.     The New York Times article also quoted the statement of Sara Cutler, the Union's President, in which she *endorsed* both suspensions, calling the removal of Wang and Muckey "good first steps" which "can't be the last."  In calling for these negative employment consequences for two union members that Local 802 is supposed to represent, Cutler emphasized gender, and endorsed negative employment consequences based on claims made in a magazine article: "As a woman … I am horrified by what was in the story."

44.     Had Cutler actually read the record of the arbitration in which her own Union successfully defeated Wang's 2018 termination, she would know that her stated reason for publicly endorsing Wang's suspension—"what was in the story" (the accusation of misconduct against Kizer)—was *never* an accusation against Wang, and that therefore, it could not fairly make Wang's ouster "good" from any perspective, particularly from that of his own Union.

45.     Cutler's position was a180-degree reversal from that of her predecessor, who had recognized that Wang's 2018 termination was not supported by just cause and submitted the dispute to arbitration, fulfilling Local 802's duty to fairly represent Wang.

46.    On April 18, CEO Ginstling posted a statement to the entire New York Philharmonic Community on its Facebook page.  In it, he described the content of Kizer's accusations as having been "*revealed* in the *New York* magazine article"—a statement that was doubly misleading in that: a) Kizer's allegations were not newly "revealed" to the Philharmonic, which had known about them since 2010; and b) contrary to the impression gleaned by many from the Article, Kizer's allegations were not and never were against Wang.  Moreover, there was *nothing* in the Article's retelling of Kizer's claims that had not been raised by the Philharmonic itself in connection with its own previous investigation, and then vetted by the arbitrator in the 20-day hearing that took place over the course of 2019.

47.    In that same email, Mr. Ginstling advised that a law firm had been engaged "to launch an independent investigation into the culture of the New York Philharmonic in recent years."  He also stated that, during this investigation, Mr. Wang [and Mr. Muckey] would not be assigned to any Philharmonic activity.  But since neither Mr. Wang nor Mr. Muckey were at that time the subject of any new accusations, the only conclusion that can be drawn is that the two were suspended based on accusations already adjudicated in their favor, in a thorough and binding arbitration.   Punishment was inflicted, not merely before the crime was proved, but before the charges were leveled and even before it was known if there would be any charges and if so what they might be.  Thus began the effort to manufacture the appearance of a reason for barring Wang from the Philharmonic.

48.    Gintsling also effectively announced in the April 18 statement that Wang and Muckey's futures with the orchestra were in doubt, and that a decision would be made "in due course."  In other words, the Philharmonic expressed its clear intent to come up with a pretext to

fire Wang (and Muckey) notwithstanding that nothing in the Article was news to either the Philharmonic or the Union.

49.    On April 19, 2024, orchestra members were informed by email that the Philharmonic was launching a second investigation to be conducted by attorney Tracey Levy "to investigate new allegations . . . alleged to have been committed by *any* musician employed by the Philharmonic."  (emphasis added)

50.    Neither at the time Wang was suspended on April 13, nor at the time the two investigations were announced on April 18th and 19th, were Wang or his lawyers ever informed that *he* was specifically being investigated, or that the reason for his suspension was either of the two investigations that had been labeled as about anyone and everyone.  However, subsequent to Wang's filing of his initial complaint, the Philharmonic began to refer to those investigations as its *excuse* to continue Mr. Wang's suspension in defiance of the arbitration award and in the absence of any just cause.  In any event, the CBA does not authorize or sanction a suspension or other negative employment consequence based on an investigation of events already extensively investigated and then adjudicated in a binding arbitration.

51.    Although the scope of the investigations, described by the Philharmonic as "the culture of the New York Philharmonic in recent years" and an investigation into new wrongdoing "by any musician" did not purport to be a new investigation or reinvestigation *of Wang* [or Muckey], the Philharmonic singled them out for adverse employment actions. That is, the Philharmonic rationalized its continuation of their suspensions (imposed when there was no investigation and no accusation to investigate) based on the new investigations, but did not suspend anyone else.

52.     In singling out Wang (and Muckey) for suspension and laying the path for their ultimate termination, the Philharmonic engaged in sex-biased discrimination against Wang, motivated in significant part by its desire to shield itself from the public's rancor and criticism that the Philharmonic failed to take seriously accusations of sexual misconduct made by women against men.

53.     The only conclusion that could be drawn was that the Philharmonic suspended Wang, not because he had done anything to deserve it or because the CBA authorized it, but simply because the Philharmonic and the Union had a public relations problem in being perceived as having previously been too soft on men accused of misconduct against women.

54.     Wang's unprecedented suspension violated the CBA, including, but not limited to Article XV's obligation to treat arbitration awards as final and binding and Article VII's prohibition on imposing discipline without just cause.

55.     Wang's suspension also violated aspects of Wang's individual employment agreement with the Philharmonic, including, but not limited to, its requirement to provide Wang with opportunities to perform with the Philharmonic, to raise his profile as a performing musician, to "schedule a minimum of 6 solo performances every three seasons" and to pay additional compensation for such solos.

56.     Wang's suspension also violates New York State Human Rights Law and the New York City Human Rights Law (hereinafter NYSHRL and NYCHRL), in that Wang is a member of a protected class, he was eminently qualified to perform as the Philharmonic's first oboe, the suspension is an adverse employment action, and because the Philharmonic took completely unprecedented and unauthorized action in the face of calls for it to be selectively

tougher on men accused of misconduct against women, the adverse action occurred under circumstances giving rise to an inference of discrimination.

57.     In spite of the Union president's public endorsement of Wang's suspension a mere two days after it was implemented, and statement that the suspension should "not be the last" adverse action against Wang, Wang nevertheless approached the Union and demanded it protest and remedy his suspension.  But by the responsive letter of its counsel dated April 26, 2024, the Union refused to take any action on Wang's behalf—pointing to the Philharmonic's newly announced investigation as the Union's reason for not protesting Wang's suspension—even though the investigation was not described as being about Wang in particular.  The Union also took the position that Wang had suffered no adverse employment action because he was being paid during his suspension.

58.     The adverse nature of Wang's suspension is underscored by, among other things, (i) the provisions in Wang's individual employment agreement that require the Philharmonic to provide him with specific performance opportunities, schedule him for solos, and to use best efforts to raise his profile, and (ii) the way the parties have, by their course of conduct, consistently interpreted "reinstatement" after arbitration under the CBA to include not only restoration of pay but also restoration to the performance schedule.

59.     The CBA also reinforces that the obligations owed by the Philharmonic to Wang (and other musicians) includes performance and not just the payment of salary and other monetary benefits.  The musicians are performers at the pinnacle of their field, who audition for the privilege of performing with one of the greatest orchestras in the world.  In any event, the CBA not only requires the musicians to be paid, it expressly requires them to be "employed" for all 52 weeks of the year – and employment means receiving compensation for doing the work of

the employer.  Likewise, the CBA refers to the musicians' "basic work week" and describes as "vacation" nine of the 52 basic work weeks.   Musicians of the caliber hired by the Philharmonic specifically go there to perform, not merely to be paid while their instruments (and skills) gather dust.

60.    Consistent with the conclusion that Wang's rights under the CBA were violated by his suspension, provisions of the Union's by laws (a document that is expressly incorporated by reference in its entirety into the CBA) state that the members of the Union are to be afforded "the opportunity to develop [their] talents and skills" and that their "work will be fulfilling."  But when, as here, a world class musician like Liang Wang is told to stay away from performances and rehearsals, indefinitely, that deprives him of his ability to have "fulfilling … work" and to develop his "talents and skills."

61.    In refusing to challenge Wang's suspension the Union was motivated in significant part by its desire to assuage critics who accused it (based on a magazine article) of having failed to take seriously women's allegations of sexual misconduct.

62.    The Union also rationalized its refusal to provide representation to Wang in connection with his suspension on the ground that the CBA does not afford Philharmonic members with any rights whatsoever to be "placed on the schedule for any …performance." That is an appalling position for a Union - representing the highest caliber artists in connection with their positions *as performers* —to take with respect to the importance of performance to its members.  The statement reveals only the extraordinary distance the Union will go to avoid performing its contractual duty to Wang, especially in light of the above-mentioned provisions of the Union's by laws that recognize that it is the mission of the Union to protect members' ability to obtain fulfilling work and develop their talent and skills.  For the Union, sworn to uphold the

rights of the musicians of the New York Philharmonic orchestra, to assert that the Philharmonic

may prohibit tenured musicians from indefinitely performing for or rehearsing with the

orchestra, as long as they are paid, is a shocking violation of the Union's obligation to advocate

for the musicians who entrust it with the protection not only of their salaries, but of their careers

with the orchestra as performers.

63.    The Union's refusal to grieve Wang's suspension under the circumstances was a

breach of the duty of fair representation, and but for that breach, it is highly likely that Wang

would have been restored to the performance and rehearsal schedule via arbitration or a

negotiated resolution.

