## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIANG WANG,<br><br>     Plaintiff,<br><br> v.<br><br>THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC., AND ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN FEDERATION OF MUSICIANS,<br><br>     Defendants. | Case No. 1:24-cv-03356-AS<br><br>[rel. 1:24-cv-03348-AS, 1:24-cv-03987-AS]<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC.'S
## MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Ashley Lynam (NY Bar No. 5701404) (admitted *pro hac vice*)
Jacob Sand (admitted *pro hac vice*)
Natalie Georges (NY Bar No. 5011325)
Morgan, Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103
T: 215.963.5000 | F: 215.963.5001
ashley.lynam@morganlewis.com
jacob.sand@morganlewis.com
natalie.georges@morganlewis.com

Geneva Ramirez (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 North Wacker Drive
Chciago, IL 60606
T: 312.324.1000 | F: 312.324.1001
geneva.ramirez@morganlewis.com

*Attorneys for The Philharmonic-Symphony*
*Society of New York, Inc.*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .................................................................................... 1

    A.    Wang's Contractual Rights ..................................................................... 2

    B.    The 2018 Investigation and Subsequent Arbitration................................. 3

    C.    2024 *Vulture* Article ............................................................................ 4

    D.    Wang's Administrative Leave and the 2024 Investigation....................... 5

    E.    Reports of Sexual Misconduct and Abuse of Power................................ 5

    F.    Other Musicians Refusal to Play with Wang ......................................... 7

    G.    Wang's Non-Reengagement................................................................... 7

    H.    Wang's Right to Dismissal Review......................................................... 8

    I.    Exhaustion of Administrative Remedies.................................................. 9

**ARGUMENT**...................................................................................................... 9

    I.    Standard of Review. ............................................................................. 9

    II.    Wang Fails to State a Hybrid Duty of Fair Representation / § 301 Claim (Count II)............................................................................................. 10

        A. The Society Did Not Breach the CBA........................................... 10

            1.   The CBA does not require "just cause" for non-reengagements. ..............11

            2.   The Society has complied with the non-reengagement and related review provisions of the CBA. ............................................................. 13

            3.   Wang's placement on paid leave did not breach the CBA........................ 14

        B. Wang Does Not Allege Facts to Support His Claim That the Union Breached Its Duty of Fair Dealing. ................................................ 17

        C. The Union Had Multiple Valid Reasons to Not Pursue a Grievance............. 18

    III.    Wang's State Law Claims (Counts III and V) Are Preempted.............................. 19

    IV.    Wang Fails to Plead Sex- or Gender-based Discrimination (Counts III, V, and VII)................................................................................................... 20

        A. Wang Does Not Plead Someone Similarly Situated Received Preferential Treatment. ...................................................................................... 21

B.  Wang Is No "Sacrificial Lamb" on the Altar of Public Sentiment. ................ 23

V.   Wang's Title VII Claim (Count VII) Should Also Be Dismissed for Failure to
Exhaust Administrative Remedies. ........................................................................ 24

**CONCLUSION** ............................................................................................................................... 25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdullayeva v. Attending Homecare Servs.*, LLC
   928 F.3d 218 (2d Cir. 2019)...................................................................................................11

*Allis-Chalmers Corp. v. Lueck*,
   471 U.S. 202 (1985)...............................................................................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662, 678 (2009) ..................................................................................................9, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 558 (2007) ......................................................................................................10

*Bloor v. Falstaff Brewing Corp.*,
   454 F. Supp. 258 (S.D.N.Y. 1978) .......................................................................................15

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147, 152–53 (2d Cir. 2002) .....................................................................................9

*CNH Indus. N.V. v. Reese*,
   583 U.S. 133 (2018)...............................................................................................................11

*Collins v. Travers Fine Jewels Inc.*,
   2019 WL 1470590 (S.D.N.Y. Mar. 23, 2018) ......................................................................11

*Cooper v. Templeton*,
   629 F. Supp. 3d 223, 233 (S.D.N.Y. 2022)...........................................................................24

*Creaven v. Erickson*,
   2023 WL 4247213 (2d Cir. June 29, 2023) ..........................................................................15

*Cummings v. City of N.Y.*,
   302 F. Supp. 3d 511 (S.D.N.Y. 2017)...................................................................................11

*Deltondo v. Sch. Dist. of Pittsburgh*,
   2023 WL 2534817 (W.D. Pa. Mar. 16, 2023) ......................................................................16

*Doe v. N.Y. Univ.*,
   438 F. Supp. 3d 172, 185 (S.D.N.Y. 2020) ..........................................................................24

*Doe v. Trs. of Columbia Univ. in City of New York*,
   2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022).......................................................................23

*Domnister v. Exclusive Ambulette, Inc.*,
   2007 WL 4244151 (E.D.N.Y. Nov. 29, 2007)..........................................................................20

*Dumas v. New United Motor Mfg., Inc.*,
   2011 WL 5006462 (N.D. Cal. Oct. 20, 2011)...........................................................................16

*Gibb v. Tapestry, Inc.*,
   2018 WL 6329403 (S.D.N.Y. Dec. 3, 2018) .............................................................................24

*Henderson v. Physician Affiliate Grp. of N.Y. P.C.*,
   2019 WL 3778504 (S.D.N.Y. Aug. 12, 2019)..........................................................................21

*Henschke v. N.Y. Hosp. – Cornell Med. Ctr.*,
   821 F. Supp. 166, 170 (S.D.N.Y. 1993) ...................................................................................25

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984)....................................................................................................................10

*Johnson v. Andy Frain Servs., Inc.*,
   638 F. App'x 68, 70 (2d Cir. 2016) ..........................................................................................21

*Jones v. Gen. Bd. of Glob. Ministries of United Methodist Church*,
   1997 WL 458790 (S.D.N.Y. Aug. 11, 1997).............................................................................24

*Laborers' Int'l Union of N. Am. (LIUNA), Local*,
   2022 BNA LA 106 (Lowe, 2022)..............................................................................................16

*Mason County*,
   127 BNA LA 141 (Siegel, 2010)...............................................................................................11

*Middleton v. City of Tucson*,
   2018 WL 1581628 (D. Ariz. Mar. 31, 2018) ...........................................................................16

*Mitchell v. Planned Parenthood of Greater N.Y., Inc.*,
   745 F. Supp. 3d 68, 89 (S.D.N.Y. 2024)...................................................................................20

*Morrissey v. Verizon Commc'ns Inc.*,
   2011 WL 2671742 (S.D.N.Y. July 7, 2011)..............................................................................20

*Muckey v. Assoc. Musicians of Greater New York, et al.*,
   1:24-cv-03348 (S.D.N.Y Feb. 28, 2025)...................................................................................22

*Nnebe v. City of New York*,
   2023 WL 2393920 (S.D.N.Y. Jan. 30, 2023) ...........................................................................22

*Novick v. Vill. of Wappingers Falls*, 376 F. Supp. 3d 318, 342–43 (S.D.N.Y. 2019) ....................21

*Ohanian v. Avis Rent A Car Sys., Inc.*,
   779 F.2d 101 (2d Cir. 1985).....................................................................................................15

*Osborne v. Moody's Invs. Serv., Inc.*,
   2018 WL 1441392 (S.D.N.Y. Mar. 22, 2018) .......................................................................22

*Pathania v. Metro. Museum of Art*,
   2013 WL 1182076 (E.D.N.Y. Mar. 21, 2013) .......................................................................17

*Perkins v. 199 SEIU United Healthcare Workers E.*,
   73 F. Supp. 3d 278 (S.D.N.Y 2014) .................................................................................17, 18

*Rapaport v. Asia Elecs. Holding Co.*,
   88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ........................................................................5, 10