64.    The fallout from the suspension was immediate and devastating.

65.    Wang had been scheduled to perform a series of solos with the orchestra

beginning on May 8, 2024.  The Mozart concerto that Wang was scheduled to perform is

considered perhaps the most important piece of music for the oboe, and Wang had been asked to

perform it 18 months prior.  He has devoted his career to mastering this piece.  From all over the

world, Wang's friends and family made plans to attend these solo concertos.  Mr. Wang's past

students, who now live all over the world, were also planning to attend.

66.    Wang was also quickly suspended or removed from multiple side-engagements,

including a teaching position and participation in five prestigious music events scheduled for

later in 2024.

The Biased 2024 investigation

67.    The Philharmonic engaged Tracey Levy, a former attorney at the same firm that

represents the Philharmonic in this action (Proskauer Rose), purportedly to conduct an

"independent" investigation into new allegations of wrongdoing by any musician.

19

68.     But in reality, whatever other objectives the Philharmonic may contend it had in commencing the Levy investigation, the investigation was launched to create an *ex post facto* rationalization for Wang's (and Muckey's) suspension, specifically, to try to manufacture "just cause" for Wang's (and Muckey's) permanent dismissal.

69.     Though operating under the guise of an impartial investigation into any misconduct by any Philharmonic employee, Levy's investigation in fact was neither impartial nor open-ended.  It targeted only two people – Wang and Muckey – two men who had prevailed in binding arbitration against past allegations of misconduct against women, and who had become public relations liabilities for Defendants - in part because of the misguided public statements of their leaders.

70.     Levy's investigation was biased from the start and lacked even the most basic elements of due process or impartial fact-finding.  First, after Wang was advised on July 9, 2024 that Levy wanted to interview him, Mr. Wang requested additional information that would enable him to understand if he was a target of the investigation, and if so, what purported conduct by him was the subject of the investigation. Wang sought this information so that he could adequately prepare to answer Levy's questions.  The investigator denied his request.

71.     The initial interview was designed like a test the investigator intended Wang to fail.  Wang was asked open-ended questions without being provided any specific details or context for the questions.  For example, Wang was asked questions like, "did you ever forcibly kiss anyone?" without being told the identity of the accuser behind that question, the date or place of the alleged event(s), or other specific details that would have allowed him to convey his recollections and corroborating evidence, and otherwise defend himself.  The most he could offer was a categorical denial.

72.     Furthermore, the matters about which Levy questioned Wang were not only described vaguely, but as could be gleaned from the questions, were about a period of time between 8 and 18 years before the interview.  Wang had no opportunity to refresh his recollection about those time periods and was provided with few, if any, contextual details to assist him in that process.

73.     After the initial interview, Wang requested follow up information so that he could provide Levy with additional documents, communications, potential witness names and the like. Levy provided minimal additional information about a few of the interview subjects – for example the year(s) and the general location (e.g. 2008 in New York) of some alleged occurrences – but stated that she could not provide further information because of the danger of retaliation by Wang.  She provided no information at all regarding the most serious accusation, which Wang did not know anything about until a few weeks later when he was allowed to read (only once and in the presence of his litigation adversary - counsel to the Union) an "executive summary" of Levy's report.

74.     Levy continued to exhibit bias against Mr. Wang in her execution of the investigation.  Among other signs of bias, she appeared to automatically credit the stories told to her by female interviewees while either discounting or dismissing entirely Wang's statements. In fact, the only female witness whose story Levy did not credit was one whose statement supported Wang.

75.     She also exhibited bias in characterizing normal, if sometimes awkward, human dating interactions in nefarious terms: asking a person (whose identity remains unknown to Wang) out on a date who did not want to be asked out was labeled as an "unwanted invitation," notwithstanding that nothing Levy said suggested Wang pursued this individual after she

rebuffed his first invitation;  an apparent misunderstanding involving some other unidentified individuals over whether a hug was to be accompanied by a kiss on the lips versus a kiss on the cheek was labeled "forcible kissing" notwithstanding that, again, there was no suggestion that Wang repeated this behavior once it became clear to him that any individual he kissed did not welcome that, and even the women answering Levy's questions about this subject reported that they considered it no big deal; Wang's purported attempt to playfully engage another unidentified woman at a party was labeled as "pinning her in a corner" and an "unwanted advance" even though the woman reported to Levy that she immediately walked under his arm and he did nothing to stop her from walking away.  Levy also relied on these and other similar examples of "misconduct" - which were alleged to have occurred a decade or more ago and primarily in settings that had nothing to do with the Philharmonic and which at most should have resulted in a talking to by human resources and workplace behavior training, something the Philharmonic did not institute until 2018, long after these events took place – to make sweeping generalizations about Wang's character and "pattern of misconduct."  In these and other ways, Levy exhibited bias towards Wang.

76.    Also, because Levy consistently withheld information from Wang that would have assisted him in more effectively responding to the accusations leveled against him, Wang was not able to suggest other witnesses with whom the investigator could speak or send the investigator communications that corroborated his version of the events.

77.    For example, the Philharmonic has publicly asserted that Wang "tried to influence decisions about tenure."  Wang now realizes, based on certain public statements, who likely made this accusation, which was purportedly based on an overheard phone call, and what that person overheard.  Had Levy disclosed the identity of the source of this accusation, Wang could

have identified witnesses who could have vouched for the content of the call and the fact that, even if it included some angst about the conduct of Cara Kizer when she was a probationary player, it was not intended to, and did not influence the decision of tenure committee members.

78.    Throughout the investigation, Mr. Wang, through counsel, requested additional information from Levy on at least five occasions. Most of these requests were rejected and when the investigator did provide some details, they were paltry at best.

79.    Because Levy withheld key information from Wang – so much so that to this day Wang does not know the identity of most of those who spoke to Levy about him, and the dates, exact locations and other identifying circumstances of the purported "events" – Levy necessarily did not hear or review anything close to all the potentially relevant evidence; she did not hear Wang's recollections or interview any witnesses he may have contemporaneously spoken to about the interactions now purported to be problematic or review contemporaneous emails or text messages he may have been able to provide. These deficiencies in the investigation were also very similar to the deficiencies of the 2018 investigation – as during that investigation Wang was "investigated" by the Philharmonic for an alleged instance of sexual misconduct it never told Wang it was investigating before firing him for it after the investigation. *See supra* at ¶ 22. Because of these deficiencies (and likely others), the Levy investigation lacked the most basic level of fairness, due process and independence, rendering suspect any conclusions Levy drew from her investigation.

80.    As was later revealed in the Executive Summary of the Levy report, in an ultimate case of Catch-22, Levy held it against Wang that he did not produce more exonerating evidence regarding the most serious allegation mentioned in the Executive Summary. That allegation involved a long-term relationship between Wang and a woman he dated well over a decade a

ago, and characterized some of their interactions as not voluntary.  But Wang had no idea until he later read the Executive Summary - after he had already received the Termination Letter – that there was such an accusation to answer.  Had he understood specifically what he was being accused of, he would have vehemently denied it and produced contemporaneous evidence tending to disprove or undermine the allegation.  But Levy deprived him of any meaningful notice and due process.

81.    Although the Levy investigation was purportedly intended to investigate any misconduct by any musician, upon information and belief, Levy invited every member of the orchestra to meet with her, and then asked them questions primarily if not exclusively targeted to digging into vague rumors regarding Wang and Muckey.  On February 28, at a telephonic conference in this matter, counsel for the Union confirmed that an investigator was hired (Levy), not as advertised to look generally into potential misconduct by anyone, but instead  "to see whether there were any additional complaints against either of those gentlemen [Wang and Muckey]."

82.    Upon information and belief 67 musicians met with Levy.  Had Levy subjected any other musician to the same level of scrutiny – asking about every rumor and every half-remembered observation and conversation at social and other events over a period spanning nearly 20 years, she undoubtedly would have learned that other members of the orchestra had made comments on others' appearances or extended unwanted invitations or made unwanted advances or commented on the conduct of a probationary musician.  But that was not the purpose of her investigation.  Her primary goal was to find pretext to enable the Philharmonic to fire Wang and Muckey once and for all and thereby satisfy the public cries for the Philharmonic to take women's claims of misconduct by men more seriously.

83.     Levy also surveyed the 67 or so orchestra members she interviewed about how they would feel about having Wang restored to the performance and rehearsal schedule, and then reported to the Philharmonic that approximately 25 said they would be uncomfortable, that some unspecified subset of that group claimed they would refuse to share the stage with Wang, and another 25 said they would not personally feel uncomfortable but wanted to be supportive or avoid negative publicity.  Upon information and belief, most, if not all, of the 67 orchestra members polled regarding Wang's future had no first-hand information regarding Wang's purported improper behavior and were asked to form opinions based on rumor and speculation and the contents of the Article, and on the above-described public reaction to the Article by persons including the Union President and Philharmonic CEO.

84.     In 2020, when Wang and Muckey were reinstated after prevailing in arbitration, no orchestra member quit in protest (even though the Philharmonic had leaked to the press that their 2018 firings were based on alleged sexual misconduct) and they performed with their colleagues for four years without a single incident.