*Rodriguez v. Connection Tech. Inc.*,
   65 F. Supp. 2d 107 (E.D.N.Y. 1999) ...................................................................................25

*Rodriguez v. It's Just Lunch Int'l.*,
   2010 WL 685009 (S.D.N.Y Feb 23, 2010) ...........................................................................16

*Roe v. St. John's Univ.*,
   91 F.4th 643 (2d Cir. 2024) ................................................................................................23

*Roenick v. Flood*,
   2021 WL 2355108 (S.D.N.Y. June 9, 2021) .........................................................................21

*Rothman v. Gregor*,
   220 F.3d 81, 88 (2d Cir. 2000) ...........................................................................................10

*Sanchez v. S&P Glob., Inc.*,
   2023 WL 8372990 (S.D.N.Y. Dec 4, 2023) ..........................................................................15

*Soloviev v. Goldstein*,
   104 F. Supp. 3d 232 (E.D.N.Y. 2015) ..................................................................................23

*Spellacy v. Airline Pilots Ass'n-Int'l*,
   156 F.3d 120 (2d Cir. 1998) ................................................................................................18

*Stafford v. Sealright, Inc.*,
   100 F. Supp. 2d 137, 138–40 (N.D.N.Y. 2000) ....................................................................25

*Stetz v. Reeher Enters., Inc.*,
   70 F. Supp. 119, 124 (N.D.N.Y. 1999) .................................................................................25

*Stinnett v. Delta Airlines, Inc.*,
   803 F. App'x 505, 509 (2d Cir. 2020) ..................................................................................22

*Sullivan v. Am. Airlines, Inc.*,
   424 F.3d 267 (2d Cir. 2005) ................................................................................................19

*Tomney v. Int'l Ctr. for Disabled*,
  357 F. Supp. 2d 721 (S.D.N.Y 2005)..........................................................................................17

*Truck Drivers, et. al. v. Schneider Tank Lines, Inc.*,
  958 F.2d 171 (7th Cir. 1992) ...................................................................................................13

*U.S. Tr. Co. of N.Y. v. Jenner*,
  168 F.3d 630 (2d Cir. 1999).....................................................................................................11

*United Steelworkers of Am., AFL-CIO-CLC v. Rawson*,
  495 U.S. 362 (1990)..................................................................................................................19

*Univ. Hosp.*,
  1997 BNA LA Supp. 103253 (Goldberg, 1997)......................................................................16

*VTR Inc. v. Goodyear Tire & Rubber Co.*,
  303 F. Supp. 773 (S.D.N.Y July 30, 1969) ..............................................................................11

*Wang v. Sussman*,
  No. 24-cv-03987 (S.D.N.Y. May 23, 2024)................................................................................4

*White v. White Rose Food*,
  237 F.3d 174 (2d Cir. 2001)...............................................................................................10, 18

*Whitehurst v. 1199SEIU United Healthcare Workers E.*,
  928 F.3d 201 (2d Cir. 2019).....................................................................................................19

*Young v. N. Drury Lane Prods., Inc.*,
  1995 WL 110126 (N.D. Ill. Mar. 13, 1995).............................................................................13

*Young v. U.S. Postal Serv.*,
  907 F.2d 305 (2d Cir. 1990).....................................................................................................17

*Zeuner v. Suntrust Bank Inc.*,
  181 F. Supp. 3d 214, 218–19 (S.D.N.Y. 2016).........................................................................10

**STATUTES**

42 U.S.C. § 2000e-5 ........................................................................................................................24

Labor-Management Relations Act § 301 (29 U.S.C. § 185).................................................. *passim*

N.Y. City Human Rights Law, N.Y.C. Admin. Code § 8-107 ....................................19, 20, 21, 22

N.Y. State Human Rights Law, N.Y. Exec. Law § 296...............................................19, 20, 21, 22

**OTHER AUTHORITIES**

29 C.F.R. § 1601.28 ........................................................................................................................25

Fed. R. Civ. P. 12 .........................................................................................................................1, 9

Defendant The Philharmonic-Symphony Society of New York, Inc. ("Society," "Philharmonic," or "New York Philharmonic") submits this Memorandum of Law in support of its Motion to Dismiss the Amended Complaint filed by Plaintiff Liang Wang under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff Liang Wang has been accused of egregious abuses of power—multiple instances of sexual assault, rape, and other misconduct—by his colleagues in New York Philharmonic, fellow musicians from universities, conservatories, and student music festivals, and community members at institutions where he performed and taught. An independent investigator, after interviewing 92 witnesses, concluded that Wang had "engaged in a persistent pattern of sexual harassment toward women, ranging from offensive comments to rape and a range of abusive behaviors in between those extremes, over the course of more than a ten-year period while he was employed by the Philharmonic." Approximately half of the Philharmonic's members have objected to taking the stage with Wang again and many have said they would refuse to play with him. To protect the musicians of one of the most renowned musical ensembles in the world, the Society exercised its contractual right to not renew Wang's contract.

Wang has now sued the Society claiming that his placement on leave and subsequent non-reengagement deprived him of his rights under the Collective Bargaining Agreement ("CBA") that governs his employment. But Wang got everything bargained for under the CBA and can point to no right he was deprived of or procedure that was not followed. He also tries to portray himself as the victim of some conspiracy to persecute him because he is a man. But he cannot point to a single occasion when a female Philharmonic member was in the same situation—accused of drugging and raping others—and received comparatively better treatment. He, therefore, cannot plead a fundamental element of his discrimination claims.

By pushing these claims, which are doomed to fail, the Amended Complaint merely confirms what his colleagues have said about him, that Wang believes "everything in the world is [his] for the taking." Wang's claims should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    Wang's Contractual Rights

The musicians in the New York Philharmonic (including Wang) are members of the Associated Musicians of Greater New York, Local 802, American Federation of Musicians ("Union"), which serves as their exclusive collective bargaining representative. Ex. C,[1] Art. I. The CBA—negotiated by the Society and Union—governs the terms of each Philharmonic member's employment and provides that members shall be "employed [by the Society] for fifty-two (52) weeks in each year of the term of the Agreement[.]" *Id.* Art. III, § A. But the Society maintains broad discretion in controlling performing personnel, including "[c]hoosing the performing personnel" and "schedul[ing] whatever activities of the Orchestra it may determine, both in the United States and abroad[.]" *Id.*; *see also id.* Art. XXIV, § A. There is no minimum number of performances or rehearsals a member must be assigned to.

The CBA also provides that tenured Philharmonic members are reengaged on a yearly basis to play with the Orchestra. *Id.* Art. XIV; *see also* FAC ¶¶ 19–20; Ex. E. All new Philharmonic members are on probation for the first 17 months of their employment, after which a committee of non-probationary (tenured) members votes on whether the new member should stay or go. Ex. C, Art. XXIV, § A(2); *id.* at Ex. B, § 3 ("Unsuccessful Auditions"); *id.* Art. XIV. Members, like Wang (the Philharmonic's Principal Oboe), who are taken off probation are referred to as "tenured" musicians and are "deemed automatically re-engaged for the following year," unless the Society

---

[1] Exhibits referenced in this Memorandum refer to those attached to the Declaration of Ashley R. Lynam filed in support of the Society's Motion to Dismiss the Amended Complaint.

provides advance notice of their non-reengagement pursuant to Article XIV if the Society so "desires." *Id.* Arts. I, XIV.

In addition to its right not to re-engage members if sufficient notice is given, the Society may terminate a Philharmonic member without the notice required by Article XIV as a "disciplinary measure" if there is "just cause" to do so. *Id.* Art. VII, § E. If a Philharmonic member objects to his non-reengagement or termination for cause, the CBA contains two separate grievance-arbitration procedures: one that applies in the case of non-reengagement, and another that applies in the case of for-cause terminations and "other disputes." *Id.* Art. XV, §§ A–B.