*New Contract*

85.     On September 17, 2024, Wang received notice that the Union and the Philharmonic had agreed to terms for the new CBA, subject to ratification.

86.     On September 23, 2024, Wang received an email from Deborah Borda advising that the new contract had been ratified, and that Wang's base pay and longevity would be increased, but overscale pay would be held to the 2023/2024 levels.

87.     Although still suspended, Wang continued to be paid base, longevity and overscale, adjusted to reflect the new contractual rates.

88.     The newly ratified CBA effective September 2024 did not reflect any changes to Article VII's just cause provisions, or the terms of Article XIV or XV.

*The 2024 Termination*

89.     Upon the conclusion of Levy's investigation, the Philharmonic made no attempt to claim that the investigations' "findings" provided the Philharmonic "just cause" to terminate Wang.

90.     Instead, on October 15, 2024, the Philharmonic sent Wang a letter from Deborah Borda, Executive Advisor, notifying him that the Philharmonic had decided not to "re-engage" Mr. Wang as a member of the orchestra for the year beginning September 21, 2025  (the "Termination Letter").  The Termination Letter did not cite to Article VII's just cause provisions, but instead to Article XIV, a provision that had never before been invoked, let alone used as a mechanism to avoid having to prove just cause under Article VII.

91.     The Termination Letter reads in full:

This is to notify you that, pursuant to Article XIV of the collective bargaining agreement between the Philharmonic-Symphony Society of New York ("Society") and Local 802 of the American Federation of Musicians, the Society will not be re-engaging you as member of the Orchestra for the year beginning September 21, 2025.

During the remainder of the current year (2024-25), you should not come to the Society's premises to rehearse or perform or for other reasons unless requested to do so by the Society's management. If you need access to the dressing room, please organize with the Orchestra Personnel Office.

We wish you well in your future endeavors.

92.     In a phone call that day, counsel for the Philharmonic advised Wang's counsel that the Philharmonic was taking the position that it did not need just cause, or even to cite a specific reason, to invoke Article XIV.

93.     Contractual provisions like Article XIV are included in some collective bargaining agreements in performing industries to provide for dismissal of members for specific non-disciplinary reasons, like inability to continue meeting artistic standards.

94.     Article XV provides a procedure for challenging a dismissal pursuant to Article XIV, which gives the Union the right to submit a dispute over its use to binding arbitration.

95.     The Philharmonic's actions were a clear and total breach of the CBA's prohibition on termination or other discipline without just cause, and a violation of his individual employment agreement.

96.     The Philharmonic took this unprecedented step – completely altering its normal longstanding and contractually codified disciplinary procedures – at least in part because Wang is male, and the Philharmonic was overcompensating to improve its image with vocal critics who expressed outrage over the Philharmonic's past handling of allegations of misconduct by males against females.  In wrongfully discharging Wang, the Philharmonic discriminated against Wang on the basis of his sex.

_Wang asks Local 802 to grieve his 2024 termination_

97.     After receiving the Termination Letter, Wang requested that Local 802 file a grievance on his behalf, challenging his termination without just cause and for no stated reason as a violation of the CBA and of his individual employment agreement.

98.     Local 802, though purportedly going through the motions of evaluating Wang's grievance pursuant to Article XV, failed to make an objective determination consistent with the Union's role as the only party who can raise a claim of a violation of the CBA on behalf of a Union member.

99.     Had they made such an objective determination, they would have concluded that Article XIV was not intended to and never has been used in this fashion, and it was therefore overreach for the Philharmonic to invoke it.  They would also have concluded that any litigation risk was slim, as any arbitrator faced with such a substantial departure from past mutually-acknowledged interpretation of the CBA would have sided with the party embracing the long-standing notion that the employer could not terminate a tenured musician without making a showing of just cause.  But the Union never made such an objective determination because they partnered with the Philharmonic in coming up with a novel way to terminate Wang (and Muckey) without just cause.  Indeed, less than a month after the termination, the Union would obtain an acknowledgment from the Philharmonic that Article XIV had *never* been used in this fashion before, and the Union exacted a promise from the Philharmonic that it would not be so used in the future, revealing the Philharmonic's and the Union's awareness of the weakness of its interpretation of Article XIV.

100.    Even though the Termination Letter made no mention whatsoever of either just cause or the Tracey Levy investigation, Local 802 focused its grievance review process on the "findings" of the Tracey Levy investigation rather than on the unprecedented nature of the Philharmonic's attempt to fire a tenured musician without citing any just cause.

101.    First, the Local 802 Executive Committee requested that the Philharmonic provide its counsel and President a copy of the report prepared by Tracey Levy.  It simultaneously entered into a confidentiality agreement that barred it from sharing the report with anyone, including Wang, thereby depriving Wang of even the most basic level of due process and opportunity (a) to fully understand and study what precisely he had been accused of

(b) to know what evidence Levy was relying on and (c) to respond meaningfully to the accusations with contrary evidence.

102.    The Union also requested that the Dismissal Review Committee – an elected committee of nine orchestra members – be permitted to review an executive summary of the Levy report (the "Executive Summary").  The Philharmonic provided it on condition that (i) members of the Dismissal Review Committee sign non-disclosure agreements, and that (ii) their review would be limited to review of a paper copy of the report, in the presence of counsel with copying, photographing, notetaking or any other attempt to retain the content prohibited.

103.    Like the Dismissal Review Committee, Wang and his attorneys were only permitted to *read* but not receive a copy of the report's Executive Summary regarding the accusations against Wang, and only after signing a confidentiality agreement barring them from disclosing any of its contents and from photographing, copying or otherwise retaining the content of the Executive Summary.  The Executive Summary did not name the interviewees who were asked questions about Wang, most whose relatively minor allegations were about events from long ago.  In any event, Wang does not know the identity of most of those interviewees.[4]

104.    Stunningly, the Executive Summary starts with the demonstrably false statement that Wang had been terminated in 2018 in part *because of Kizer's allegations*, thereby perpetuating the false impression started by the Article.  The falsity of this statement was known

---

[4] On February 28, during a telephone conference with the Court, counsel for the Union represented that the Levy "investigatory report was provided to [Wang and Muckey] when they gave their decision to contest the non-reengagement", and that they were provided "with a copy of the executive summary of the Philharmonic's investigation."  Neither of those statements were fully accurate, as neither Wang nor his counsel have been permitted to receive the investigatory report and while, as set forth above, Wang/Muckey and their counsel were permitted to read the executive summary once, and not in private, neither was provided with a copy of that document either.

to the Union, but the statement was passed along to the Orchestra Committee, which very likely was influenced and corrupted by this statement, whose falsity would have been unknown to its members.

105.    The Executive Summary went on to detail a laundry list of eleven or more purported incidents of misconduct.  Most of these accusations of misconduct were from long ago and even if true, were not on their face sufficient to constitute just cause for termination or even any other discipline.  These incidents ranged from accusations that Wang had made inappropriate comments, asked people out on dates who did not want to be asked out, made passes at people who did not want to date Wang.  The one, more serious contention was that Wang committed sexual misconduct against one woman he had dated for approximately a year, though the Executive Summary was short on details.  These purported events all occurred between 2006 to 2016, and most well over a decade ago.  To this day, Wang does not know who most of these interviewees are.   The report did not accurately reflect that Wang did respond to many of Levy's questions, such as by acknowledging that had long ago asked a woman a question that he thought would be harmless but she found offensive, and asked out some of the people on dates who told Levy years later that they did not want to be asked out.  Levy's report did not suggest that Wang pursued further any of the individuals who reportedly rebuffed Wang's invitations and advances.

106.    The report did not acknowledge that Levy had repeatedly withheld from Wang and his attorneys sufficient detail to enable him to understand what specifically he had been accused of and therefore deprived him of any meaningful opportunity to present exculpatory or mitigating information to Levy.

107.    The Executive Summary also communicated that Levy attempted to meet with every member of the orchestra and survey them about whether they would be "comfortable"

appearing on stage with Wang in the future.  The Executive Summary stated that a "significant" percentage of the surveyed members of the orchestra said they would be uncomfortable being on stage with Wang, though nothing in the Executive Summary suggested the individuals who were "uncomfortable" relied on anything for that discomfort other than the Article, which the Union and Philharmonic knew to be misleading about Wang, or the above-described public statements made by the Union President, the Orchestra Committee, and the Philharmonic CEO.  Upon information and belief, there was no overlap between the 67 orchestra members interviewed by Levy and the interviewees who gave accounts of personal interactions with Wang many years ago.  The Executive Summary does not indicate that any of those persons were employees of the Philharmonic at the time Levy interviewed them, and the vast majority had never been.

108.    There was nothing in the Executive Summary that indicated Levy considered whether any of the interviewees had been pressured to come forward by peers or whether those who might have spoken up for Wang might have been cowed into silence in an environment where the loudest voices excoriated any questioning of the assumption that women's accusations should be believed and men's denials presumptively rejected.