The CBA also contemplates that the Philharmonic's titled members may negotiate individual agreements with the Society concerning overscale salary above the base pay provided for in the CBA. *See, e.g.*, *id.* Art. IV, § D; *id.* Art. III, § C(2); *id.* Ex. A, § 13; Ex. E. Wang entered into an individual agreement with the Society on March 6, 2013, which expired at the end of the 2016–17 season and incorporated the terms and conditions of the CBA. *See* Ex. E. The Society prepared another individual agreement for Wang's consideration covering the 2023–24 season, which incorporated the terms of the 2013 agreement. *Id.* But that agreement was not binding unless and until it was signed by all parties, and Wang did not sign it. *Id.* Thus, the sole contract governing his employment at the time of his notice of non-reengagement was the CBA.

## B.    The 2018 Investigation and Subsequent Arbitration

In 2018, the Society hired former Federal Judge Barbara S. Jones to investigate allegations by Cara Kizer (a former Philharmonic horn player) that Wang served her wine laced with a date-rape drug, and Matthew Muckey (the Philharmonic's Associate Principal Trumpet) raped her. FAC ¶ 20. That investigation unearthed unrelated allegations that Wang had drugged and raped another woman, which Judge Jones found credible. Ex. F at 2 n.4, 16–17. The Society subsequently fired Wang for cause in September 2018. FAC ¶¶ 23–24. Wang and Muckey appealed

to their Union, which challenged their dismissals in an arbitration. FAC ¶ 26.

The arbitrator found that the allegations against Wang had not been proven by "clear and convincing" evidence and ordered that Wang and Muckey be "reinstated and made whole for all contractual benefits lost, including full back pay and seniority" ("Award").[2] Ex. D at 1 n.1; Ex. F at 1 n.1; FAC ¶ 27.

### C.    2024 *Vulture* Article

On April 12, 2024, *Vulture*—an entertainment-and-culture outlet of *New York* magazine— published an article titled, "A Hidden Sexual-Assault Scandal at the New York Philharmonic: Two Musicians Were Fired for Sexual Misconduct. Why Were They Allowed Back in the Orchestra?"[3] Ex. B. The article details an incident during one of the Philharmonic's residencies in Vail, Colorado, involving Kizer, Wang, and Muckey. *Id.* It describes how Kizer joined Muckey and Wang for a glass of wine at Muckey's condo while she waited for her husband's flight to arrive. *Id.* Kizer said that Wang brought her a glass of red wine, and she has no recollection of the evening after she drank from that glass. *Id.* The article describes Kizer waking up the next morning naked in Muckey's bed, feeling groggy and sick, with red vomit stains on the floor around the bed. *Id.* And it describes how Kizer returned to her hotel room and realized a tampon had been pushed so far into her vagina that she had trouble removing it. *Id.* And it describes how Muckey's DNA was found on the tampon and how a lab later found GHB—a date-rape drug—in a sample of Kizer's hair. *Id.* It continues to describe how Kizer went to the Vail police, who recommended the District

---

[2] With respect to the allegations that Wang had drugged and raped another woman, the arbitrator adopted the view that a person can meaningfully consent to sex while in a blackout state. Ex. D at 1 n.1. That woman also testified that during subsequent encounters during which Wang initiated sex, Wang "would almost take it like a joke" when she "asked him not to do it, to stop, and . . . to behave" and that she "would just give in" because it "was an easier route to take than fighting someone." Ex. F at 16. Nevertheless, the arbitrator did not find that Wang had raped her, but that she just hadn't "fully" consented. *Id.*

[3] Wang sued the author and the media outlet for defamation (Compl., *Wang v. Sussman*, No. 24-cv-03987 (S.D.N.Y. May 23, 2024)), and this Court dismissed the defamation claims outright (Opinion and Order, *Wang v. Sussman*, No. 24-cv-03987 (S.D.N.Y. Jan. 13, 2025)).

Attorney press charges. *Id.*

### D.    Wang's Administrative Leave and the 2024 Investigation

The Society placed Wang on administrative leave with pay the day after the *Vulture* article came out. Ex. D at 2; FAC ¶ 36. Wang claims the decision was solely due to "'strong feelings' generated by a magazine article" and that there was "no accusation [against him] to investigate" at the time; but Wang was actually placed on leave because "several musicians had reported that the conduct in the *Vulture* article was not an isolated incident, but rather part of a pattern of improper conduct."[4] Ex. D at 2; *compare* Ex. F at 1 *with* FAC ¶ 104.

The Society engaged an attorney (the "Investigator") to investigate any allegations of sexual misconduct "distinct from those in the *Vulture* article or the 2020 arbitration award—by any member of the Orchestra." Ex. D; FAC ¶ 49; Ex. G. The notice of the investigation posted on the Society's website did not solicit reports about specific individuals or reports solely against men. *Compare* Ex. G *and* FAC ¶ 49 *with* FAC ¶ 51. The investigation's purpose was to "ensure a safe and respectful environment for *all*[.]" Ex. G; *see also* Ex. F at 1.

The Investigator interviewed 69 Philharmonic members (including Wang) and 23 other individuals. FAC ¶ 82; Ex. F at 1. Numerous new reports that Wang had engaged in sexual misconduct surfaced during the investigation. Ex. F at 2. Wang was interviewed several times with his legal counsel and a Union representative present. Ex. F at 2 n.3. He was also given the opportunity to provide additional information about the subjects of his interviews. *Id.*

### E.    Reports of Sexual Misconduct and Abuse of Power

According to the Investigator's Executive Summary, eleven women came forward to report concerning behaviors by Wang ranging from "inappropriate comments and unsolicited invitations,

---

[4] *Rapaport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (if documents attached to or relied upon in the complaint "contradict the allegations of the . . . complaint, the documents control and this Court need not accept as true the allegations in the . . . complaint").

to sexual advances, to unwelcome kisses, to sexual assault and rape." Ex. F at 2; FAC ¶ 105.[5] "Most

of the accounts were confirmed by other individuals to whom they were reported at the time, and

some were additionally confirmed by electronic communications." Ex. F at 2. The Investigator

concluded that "Wang has engaged in a persistent pattern of sexual harassment toward women,

ranging from offensive comments to rape . . . over the course of more than a ten-year period while

he was employed by the Philharmonic." *Id.* at 2.

Some of these women were college students when Wang sexually abused or harassed them:

- Wang's private oboe student recounted that "Wang served her port wine and some salmon and she passed out before finishing even one glass of the port wine. . . . [S]he woke up naked on Mr. Wang's bed. She said she was 24 and a virgin at the time. . . . [S]he was so traumatized by what had occurred that she . . . did not go out for a month. . . . Wang told her he was sorry, but he could not help himself . . . . [S]he was afraid if she did something, Mr. Wang would try to kick her out from the school, so she decided to focus on what she had to finish and what she could control, which was to learn something, and she remained Mr. Wang's student." *Id.* at 12–13.

- "Wang kept trying to kiss her and when she eventually offered her cheek, Mr. Wang grabbed her face and kissed her on the mouth." *Id.* at 8.

- "Wang was sitting in the back of the car behind her when he started tugging at the ties on her halter top, and asking what would happen." *Id.* at 5.

- "Wang commented how he would love it if she would get up on the table and show some skin." *Id.* at 6.

- After a trial lesson at his home with a prospective student, "Wang tried to kiss her on her cheek and said that she should not have come to New York, that she was too attractive." *Id.* at 8.

Other women he sexually harassed or abused were his colleagues.