109.    Beyond reviewing the Levy report, Local 802 undertook no investigation into its contents.  For example, no one from Local 802 ever contacted Wang to hear his side of the story, or view evidence he might have, or speak to witnesses he might name that could fill in missing details in the Levy report.

110.    Instead, Wang was asked, on short notice, still in the dark as to many of the charges against him beyond vague statements like "a woman claims you forcibly kissed her around 2012," to submit written and oral statements to Local 802's Executive Committee.  The oral statement was limited to 15 minutes and Wang was not permitted to be represented by

counsel when giving his statement.  Notably, Wang was not afforded an opportunity to make any statement at all to the Dismissal Review Committee's nine members.

111.    Wang's statements to the Local 802 Executive Committee pointed out the unprecedented nature of the Philharmonic's decision to terminate a tenured musician without just cause, relying on Article XIV of the CBA.  Wang also described the procedural and factual flaws in the biased investigation and the inaccuracies contained in the Article.  His factual rebuttals were necessarily limited by the Philharmonic's refusal (and the Union's acquiescence in that refusal) to disclose details that would enable him to present his information, and by the fact that he was not permitted to even retain a copy of the Executive Summary to refresh his recollection as to its specific contents, let alone see the full investigative report against him.  The Local 802 Executive Committee did not ask Wang a single question after he read his statement.

112.    Despite the fact that the Philharmonic had failed to claim just cause for Wang's termination, the Dismissal Review Committee voted unanimously not to grieve Wang's termination.  In so doing they appear to have relied on what they read in the Executive Summary about accusations that *even the Philharmonic* did not cite or mention in its letter to Wang explaining the basis of his termination– and despite having never heard anything from Wang.

113.    The Local 802 Executive Board also voted unanimously not to grieve Wang's termination based on Article XIV, notwithstanding its acknowledgment in writing that Article XIV had never before been invoked as a basis to terminate or discipline a member of the orchestra based on his or her conduct or purported unpopularity.

114.    This decision not to grieve the termination, which failed to honor the Union's solemn obligation of fair representation to Wang, was motivated in part by discriminatory intent

as it was made for the purpose of assuaging public criticism of the Union for having previously defended men against charges of wrongdoing by women.

115.    Given the unprecedented nature of the Philharmonic's reliance on Article XIV, a Union challenge would have resolved the breach via negotiation or likely resulted in a binding arbitration decision in Wang's favor.

116.    Although the Philharmonic itself did not even mention the investigation in its written  termination letter to Wang, it and the Union then used and manipulated the investigation to smear Wang in the Philharmonic community and in the press and to counter public criticism that it had not done enough in the past to address women's concerns about male misconduct.

117.    For example, a November 4, 2024 article reporting on Wang and Muckey's terminations, indicates that the Philharmonic had communicated to the press that Wang and Muckey were fired because "an inquiry found credible claims against the musicians of sexual assault and harassment" notwithstanding that the Philharmonic gave no such reasons in the Termination letter and did not ever claim to have "just cause."

*The Union's Written Decision*

118.    On November 4, 2024, Local 802 issued a document entitled "Unanimous Decision of the Executive Board of Associated Musicians of Greater New York, Local 802, AFM, on the Philharmonic Symphony Society of New York's Non-Reengagement of Liang Wang and Matthew Muckey," explaining the decision of Local 802's Executive Board with respect to the non-reengagement of Mr. Wang's employment (the "Local 802 Decision").

119.    The contents of the Local 802 Decision, after being sent to the entire Philharmonic community, were reported in the media.

120.    The Local 802 Decision made clear what Wang had suspected from day one of his

suspension back in April 2024; that the Union and Philharmonic had colluded to devise a way to

get rid of Wang – whether arguable just cause could be found *or even if not*. The Local 802

Decision admits that the Philharmonic had never before used Article XIV to dismiss a musician,

and that Local 802 leadership feared that allowing the Philharmonic to do so unchallenged could

set a dangerous precedent. As the Local 802 decision states:

> [The Union] expressed concern to [the Philharmonic] about the precedent that this could
> set for the NY Phil's use of Article XIV instead of the just cause dismissal process in
> Article VII.E.7. . . . [the Philharmonic] confirmed that [it] would not use the Article
> XIV non-reengagement procedure to supplant or do an end-run around the requirement
> for having "just cause" for dismissals under Article VII.E.7 of the CBA. This
> understanding was later confirmed in writing between counsel for Local 802 and counsel
> for the NY Phil.

121.    Thus, the Philharmonic and Local 802 admitted in writing that they made an

exception to their normal practices and CBA interpretations only in order to terminate the

employment of Wang (and Muckey), and that they intend to return to business-as-usual and

compliance with the CBA's just cause requirement once Wang and Muckey were fired without

honoring that essential due process right afforded by the CBA.

122.    The Union's refusal to grieve the Philharmonic's blatant violation of the CBA,

which it openly admits was a gross departure from past practice and an "end run" around the

CBA's just cause requirement, was a clear breach of its duty of fair representation.  That duty

includes a duty to investigate before deciding whether or not a grievance has merit, a duty to

submit *potentially* meritorious grievances to binding arbitration, and a duty to ensure members

accused of wrongdoing receive fair treatment and due process, among others.  The Union's utter

capitulation to the Philharmonic's "end run" around the just cause requirement breached each of

these duties.  The Union relied, without any independent investigation, on a one-sided, employer

generated investigative report that was *not even relied on by the employer* to try to give its acquiescence to the Philharmonic's breach a fig leaf of justification. The Union, in deciding not to grieve the Philharmonic's dubious interpretation of Article XIV to target only Wang and Muckey, did so not because the Union did not harbor doubts that Article XIV lawfully allows terminations without a reason grounded in just cause, but because the application of Article XIV targeted two musicians, Wang and Muckey, who the Union had long ago decided to vilify and abandon, as exemplified by its President's public endorsement of their suspensions the moment the suspensions had been announced in April, 2024.

123. The Union's decision was made at least in part because Wang is male, and the Union was overcompensating to improve its image with vocal critics who expressed outrage over the Union's past handling of allegations of misconduct by male union members against females. In so doing, the Union discriminated against Wang on the basis of his male sex and in so doing deprived Wang of his right to fair representation, including the right to have his wrongful discharge adjudicated via binding arbitration.

124. The Union's breach of its duty of fair representation, including, but not limited to its discriminatory bias against him, is further evidenced in the details of the Local 802 Decision.

125. For example, the Local 802 Decision repeats over and over that the statements of women were credited outright by the investigator, representatives of Local 802 and the Philharmonic, and members of the Orchestra, while no statements made by Wang (or Muckey) were credited. The Local 802 Decision also made clear its bias by only including details alleged by the women interviewed and entirely ignoring certain details provided by Mr. Wang, such as the fact that one of the accusations involved a woman with whom he had a long-term consensual relationship in which they introduced each other to the other's parents and discussed marriage,

and that the day he reviewed the Executive Summary was the first time he learned that she had leveled an accusation against him.

126.    The Local 802 Decision also fails to acknowledge that Wang was never provided sufficient information to enable him to give anything close to a complete and accurate response to the allegations against him so that the investigator and ultimately, the Philharmonic and Local 802, would have all the facts of the alleged events.

127.    The Local 802 Decision also indicates that the Executive Committee gave significant weight to the unanimous recommendation of the Dismissal Committee, despite the facts that (a) Wang was never permitted to address that committee; (b) its deliberation was prejudiced by the false statement in the Levy Executive Summary that there had been accusations by Kizer against Wang upon which the Philharmonic based its 2018 decision to fire Wang; and (c) there is no indication whatsoever that it undertook any independent investigation into the veracity of the allegations in the Levy report.  The Decision details that some members of the DRC, appearing to fully credit the Executive Summary despite having heard nothing from Wang or any witnesses or evidence he might marshal, claimed they would resign rather than take the stage with Wang or Muckey.

128.    The Local 802 Decision also reveals bias in its revisionist history and in what it does and does not say; although the Philharmonic suspended Wang within 24 hours of the publication of the Article, and counsel for the Philharmonic did not give any reason for the then-temporary suspension other than the media firestorm, the Decision claims the suspensions were issued in response to "young women" who reported that "they did not feel safe in their workplace" both because of the contents of the Article and purportedly also because of

unspecified "stories" shared by colleagues - as if such vague concerns ungrounded in objective facts could justify Wang's suspension.

129.     The Decision also attempts to justify itself because "several musicians" claimed the Article's allegations did not represent "isolated incidents."  Upon information and belief the "several musicians" had no first-hand knowledge of any misconduct, and the "isolated incidents" statement was a social media post based not on any credible specific allegation but on rumor and speculation.

130.     The Decision ignores the fact that the Union had, just four years earlier, successfully and appropriately fought for Wang's reinstatement, and that the Article, "stories," and unverified rumors were not a valid basis to sideline and then terminate a tenured musician.