- "They were just talking in the hotel room" before Wang "threw her on the bed, straddled her at her center with her lower body held between his legs, held her arms down, and was trying to take her pants off. . . . [S]he was not sure why but Mr. Wang then suddenly stopped and let her go, just at the point where she felt she needed to accept what was about to

---

[5] While the Investigator credited these accounts, she did not credit every account. *See, e.g.*, Ex. F at 20 ("I do not, therefore, find sufficient basis to credit LW Complainant 14's account as true."); *id.* at 22 ("I do not however find sufficient basis to conclude that Mr. Wang actively sought to obstruct LW Complainant 1 from auditions.").

happen next, and she left." *Id.* at 11.

- "Wang approached her, asked if she was a virgin, and offered to teach her." *Id.* at 6.

Several individuals also reported that "Wang had made inappropriate sexual and other offensive comments," and abused his power (e.g., bullying students and obstructing the career of other musicians). *Id.* at 2, 17–19.

### F.    Other Musicians' Refusal to Play with Wang

Many of the Philharmonic's members who spoke with the Investigator expressed the view that Wang should not be permitted to return to the Philharmonic. Ex. F at 23. Of the 67 members who spoke with the Investigator, 50 (a majority of the Philharmonic's total members) said they would be concerned if Wang returned, and 25 stated they would not take the stage or would feel extremely uncomfortable or unsafe if Wang returned. Ex. F at 23–24; Ex. D at 8; FAC ¶ 83.

### G.    Wang's Non-Reengagement

On October 15, 2024, the Society gave Wang a written notice of non-reengagement, notifying him that he would not be reengaged as a Philharmonic member for the 2025–26 season pursuant to Article XIV of the CBA. FAC ¶ 90. Article XIV provides:

> If the Society desires not to engage a member of the Orchestra for the following year (years computed September 21 to September 20), it must give written notice to that effect to said member by February 15th prior to the beginning of the year in question; otherwise, said member shall be deemed automatically re-engaged for the following year. . . .

Ex. C, Art. XIV.

An exercise of the Society's non-reengagement rights does not require just cause. *Id.* If the Society "desires" not to reengage a musician, timely written notice is the sole prerequisite. *Id.* The only reference to "just cause" in the entire CBA is found in Article VII, § E, which governs the "Conduct of Musicians" and provides that musicians may be subject to "disciplinary measures in the event of the violation of these rules or for other just cause." *Id.* Art. VII, § E. But the Society did not fire Wang under Article VII in 2024; it exercised its right not to reengage him under

Article XIV. FAC ¶ 91. And, to be clear, there is no limitation in the CBA on the Society's discretion to do so because no such limitation was collectively bargained for.[6] *Id.* Wang has continued to be paid after receiving notice of his non-reengagement. FAC ¶ 87; Ex. D at 2.

### H.    Wang's Right to Dismissal Review

Article XV, Section A of the Collective Bargaining Agreement provides:

> In the event a notice of termination is given to any [Philharmonic] member in accordance with Article XIV above, a copy of such notice shall be mailed to the Union by registered mail within two (2) weeks after it is mailed to the member. If the individual concerned protests such termination, the Union shall then instruct the Orchestra Committee to call a meeting of the Orchestra so that a Dismissal Review Committee of nine (9) shall be elected. The Union, in conjunction with the Dismissal Review Committee and the [Philharmonic], shall meet immediately to settle the dispute. If the matter is not settled within two (2) weeks after notice to the Union, then the propriety of the termination may be submitted to arbitration by the Union within sixty (60) days after receipt of said notice, under the Voluntary Labor Arbitration Rules of the American Arbitration Associations. . . . The provisions of this Section A shall apply to all members of the Orchestra except probationary employees.

Ex. C, Art. XV, § A. The Society and the Union followed this procedure to the tee.

On October 15, 2024—the same day the Society sent Wang a notice of non-reengagement—the Society notified the Union. Ex. D at 2; FAC ¶¶ 3, 90. Wang protested the non-reengagement under Article XV of the CBA. FAC ¶ 97. The Union asked the Philharmonic's members to nominate candidates for the nine-member Dismissal Review Committee ("DRC") and held an election. Ex. D at 2. On October 23, 2024, the Union's President and members of the DRC met and reviewed the allegations against Wang. Ex. D at 2; FAC ¶ 102. After considerable discussion and evaluation of the evidence presented and recognizing the fact that many Philharmonic members would not take the stage if Wang returned, the DRC unanimously recommended the Union not contest Wang's non-reengagement. Ex. D at 3–4; FAC ¶¶ 191–92.

---

[6] Even if some rationale was required to exercise the Society's right not to reengage a member, a majority of the Philharmonic's members informed the Investigator that they would be concerned if Wang returned. Ex. F at 23–24; Ex. D at 8.

On October 25, 2024, three members of the DRC, the Union's President, and the Executive Advisor to the Society's Board of Directors met to try to settle Wang's dispute. Ex. D at 3–4. The DRC again emphasized that "a supermajority of the [Philharmonic] who spoke to the investigator—who comprise a majority of the entire Orchestra—will not take the stage or will feel unsafe or uncomfortable if [Wang] return[ed]." Ex. D at 7. The Union's Executive Board later met to review the matter, at which time they reviewed Wang's written submission and allowed him to present his position orally. *Id.* at 7–8; FAC ¶ 110. "[I]gnoring the *Vulture* article and the facts underlying the 2020 arbitration award," the Executive Committee unanimously agreed that Wang's notice of non-reengagement was appropriate and elected not to challenge it in arbitration. Ex. D at 9. The Executive Committee issued its written decision on November 4, 2024. *Id.*; FAC ¶ 118. This process complied exactly with the grievance procedures of the CBA. *See* Ex. C, Art. XV.

## I.    Exhaustion of Administrative Remedies

On March 10, 2025, Wang filed a charge of discrimination against the Society with the Equal Employment Opportunity Commission ("EEOC"). FAC ¶ 135. The EEOC issued a right-to-sue letter the same day. *Id.* ¶ 136.

## ARGUMENT

## I.    STANDARD OF REVIEW.

In assessing a Rule 12(b)(6) motion, "a court must accept as true all of the allegations contained in a complaint," but that tenet "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). If documents

attached to or relied on in the complaint "contradict the allegations of the . . . complaint, the documents control and this Court need not accept as true the allegations in the . . . complaint." *Rapaport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Zeuner v. Suntrust Bank Inc.*, 181 F. Supp. 3d 214, 218–19 (S.D.N.Y. 2016). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft*, 556 U.S. at 679. Where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (cleaned up). Thus, if it appears from the face of the complaint that a plaintiff cannot prove a set of facts that would entitle him or her to the relief sought, the court should dismiss the plaintiffs' claims. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## II. WANG FAILS TO STATE A HYBRID DUTY OF FAIR REPRESENTATION / § 301 CLAIM (COUNT II).

"To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement *and* (2) that the union breached its duty of fair representation vis-à-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001) (emphasis added); *see also* § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185. Wang has not and cannot plead a breach of the CBA by the Society or a breach of the Union's DFR; accordingly, Count II must be dismissed.

### A. The Society Did Not Breach the CBA.

Wang's Hybrid § 301 Claim fails because the Society did not breach the CBA. Indeed, Wang has not plausibly alleged a violation of *any* contractual provision of the CBA, the Award, or his individual agreement. Instead, he seeks to rewrite the CBA for his sole benefit by inserting "just cause" requirements where they do not exist and striking all of the rights, bargained for by the Society and Union, to manage the activities of the Orchestra.