131.     The Local 802 Decision also makes clear that the Union in part attempted to improperly base its refusal to take up Wang's grievance not on the terms of the CBA, not on any just cause determination by either the Union or the Philharmonic, but on what was essentially an artificially constructed popularity contest – Levy's dubious survey of 67 of approximately 100 members of the orchestra.  According to the Decision, the DRC "emphasized that at least 2/3 of the Orchestra members who spoke to the investigator said that they would not take the stage or would feel extremely uncomfortable if Muckey and Wang [without distinguishing between the two] returned."  Besides the fact that such a "survey" does not provide a valid basis to dismiss a musician under the CBA, the Decision grossly distorts the results.  According to the Executive Summary, roughly 25 musicians told Levy something to the effect that they would not be comfortable sharing the stage with Wang, and another 25 or so said they weren't personally uncomfortable but wanted to be supportive of those who would be or wanted to protect the reputation of the Philharmonic.  The Local 802 Decision reveals that the source of dismay of

those who were uncomfortable was not their own experiences, but rather, what they read in the article, as well as the "stories" they were told. In any event, Defendants themselves had helped to trigger the very discomfort about Wang and Muckey (the above referenced public statements of the Union President and the Philharmonic CEO) that they then relied upon to abandon them.

132. As a result of the actions described herein, and others, the Union breached its duty of fair representation to Wang, and also discriminated against him on the basis of his male sex under circumstances giving rise to an inference of discriminatory intent. In so doing, the Union deprived him of both his current employment, supplemental work, and future employment opportunities, and his right to have his employer's breaching conduct challenged.

133. As a result of the actions described herein, and others, the Philharmonic breached its contractual duties to Wang and discriminated against him on the basis of his male sex, which deprived him of both his current employment, supplemental work, and future employment opportunities.

134. Mr. Wang has been made into the proverbial sacrificial lamb whose career has been destroyed in the Philharmonic and Local 802's effort to show that they are tough on men and supportive of women, and in so doing they have made a mockery of their obligations under the Labor and Management Relations Act, Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000 *et seq*.and state and local human rights laws.

### *Mr. Wang files an EEOC Charge and receives "right-to-sue" letter*

135. On March 10, 2025, Mr. Wang filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Philharmonic and the Union. Both charges alleged violations of Title VII of the Civil Rights Act, 42 U.S.C 2000e *et seq*., arising from the Philharmonic and the Union's sex-based discrimination against Mr. Wang.

136.    On March 10, 2025, the EEOC issued right to sue letters for both charges.  Mr.
Wang received both right to sue letters on March 17, 2025.  The right to sue letters authorize Mr.
Wang to proceed with his discrimination claims against the Philharmonic and the Union in
federal or state court.

## DAMAGES

137.    As a result of Defendants' breaching and discriminatory conduct, Mr. Wang has
suffered a continuing cascade of extensive damages in the form of lost past and future income,
reputational damages, severe emotional distress, loss of potential job opportunities, and loss of
prestigious positions around the world, among others.

138.    Defendants' wrongful conduct has caused Mr. Wang to suffer severe economic
harm.

### *Loss of Philharmonic compensation*

139.    Effective September 21, 2025, Wang will be deprived of his entire Philharmonic
compensation package, with no viable prospect for replacing that package via alternative
employment given the severe reputational damage caused by Defendants' actions.

140.    Mr. Wang has also suffered damages from being underpaid, first during his
suspension and then after the Philharmonic fired him but kept him on reduced salary until
September, 2025.  *First*, during his suspension he was not awarded any solo performances,
which he was contractually guaranteed, and for which he was entitled to additional
compensation.

141.    Second, in the wake of the October 15 termination, although Wang continues to
be paid through September 2025, his pay has been substantially reduced.  Rather than being paid
both "base" and overscale, as of the date of the filing of this complaint, he is currently only paid

the "base pay" rate, which is only about 40% of the rate of pay he would receive if he had not been terminated on October 15.

### *Loss of Outside Engagements*

142.    Given Wang's unquestionable musical talent and prestigious position with the Philharmonic, he was regularly invited to participate in outside engagements, including teaching, judging, advising and performing, among others, around the country and globally.  Almost all of these opportunities were cancelled once it became common knowledge that Wang had been indefinitely suspended and later terminated from his position with the Philharmonic.

143.    For example, Mr. Wang was invited to be the season opener for the New York Lyric Chamber Music Society in September 2024.  After the April suspension, Mr. Wang was notified that this offer had been rescinded.

144.    On April 15, 2024, the Taipei Music Academy and Festival informed Wang that it was being pressured to cancel Wang's participation in the festival and later did so.

145.    Wang had also been asked to serve as a juror at the 2024 ARD International Music Competition, the largest international classical music competition in Germany.  Since 1952, the competition has been one of the most prestigious classical music competitions in the world.  On April 17, 2024, Wang was notified that he would no longer be appointed as a juror for the competition.  ARD cited as a reason for the suspension the fact that "the Philharmonic had released you from your duties."

146.    On April 29, 2024, Wang heard from Marc Neikrug, the director of the Santa Fe Chamber Music Festival, and composer of a concerto that Wang was expected to perform in 2024, on a date to be determined.   Neikrug was commissioned by the Philharmonic to write the piece expressly for Wang to perform.  However, in light of the Philharmonic's decision to suspend Wang, Neikrug concluded that he had no choice but to find "another place for his

piece." He specifically attributed his decision, not to any fault of Wang's, but to the damage to Wang's reputation caused by the Philharmonic's actions: "I believe, due to the press generated by the orchestra's actions, it will be impossible for you to play the concerto."

147.    In March 2024, Wang was asked to serve as a Consultant and Artist for DC Brothers, which would involve musical instrument development, marketing, and brand representation on an ongoing basis under a lucrative annual contract. Because of the April 2024 suspension, Wang was notified that DC Brothers was cancelling the contract.

148.    Wang was a sponsored artist and distributor for F. Loree, a French manufacturer of oboes. In this position, he received unlimited access to deep discounts on oboes. Wang lost this position as a result of Defendants' actions.

149.    Before the events described herein, Wang was the Artistic Director of the Chinese American Arts Council. On April 30, 2024, the Council's Executive Director wrote to inform Wang that his contract had been cancelled and cited the public statements made by the New York Philharmonic as part of the reason for the Council's decision.

150.    Wang's contract with the Shanghai Conservatory of Music was also cancelled because of Defendants' actions. Wang's position with the Shanghai Conservatory, which had been renewed every year since 2012, involved teaching, artistic practice, international exchange, academic development, and promotion of influence.

151.    Wang was employed as an oboe instructor at the Manhattan School of Music since 2009. On April 19, 2024, the Manhattan School of Music publicly announced the suspension of Wang as a member of MSM's precollege faculty. MSM later terminated Wang. Upon information and belief, MSM's decisions were influenced in large part by the

Philharmonic's suspension and termination and the Union's endorsement of and acquiescence to those contractual breaches.

152.    Because of his suspension and termination, Wang has had no prospect of finding alternative work in his field, nor will he have such opportunities in the foreseeable future.

153.    The damages Wang incurred as a result of Defendants' actions reached all corners of his personal and professional life.  In a short span of time, everything to which he had devoted his entire life has been unceremoniously stripped from him.  His future plans and economic security were extinguished, and his wife and young children were left without their main source of financial support.

154.    This caused Wang additional damages in the form of severe emotional and existential distress.

## FIRST CLAIM FOR RELIEF

### HYBRID §301/DFR CLAIM:
### Breach of Duty of Fair Representation
### (as to Defendant Union)

155.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

156.    Mr. Wang is a member in good standing of Local 802.

157.    Under federal labor law, Defendant Union is the sole representative of its members in dealings with the Philharmonic.

158.    As such, Defendant Union owes each of its members, including Mr. Wang, a duty of fair representation.

159.    In addition, Article 10 of the bylaws of the American Federation of Musicians expressly states that all members of the AFM have the right to fair representation in all matters relating to collective bargaining with an employer.

160.    The Philharmonic breached the CBA by suspending Mr. Wang without just cause and in violation of the terms of a 2020 Arbitration Decision.

161.    By letter, Mr. Wang demanded that the Union seek enforcement of the 2020 Arbitration Decision, including an end to Wang's indefinite suspension and full reinstatement to his position in the orchestra.

162.    Rather than demanding Mr. Wang's reinstatement to his position as Principal Oboe and continued enforcement of the 2020 Arbitration Award, the Union instead refused, in writing, to so represent Mr. Wang and thereby breached its duty of fair representation.  That refusal and ongoing failure to act to enforce Mr. Wang's rights was arbitrary, discriminatory and in bad faith under the circumstances, as the Union was a party to and thus bound by the 2020 Arbitration Award, and also privy to the extensive Arbitration hearing record which made clear that the Philharmonic failed to establish good cause for terminating Wang in 2018.