"[C]ollective bargaining agreements must be interpreted according to ordinary principles of contract law." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 135 (2018) (internal quotations and citations removed); *see also Abdullayeva v. Attending Homecare Servs., LLC*, 928 F.3d 218, 222 (2d Cir. 2019). And the plaintiff "must identify what provisions of the contract were breached as a result of the acts at issue." *Collins v. Travers Fine Jewels Inc.*, 2019 WL 1470590, at *3 (S.D.N.Y. Mar. 23, 2018). "[I]f defendants were given the right to do what they did by the express provisions of the contract, there can be no breach." *VTR Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 778 (S.D.N.Y July 30, 1969). And Wang has not identified a provision that actually exists in the CBA or any other contract that the Society has supposedly breached.

### 1.    The CBA does not require "just cause" for non-reengagements.

"[W]here . . . a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *U.S. Tr. Co. of N.Y. v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999). Both courts and labor arbitrators apply this rule when interpreting the provisions of a CBA. *See, e.g., Cummings v. City of N.Y.*, 302 F. Supp. 3d 511, 524 (S.D.N.Y. 2017) ("Unambiguous provisions [of a CBA] should be enforced as written."); *Mason Cnty.*, 127 BNA LA 141 (Siegel, 2010) ("To ignore clear and unambiguous contract language would usurp the role of the union and employer and demonstrate disrespect for the collective bargaining process."). Wang does not identify a "just cause" requirement in the CBA's non-reengagement clause Art. XIV because there is none. Ex. C, Art. XIV. The Court's analysis can start and end there because the term Wang claims was breached does not exist.

To get around this inevitable conclusion, Wang attempts to rewrite the CBA for his own benefit by conflating its non-reengagement and disciplinary provisions and by repeatedly pleading that the Society's invocation of the non-reengagement clause is "unprecedented." FAC ¶¶ 3, 54, 56, 96, 100, 111, 115, 173, 230, 262. Wang alleges that the Society "breached Article VII's

requirement that it have 'just cause' to terminate any tenured musician." FAC ¶ 198. But the

Society did not terminate Wang pursuant to Article VII—the only provision in the CBA requiring

"just cause"—but provided notice of his non-reengagement under Article XIV:

> If the Society *desires* not to engage a member of the Orchestra for the following
> year… it must give written notice to that effect to said member by February 15th
> prior to the beginning of the year in question; otherwise, said member shall be
> deemed automatically re-engaged for the following year. The Society, however, will
> endeavor whenever possible to give the Orchestra member concerned one year's
> dismissal notice.

Ex. C, Art. XIV (emphasis added).

Article XIV stands separate from and without any cross reference to Article VII. *Id.*

Article XIV contains no "just cause" requirement; the Society may exercise its right not to

reengage a Philharmonic member for any legal reason it "desires"—including inability of an

orchestra member to coexist with the other members of the ensemble—as long as sufficient notice

is provided.[7] It does not reference "discipline" or Article VII such that the Court could reasonably

conclude that the parties intended for Article XIV to incorporate any of Article VII's terms,

including its "just cause" requirement. *Id.*

This makes sense because Article XIV contains other safeguards. Specifically, the non-

reengaged member can challenge the "propriety" of his non-reengagement, which triggers a

detailed collectively bargained-for review process that involves, among other things, the election

of a Dismissal Review Committee—nine members of the Philharmonic elected by the members at

large (i.e., Wang's peers)—who weigh in regarding the "propriety" of the non-reengagement. *Id.*

---

[7] Wang alleges that "[c]ontractual provisions like Article XIV are included in some collective bargaining
agreements in performing industries to provide for dismissal of members for specific non-disciplinary
reasons, like inability to continue meeting artistic standards." FAC ¶ 93. But the CBA does not specify non-
disciplinary reasons for non-reengagement. So Wang's allegation concerning industry practice—even if
accepted as true on a motion to dismiss—has no bearing because the parties *in this case* negotiated clear
and unambiguous contract language that does not limit the Society's use of the non-reengagement provision
to particular circumstances.

Art. XV(A). By contrast, Article VII applies when the Society terminates a member, with *or without notice*, for "disciplinary" reasons. *Id.* Art. VII(E)(7). Because of the comparative severity of immediate loss of employment and pay, a termination under Article VII (unlike Article XIV) must be supported by "just cause." *Id.* Wang advocates that the Court should obliterate these distinct procedures and rewrite Article XIV of the CBA to require just cause, collapsing it into Article VII, even though the parties clearly intended to keep these provisions separate.

Moreover, no principle of contract law supports the position that a contractual term (like Article XIV of the CBA) should not be given effect just because it has not been used before. And courts have applied the CBA language as written when confronting "atypical" non-"just cause" provisions in other contexts. *See Truck Drivers v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 174–75 (7th Cir. 1992) (declining to interpolate a just-cause provision into the grievance procedure); *Young v. N. Drury Lane Prods., Inc.*, 1995 WL 110126, at *3 (N.D. Ill. Mar. 13, 1995), *aff'd*, 80 F.3d 203 (7th Cir. 1996) (refusing to imply "just cause" requirement and finding plaintiff's argument that the CBA was atypical to be unavailing). Accordingly, Wang's arguments regarding the "unprecedent" exercise of Article XIV are irrelevant to analyzing whether or not the CBA has been breached.

### 2. The Society has complied with the non-reengagement and related review provisions of the CBA.

The Society strictly adhered to the non-reengagement review process outlined in Article XV(A). And Wang pleads as much:

| Articles XIV and XV(A) Requirements | Allegations |
|---|---|
| 1. "If Society desires not to engage a member of the Orchestra for the following year…it must give written notice to said member by February 15th prior to the beginning of the year in question… Article XIV." Ex. C, Art. XIV. | "On October 15, 2024, the Philharmonic sent Wang a letter . . . notifying him that the Philharmonic had decided to not 're-engage' Mr. Wang as a member of the orchestra for the year beginning September 21, 2025." FAC ¶ 90. |
| 2. "The Society, however, will endeavor | This notice was given to him on October 15, 2024, |

| | |
|---|---|
| whenever possible to give the Orchestra member concerned one year's dismissal notice." Ex. C, Art. XIV. | almost *eleven* months prior to the start of the 2025–26 season. FAC ¶¶ 90–91. |
| 3. "In the event a notice of termination is given to any Orchestra member in accordance with Article XIV above, a copy of such notice shall be mailed to the Union by registered mail within two (2) weeks after it is mailed to the member." Ex. C, Art. XV, § A. | "On October 15, 2024, the NY Phil notified [the Union] that … they had issued notices of non-reengagement to Wang … pursuant to Article XIV of the parties collective bargaining agreement (the "CBA")." Ex. D at 2; *see also* FAC ¶ 118 (incorporating Ex. D by reference). |
| 4. "If the individual concerned protests such termination, the Union shall then instruct the Orchestra Committee to call a meeting of the Orchestra so that a Dismissal Review Committee of nine (9) shall be elected. Article XV." Ex. C, Art. XV, § A. | "After receiving the Termination Letter, Wang requested that Local 802 file a grievance on his behalf, challenging his termination." FAC ¶ 97. And the DRC was elected. *Id.* ¶ 102. |
| 5. "The Union, in conjunction with the Dismissal Review Committee and the Society, shall meet immediate to settle the dispute. Article XV." Ex. C, Art. XV, § A. | "[T]he Dismissal Review Committee voted unanimously not to grieve Wang's termination." FAC ¶ 112. "The Local 802 Executive Board also voted unanimously not to grieve Wang's termination based on Article XIV… ." *Id.* ¶ 113. And "[o]n November 4, 2024, Local 802 issues a document entitled 'Unanimous Decision of the Executive Board of Associate Musicians of Greater New York, Local 802, AFM, on the Philharmonic Symphony Society of New York's Non-Reengagement of Liang Wang and Matthew Muckey,' explaining the decision of the Union's Executive Board with respect to the non-reengagement of Mr. Wang's employment." FAC ¶ 118. |

Given that Wang has pleaded the Society's compliance with the unambiguous terms of the CBA governing non-reengagement and review of non-reengagement decisions, he has failed plausibly to allege a breach of the CBA under § 301 of the LMRA, and Count II must be dismissed.