163.    Moreover, in a further breach of the Union's duty of fair representation, the President of the Union made public statements endorsing Mr. Wang's suspension instead of defending Mr. Wang's right to be reinstated to his position under the CBA and the binding Arbitration Award.  Such statements were made at best arbitrarily and at worst, in bad faith, as the President knew, or should have known that there was no valid basis to endorse Wang's suspension given the factual context in which it arose (e.g., a misleading and one-sided article regarding subjects adjudicated in the binding arbitration) and the CBA's requirements.

164.    At all points during his suspension, the Union failed to seek an end to Wang's suspension, which is contrary to the Arbitration Award, or otherwise seek any remedy resulting from Mr. Wang's unfair and improper suspension by the Philharmonic.

165.    There was a causal connection between the Union's breach of its duty to Mr. Wang and the Philharmonic's suspension of Mr. Wang, and its associated harms to Mr. Wang.

166.    While Mr. Wang's suspension was still ongoing, on October 15, 2024, the Philharmonic told Wang that it would terminate him (with reduced salary paid until September 21, 2025).

167.    Although this decision was made following the conclusion of the Levy Investigation, which was purportedly initiated to look into allegations of wrongdoing against *any* member of the Philharmonic, but in fact was designed to target Mr. Wang and provide a pretense for his termination, the results of the Investigation were not cited as the reason for Mr. Wang's termination.

168.    Even considering the flawed, biased, and discriminatory process and findings of the Levy Report, there was no "just cause" basis for Mr. Wang's termination under Articles VII or XV of the CBA.

169.    As a result, in conjunction with the Union, the Philharmonic determined that it would use a never before invoked provision of the CBA, Article XIV, to execute an "end run" around the "just cause" requirement and terminate Mr. Wang.

170.    The Philharmonic's termination of Wang without just cause and in reliance on Article XIV instead of Article VII was a clear breach  of the CBA.

171.    Wang demanded that the Union grieve his termination.

172.    The Union refused.

173.    Even though the Philharmonic in no way relied on the Levy report as a basis for Wang's termination, the Union proceeded to rely on such report to try to justify its decision to

refuse to grieve Wang's unprecedented termination, all while restricting Mr. Wang's access to the Report.

174.    The Union also failed to investigate the purported "findings" in the Levy report upon which it relied for the Local 802 Decision, and failed to give Wang even a pretense of due process to answer the purported charges that remain cloaked in secrecy.

175.    The Union thereby further breached its duty of fair representation to Wang and there is a causal connection between that breach and the harms suffered by Mr. Wang as a result.

176.    In so doing the Union proximately caused and will continue to cause significant actual damages to be suffered by Mr. Wang, including but not limited to reputational harms, emotional harm, loss of business opportunities and the incurring of attorneys' fee and other costs and expenses necessary to prosecute these claims.

177.    Other members of the Union are also harmed by the Union's actions for which Wang seeks relief, in that the Union took the position, contrary to the interests of all of its members who are tenured players with the Philharmonic, that (i) so long as the Philharmonic does not withhold salary it can arbitrarily suspend its world class musicians from performing or even rehearsing, indefinitely, and (ii) it can fire tenured musicians for any reason or no reason at all, so long as the Philharmonic provides at least seven months advanced notice and pays a reduced salary, consisting of only base salary, to the musician for that notice period.

178.    Based upon the foregoing, Mr. Wang is entitled to the following relief:

a.    a declaratory judgment declaring that the Union's conduct breached its DFR to Mr. Wang;

b.    economic damages of not less than $50,000,000 in an amount to be determined at trial and prejudgment interest; and

    c.     attorneys' fees, costs and disbursements in an amount not presently capable of ascertainment.

## SECOND CLAIM FOR RELIEF

### HYBRID 301/DFR:
### Breach of Collective Bargaining Agreement
### (as to Defendant Philharmonic)

179.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

180.    Mr. Wang has been employed fulltime as Principal Oboe for the Philharmonic since 2006, and as such, is a "musician" as that term is used in the CBA.

181.    On April 13, 2024, the Philharmonic suspended Mr. Wang (with pay) from performing or rehearsing with the orchestra, and gave no reason or end date.

182.    Under the CBA and Mr. Wang's individual employment agreement, an indefinite suspension, even with pay, is an adverse employment action.

183.    The Philharmonic had no just cause to indefinitely suspend Mr. Wang.

184.    The suspension closely followed the publication of an article that questioned the Philharmonic's compliance with a four-year old final and binding Arbitration Award that found Wang had been terminated without just cause and ordering his reinstatement with full benefits.

185.    The content of the Article focused on events that occurred in 2010 in Vail, Colorado. Wang was never accused of wrongdoing in connection with those events, as the Philharmonic was well aware, and those events were fully vetted in the Arbitration.

186.    Shortly after the suspension, the Philharmonic's CEO publicly acknowledged the final and binding nature of the Arbitration Award.

187.    Yet in the same interview he separately implied that the suspensions were warranted because the Article had "prompted a lot of strong feelings."

46

188.    On April 18, 2024, the Philharmonic issued a public statement to the Philharmonic community announcing a broad investigation into workplace culture and also announcing Wang and Muckey's suspensions.

189.    The Philharmonic had not, in its public statements or in its private statements to Wang's attorney, in the weeks and months immediately following his suspension, claimed to be aware of any new allegation or complaint against Wang.

190.    On these facts, the only inference to be drawn is that the Philharmonic had no just cause to suspend Wang, and that the suspension was a capitulation to pressure from a misinformed public to violate the final and binding nature of the 2020 Arbitration Award.

191.    Article XV of the CBA required the Philharmonic to treat the Arbitration Decision as final and binding.

192.    Article VII of the CBA prohibits the Philharmonic from taking disciplinary action against Wang without just cause.

193.    The CBA requires the Philharmonic to employ Mr. Wang 52 weeks per year.

194.    Mr. Wang's individual employment agreement requires the Philharmonic to "raise [Wang's] profile" and provide Wang with "solo opportunities".

195.    The Philharmonic breached the CBA and Mr. Wang's individual employment agreement with the Philharmonic by placing him on indefinite suspension from rehearsals and performances, including, but not limited to, long-scheduled and contractually required solo performances, without cause, and in violation of the final and binding Arbitration Award that compelled his full reinstatement.

196.    While Wang's suspension was still ongoing, on October 15, 2024, the Philharmonic further breached the CBA by terminating Wang (with a substantially reduced salary - base pay only - continuing until September 21, 2025).

197.    The Philharmonic did not rely on just cause or any other reason for the termination, and took the position that it did not need a reason, relying on Article XIV of the CBA instead of Article VII.  Article XIV had never before been invoked to fire a tenured musician.

198.    The Philharmonic thereby once again breached Article VII's requirement that it have "just cause" to terminate any tenured musician, as well as the provisions of Wang's individual agreement.

199.    The Philharmonic's breaches were intentional and in bad faith in that the Philharmonic knew that its decisions to suspend and later terminate Wang were contrary to (i) the CBA's provision making the previous arbitration result binding, (ii) the CBA's prohibition on discipline without just cause and (iii) the provisions of Wang's individual agreement, and would have devastating consequences for Wang's reputation and his current and future ability to continue his career as a premier musician.

200.    The Philharmonic's breaches have had devasting consequences on Wang's reputation, his professional relationships and his professional opportunities.  As a direct result of the suspension and eventual termination, Wang has been, and continues to be irreparably harmed.  Virtually every single collaborating organization and individual with whom Wang regularly and newly participated in outside engagements indefinitely suspended or terminated their professional relationships with Wang as a direct result of the Philharmonic's breaching conduct.

201.    At least one of those terminations amount to a permanent loss of a professional opportunity in the form of a promised solo of a new Marc Neikrug Concerto that was specifically written for the Philharmonic to be performed by Mr. Wang.

202.    In the face of the Union's breach of its DFR, Mr. Wang is entitled to bring this claim for breach of the CBA against the Philharmonic directly.

203.    Based upon the foregoing, Wang is entitled to the following relief:

a.    a declaratory judgment that by suspending and terminating Wang, the Philharmonic has violated the 2020 Arbitration Award and breached the CBA;

b.    a permanent injunction enjoining the Philharmonic from terminating Mr. Wang's employment;

c.    reinstatement of Wang to his position at the Philharmonic as Principal Oboe and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority;

d.    economic damages of at least $50,000,000, in an amount to be determined at trial, as well as pre-judgment interest; and

e.    attorneys' fees, costs and disbursements in an amount not presently capable of ascertainment.

**THIRD CLAIM FOR RELIEF**

**DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**
**(as to Defendant Philharmonic)**

204.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

205.    The New York Human Rights Law § 296 prohibits discrimination in employment on the basis of sex.  Section 296(1)(a) specifically prohibits discrimination by employers on the

basis of an individual's sex "in compensation or in terms, conditions or privileges of employment."

206.    Mr. Wang is a male and thus a member of a protected class for purposes of § 296.

207.    Mr. Wang's qualifications as Principal Oboe are exceptional, as has been repeatedly acknowledged by the Philharmonic.