### 3. Wang's placement on paid leave did not breach the CBA.

Wang's second theory of relief under § 301 of the LMRA attempts to establish what amounts to a right to play:

> "[The Society] breached the CBA and Mr. Wang's individual employment agreement … by placing him on indefinite suspension from rehearsals and performance, including but not limited to, long-scheduled and contractually required solo performances, without cause, and in violation of the final and binding

Arbitration Award that compelled his full reinstatement."

FAC ¶ 195. But Wang has no enforceable individual agreement with the Society because he never executed one, and the CBA—the only agreement governing his employment—does not provide such a right. His arguments to the contrary have three fundamental flaws requiring its dismissal.

First, Wang alleges that he was entitled to certain performance opportunities by the terms of his individual agreement. FAC ¶ 58. But, in fact, he has had no binding individual agreement with the Society since at least September 2023. *See* Ex. E. The agreement Wang quotes from was executed on March 6, 2013, and expired at the end of the 2016–17 season. *Id.* The Society also prepared a new agreement for the 2023–24 seasons that incorporated the terms of the 2013 agreement and stated that it would be "binding" upon its execution by the Society and Wang. *Id.* But Wang never signed, and that agreement never became binding. *Id.*; *see Sanchez v. S&P Glob., Inc.*, 2023 WL 8372990, at *1 (S.D.N.Y. Dec 4, 2023) (dismissing breach of contract claim where the contract reflected "the parties did not intend to be bound absent a fully executed agreement").

Even if the 2023–24 agreement was enforceable, it only required the Society's "best efforts to raise [Wang's] profile." Ex. E. That agreement did not entitle Wang to stage time because a "best efforts" clause is not a guarantee; it simply "imposes an obligation to act with good faith in light of one's own capabilities" and "necessarily takes its meaning from the circumstances." *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 266 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609, 613 n.7 (2d Cir. 1979); *see also Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 108 (2d Cir. 1985); *Creaven v. Erickson*, 2023 WL 4247213, at *4 (2d Cir. June 29, 2023).[8]

Given that Wang has no individual agreement with the Society, the CBA exclusively governs his employment, and it does not vest Wang with a right to play. Rather, it empowers

---

[8] Not only is a breach of contract preempted by § 301, but Wang does not allege breach of his individual contract. (*See supra* § II.A.3.)

Society to "schedule whatever activities of the Orchestra it may determine" and does not include *any* provisions setting a minimum number of rehearsals or concerts a given musician must be assigned to. Ex. C, Art. III, § A. *See Rodriguez v. It's Just Lunch Int'l.*, 2010 WL 685009, at \*10 (S.D.N.Y Feb 23, 2010) (merely alleging an agreement was breached does not sustain a breach of contract claim).

Second, Wang equates being placed on paid leave with discipline requiring "just cause" without citing any provision of the CBA that defines "disciplinary measures" to include paid leave. FAC ¶¶ 183, 192. There is no such provision, and Wang's placement on paid leave, therefore, cannot constitute discipline under Article VII. *See, e.g.*, *Deltondo v. Sch. Dist. of Pittsburgh*, 2023 WL 2534817 (W.D. Pa. Mar. 16, 2023) (claims related to paid suspension dismissed in part because plaintiff failed to identify any provision of the CBA stating that a suspension with pay constitutes a "disciplinary action" under the CBA).

Third, Wang argues that the CBA "requires the Philharmonic to employ [him] 52 weeks per year." FAC ¶ 193. While this is true (Ex. C, Art. III, § A), Wang's conclusion that he *was not* employed while on paid leave is not. Courts and labor arbitrators distinguish between paid leave and employment termination, finding the former does not sever the employment relationship. *See Dumas v. New United Motor Mfg., Inc.*, 2011 WL 5006462, at \*7 (N.D. Cal. Oct. 20, 2011); *see generally Middleton v. City of Tucson*, 2018 WL 1581628, at \*5–6 (D. Ariz. Mar. 31, 2018); *Laborers' Int'l Union of N. Am. (LIUNA), Local __*, 2022 BNA LA 106 (Lowe, 2022) (employee was "placed on unpaid administrative leave" and "was not terminated"); *Univ. Hosp.*, 1997 BNA LA Supp. 103253 (Goldberg, 1997) (grievant was placed on paid administrative leave and was not terminated until four months later). In sum, placement on paid leave is not the equivalent of employment loss, and Wang can point to no term in the CBA—the only contract governing his employment—to support his contention that he had a right to play. As such, Count II should be

16

dismissed.

**B.    Wang Does Not Allege Facts to Support His Claim That the Union Breached Its Duty of Fair Dealing.**

The "Union's breach is a prerequisite to a consideration of the merits of [a] claim against [the plaintiff's] former employer." *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990); *see also Tomney v. Int'l Ctr. for Disabled*, 357 F. Supp. 2d 721, 738 (S.D.N.Y 2005) (dismissing breach of CBA claim against employer where union did not violate "its duty of fair representation in handling of the employee's grievance"); *Pathania v. Metro. Museum of Art*, 2013 WL 1182076, at *23–26 (E.D.N.Y. Mar. 21, 2013) (same). But to adequately allege a DFR breach, Wang must allege that the Union's decision not to challenge his non-reengagement was "arbitrary, discriminatory, or in bad faith," i.e., the result of some "fraudulent, deceitful, or dishonest action." *White*, 237 F.3d at 179 (citation omitted). It does not matter if the Union's "judgments are ultimately wrong." *Id.* (citation omitted). Its actions are only "arbitrary" if, "in light of the factual and legal landscape at the time of [its] actions, [its] behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Id.* (citation omitted). Given the evidence of misconduct and the DRC's unanimous recommendation not to reengage Wang, he has not and cannot plead as much.

Instead, he simply alleges that the Union "breached its duty of fair representation" when it "refused to represent" him by grieving his placement on paid leave and subsequent non-reengagement and that this "refusal and ongoing failure to act to enforce [his] rights was arbitrary, discriminatory, and in bad faith under the circumstances." FAC ¶¶ 162, 175. But "[a] union's failure or refusal to pursue a grievance on its own does not constitute a breach of the duty of fair representation." *Perkins v. 199 SEIU United Healthcare Workers E.*, 73 F. Supp. 3d 278, 284 (S.D.N.Y 2014) (citation omitted). And even if this refusal could be considered a breach (as discussed *infra*, it is not), Wang's allegations are wholly conclusory. *Id.* (allegation "that the Union

17

failed to provide a reasonable, non-arbitrary or capricious investigation" was vague and conclusory). Thus, his hybrid § 301/DFR claim should be dismissed.

### C.    The Union Had Multiple Valid Reasons to Not Pursue a Grievance.

The Union proffered multiple valid reasons for its decisions not to grieve Wang's placement on paid leave or his subsequent non-reengagement, including: the number and severity of the credible allegations of sexual misconduct against him; his lack of contrition; a DRC member's personal experience being "plagued by [Wang's] presence"; "the sobering fact that 2/3 of the Orchestra members interviewed will not take the stage, or will feel unsafe or uncomfortable, if Muckey and Wang return"; and the reality that the Society "will not be able to stage performances" if its members refuse to take the stage. Ex. D at 6, 8; FAC ¶ 118.