208.    Mr. Wang was suspended (and later terminated), without cause or explanation, and in clear violation of (i) the terms of his employment, which, among other things, expressly require that he be given opportunities to perform and excel as a musician, and (ii) the 2020 Arbitration Award, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

209.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent acknowledgement of the "strong feelings" it generated, including calls for the Philharmonic to suspend Wang and Muckey, or take other harsher action against men who had been accused of misconduct by women.

210.    After the suspension had already begun, the Philharmonic pointed to the investigations that were not then described as focused on any musician in particular, as the reason for the suspensions.

211.    No other Philharmonic musicians were similarly suspended during the pendency of the investigations.  In other words, the only individuals targeted in the Philharmonic's April 13, 2024 suspension announcement were men who had been vindicated and reinstated *via* binding arbitration in connection with past allegations of purported misconduct against women.

212.    Upon information and belief, the Philharmonic has never placed a tenured female Philharmonic musician in good standing on indefinite suspension during the pendency of an orchestra-wide investigation or otherwise.

213.    After the conclusion of the Levy Investigation, the Philharmonic decided to terminate Mr. Wang's employment.  The Philharmonic did not purport to base Wang's termination on the results of the investigation, nor did it assert any other just cause for his termination.  Instead, the Philharmonic completely distorted its normal disciplinary procedures to claim that it could fire a tenured musician for no reason at all.  The Philharmonic's decision was purely motivated by discriminatory animus because Mr. Wang was a man who allegedly had been accused of misconduct against females.

214.    Wang's suspension, even with pay, and his termination, resulted in material harm to an esteemed classical musician whose success and reputation depend not on whether he merely receives a paycheck, but on his ability to perform with the orchestra.  And with the termination, his ability to receive a paycheck, whether from the Philharmonic or elsewhere, has also been decimated.

215.    Every performance and rehearsal Mr. Wang missed as a result of the suspension and termination, including, but not limited to, long-scheduled solo performances, has materially harmed him and will continue to cause him harm in the future.

216.    The unlawful suspension and termination have caused severe reputational harm to Wang, resulting in past and future lost professional opportunities beyond the Philharmonic.

217.    As a direct and proximate result of the Philharmonic's discriminatory conduct, Wang has suffered, and continues to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages,

including, but not limited to, reputational harms and severe emotional distress, for which Wang is entitled to an award of damages.

### FOURTH CLAIM FOR RELIEF

### DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
#### (as to Defendant Union)

218.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

219.    The New York Human Rights Law § 296 prohibits discrimination in employment on the basis of sex.  Section 296(1)(c) specifically provides that labor organizations are prohibited from "discriminat[ing] in any way against any of its members" on the basis of the member's sex or other protected status.

220.    Mr. Wang is a male and thus a member of a protected class for purposes of § 296.

221.    Mr. Wang is a member in good standing of Local 802 and highly qualified to fulfill his position of first oboe in the orchestra.

222.    Mr. Wang was suspended (and later terminated) by the Philharmonic, without cause or explanation, and in clear violation of (i) the terms of his employment, which, among other things, expressly require that he be given opportunities to perform and excel as a musician; and (ii) the outcome of the 2020 arbitration, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

223.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent acknowledgement of the "strong feelings" it generated, including calls for the Philharmonic to suspend Wang and Muckey, or take other harsher action against men who had been accused of misconduct by women.

224.    Rather than represent Mr. Wang fairly by demanding that the Philharmonic reinstate Mr. Wang, as it would any other employee who had been indefinitely suspended in violation of a final and binding arbitration award and in the absence of just cause, the Union, instead, rejected Mr. Wang's requests and demands to so represent him.

225.    The Union rejected similar requests and demands from Mr. Muckey.

226.    Union President Sara Cutler went so far as to publicly endorse the Philharmonic's actions, calling the suspensions "a good first step" and emphasized gender in her public statements.

227.    In other words, when called upon to defend two male union members who had defeated previous allegations made by women, who had been singled out for suspension in the face of resurfaced allegations that were adjudicated in the men's favor in a final and binding arbitration, the Union instead threw them under the bus.

228.    Upon information and belief, the Union has never before endorsed an employer's indefinite suspension of a tenured female musician during the pendency of an investigation or otherwise and never before refused to object to a member's suspension inconsistent with honoring a favorable final and binding arbitration award in the Union's and the employee's favor.

229.    The Union's discriminatory actions continued after the conclusion of the Levy Investigation when the Union worked with the Philharmonic to devise a way to terminate Mr. Wang even though it had no just cause to do so.

230.    After the Philharmonic terminated Wang, based not on any just cause but on an unprecedented reading of the CBA that, the Union's own admitted that that provision had never before invoked for such a purpose, and would never be invoked again and instead was an end run

around the CBA's just cause requirements.  The Union's collusion with the Philharmonic in wrongfully discharging Wang was motivated by discriminatory animus against Wang because he was male and allegedly had been accused of misconduct against females.

231.     As a result of its bias against Wang based upon his sex, the Union consented to, acquiesced and/or joined in the Philharmonic's unlawful discrimination, which included the Philharmonic's plan to suspend and later terminate Wang.

232.     Wang's suspension, even with pay, and his termination, resulted in material harm to an esteemed classical musician whose success and reputation depend not on whether he merely receives a paycheck, but on his ability to perform with the orchestra.  And with the termination, his ability to receive a paycheck, whether from the Philharmonic or elsewhere, has also been decimated.

233.     The Union's discriminatory treatment of Wang, that is, its failure to fight against and instead its traitorous public endorsement of Wang's suspension and termination, has proximately caused Wang to suffer, and to continue to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages, including, but not limited to, reputational harms and severe emotional distress, for which Wang is entitled to an award of damages.

## FIFTH CLAIM FOR RELIEF

### DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
### (as to Defendant Philharmonic)

234.     Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

235.    Section 8–107(1)(a) of the NYCHRL makes it unlawful for an employer, because of an employee's gender, "to discriminate against such person in compensation or in terms, conditions or privileges of employment."

236.    The Philharmonic is an employer and Mr. Wang is the Philharmonic's employee as those terms are used in the NYCHRL.

237.    Mr. Wang is a male and thus a member of a protected class for purposes of the NYC Human Rights Law.

238.    Mr. Wang's qualifications as Principal Oboe are exceptional, as has been repeatedly acknowledged by the Philharmonic.

239.    Mr. Wang was suspended and later terminated, without cause or explanation, and in clear violation of (i) the terms of his employment, which, among other things, expressly require that he be given opportunities to perform and excel as a musician and (ii) the 2020 Arbitration Award, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

240.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent acknowledgement of the "strong feelings" it generated, including calls for the Philharmonic to suspend Wang and Muckey, or take other harsher action against men who had been accused of misconduct by women.

241.    After the suspension had already begun, the Philharmonic pointed to the investigations that were not then described as focused on any musician in particular, as the reason for the suspensions

242.    No other Philharmonic musicians were similarly suspended based on the pendency of the investigations.  In other words, the only individuals targeted in the

Philharmonic's April 2024 suspension announcement were men who had been vindicated and reinstated *via* binding arbitration in connection with past allegations of purported misconduct against women.

243.    Upon information and belief, the Philharmonic has never placed a tenured female Philharmonic musician on indefinite suspension during the pendency of an orchestra-wide investigation or otherwise.

244.    Mr. Wang's suspension, even with pay, and dismissal, resulted in material harm to an esteemed classical musician whose success and reputation depends not on whether he merely received a paycheck, but on his ability to perform with the orchestra. And with the termination, his ability to receive a paycheck, whether from the Philharmonic or elsewhere, has also been decimated

245.    Every performance and rehearsal Mr. Wang has missed and continues to miss because of his suspension and termination, including, but not limited to, long-scheduled solo performances, has materially harmed him and will continue to harm him in the future.

246.    The unlawful suspension and termination has caused severe reputational harm to Mr. Wang, resulting in past and future lost professional opportunities beyond the Philharmonic.

247.    As a direct and proximate result of the Philharmonic's discriminatory conduct, Mr. Wang has suffered, and continues to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages, including, but not limited to, reputational harms and severe emotional distress, for which Wang is entitled to an award of damages.

## SIXTH CLAIM FOR RELIEF

### DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
### (as to Defendant Union)

248.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

249.    The NYCHRL at NYC Admin. Code 8-107(1)(c) makes it unlawful for a labor organization "to discriminate in any way against any of its members" on the basis of a members' gender.

250.    The Union is a labor organization, and Mr. Wang is one of its members as those terms are defined in Section 8-107(1)(c).

251.    Mr. Wang is a male and thus a member of a protected class for purposes of the NYCHRL.

252.    Mr. Wang is a member in good standing of Local 802 and highly qualified to fulfill his position of first oboe in the orchestra.

253.    Mr. Wang was suspended and later terminated by the Philharmonic, without cause or explanation, and in clear violation of (i) the terms of his employment, which, among other things, expressly require that he be given opportunities to perform and excel as a musician; and (ii) the outcome of the 2020 arbitration, which ordered his full reinstatement to the position of first oboe, including all associated terms and benefits.