Wang's claim that the Union breached its DFR amounts to a claim that, regardless of the rationale for doing otherwise, Wang is entitled to have the Union do as *he* pleases. *See* FAC ¶¶ 163, 173, 174. That is not what the law provides. The Union need only have taken "a position on the basis of an informed, reasoned judgement regarding the merits of [Wang's] claim in light of the language contained in the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 127 (2d Cir. 1998). Even if the Union's rationale for not pursuing a grievance was incorrect (it was not), Wang's argument still fails because unions may act within a "wide range of reasonableness [which] gives the union room to make discretionary decisions and choices, even if those judgements are ultimately wrong." *White*, 237 F.3d at 179 (citations omitted); *see also Perkins*, 73 F. Supp. 3d at 284 (holding DFR not "breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance").

The Union based its decision on a correct interpretation of the CBA (*see supra* § II.A) and issued a well-reasoned decision illustrating the numerous bases for its determination, including the

thorough investigation by the Society, the unanimous recommendation of the elected nine-member Dismissal Review Committee not to challenge the non-reengagement, the overwhelming sentiment of the Philharmonic's members, and the more permissive standard and limited scope of review applicable to non-reengagement under Article XIV. *See generally* Ex. D. Count II must be dismissed for failure to state a claim because Wang has alleged no facts to show that this determination was irrational or discriminatory (i.e., done in a manner different than a similarly situated individual or made in bad faith).

### III.    WANG'S STATE LAW CLAIMS (COUNTS III AND V) ARE PREEMPTED.

Wang's discrimination claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, are preempted by § 301 of the LMRA. Section 301 empowers federal courts to hear contract disputes between employers and labor unions. 29 U.S.C. §185(a). In doing so, courts apply federal law, *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 368 (1990), and state-law claims, including discrimination claims, that are "inextricably intertwined with consideration of the terms of [a] labor contract," are completely preempted. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985); *see also Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005) (explaining § 301 of the LMRA completely preempts related state-law claims); *Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201, 206 (2d Cir. 2019) ("when resolution of a state law claim is 'substantially dependent' upon or 'inextricably intertwined' with analysis of the terms of a CBA, the state law claim 'must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law").

Wang essentially claims that the Society discriminated against him based on sex by placing him on paid leave and subsequently opting not to reengage him. But these allegations turn on the Court's evaluation and application of the terms of CBA, including whether non-reengagement

requires any justification at all, whether paid leave is "disciplinary," and whether Wang's non-reengagement was appropriately reviewed. *See Whitehurst*, 928 F.3d at 207 (employee's discrimination claims under NYSHRL and NYCHRL were preempted determining whether employer needed just cause to terminate the employee and the employee's rights after termination "were entirely defined by the grievance process in the parties' CBA"); *see also Morrissey v. Verizon Commc'ns Inc.*, 2011 WL 2671742, at \*5 (S.D.N.Y. July 7, 2011) (plaintiff's discrimination claim preempted where the inference of discrimination came from employer's alleged violation of its obligations under the CBA); *Domnister v. Exclusive Ambulette, Inc.*, 2007 WL 4244151, at \*12 (E.D.N.Y. Nov. 29, 2007) (plaintiffs' claim that defendant's failure to apply certain provisions of the CBA to them was an adverse action under the NYSHRL and NYCHRL "necessarily involve[d] 'interpretation' of the CBA in order to determine whether Plaintiffs were, in fact, entitled to be covered by the provisions of the . . . CBA"). Wang's NYSHRL and NYCHRL claims, therefore, are "inextricably intertwined" with his § 301 claim and are preempted, warranting dismissal with prejudice.

## IV. WANG FAILS TO PLEAD SEX- OR GENDER-BASED DISCRIMINATION (COUNTS III, V, AND VII).

Even if § 301 did not preempt Wang's state-law claims, he has not adequately alleged any state or federal discrimination claims. To state a Title VII claim, a plaintiff must allege that he "(1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 89 (S.D.N.Y. 2024). Similarly, to state discrimination claims under NYSHRL and NYCHRL, a plaintiff must allege "(1) he or she is a member of a protected class, (2) he or she was qualified to hold the position, (3) he or she was subject to an unfavorable change or treated less well than other employees, and (4) the unfavorable change or different treatment occurred under circumstances

20

giving rise to an inference of discrimination." *Id.* at 104, 107 ("New York courts have implied that the standards for employment-discrimination claims under the NYSHRL and NYCHRL are now largely the same."). Wang has failed to satisfy his pleading burden under either standard.

### A.    Wang Does Not Plead Someone Similarly Situated Received Preferential Treatment.

To plausibly allege an inference of sex discrimination under Title VII, the NYSHRL, and NYCHRL based on differential treatment of the sexes, a plaintiff must plead facts to show "[he] was similarly situated in all material respects" to comparators who "engaged in comparable conduct" and received comparatively preferential treatment. *Roenick v. Flood*, 2021 WL 2355108, at *5 (S.D.N.Y. June 9, 2021) (citations omitted); *see also Novick v. Vill. of Wappingers Falls*, 376 F. Supp. 3d 318, 342–43 (S.D.N.Y. 2019) ("To be similarly situated in all material respects, Plaintiff must show that similarly situated employees who went undisciplined engaged in comparable conduct."); *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 70 (2d Cir. 2016). Wang has not done so. Instead, he claims merely, "upon information and belief" that the Society "has never placed a tenured female Philharmonic musician on indefinite suspension during the pendency of an orchestra-wide investigation or otherwise." FAC ¶ 243. But that is not enough. *See Henderson v. Physician Affiliate Grp. of N.Y. P.C.*, 2019 WL 3778504, at *5 (S.D.N.Y. Aug. 12, 2019) (dismissing NYSHRL and NYCHRL discrimination claims where plaintiff failed "to identify any similarly situated comparator, alleging only 'upon information and belief' that the 'other' physicians" in her department were treated differently).

To adequately allege that he "was similarly situated in all material respects" to similarly situated comparators who "engaged in comparable conduct," Wang would have to plead that:

> 1)  after the publication of an article describing misconduct by a tenured female Philharmonic member and subsequent reports that the "conduct described in the article was not an isolated incident" (Ex. D at 1), the Society did not put that musician on leave or investigate the subsequent reports; and

21

2) the Society renewed the contract of a tenured female Philharmonic member after:

    a) an independent investigation unearthed credible allegations of sexual misconduct against her including behavior ranging from inappropriate comments to unwelcome kisses, to sexual assault and rape, and where many of these allegations were corroborated by other individuals or electronic communications (Ex. F);

    b) an independent investigation unearthed credible allegations of the musician's egotism, demeaning comments, manipulation of colleagues, and mistreatment of her students (Ex. F); *and*

    c) a "supermajority of the Orchestra who spoke to the investigator—who comprise a majority of the entire Orchestra—will not take the stage or will feel unsafe or uncomfortable if [Wang] return[s]" (Ex. D at 7; Ex. F at 2).