254.    Wang's suspension coincided with release of the Article, and the Philharmonic's subsequent acknowledgement of the "strong feelings" it generated, including calls for the Philharmonic to suspend Wang and Muckey, or take other harsher action against men who had been accused of misconduct by women.

255.    Rather than represent Mr. Wang fairly by demanding that the Philharmonic reinstate Mr. Wang, as it would any other employee who had been indefinitely suspended in violation of a final and binding arbitration award and in the absence of just cause, the Union, instead, rejected Mr. Wang's requests and demands to so represent him.

256.    The Union rejected similar requests and demands from Mr. Muckey.

257.    Union President Sara Cutler went so far as to publicly endorse the Philharmonic's suspensions, calling them "a good first step" and invoked gender in her statement.

258.    In other words, when called upon to defend two male union members who had been singled out for suspension in the face of resurfaced allegations from women that were adjudicated in the men's favor in a final and binding arbitration, the Union instead threw them under the bus.

259.    Upon information and belief, the Union has never before endorsed an employer's indefinite suspension of a tenured female musician during the pendency of an orchestra-wide investigation or otherwise and never before refused to act on behalf of an employee against whom negative employment consequences were imposed that are contrary to a final and binding arbitration award in the Union's and the employee's favor.

260.    Mr. Wang's suspension, even with pay, and dismissal, resulted in material harm to a musician whose future success depends not on whether he merely received a paycheck, but on his ability to perform with his orchestra.

261.    The Union's discriminatory actions continued after the conclusion of the Levy Investigation when the Union worked with the Philharmonic to devise a way to terminate Mr. Wang.

262.     After the Philharmonic terminated Wang, based not on any just cause but on an unprecedented reading of the CBA, the Union admitted that that provision of the CBA had never before been invoked in such a context, and would never be invoked again and instead was an end run around the CBA's just cause requirements.  The Union's efforts to acquiesce in and not grieve the termination of Wang were motivated by discriminatory animus against Wang because he was male *and* allegedly had been accused of misconduct against females and the Union had been criticized for having failed to take women's claims of misconduct by men seriously.

263.     As a result of its bias against Wang based upon his sex, the Union consented to, acquiesced and/or joined in the unlawful discrimination, which included the Philharmonic's plan to terminate Wang.

264.     The Union's discriminatory conduct towards Wang, that is, its failure to fight against and instead its traitorous public endorsement of Wang's suspension and termination has proximately caused Wang to suffer, and to continue to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages, including, but not limited to, reputational harms and severe emotional distress, for which Plaintiff is entitled to an award of damages.

## SEVENTH CLAIM FOR RELIEF

### DISCRIMINATION UNDER TITLE VII
(as to Defendant Philharmonic)

265.     Mr. Wang hereby incorporates each preceding paragraph as if fully restated herein.

266.     Title VII, 28 U.S.C. § 2000e-2, makes it unlawful for an employer:

[T]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex…

267.    The Philharmonic discriminated against Wang based upon his sex when it terminated him from his tenured position in the orchestra.

268.    The nature and the timing of the Philharmonic's actions, along with the public statements of its own representatives, raise a strong inference of discriminatory bias.

269.    The events that culminated in Wang's termination began with release of the Article, and the Philharmonic's subsequent acknowledgement of the "strong feelings" it generated, including calls for the Philharmonic to suspend Wang and Muckey, or take other harsher action against men who had been accused of misconduct by women.

270.    The Philharmonic caved to those strong feelings by immediately suspending Wang and telegraphing that Wang's future was in doubt despite having no basis to do so.

271.    The procedures used during and after the Levy Investigation offer further proof of the Philharmonic's discriminatory bias as only male musicians were investigated, information was withheld from Wang in order to undermine his ability to provide exculpatory and other relevant evidence on his own behalf, and only the accounts of female musicians were credited by the investigator and the Philharmonic.

272.    The findings in the Executive Summary were also indicative of discriminatory bias and they contained numerous misleading or outright erroneous statements and dubious conclusions that rested on an incomplete factual record.

273.    Moreover, the findings were unfair, biased and pre-determined to find against Mr. Wang because he is a male.

274.    Even with these flaws, the investigation did not produce the pretextual just cause the Philharmonic sought to support its termination of Wang.

275.    Instead it changed the rules on a one-time basis with the collusion of the Union, to invoke a section of the CBA that had never been invoked to ram through the termination without just cause.

276.    The Philharmonic's motivation for its determination to take a strong stance against Wang, a male, and its termination of Wang reflect an impermissible bias favoring females.

277.    By reason of the foregoing, the Philharmonic has violated Title VII in its unlawful discrimination against Wang on the basis of sex, thereby causing him to suffer, and continue to suffer, damages including, but not limited to, loss of past and future income, compensation and benefits, and non-economic damages, including, but not limited to, reputational harms and severe emotional distress, for which Wang is entitled to an award of damages.

278.    Based upon the foregoing, Mr. Wang is entitled to the following relief:

    a.    a permanent injunction enjoining the Philharmonic from terminating Mr. Wang's employment;

    b.    reinstatement of Wang to his position at the Philharmonic as Principal Oboe and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority;

    c.    economic damages of at least $50,000,000 in an amount to be determined at trial;

    d.    other compensatory and punitive damages in an amount to be determined at trial; and

    e.    attorneys' fees, costs and disbursements in an amount not presently capable of ascertainment.

## EIGHTH CLAIM FOR RELIEF

## DISCRIMINATION UNDER TITLE VII
(as to Defendant Union)

279.    Mr. Wang hereby incorporates each preceding paragraph as if fully restated

herein.

280.    Title VII, 28 U.S.C. § 2000e-2, makes it unlawful for a labor organization:

(1) to exclude or to expel from its membership, or otherwise to discriminate
against, any individual because of his … sex…;

(2) to limit, segregate, or classify its membership or applicants for membership, or
to classify or fail or refuse to refer for employment any individual, in any way
which would deprive or tend to deprive any individual of employment
opportunities, or would limit such employment opportunities or otherwise
adversely affect his status as an employee or as an applicant for employment,
because of such individual's … sex…; or

(3) to cause or attempt to cause an employer to discriminate against an individual
in violation of this section.

281.    The Union both discriminated against Wang on the basis of his sex and caused or

attempted to cause the Philharmonic to discriminate against Mr. Wang because of his sex.

282.    The Union refused to challenge Wang's termination which was a clear violation

of the CBA and therefore a clear breach of its duty of fair representation.

283.    In fact, the Union colluded with the Philharmonic to devise a way to unlawfully

terminate Wang, in the absence of any basis to do so.  The Union's unlawful actions were

motivated by a discriminatory animus against Wang because he was male and had been accused

of misconduct against women, and the Union was under public pressure to prove it took

women's accusations of misconduct by men seriously.

284.    The Union's discriminatory conduct towards Wang, including, but not limited to,

its failure to challenge Wang's termination and its collusion with the Philharmonic to facilitate

that wrongful termination violated Title VII.

285.    Based upon the foregoing, Mr. Wang is entitled to the following relief:

    a.    economic damages of at least $50,000,000, in an amount to be determined at trial;

    b.    other compensatory and punitive damages in an amount to be determined at trial; and

    c.    attorneys' fees, costs and disbursements in an amount not presently capable of ascertainment.

WHEREFORE, Mr. Wang is entitled to judgment against Defendants as follows:

1.    Declaring that the Union has breached its DFR to Mr. Wang;

2.    Declaring that the Philharmonic has breached the CBA and Mr. Wang's individual employment agreement;

3.    Pending the final adjudication of Wang's other claims, granting a preliminary injunction by ordering the Philharmonic to restore Mr. Wang to his position in the orchestra, including to his typical performance schedule as first oboe, rescheduling cancelled solos and otherwise making Mr. Wang whole by fulfilling all contractual terms;

4.    Granting a permanent injunction, enjoining the Philharmonic from any further suspension or termination of Wang as a performing member of the orchestra based on (i) the events already adjudicated in the arbitration; (ii) the pendency of a mere investigation and/or (iii) any termination decision that is not supported by just cause;

5.    Awarding economic damages of at least $50 million, in an amount to be proven at trial;

6.    Awarding other compensatory and punitive damages;

7.    Awarding prejudgment interest; post-judgment interest; and reasonable attorneys' fees incurred by Wang in connection with this suit; and

8.     for such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Dated:     New York, New York
           April 10, 2025

                              CARTER LEDYARD & MILBURN LLP

                    By:         */s/ Alan S. Lewis*
                              Alan S. Lewis
                              Karen E. Meara
                              28 Liberty Street, 41st Floor
                              New York, NY 10005
                              lewis@clm.com
                              meara@clm.com
                              (917) 533-2524

                              *Attorneys for Plaintiff Liang Wang*

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C.A. § 1746, I, Liang Wang, hereby declare and verify under penalty of perjury under the laws of the United States that I have read the foregoing Amended Complaint, and that the allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Executed on April 10, 2025

Liang Wang