The reality is that Wang cannot plead his placement on paid leave or non-reengagement constitutes disparate treatment because no woman in the Philharmonic has ever been accused of such egregious serial sexual misconduct. As he cannot plead facts "suggesting that the . . . putative comparators engaged in conduct similar to [him]," his allegations are "too general and conclusory" to plausibly state an inference of sex discrimination. *Stinnett v. Delta Airlines, Inc.*, 803 F. App'x 505, 509 (2d Cir. 2020) (summary order); *see also Osborne v. Moody's Invs. Serv., Inc.*, 2018 WL 1441392, at *5 (S.D.N.Y. Mar. 22, 2018) (dismissing Title VII, NYSHRL, and NYCHRL sex discrimination claims where plaintiff "[did] not even point to any other male employee" who engaged in the same conduct); *Nnebe v. City of N.Y.*, 2023 WL 2393920, at *14 (S.D.N.Y. Jan. 30, 2023), *report and recommendation adopted*, 2023 WL 2088526 (S.D.N.Y. Feb. 17, 2023) (dismissing NYCHRL claim where plaintiff did not allege comparators engaged in conduct of comparable seriousness).[9]

All Wang has done is allege that the Society's "decision was purely motivated by

---

[9] Wang admits there is no similarly situated woman. On February 28, 2025 the Court held a conference before Judge Subramanian. The Court asked: "And are you aware of any women who have been accused of sexual misconduct who were treated better by either of the defendants? Is there any situation like that?" Wang's counsel replied: "No." *Muckey v. Assoc. Musicians of Greater New York, et al.*, 1:24-cv-03348 (S.D.N.Y Feb. 28, 2025), ECF 82, 29:6–10.

discriminatory animus because . . . Wang was a man who allegedly had been accused of misconduct against females." FAC ¶ 213. This type of conjecture has been routinely rejected by courts at the motion to dismiss stage. *See Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 249 (E.D.N.Y. 2015) (holding that the plaintiff failed to state a claim under Title VII or the NYSHRL where "he ha[d] done no more than point to various ways in which he [felt] he was mistreated and argue[d] that it must have been because of his gender, race, and national origin") (internal quotation omitted). It should be rejected here as well.

### B.     Wang Is No "Sacrificial Lamb" on the Altar of Public Sentiment.

In the absence of a similarly situated comparator, Wang attempts to conjure up a discrimination claim by alleging that the Society succumbed to public outcry that it should "take harsher action against men who had been accused of misconduct by women," making Wang a "proverbial sacrificial lamb" to appease its critics. FAC ¶¶ 32, 209, 268. But "public pressure, standing alone, is not sufficient to permit a plaintiff to survive a motion to dismiss"; "the pressure must be combined with clear procedural irregularities in a [defendant's] response to allegations of sexual misconduct." *Roe v. St. John's Univ.*, 91 F.4th 643, 675 (2d Cir. 2024).

Wang does not allege as much. Instead, he concludes repeatedly that the use of Article XIV was unprecedented or that it had not been used before. FAC ¶ 99. But such allegations do not support an inference of discrimination, which requires fact-based allegations that the Society "completely disregarded the [review] process" in the CBA. *See Doe v. Trs. of Columbia Univ. in City of N.Y.*, 2022 WL 3666997, at *18 (S.D.N.Y. Aug. 25, 2022) ("Doe does not allege any facts showing how [defendant's] compliance with its own policy amounts to a 'clearly irregular' process."); *see also Roe*, 91 F.4th at 655 (complaints that defendant "justified its decision against [plaintiff] with an unsatisfying explanation" did not "rise[] to the level of the allegations of objectively deficient investigations"). And, as described above in § II.A.2, Wang expressly pleads

that the Society complied with the CBA's review process *to the letter*.

Wang also fails to plead that anything was wrong with the 2024 investigation other than that he disagreed with the Investigator's conclusions. *See* FAC ¶¶ 18–28 (failing to argue the investigation was improper, merely that he disagreed with the outcome). But "dissatisfaction with the adequacy of Defendants' investigation—even if objectively warranted—is insufficient to support an inference of discrimination." *Cooper v. Templeton*, 629 F. Supp. 3d 223, 233 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977 (2d Cir. June 8, 2023); *see also Jones v. Gen. Bd. of Glob. Ministries of United Methodist Church*, 1997 WL 458790, at *2 (S.D.N.Y. Aug. 11, 1997) ("attempts to challenge the validity of the investigation . . . and the credibility of the witnesses . . . may prove that the investigation was poorly conducted and that plaintiff was unfairly discharged, [but] it does not raise an inference of discrimination based on race or sex"); *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 185 (S.D.N.Y. 2020) ("Plaintiff's remaining contentions regarding the investigations and hearings were 'minimal irregularities,' and are insufficient to infer sex discrimination."). As Wang points to no clear irregularities in the 2024 investigation or the review of his non-reengagement, he has not stated a claim for discrimination.

## V.    WANG'S TITLE VII CLAIM (COUNT VII) SHOULD ALSO BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES.

Wang's Title VII claim should be dismissed because EEOC charges were not pending for at least 180 days. Title VII provides:

> If a charge filed with the Commission . . . is dismissed by the Commission, or if within ***one hundred and eighty days*** from the filing of such charge . . . whichever is later, the Commission has not filed a civil action under this section . . . . or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, . . . the Commission . . . shall so notify the person aggrieved and . . . a civil action may be brought against the respondent named in the charge.

42 U.S.C. § 2000e-5(f)(1) (emphasis added). This section "plainly provides that, after a charge has

been filed, the EEOC has 180 days to dismiss the charge or file a civil action." *Gibb v. Tapestry, Inc.*, 2018 WL 6329403, at \*5 (S.D.N.Y. Dec. 3, 2018). "Only after 180 days have elapsed may the charging party pursue his or her claims in court." *Id.*; *see also Henschke v. N.Y. Hosp. – Cornell Med. Ctr.*, 821 F. Supp. 166, 170 (S.D.N.Y. 1993); *Rodriguez v. Connection Tech. Inc.*, 65 F. Supp. 2d 107, 111–12 (E.D.N.Y. 1999) (allowing early right-to-sue letters would undermine EEOC's statutory duty to investigate every charge filed); *Stetz v. Reeher Enters., Inc.*, 70 F. Supp. 119, 124 (N.D.N.Y. 1999) (early EEOC letters would enable "parties to circumvent the administrative scheme").[10] Wang alleges only that he filed a charge of sex-based discrimination against the Society on March 10, 2025, and that the EEOC issued a right-to-sue letter on the same day. FAC ¶¶ 135–36. Accordingly, his right-to-sue letter is invalid because its early issuance "violates the threshold provision of Title VII" that the EEOC "shall make an investigation of the complaint." *Rodriguez*, 65 F. Supp. 2d at 112 (notice issued 39 days after filing of charge was invalid); *Stafford v. Sealright, Inc.*, 100 F. Supp. 2d 137, 138–40 (N.D.N.Y. 2000) (notice issued 16 days after filing of charge was invalid).

## CONCLUSION

For these reasons, the Society respectfully requests that the Court dismiss Counts II, III, V, and VII of the Amended Complaint with prejudice and dismiss the Society from this action.

Dated: June 9, 2025                      Respectfully submitted,

                                      */s/ Ashley R. Lynam*
                                      Ashley R. Lynam
                                      (NY Bar No. 5701404) (admitted *pro hac vice*)
                                      Jacob Sand (admitted *pro hac vice*)
                                      Natalie Georges (NY Bar No. 5011325)
                                      MORGAN, LEWIS & BOCKIUS LLP

---

[10] The EEOC regulations that purport to permit early right-to-sue notices do not provide that such notices may be automatically issued upon request. 29 C.F.R. § 1601.28(a)(2). The EEOC must determine, and certify, that it has investigated whether it is capable of completing its processing of the charge within 180 days. *Id.* Wang does not allege the right-to-sue letter said as much.

2222 Market Street
Philadelphia, PA  19103-3007
T: 215.963.5000 | F: 215.963.5001
ashley.lynam@morganlewis.com
jacob.sand@morganlewis.com
natalie.georges@morganlewis.com

Geneva Ramirez (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
T: 312.324.1000 | F: 312.324.1001
geneva.ramirez@morganlewis.com

*Attorneys for The Philharmonic-Symphony Society
of New York, Inc.*

## LOCAL RULE 7.1(c) CERTIFICATE

The undersigned attorney certifies that this document complies with the word-count limitation of Local Rule 7.1(c) because it contains 8,673 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and certificates.

*/s/ Ashley R. Lynam*
Ashley R. Lynam