UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
LIANG WANG,                                    :
                                               :   Case No.
                          Plaintiff,           :   1:24-cv-03356 (AS)
                                               :
              vs.                              :   [rel. 1:24-cv-03348 (AS)]
                                               :
THE PHILHARMONIC-SYMPHONY          :   **<u>ORAL ARGUMENT</u>**
SOCIETY OF NEW YORK, INC. AND      :   **<u>REQUESTED</u>**
ASSOCIATED MUSICIANS OF GREATER :
NEW YORK, LOCAL 802, AMERICAN      :
FEDERATION OF MUSICIANS,           :
                                               :
                          Defendants.          :
-----------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE <u>FIRST AMENDED COMPLAINT</u>


CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, NY 10005
(917) 544-2524
lewis@clm.com
meara@clm.com

*Attorneys for Plaintiff Liang Wang*


*Of Counsel,*
    Alan S. Lewis
    Karen E. Meara

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

FACTS .................................................................................................................... 12

ARGUMENT .......................................................................................................... 12

I.    THE COMPLAINT PLAUSIBLY ALLEGES WANG'S HYBRID
CLAIM ......................................................................................................... 12

    A.    The Amended Complaint Plausibly Alleges that the Philharmonic
Breached the Collective Bargaining Agreement by Suspending
and Terminating Wang in Violation of the Arbitration Award
and Without Even Asserting Just Cause ................................................. 13

        1.    The Complaint Plausibly Pleads that the Philharmonic
Breached the CBA by Its Suspension and Termination of
Wang in Violation of Its Obligation to Treat the 2020 Award
as Final and Binding......................................................................... 14

        2.    The Complaint Plausibly Pleads that the Philharmonic
Breached the CBA by Disciplining Wang Without Just
Cause ................................................................................................. 22

        3.    Article XIV Does Not Permit the Philharmonic to Discipline
Wang by Firing Him Without a Reason ........................................... 23

    B.    Wang Has Plausibly Alleged that the Union Breached Its Duty
of Fair Representation When It Refused to Grieve Wang's
Suspension and Termination.................................................................... 28

    C.    Wang Has Plausibly Alleged Both that the April 2024 Suspension
Violated His Contractual Rights and that the Union Therefore
Breached Its Duty of Fair Representation When It Refused to
Grieve the Suspension............................................................................. 45

i

II.   WANG HAS ADEQUATELY PLED THAT DEFENDANTS
      DISCRIMINATED AGAINST HIM BASED ON HIS SEX IN
      VIOLATION OF TITLE VII ....................................................................49

      A.   The Philharmonic Violated Title VII When It Terminated Wang's
           Employment Because of Public Criticism Over the Philharmonic's
           Past Handling of Allegations of Misconduct by Men Against
           Women .................................................................................................49

      B.   Wang States a Sex Discrimination Claim Against the Union ...............56

III.  THE EEOC MAY ISSUE A RIGHT TO SUE LETTER BEFORE
      180 DAYS EXPIRES .....................................................................................59

IV.   WANG HAS ADEQUATELY PLED HIS STATE LAW
      DISCRIMINATION CLAIMS........................................................................61

      A.   Wang's State Law Claims Are Not Preempted ....................................63

      B.   Plaintiff's State Law Claims Are Not Barred by *Martin v. Curran* ......67

CONCLUSION ...........................................................................................................71

WORD COUNT CERTIFICATION .......................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Com Corp. v. Banco do Brasil, S.A.*,
  171 F.3d 739 (2d Cir. 1999) ................................................................26

*Agosto v. Corr. Officers Benev. Ass'n*,
  107 F. Supp. 2d 294 (S.D.N.Y. 2000) ................................................56

*Allis-Chalmers Corp. v. Lueck*,
  471 U.S. 202 (1985)............................................................................63

*Arar v. Ashcroft*,
  585 F.3d 559 (2d Cir. 2009) ...............................................................15

*Ayers v. Bloomberg, L.P.*,
  203 A.D.3d 872 (2022)..................................................................62, 64

*Barr v. United Parcel Service, Inc.*,
  868 F.2d 36 (2d Cir. 1989) ...........................................................29, 36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................13

*Bennett v. Local Union No. 66, Glass Workers Int'l Union*,
  958 F.2d 1429 (7th Cir.1992) .............................................................37

*Bernard v. Citibank, N.A.*,
  151 N.Y.S.3d 87 (2d Dept. 2021)........................................................48

*Biberaj v. Pritchard Industries, Inc.*,
  2009 WL 10738222 (S.D.N.Y. Sept. 28, 2009) ............................31, 43

*Bryant v. Verizon Communications, Inc.*,
  550 F. Supp. 2d 513 (S.D.N.Y. 2008) .................................................64

*Buczakowski v. 1199SEIU*,
  No. 518-CV-0812, 2019 WL 5697899 (N.D.N.Y. Nov. 4, 2019).....................44

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987)............................................................................64

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir.2002) ...............................................................17

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill
  Lynch, Pierce, Fenner & Smith Inc.*,
  232 F.3d 153 (2d Cir. 2000) ........................................................25, 26

*Cruz v. SEIU Loc. 32BJ*,
  No. 19-CV-11836, 2021 WL 3604661 (S.D.N.Y. Aug. 12, 2021) ...................64

*Cummings v. City of New York*,
  302 F. Supp. 3d 511 (SDNY 2017) ..............................................24, 26

*DelCostello v. International Broth. of Teamsters*,
  462 U.S. 151 (1983)...........................................................................13

*Doe v. Columbia*,
  831 F.3d 46 (2d Cir. 2016) ....................................................52, 53, 54

*Doe v. New York Univ.*,
  438 F. Supp. 3d 172 (S.D.N.Y. 2020) ..................................................54

*Driver v. US Postal Service, Inc.*,
  328 F. 3d 863 (6th Cir. 2003) .............................................................39

*Farah v. Emirates and Emirates Severance Plan*,
  2024 WL 1374762 (S.D.N.Y. Mar. 31, 2024)........................................63

*Faulkner v. Beer*,
  463 F.3d 130 (2d Cir. 2006) ...............................................................17

*Figueira v. Black Entertainment TV*,
  944 F. Supp. 299 (S.D.N.Y. 1996) ......................................................61

*Girolamo v. Teamsters Local 72*,
  1998 WL 889039 (S.D.N.Y. Dec. 21, 1998)........................................70

*Global Network Commc'ns, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir.2006)) ...............................................................17

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016) ...............................................................17

*Gold v. Loc. Union No. 888 U.F.C.W., AFL-CIO*,
758 F. Supp. 205 (S.D.N.Y. 1991) .................................................................40

*Hernandez v. Premium Merch. Funding One, LLC*,
No. 19-CV-1727, 2020 U.S. Dist. LEXIS 122643 (S.D.N.Y.
July 13, 2020)......................................................................................7, 60, 61

*Holt v. Town of Stonington*,
765 F.3d 127 (2d Cir. 2014) ..........................................................................59

*Huerta v. J.D. Workforce, Inc.*,
No. 23-CV-5382, 2025 US Dist. LEXIS 40517 (S.D.N.Y.
Mar. 3, 2025)...........................................................................................60, 61

*Jenkins v. Arcade Bldg. Maint.*,
No. 98-CV-3133, 1999 WL 1051105
(S.D.N.Y. Nov. 19, 1999) ..............................................................................52

*Johnson v. USPS*,
756 F.2d 1461 (9th Cir. 1985) .......................................................................41

*Jones v. Interlake Steamship Co.*,
No. 20–2210, 2021 WL 3719355 (6th Cir. Aug. 23, 2021) .............................37

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir.1991 ............................................................................17

*Kitani v. NYC Transit Auth.*,
No. 19-CV-1043, 2022 WL 874781 (S.D.N.Y. Mar. 24, 2022)..................69, 70

*Langford v. International Union of Operating Engineers, Local 30*,
765 F. Supp. 2d 486 (S.D.N.Y. 2011) ........................................................69, 70

*Lenzi v. Systemax, Inc.*,
944 F.3d 97 (2d Cir. 2019) ............................................................................59

*Lewis v. Tuscan Dairy Farms, Inc.*,
25 F.3d 1138 (2d Cir. 1994) ..........................................................................34

*Linton v. United Parcel Service*,
15 F. 3d 1365 (6th Cir. 1994) ...................................................................37, 43

*Littlejohn v. City of New York,*
   795 F.3d 297 (2d Cir. 2015) ...................................................50, 51, 52

*Livadas v. Bradshaw,*
   512 U.S. 107 (1994).........................................................................65

*Loeffler v. Staten Island Univ. Hosp.,*
   582 F.3d 268 (2d Cir. 2009) .............................................................62

*Luppo v. Waldbaum,*
   131 A.D. 2d 443 (2d Dept 1987) ..................................................18, 45

*Martin v. Curran,*
   303 N.Y. 276 (1951) ...........................................................67, 68, 69, 70

*McIntyre v. Longwood Cent. Sch. Dist.,*
   2008 WL 850263 (E.D.N.Y. Mar. 27, 2008)......................................70

*Menaker v. Hofstra Univ.,*
   935 F.3d 20 (2d Cir. 2019) ...................................................52, 53, 56, 58

*Mwangi v. Passbase, Inc.,*
   No. 21-CV-6728, 2022 U.S. Dist. LEXIS 106103, 2022 WL
   2133734 (S.D.N.Y. June 14, 2022) ...................................................60

*Novick v. Vill. of Wappingers Falls, New York,*
   376 F. Supp. 3d 318 (S.D.N.Y. Mar. 27, 2019)..................................51

*Palladino v. CNY Centro, Inc.,*
   23 N.Y.3d 140 (2014) ..................................................................68, 69

*People v. Newspaper and Mail Deliverers' Union of New York and
   Vicinity,*
   250 A.D.2d 207 (1st Dep't 1998) ......................................................70

*Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers,*
   378 F.3d 269 (2d Cir. 2004) ...................................................30, 37, 43

*Ramroop v. Commc'ns Workers of Am. Local 1182,*
   2022 WL 17574009 (N.Y. Sup. Ct. Dec. 8, 2022) ........................69, 70

*Roach v. New York City Hous. Auth.,*
   No. 23-CV-08135, 2025 WL 1769845 (S.D.N.Y. May 6, 2025)......................56

*Roenick v. Flood, et al.*,
　20-CV-7213, 2021 WL 2355108 (S.D.N.Y. Jun. 9, 2021)...........................51, 63

*Roth v. Jennings*,
　489 F.3d 499 (2d Cir. 2007) ...............................................................17

*Rothschild v. Title Guar. & Trust Co.*,
　204 N.Y. 458 (1912) ..........................................................................48

*Samuels v. Air Transp. Loc. 504*,
　992 F.2d 12 (2d Cir. 1993) .................................................................35

*Sanchez v. S&P Global, Inc.*,
　2023 WL 8372990 (S.D.N.Y. Dec. 4, 2023) .......................................49

*Santiago v. ACACIA Network, Inc.*,
　634 F. Supp. 3d 143 (S.D.N.Y. 2022) .................................................59

*Scales v. N.Y. Hotel & Motel Trades Council, Local 6*,
　No. 21 Civ. 8142, 2023 U.S. Dist. LEXIS 19741 (S.D.N.Y.
　Feb. 6, 2023) ......................................................................................35

*Schoonover v. Consolidated Freightways Corp. of Delaware*,
　147 F.3d 492 (6th Cir. 1998) .............................................................35

*Sim v. New York Mailers' Union Number 6*,
　166 F.3d 465 (2d Cir. 1999) ..............................................................30

*Spellacy v. Air Line Pilots Ass'n-Int'l*,
　156 F.3d 120 (2d Cir. 1998) ..............................................................30

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
　560 F.3d 118 (2d Cir. 2009 ................................................................59

*Terry v. Ashcroft*,
　336 F.3d 128 (2d Cir. 2003) ..............................................................50

*Thomas v. Little Flower for Rehab. & Nursing*,
　793 F. Supp. 2d 544 (E.D.N.Y. 2011) ..........................................29, 35

*Truck Drivers v. Schneider Tank Lines, Inc.*,
　958 F.2d 171 (7th Cir. 1992) ........................................................27, 28

*Vaca v. Sipes*
    386 U.S. 171 (1967).............................................................*passim*

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015) ...................................................50

*Von Maack v. 1199SEIU United Healthcare Workers E.*,
    No. 14-CV-4360, 2014 WL 5801349 (S.D.N.Y. Nov. 7, 2014),
    *aff'd but criticized*, 638 F. App'x 66 (2d Cir. 2016) ........................51

*Wellner v. Montefiore Med. Ctr.*,
    No. 17-CV-3479, 2019 WL 4081898 (S.D.N.Y. Aug. 29, 2019) .....................62

*White v. White Rose Food, a Div. of DiGiorgio Corp.*,
    237 F.3d 174 (2d Cir. 2001) ..................................................13

*Whitehurst v. 1199SEIU United Healthcare Workers E.*,
    928 F.3d 201 (2d Cir. 2019) ..................................................64

*Young v. N. Drury Lane Prods., Inc.*,
    1995 WL 110126 (N.D. Ill. Mar. 13, 1995), *aff'd*, 80 F.3d 203
    (7th Cir. 1996)...........................................................27, 28

*Young v. U.S. Postal Service*,
    907 F.2d 305 (2d Cir. 1990) ...............................................13, 28

## Statutes

Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*) ........49, 56, 60

NYC Admin. Code § 8–107(1)(a) ...............................................62

NYS Exec. L. § 296 ..........................................................61

NYS Exec. L. § 300 ..........................................................62

## Other Authorities

United Electrical, Radio & Machine Workers of America, "The Seven
    Tests of Just Cause," UE Steward, November 2021 .....................40-42

Fussell, John T. and Robert Cheverie, "A Union Steward's Guide to Handling Grievances, The Basics" (Connecticut Teamsters, Feb. 23, 2021..................................................................................................23

Wetherill R.R., Fromme K., "Alcohol-Induced Blackouts: A Review of Recent Clinical Research with Practical Implications and Recommendations for Future Studies" (May 2016)..........................................19

## PRELIMINARY STATEMENT

Liang Wang was hired by the New York Philharmonic as first oboe in 2006. Eighteen years later, he received a letter from the Philharmonic permanently terminating him from his position as a member of its orchestra. Wang's Union, Associated Musicians of Greater New York, Local 802, American Federation of Musicians (the "Union"), rejected his request that it challenge the termination. Wang, whose previously filed suit against the Philharmonic and the Union was pending in this Court, amended his complaint (with the Court's permission) to add claims based on his termination. Defendants have since moved to dismiss, but as demonstrated below, their arguments lack merit.

In its entirety, the curt termination letter Wang received, on October 15, 2024, stated as follows:

> This is to notify you that, pursuant to Article XIV of the collective bargaining agreement between the Philharmonic-Symphony Society of New York ("Society") and Local 802 of the American Federation of Musicians, the Society will not be re-engaging you as member of the Orchestra for the year beginning September 21, 2025.

> During the remainder of the current year (2024-25), you should not come to the Society's premises to rehearse or perform or for other reasons unless requested to do so by the Society's management. If you need access to the dressing room, please organize with the Orchestra Personnel Office.

> We wish you well in your future endeavors.

Wang's First Amended Complaint (ECF No. 91) ("FAC") ¶ 91.

Even though the letter gave no reason for the termination, it was not a surprise. Over six months earlier, the Philharmonic had barred Wang—and another tenured orchestra member, Matthew Muckey—from all performances, rehearsals, or even from entering the Philharmonic's premises. FAC ¶¶ 35-37. That occurred on April 13, 2024, one day after the publication of an unfavorable magazine article about Wang and Muckey (the "Article"). FAC ¶ 29. Just as the Philharmonic gave no reason to Wang (and Muckey) when it fired them in October 2024, it had made no accusation about Wang and Muckey when it banished them the previous April. *See* FAC ¶¶ 36, 91. Rather, the Philharmonic merely pointed to the magazine article, which criticized the outcome of a 2019 arbitration proceeding. FAC ¶ 36.

In that arbitration, the Philharmonic had failed to prove any misconduct by Wang (or Muckey) and had been ordered to reinstate them. FAC ¶¶ 26-28. As the Philharmonic well knew, the Article that came along four years after the arbitration was misleading: it suggested that the Philharmonic had fired Wang for drugging Cara Kizer (a former probationary player with the Philharmonic) in Vail, Colorado in 2010. FAC ¶ 33. Instead, and as the Philharmonic's lead counsel had expressly acknowledged on the record early in the 2019 arbitration hearing, this was simply wrong. That is, "Mr. Lewis [Wang's counsel then and now] is right.

*We don't say that [Wang] engaged in misconduct in Vail*."  *See* Compl., ECF No. 1 ¶ 15.

The Union likewise knew that the Article was wrong in reporting that Wang had been terminated by the Philharmonic based on an accusation against him from Kizer.  The Philharmonic and the Union were also each aware of other distortions in the Article, such as the flawed discussion of purported corroborative evidence that Kizer had been drugged.  FAC ¶¶ 33-34.  The arbitration hearing revealed instead that there was no such competent evidence.  In his written decision, Arbitrator Bloch concluded that "vigorous efforts to secure proof of drugs in [Kizer's] system" were "wholly unavailing."

The Article elicited a strong and negative public reaction, in part grounded in the apparent perception that Wang and Muckey's previous success in the arbitration was an illustration of the Philharmonic's historic "non-responsiveness when dealing with allegations of sexual misconduct" (ECF No. 110, "Union Br." at 21) by men against women, which had also been a theme of the Article.  *See, e.g.*, FAC ¶ 32.  A media generated firestorm poured down on Defendants, and Wang and Muckey became the poster boys for such misconduct, notwithstanding that the arbitrator had four years earlier issued a decision in each of Wang's and Muckey's favor.  FAC ¶¶ 31, 32, 40.

As a result, the Philharmonic and the Union decided, separately and in cahoots with each other, to get rid of Wang and Muckey rather than try and calm the storm that the misleading Article had ignited surrounding historic issues of gender and sexual misconduct. Thus, the Philharmonic instantly banished both Wang and Muckey from its premises one day after the Article was published. FAC ¶ 36. Moreover, the Philharmonic and the Union immediately set out to nurture rather than confront the misplaced fear of Wang the Article had triggered. For example, acting as if the Article had presented something *new and credible to the Philharmonic*, the Philharmonic's CEO immediately and publicly described the allegations as "distressing" and newly "*revealed*." FAC ¶¶ 35, 46. This was misleading: *nothing* in the Article's retelling of Kizer's story, 14 years after the event, was "revealed" to the Philharmonic, all of which had been thoroughly vetted by the arbitrator in the 20-day hearing that took place in 2019. FAC ¶ 46. Two days later, the Union's President publicly endorsed Wang's suspension. FAC ¶¶ 43-44. The writing was thus on the wall: the Philharmonic and the Union would collude to find an excuse to avoid affording Wang (and Muckey) their contractual rights to employment and to Union representation.

The only question was what particular fig leaf they would attach as rationalization for the completion of this pre-conceived intention. As the Philharmonic and the Union then knew, Wang and Muckey were leading stable

and law-abiding lives. Each had gotten married in recent years, were the fathers of

young children, and were devoting their lives to their careers and families.  FAC

¶¶ 8, 153.  In the four years since both musicians had returned to the orchestra in

the wake of the arbitration award issued in 2020, *nobody within or even outside*

*the Philharmonic had uttered a word of complaint to the Philharmonic against*

*either musician*, each of whom continued to perform at the pinnacle of their

profession.  FAC ¶ 28.  Indeed, the Philharmonic did not hesitate to praise Wang,

as it did in this November 22, 2022 letter by its personnel manager, DeAnne

Eisch:

> Mr. Liang Wang has been employed fulltime as Principal Oboe of the
> New York Philharmonic since September 4, 2006.  He is a tenured
> and valued member of the Orchestra….  Mr. Wang possesses the rare
> level of musicianship and technical ability that the New York
> Philharmonic, the oldest and most storied orchestra in the United
> States, demands.  The Orchestra has 4 tenured oboe positions.  As
> Principal Oboe, Mr. Wang leads the oboe section and his musical
> contribution is critical to our success.

FAC ¶ 14.

The Philharmonic's tune changed after the Article was published two years

later when it scapegoated Wang and Muckey to rebut the perception that it had a

long-standing "practice of 'not taking [female] musician complaints seriously

[pertaining to] … sexual harassment and assault.'"  Union Br. at 6.  *See also* FAC

¶ 32.  The Philharmonic made this decision, even though: (a) *the musicians* had

prevailed in the 2019 arbitration; (b) the orchestra had functioned seamlessly since

the two musician's return to their positions in 2020; and (c) nobody known to the Philharmonic had since made any accusation against either of them. FAC ¶¶ 27-28, 84.

On the heels of suspending Wang and Muckey in the wake of the Article, the Philharmonic decided upon a strategy: it would engage a nominally "independent" investigator to drum up "just cause" (the requirement set forth in the collective bargaining agreement ("CBA") for terminating tenured members of the orchestra for disciplinary reasons) and thereby placate the mob that was clamoring for Wang and Muckey's heads. The Philharmonic and the Union made clear that Wang and Muckey's fates *depended* on the outcome of the newly-conceived investigation—even though the investigation was not at inception described as an investigation *of Wang or Muckey but rather as a broader investigation not focused on particular individuals*. FAC ¶¶ 48, 67-69. Echoing this theme, the Philharmonic also later represented to the Court that beginning in April 2024, Wang and Muckey were placed on leave pending the outcome of the investigations, (*see* ECF No. 23 at 5), although that misrepresented the facts in multiple respects. *See, e.g.*, FAC ¶¶ 50, 51 (alleging, for example, that "[n]either at the time Wang was suspended nor at the time the two investigations were announced … were Wang or his lawyers ever informed that he was specifically

being investigated, or that the reason for his suspension was either of the two investigations …").

The investigation was biased from beginning to end.  FAC ¶¶ 69-83.  The investigator examined Wang's and Muckey's social lives of past decades (but not the lives of other Philharmonic musicians) (FAC ¶¶ 69, 71-72) against her arbitrary personal theories surrounding perceived "power imbalances" in outside-of-work dating relationships.  For example, it described a 2012 occurrence at a gathering after a performance when Wang kissed a woman (not a colleague) on the lips rather than on the cheek as she was expecting.  FAC ¶¶ 75, 110.  This and other similar contentions made in the Executive Summary of Levy's investigative report (the "Levy Report") would not rise to the level of just cause for termination in 2024, even if the Philharmonic could prove the truth of such allegations.

Amid its focus on alleged behavior of more than a decade ago that was at worst, boorish, the Levy Report did accuse Wang of sexually assaulting *one* person.  FAC ¶ 105.  But as to that accusation, the investigator had not given Wang a fair chance—or any chance—to even address it.  FAC ¶¶ 70, 73.  Levy framed her questions to Wang around that accusation—relating to a long-term relationship of over a decade ago, around whether the relationship had started during or after the period when Wang was giving music lessons to the person who became his girlfriend.  Nothing Levy said to Wang apprised him of the idea that

he was being investigated for an assault of that person.  In this way, Levy

thwarted Wang's attempts to present his side of the story, FAC ¶¶ 22, 71, 79.[1]

In any event, the Philharmonic well knew that the evidence of any

misconduct by Wang of a kind that would make dismissal an allowable sanction

was so weak that it did not even try to rely on Levy's findings to fire Wang.

Instead, once in possession of Levy's report, the Philharmonic decided that it

would not use *any* of its investigative findings to justify Wang's (or Muckey's)

long-planned firings.  FAC ¶¶ 89-91.  As noted, the termination letter did not give

any reason for Wang's firing.  But as is undisputed, Article VII requires "just

cause" for the imposition of any discipline, and as is also undisputed, the

Philharmonic did not even pretend to assert just cause when it fired Wang.  *See*

*also* FAC ¶¶ 2, 23.  Moreover, the Philharmonic's legalistic proclamation that

Wang's firing was *not disciplinary*, that is, imposed for alleged misconduct,

cannot be squared with the first words in its own brief—"Plaintiff Liang Wang

has been accused of …".  ECF No. 106, "Phil Br." at 1.  Since it is not reasonably

debatable that the Philharmonic disciplined Wang, and did so without even

claiming just cause, the conclusion that the Philharmonic breached the CBA is

plain and will not depend on the need for contract interpretation.  The

---

[1] In fact, Wang did not learn that such an allegation had been leveled against him until about
two weeks after he was fired, when he was briefly permitted to read the Levy Executive Report.
FAC ¶ 105.

Philharmonic's reliance on, and both Defendants' arguments surrounding Article XIV are thus a distraction, because even Defendants do not argue that Article XIV displaces the Article VII requirement for just cause in the face of the imposition of discipline.

To be sure, the Union cites to Article XIV for its defense of its decision to acquiesce in Wang's termination. The Union asserts that Article XIV places "no limitations" on its use to terminate tenured musicians (Union Br. at 1) and that the Union's "careful contractual analysis" (Union Br. at 19) was that Article XIV forecloses a "credible breach of contract claim that it could assert." Union Br. at 20. But it is that argument which is neither credible nor made in good faith. The Union's brief, like the Philharmonic's, reveals the Union's actual belief that Wang's termination was disciplinary, even if the employer kept its disciplinary reasons out of its termination document in the service of pretending the termination was non-disciplinary. Thus, the Union's brief attributes Wang's termination to "subsequent events" and "unwelcome behavior" which in turn are described as purported misconduct by Wang, i.e., "sexual abuse and harassment toward women." Union Br. at 13, 14. With these words, the Union too acknowledges that it believes Wang's termination had a disciplinary character. In any event, this is not actually a new realization by the Union, as it has never genuinely believed that Wang's termination was not disciplinary, or that the

requirement set forth in Article VII limiting discipline to findings of just cause can be supplanted by the employer's mere citation of another CBA provision like Article XIV when terminating the employee.

As the Amended Complaint instead details, the Union's decision to adopt that view and refuse to grieve Wang's termination under the circumstances was made in bad faith and for discriminatory purposes.  FAC ¶¶ 5, 98-100, 162-163.  Indeed, as recently as February 28, the Union, through its principal counsel, advised the Court that Article XIV is "*not* a wide-open door that can be used at any time."  Declaration of Alan S. Lewis ("Lewis Decl."), Ex. C at 14:21–22.  The Union's Executive Board, for its part, acknowledged not only that it had "expressed concern" to the Philharmonic about its interpretation of Article XIV, but also that in response, the Philharmonic "confirmed" to the Union "that [it] would not use the Article XIV non-reengagement procedure [in the future] to supplant or do an end-run around the requirement for having 'just cause' for dismissals…."  FAC ¶ 120.  The Union's own contradictions more than raise serious doubt as to whether it relied in good faith on its "careful contractual analysis" (Union Br. at 19) of Article XIV as supposedly foreclosing a "credible breach of contract claim that it could assert" (Union Br. at 20), and, more importantly at this juncture, Wang more than plausibly alleges that it did not.  *See* FAC ¶¶ 120–22.

The Union's bad faith and bias was also revealed by its reliance on the contents of the Levy Report even though the Philharmonic did not cite to that report or offer any reasons at all when it terminated Wang. FAC ¶ 100. Perhaps most egregiously, the Union leaned heavily on the results of a poll Levy conducted asking orchestra members how they would feel about the possibility of Wang returning to the stage, knowing that their "feelings" were informed primarily, if not exclusively, by the contents of the Article, hostile statements about Wang from the Union's President two days after his suspension, rumors they had heard, and public commentary on blogs and social media that called for Wang and Muckey to be removed from the orchestra. FAC ¶ 127. Defendants cite to no authority (and there is none) that would permit the employer and the Union to terminate a tenured musician on the basis of such a poll.

Finally, the Amended Complaint plausibly alleges that the Union and the Philharmonic violated federal and state discrimination laws. The breaching conduct took place amidst substantial public outcry over Defendants past failures to address claims of sexual misconduct by men against women, and in an effort to counteract that criticism, Defendants improperly shortcut or changed their normal policies and procedures, culminating in Wang's and Muckey's wrongful discharge. Defendants took gender into account at each step of their decision-making process, from Wang's initial suspension one day after the Article was

published, to their public statements signaling allegiances with those who were calling for women to be believed and Wang and Muckey to be fired at a moment devoid of any basis to take a stance, to Wang's and Muckey's termination for no reason at all, to the Union's decision to come up with its own independent reasons not to challenge the Philharmonic's clear breach.

## **FACTS**

The facts are taken from Wang's amended complaint, as detailed above in the Preliminary Statement, and below were responding to Defendants' specific dismissal arguments.

## **ARGUMENT**[2]

## I. THE COMPLAINT PLAUSIBLY ALLEGES WANG'S HYBRID CLAIM

A union-represented employee who seeks court relief for his employer's breach of a collective bargaining agreement, after his union declined to grieve the employer's breach, must establish first that the "employer breached a collective bargaining agreement," and second, that "the union breached its duty of fair representation" owed to the union member. *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178–179 (2d Cir. 2001); *see also Vaca v. Sipes*

---

[2] Defendants have also moved to dismiss all of the claims in the related case, *Muckey v. The Philharmonic-Symphony Society of New York, Inc., et al.*, 1:24-cv-03348-AS. Wang expressly incorporates by reference all factual assertions and legal arguments made by Muckey that are pertinent to arguments made by Wang in this memorandum of law.

386 U.S. 171, 177 (1967); *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 165 (1983); *Young v. U.S. Postal Service*, 907 F.2d 305, 307 (2d Cir. 1990). To state such a "Hybrid Claim," like any other cause of action, a complaint need only plead enough facts to make the claim plausible. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Wang's amended complaint plausibly (and in considerable detail) alleges both that the Philharmonic breached the Collective Bargaining Agreement and that the Union breached its duty of fair representation.

### A. The Amended Complaint Plausibly Alleges that the Philharmonic Breached the Collective Bargaining Agreement by Suspending and Terminating Wang in Violation of the Arbitration Award and Without Even Asserting Just Cause

Wang's Amended Complaint plausibly pleads that the Philharmonic breached its contractual obligations to Wang in two ways. *First*, the Philharmonic violated Article XV's mandate to treat the 2020 arbitration award as final and binding by suspending and then terminating Wang in 2024 based on the same allegations (as repackaged in the article) already adjudicated in the earlier arbitration. *Second*, the Philharmonic violated Article VII by suspending and then terminating Wang without "just cause." The Philharmonic's own belated characterization of its reason for terminating Wang as his purported "misconduct" Phil Br. at 1, cannot be reconciled with its argument that its termination of Wang was non-disciplinary and therefore not subject to the just cause standard (Phil Br.

at 12): it is indisputable that when an employer terminates an employee for "misconduct" that such constitutes employment discipline.

### 1. The Complaint Plausibly Pleads that the Philharmonic Breached the CBA by Its Suspension and Termination of Wang in Violation of Its Obligation to Treat the 2020 Award as Final and Binding

The Amended Complaint sufficiently pleads that the Philharmonic's *actual* reason for suspending and then terminating Wang is grounded in the facts *adjudicated in Wang's favor* in the 2020 Arbitration Award. *See* FAC ¶ 163 (attributing his banishment to "a misleading and one-sided article regarding subjects adjudicated in the binding arbitration"); FAC ¶ 190 (alleging that this termination was "a capitulation to pressure from a misinformed public to violate the final and binding nature of the 2020 Arbitration Award") *see also* FAC ¶¶ 47, 48, 53, 54. Indeed, Wang was banished from the Philharmonic *one day* after the publication of the 2024 article, (FAC ¶ 36), and the Philharmonic's CEO defended the action by publicly stating that the article's coverage of those old (debunked) accusations had generated "strong feelings". *See, e.g.*, FAC ¶¶ 38–40.

Neither Defendant disputes that firing either musician based on the allegations adjudicated in arbitration is impermissible under the CBA. And neither Defendant meaningfully challenges that the complaint plausibly pleads that the Philharmonic did just that. The Philharmonic makes the perfunctory contention that "Wang has not plausibly alleged a violation of … the [Arbitration]

Award" (Phil Br. at 10), but it does not bother to explain that conclusory statement.

Instead, Defendants suggest that the terminations were motivated by the conclusions of the 2024 report generated by Tracey Levy (the "Levy Report"). *See, e.g.*, Phil Br. at 1; Union Br. at 1. But there are four reasons why that argument does not defeat the plausibility of the well-pled and contrary allegations of the complaint.

*First*, at this stage the Court must accept as true all factual allegations in the complaint and also draw all inferences *in favor of the plaintiff*. *See, e.g., Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir. 2009) ("construe[ing] all reasonable inferences … in the light most favorable to the plaintiff"). To the extent there are competing inferences on the reason for the termination, those must be resolved in favor of Wang's allegations at this procedural stage.

*Second*, the Levy Report, having been written before Wang's termination, by a person outside the Philharmonic not authorized to make decisions for the Philharmonic, does not, perforce, address whether the Philharmonic later relied on it—or something else—as its basis for the termination.

*Third*, the Court may not consider the truth of the allegations in the Levy Report in evaluating the adequacy of Wang's complaint, notwithstanding the Defendants' arguments to the contrary. *See* (Phil Br. at 5, n. 4; *see also* Union Br.

at 4, 10).  The complaint references certain aspects of the investigation that culminated in the Levy Report for the narrow purpose of demonstrating that the investigation was a fig leaf to mask the Philharmonic's predetermined termination decision.  *See* FAC ¶ 68 (describing how the Levy investigation was "launched to create an *ex post facto* rationalization for Wang's (and Muckey's) suspension, and to manufacture 'just cause' to remove Wang (and Muckey) permanently").  The amended complaint does not rely on, and disputes the truth of, the contents of the Levy Report—a document that the Philharmonic had only allowed the Plaintiffs and their counsel to read *once* (in the presence of the Union's counsel and with notetaking prohibited) before it was attached to its recently filed motion.  FAC ¶ 103.[3]

A document not expressly incorporated into a complaint may not be considered on a motion to dismiss unless its contents are "integral" to the claims.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016).  A document is "integral" only when the complaint "relies heavily on its terms and effect."  *Id.* (*quoting Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002)).  "In most

---

[3] Now that Plaintiff finally has a copy of the Levy Report, it is plain why Defendants refused to give him a copy, until filing it publicly with their motion.  As explained below, the Levy Report has yet more evidence that could be cited in a complaint for the conclusion the Philharmonic breached the CBA, given that the Levy Report, now seemingly endorsed by the Philharmonic to justify Wang's termination, explicitly makes negative findings (to Wang) about the accusation against Wang that was rejected in the final and binding arbitration decision.

instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls…." *Id.* (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir.2006)). And even where documents are incorporated by reference or deemed "integral," they may be considered "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents.*'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (*quoting Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991)); *see also Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (even "integral" documents may not become a basis for dismissal if a "dispute exists regarding the authenticity or *accuracy* of the document") (emphasis added). Accordingly, the Court may not consider the allegations of the Levy Report for their truth, nor may it consider anything other than Wang's amended complaint to determine whether the Philharmonic relied on the Report or other reasons to terminate Wang. *Roth,* 489 F.3d at 509.

Moreover, it is a plain breach of the Philharmonic's obligation to treat the arbitrated accusations as final and binding for it to rely on the Levy Report to validate its firing of Wang (as it seeks to do in its brief) because the factual basis of the Levy Report is *not* independent of the arbitrated allegations. Levy writes that she "considered the arbitrator's findings with regard to [Wang's accuser's] testimony in the context of my assessment of the personal accounts that other

17

individuals shared with me."  Levy then goes so far as to make a finding that it was "likely" that Wang was guilty of the "sexual assault or rape of … Arbitration Witness 1"—the person whose allegation was rejected by the arbitrator in 2020. Thus Levy, plainly and expressly, and without benefit of hearing or even reading witness testimony, relied on a reexamination of the arbitrated allegation against Wang for her negative conclusions as to him, which made it improper for the Philharmonic to rely on her report to fire him again.[4]  *Luppo v. Waldbaum*, 131 A.D. 2d 443 at 445 (2d Dept 1987) (arbitration awards have same *res judicata* and collateral estoppel effect as decisions of courts).

Moreover, the manner in which Levy reached her conclusions about the arbitrated allegation reveals a shocking lack of interest in even understanding the arbitration result she sought to criticize.  In short, she made her findings in a state of unfortunate ignorance concerning key aspects of the arbitration record

---

[4] It is apparent from Levy's report, in describing what she reviewed, that while she read the arbitrator's decision, she did not read the transcript of the 20-day arbitration hearing, which was crucial to an actual understanding of the matter.  Since the arbitrator understood he was writing a confidential decision *for the parties*, not a public document for an audience unfamiliar with the hearing testimony, it was not intended to be a complete recitation of all of the facts that caused the Philharmonic's claims to fail.  For example, at the hearing, Wang's principal accuser contended she had hardly ever met Wang before the event that was the focus of her testimony—but she was then confronted with photograph after photograph of her with Wang in the years after she met him and before the alleged assault, such as in two of her own homes, while traveling with Wang to perform, and with Wang's parents.  The hearing also reflected that, on the day after the event that was the subject of her accusation against Wang, she contacted Wang, asked to stay at his apartment, and then participated in sexual activity she admitted was consensual.  Levy had no basis for criticism of the arbitrator's decision, based on the face of the decision alone, without reading the underlying testimony that was critical to understanding how profoundly unsupportable the Philharmonic's claims against Wang had been.

necessary to understand the result favorable to Wang, as detailed in n.3 supra.

Another example of important testimony that Levy failed to read is its revelation

that Wang's accuser was a friend of his who acknowledged periodic sex with

Wang over many years.  That accuser told Barbara Jones, the Philharmonic's

investigator at the time, that she did not remember her first sexual encounter with

Wang—the only encounter that was at issue.  It was only many years after the

encounter that she first speculated that she *might* have been drugged (while

acknowledging that she did not know if this was so and that she had also

consumed a considerable amount of alcohol).  But as Wang's—*and the Union's*—

expert testified at the arbitration hearing, consumption of alcohol is readily

capable of causing a memory "blackout."  That is, while under the influence of

alcohol, a person can act volitionally, including by having consensual sex, but the

alcohol consumed causes the person to be unable to form long-term memories

from a period of time during their intoxication.  In short, "blackout" as that term

was used in the 2019 arbitration hearings is a state of memory loss and does not

mean "unconscious."  *See also, e.g.*, Wetherill R.R., Fromme K., "Alcohol-

Induced Blackouts:  A Review of Recent Clinical Research with Practical

Implications and Recommendations for Future Studies." ALCOHOL CLIN EXP RES.

(2016 May; 40(5):922–35) (noting that "Alcohol-induced blackouts are defined as

amnesia, or memory loss, for all or part of a drinking episode…. There is no

objective evidence that a person is in an alcohol-induced blackout … thus it can be difficult or impossible [for third party observers] to know whether or not a drinker is experiencing a blackout.").[5]  It was this expert testimony that Arbitrator Bloch quoted when he wrote: "it is possible, in a blackout state, for a person [i.e., Wang's accuser] to engage in a variety of volitional behaviors …" and to "decid[e] to have sex or not have sex."  ECF No. 107, Declaration of Ashley R. Lynam ("Lynam Decl."), Ex. D at 1, n.1.

Levy decided to make herself a fact finder with respect to the allegations litigated at the 2020 arbitration hearing, but *without having read the testimony* (i.e., the testimony of Wang's expert) *that supported the arbitrator's findings on this point*.   The reason is simple.  Levy, well aware of the goals the Philharmonic had for her investigation, wanted to serve those goals, and confronting arbitration testimony inconsistent with her negative findings about Wang would not help her to give the Philharmonic the investigative conclusion that she knew it wanted her to reach.

*Finally*, the Philharmonic may not rely on the Levy Report to defeat the plausibility of Wang's complaint because *the termination letter* does not reference the report or Levy's conclusions.  Under the CBA, the Philharmonic must

---

[5] Available at <u>Alcohol-induced blackouts: A review of recent clinical research with practical implications and recommendations for future studies - PMC</u>.  Accessed July 28, 2025.

articulate its reasons for termination so that the other participants in the process

can perform their assigned roles based on the articulated reasons.  For example,

Article XV provides:

> In the event a notice of termination is given to any Orchestra member
> in accordance with Article XIV above, a copy of such notice shall be
> mailed to the Union by registered mail within two (2) weeks after it
> is mailed to the member.  If the individual concerned protests such
> termination, the Union shall then instruct the Orchestra Committee
> to call a meeting of the Orchestra so that a Dismissal Review
> Committee of nine (9) shall be elected. The Union, in conjunction
> with the Dismissal Review Committee and the Society, shall meet
> immediately to settle the dispute. If the matter is not settled within
> two (2) weeks after notice to the Union, then the propriety of the
> termination may be submitted to arbitration by the Union within sixty
> (60) days after receipt of said notice, under the Voluntary Labor
> Arbitration Rules of the American Arbitration Association. The
> standard of proof applicable to any disputes adjudicated pursuant to
> this section will be the "preponderance of evidence" standard.

Lynam Decl. Ex. C, Article XV(A).

As is evident, in the event of an Article XIV termination, the parties

charged with considering the termination decision—the Dismissal Review

Committee, the Union, and Arbitrator—are to assess the evidence and propriety of

the underlying *allegations*.  The Philharmonic took the position that it could

dismiss Wang for no reason at all, but whatever reasons it may assert for a

termination, nothing in the CBA grants the Philharmonic license to later conjure

up a different justification for its actions, i.e., based on supposed misconduct,

when that carte blanche authority is challenged.  In any event, Wang has plausibly

alleged that the real reason for his termination, notwithstanding the

Philharmonic's flip-flopping representations, was the public outcry over the

Article, which Defendants do not dispute would be a breach of the requirement set

forth in Article XV making the arbitration decision final and binding.

> **2.  The Complaint Plausibly Pleads that the Philharmonic Breached the CBA by Disciplining Wang Without Just Cause**

The Complaint also plausibly pleads that Wang's termination violated

Article VII of the CBA, which requires "just cause" for the Philharmonic to take

"disciplinary measures." *See* FAC ¶¶ 2, 23.  Again, the Philharmonic did not

provide just cause or any reason at all in the termination letter.  FAC ¶ 91. The

Philharmonic now argues, echoed by the Union, that a showing of just cause was

not required because Wang's termination was not "a disciplinary measure."

Union Br. at 14; Phil Br. at 7, 11, 12.

However, it seems clear that neither Defendant believes its own argument.

On the first page of its brief, the Philharmonic says that Wang had been "accused

of … misconduct," states that the "situation" that led to Wang's dismissal was that

he was "accused of drugging and raping others," and provides that it ultimately

ended his tenure because these allegations described "a range of abusive

behaviors."  Phil Br. at 1.  All of this underscores that Wang was indeed

"disciplined."  Any other conclusion is, quite frankly, absurd and irreconcilable

with what "discipline" means in the context of employment and labor law.  *See, e.g.*, Fussell, John T. and Robert Cheverie, "A Union Steward's Guide to Handling Grievances, The Basics" at 7 (Connecticut Teamsters, Feb. 23, 2021) ("Just Cause is the underlying theory of every disciplinary or termination case."). [6] But regardless of whether Wang was terminated because the Philharmonic impermissibly reconsidered the arbitration result in the wake of the April 2024 Article (as Wang alleges), or because of misconduct alleged in the Levy Report (as the Philharmonic suggests on page one of its brief), there can be little doubt that the termination was required to be supported by "just cause."  And the Philharmonic has never even pretended that it could fulfill this requirement.  *See* FAC ¶ 92 (pleading that on the day of Wang's termination, former counsel to the Philharmonic told Wang's counsel that the Philharmonic's position was that it did not need just cause to terminate Wang, so long as it gave him notice and severance).

### 3.    Article XIV Does Not Permit the Philharmonic to Discipline Wang by Firing Him Without a Reason

Unable to dispute that it did not claim just cause, and facing the fact that Wang's discipline was improperly based on an allegation that had already been arbitrated in his favor, the Philharmonic pivots to argument that merely because it

---

[6] https://teamsters493.org/wp-content/uploads/2021/03/THE-UNION-STEWARDs-Grievance-Guide.02.23.2021-2-1.pdf

*cited* Article XIV in its termination letter and not Article VII that it need not meet the "just cause" requirement that is inherent in the concept of due process in labor relations and codified in the Union's bylaws.[7]  But labeling Wang's termination as "non-disciplinary" does not make it so.  Such a reading would undercut the rights secured under Article VII and be incompatible with a key purpose of the agreement—to afford meaningful due process to the Philharmonic's tenured musicians.

But the Philharmonic's arguments about Article XIV are made in a vacuum, and make no sense when considered in light of the grievance procedures *for Article XIV terminations* that are set forth in Article XV.  *See Cummings v. City of New York*, 302 F. Supp. 3d 511, 524 (SDNY 2017) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) for the proposition that a contract must be interpreted "in the context of the entire integrated agreement" and finding certain terms in the parties' collective bargaining agreement ambiguous).  Article XV describes an Article XIV "non-reengagement" as a "termination," requires prompt notice of such termination to be given to the Union, mandates the

---

[7] *See* Bylaws of the American Federation of Musicians of the United States and Canada, revised September 15, 2023 at Article 10, Section 1(3), attached as Exhibit C to the Declaration of Liang Wang (listing among member's rights the right to "Due Process in all cases of discipline").

formation of a nine-person committee to "review" the "dismissal," and, where the matter is not settled, requires that the "propriety" of the dismissal be submitted to "arbitration" under the Voluntary Labor Arbitration Rules of the American Arbitration Association.  Lynam Decl. Ex. C, Article XV(A).  Furthermore, reflecting the greater rights afforded *tenured* musicians like Wang and Muckey in these circumstances, the CBA exempts "probationary employees" from all of these procedural protections against Article XIV terminations.  Lynam Decl. Ex. C, Article XV(A) (note that probationary employees are also entitled to advance notice of non-reengagement).

It makes no sense that the CBA would contemplate an arbitration in which the Philharmonic would have to prove the "propriety" of an Article XIV dismissal *if*, the employee could be terminated without any cause.  Nor would it make sense to exempt non-tenured orchestra members from the procedural protections of Article XV if the Philharmonic had carte blanche to dismiss even tenured members without a reason.  In short, Article VII limits the imposition of termination or other discipline to "just cause," which Article XIV does not change.  And Articles XIV and XV together require that even under Article XIV, tenured musicians can only be terminated based on a kind of reason that is capable of being proven or disproven over a union's objection with evidence at an arbitration.  To the extent there is any ambiguity in the CBA (which there is not),

that ambiguity cannot be resolved on this motion.  *Cummings*, 302 F. Supp. at 524 ("'interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder' through consideration of extrinsic evidence 'unless the evidence presented about the parties intended meaning is so one-sided that no reasonable person could decide to the contrary.'") (quoting *Compagnie Financiere de CIC et de L'Union Europeenne,* 232 F.3d at 158 and *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999)).  Tellingly, Defendants had never interpreted the CBA to grant the Philharmonic authority to use Article XIV for any or no reason, let alone as an alternative to Article VII upon completion of an investigation into purported misconduct.  FAC ¶¶ 90, 120.

Indeed, the Philharmonic's contention that Article XIV supplants Article VII whenever it is merely cited and its procedures followed was so obviously dubious that the Union (i) raised concerns about the precedent it would set and (ii) demanded a written commitment from the Philharmonic that Article XIV not again be invoked "to do an end run" around Article VII's "just cause" requirement.  FAC ¶ 120.  In other words, both the "Philharmonic and Local 802 admitted in writing that they made an exception to what the CBA requires, only in order to terminate the employment of Wang (and Muckey) and that they intend to return to business-as-usual and compliance with the CBA's unambiguous just cause requirement once Wang and Muckey were fired without honoring that

26

essential due process right granted by the CBA." FAC ¶ 121. In this light, Wang's position that the Philharmonic's firing of him, without a reason grounded either in his conduct or his artistic performance, is surely plausible and cannot be dismissed on a Rule 12(b)(6) motion.

Neither *Truck Drivers v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 174–75 (7th Cir. 1992) nor *Young v. N. Drury Lane Prods., Inc.*, 1995 WL 110126, at *3 (N.D. Ill. Mar. 13, 1995), *aff'd*, 80 F.3d 203 (7th Cir. 1996), two decisions presented by the Philharmonic as non-binding authority for its argument that the Philharmonic did not breach the CBA here, lends it no aid. Both involved contracts where the term "just cause" appears nowhere within its plain terms and thus those courts properly refused to read such a requirement into those contracts. Here, by contrast, the CBA's plain terms indicate the parties bargained for "just cause" in all cases of "discipline" under Article VII; "Society may take disciplinary measures in the event of the violation of these rules or for other just cause." Moreover, in both *Truck Drivers* and *Young*, the relevant contracts lacked many of the procedural protections in Wang's CBA, including the option to submit a grievance over a termination to arbitration. *Truck Drivers*, 958 F.2d at 12 ("the agreement" did not "specif[y] a further dispute resolution process" if the union and employer "deadlocked" beyond "resort to economic muscle" or in other words, going on strike, and "did not contain an arbitration clause"); *Young*, 1995

WL 110126, at *1. ("the 1993 Agreement made no reference to the termination of services of either the contractor or the musicians during the period covered by the Agreement and contained no grievance or arbitration provisions."). Here, Wang simply asks the court to enforce the plain terms of the CBA as written and reject Defendants' attempt to pretend the CBA permits the Philharmonic to discipline tenured musicians without just cause.

## B.    Wang Has Plausibly Alleged that the Union Breached Its Duty of Fair Representation When It Refused to Grieve Wang's Suspension and Termination

Wang's amended complaint more than plausibly pleads that Local 802 breached its duty to fairly represent him when it refused to grieve his suspension or submit his termination to arbitration, on several different and independently sufficient grounds. It also plausibly pleads that, but for the Union's wrongful conduct, Wang would not have been suspended or terminated. *See, e.g.*, FAC ¶¶ 3, 57–66, 97–99, 115, 120, 132, 134, 137–154, 165, 175–177, 233, 264; *Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43 (2d Cir. 1989) (noting that the causal connection element can be satisfied by union conduct that "seriously undermines the arbitral process"). Defendants' arguments to the contrary ask the Court to ignore crucial facts pled by Wang in favor of the Union's self-serving statement of reasons for refusing to grieve Wang's termination. *See, e.g.*, Union Br. at 19 (citing extensively to the Union's decision but not Wang's complaint).

A union, as the exclusive bargaining representative of its members under the National Labor Relations Act 29 U.S.C. 159, has "a statutory duty to fairly represent" each of its members, "without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). [8]  At this stage, Wang's allegation that the Union breached its duty of fair representation need only be plausible. *See, e.g., Thomas v. Little Flower for Rehab. & Nursing*, 793 F. Supp. 2d 544, 549 (E.D.N.Y. 2011) (denying motion to dismiss and noting "there is no heightened pleading standard for a breach of the duty of fair representation cause of action").

A union member can demonstrate a DFR breach in the context of a dispute over a grievance by showing that the grievance had merit and that the union's refusal to advance the grievance was discriminatory, arbitrary, or made in bad faith. *Spellacy v. Air Line Pilots Ass'n-Int'l*, 156 F.3d 120 (2d Cir. 1998).

A union's refusal to press a meritorious grievance is discriminatory when, "without legitimate purpose," it "takes action favoring some of its members at the expense of others" or when it "causes an employer to discriminate against employees on arbitrary, hostile or bad faith grounds." *Ramey v. Dist. 141, Int'l*

---

[8]  The duty of fair representation is also enshrined in the American Federation of Music's 2023 Bylaws at Article 10, Section (1)(4). *See* Ex. E to the Lewis Decl.

*Ass'n of Machinists and Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004)

(internal quotations and citations omitted). A union acts "arbitrarily" when, for

example, it simply ignores a meritorious grievance or handles it in a "perfunctory"

manner. *Vaca*, 386 U.S. at 191, 87 S. Ct. 903. Where a union engages in "fraud,

dishonesty, and other intentionally misleading conduct" it acts in bad faith.

*Spellacy*, 156 F.3d at 126. *See also Sim v. New York Mailers' Union Number 6*,

166 F.3d 465, 472 (2d Cir. 1999) (bad faith involves "fraudulent, deceitful or

dishonest conduct"). While plausibly pleading any one of these three types of

improper union conduct would defeat Defendants' motion, Wang's amended

complaint plausibly pleads all of them.

As discussed *supra*, and contrary to the Union's misrepresentation, *see*

Union Br. at 19 (referring to "the investigative report on which the Society's

decision [to terminate Wang] was based"), the Philharmonic did not cite to the

Levy investigation, or indeed any reason at all, when it notified Wang that he

would be terminated pursuant to Article XIV. The Union readily admitted that the

Philharmonic had never before tried to terminate a musician pursuant to Article

XIV and that this set off alarm bells for the Union vis a vis the precedent it would

set for doing an "end run" around Article VII's just cause provision: "[the union]

expressed concern to [the Philharmonic] about the precedent that this could set for

the NY Phil's use of Article XIV instead of the just cause dismissal process in

Article VII.E.7."  FAC ¶ 120.  In light of that admission alone, Wang's amended complaint more than plausibly pleads, and at the very least is entitled to the favorable inference, that the Union knew that the basis of the termination was questionable as an "end run" around what the CBA requires, triggering its obligation, as a faithful discharge of its provision of fair representation, to object rather than acquiesce.  *Vaca*, 38 U.S. at 191 ("a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion"); *Biberaj v. Pritchard Industries, Inc.*, 2009 WL 10738222, at *7 (S.D.N.Y. Sept. 28, 2009) (employee stated claim for breach of DFR where complaint alleged union failed to process meritorious grievances and acted with dishonesty).

Moreover, some of the Union's own stated reasons for its decision are facially incompatible with the faithful provision of fair union representation.  The Complaint pleads numerous facts that support the conclusion that the Union's failure to grieve his [and Muckey's] termination was pre-ordained and not the product of a dispassionate "contractual analysis" (Union Br. at 19).  The first set of such facts involve the Union's conduct in the wake of the Article and Wang's immediate suspension.  Six months before undertaking any "contractual analysis," the Union and its "orchestra committee" each publicly positioned the Union as supportive of the allegations against Muckey *and Wang* in the Article even though the Union *knew* that the Article was incorrect in suggesting that Wang had been

terminated for drugging Kizer. FAC ¶ 34. ("the Union … did nothing to correct the misperception of Wang that it knew the Article had created"). Thus, three days after the Article was published, and two days after the Philharmonic suspended Wang, Susan Cutler, the Union's president stated that Wang's suspension was "good" even though there were no accusations against Wang at that time and the calls for his removal were driven by an Article about an arbitration that *he and the Union, acting for him, had won*. FAC ¶¶ 5, 43–45.[9] Also, at the same time, a division of the Union that "represents players" issued a statement that "we believe [the accuser]" [based on a magazine article] and, without evidence asserted "we don't believe these are isolated incidents involving … Liang Wang." FAC ¶ 41.

Cutler also made clear that the Union was not making its decision about Wang's predicament based only on the *individualized facts* that were relevant to the propriety of his banishment: she tied Wang's predicament and her

---

[9] There is no basis for the Union's request to disregard Cutler's statements because she was not "acting in a representative capacity." Union Br. at 22. She did not qualify her statements to the New York Times as personal and unattributable to the Union of which she was the President. Rather than saying "no comment" in connection with two of Local 802's members being put "offstage for the time being," she specifically endorsed Wang and Muckey's suspensions as further detailed in note 8 below. FAC ¶¶ 43–45

endorsement of his suspension to what she called a "culture of complicity that has raged at the N.Y. Philharmonic for too long" that she sought to "erase." Union Br. at 7. Likewise, the Union's orchestra committee used its public statement about the Vulture Article to criticize the Philharmonic's history of "not taking musician complaints seriously" in the context of "sexual harassment and assault." Singer Decl. Ex. C. In short, from the moment of publication of the Vulture Article, the Union treated Wang as a symbol of perceived societal failures to take seriously allegations of sexual misconduct against women, and because the Union's hostility to him was convenient in this context, it was baked in.[10]

After Wang's termination, the Union merely "went through the motions of evaluating Wang's grievance". FAC ¶ 27. If anything, as noted above, the

---

[10] The Union protests that Cutler's comments did not constitute a breach of the duty of fair representation. Union Br. at 20. This is a distraction, as Wang does not allege a separate claim against Cutler or even a separate claim against the Union based on Cutler's statements standing alone. Instead and explained above, the Amended Complaint emphasizes Cutler's statement to make the point that the Union, contrary to its obligation to act fairly and without hostility towards each of its members, FAC ¶¶ 44-45, made up its mind to acquiesce to public outcry concerning perceived societal injustices related to gender and find a way to help the Philharmonic get rid of Wang from the moment the Article was published. This was particularly egregious considering that the Union had been on Wang's and Muckey's sides in the arbitration and the Article focused only on allegations that had been fully vetted in Wang and Muckey's favor.

In any event, Cutler's quotation in the New York Times article, which she has never disavowed, makes clear that, contrary to the Union's attempt to rewrite history, Cutler's "good first step" comment was made very specifically about Wang's (and Muckey's) suspension:

> Sara Cutler, the president and executive director of Local 802, … said in a statement on Monday that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being "are good first steps but they can't be the last."

ECF No. 20, Declaration of Olivia R. Singer ("Singer Decl."), Ex. E.

Philharmonic's actions set off alarm bells, as the Union was concerned that the Philharmonic could cite this decision to make other "end run[s]" around Article VII's just cause requirement. FAC ¶ 120. *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1142 (2d Cir. 1994) (affirming DFR breach where union entered into and concealed secret deal with employer to give up the seniority rights of plaintiffs but not of other bargaining unit members). Yet, the Union acquiesced in the Philharmonic's application of Article XIV so as to govern *only Wang and Muckey's terminations* and not the terminations of others, past or the future. *See* FAC ¶ 121 (departing from "normal practices and CBA interpretations … in order to terminate the employment of Wang [and Muckey])." *See also* Lewis Decl. Ex. C at 14:21–22. (Union counsel admitting to Court that Article XIV is "*not* a wide-open door that can be used at any time.")

In this light, Wang has plausibly pled that the Union's siding with the Philharmonic, against him [and Muckey] was arbitrary, discriminatory and based on bad faith. While many of the facts pled by Wang, standing alone, would support this conclusion, the Court is not so limited. Instead, Wang's claim is plausible if the aggregation of reasons permitting the conclusion that the Union acted improperly plausibly permit this conclusion. *See Schoonover v. Consolidated Freightways Corp. of Delaware*, 147 F.3d 492, 496 (6th Cir. 1998) (observing that it is all of the "reasons which, in combination, would justify the

34

jury's finding that the union's representation [] was 'arbitrary, discriminatory, perfunctory, or in bad faith'" that a court must consider).

It is also plain that Wang's complaint plausibly pleads that the Union acted arbitrarily, a standard that is met when a union "ignores … a meritorious claim.'" *Scales v. N.Y. Hotel & Motel Trades Council, Local 6*, No. 21 Civ. 8142, 2023 U.S. Dist. LEXIS 19741, at *20–21 (S.D.N.Y. Feb. 6, 2023) (quoting *Thomas*, 793 F. Supp. 2d  at 548; *Samuels v. Air Transp. Loc. 504,* 992 F.2d 12, 16 (2d Cir. 1993).  The Union did just that—ignore a meritorious claim—as its Executive Board admitted when it explained its concern that relying on Article XIV instead of Article VII in the face of misconduct accusations was impermissible as an "end run" around the just cause requirement.

Thus, the Union did not side with the Philharmonic because it truly believes, as it now pretends, that a discharge following a lengthy investigation that concludes with the making of findings of misconduct, is a *non-disciplinary* action. The Union did not side with the Philharmonic over Wang out of any true belief that the Philharmonic is exempted from the just cause requirement, whenever it merely *labels* a discharge non-disciplinary, and/or provides notice and severance. Instead, the Union knew that the reason the Philharmonic had banished Wang was either because of the already arbitrated allegations, which the Union knew was impermissible, or perhaps because of some allegations in the Levy Report. But in

either case, the Union understood that the suspension and termination were related to allegations of misconduct, and therefore disciplinary, triggering the just cause standard. The Union thus knew that a grievance against a termination that disdained having to show just cause would have been therefore meritorious, but acquiesced in the termination anyway. FAC ¶ 99. *Barr*, 868 F.2d at 43 (causal connection established where union's conduct "seriously undermined the arbitral process").

In addition to being arbitrary, the Union's refusal to press Wang's grievance was discriminatory because the Union's decision that, in the future, it would revert to holding the Philharmonic to the just cause standard in the context of misconduct allegations—just not for Wang and Muckey—was a choice that "favors some of its members at the expense of others without legitimate purpose." *Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004) (internal quotations and citations omitted). This is precisely what occurred here, and what courts have routinely found to be a breach of collective bargaining agreements. *See Linton v. United Parcel Service*, 15 F. 3d 1365, 1373 (6th Cir. 1994 ) (holding that "failure to accord a member the same treatment given to all other members might very well constitute a breach of the union's duty of fair representation, thus creating a jury question on this issue"); *see also Bennett v. Local Union No. 66, Glass Workers Int'l Union*, 958 F.2d

1429, 1435 (7th Cir.1992) ("[t]here is an important distinction between a negotiated modification of an agreement's terms and an unstated 'modification' *intended to apply only to selected individuals*: we call the latter a 'breach'")*; Jones v. Interlake Steamship Co.*, No. 20–2210, 2021 WL 3719355, at \*6 (6th Cir. Aug. 23, 2021) (denying motion to dismiss where complaint emphasized that the Union had negotiated a "side letter" with the employer that "negotiate[d] a just cause carveout" for certain union members, declining to infer that the carveout was reasonable in light of the "these distinctions among union members").

The Union's deliberate failure to provide fair representation to Wang is further evidenced by the way it processed and analyzed the allegations of the Levy Report. Given the Philharmonic's decision *not* to mention any allegations against Wang in its termination letter and to rest for its "non-reengagement" decision purely on contractual formalism, the Union's decision to base its own decision on the conclusions of the Levy Report was inappropriate, as the Union knew. That is, even if the Union *had* set out to assess the "propriety" of *the employer's Article XIV termination decision*—its role under Article XV was to examine *the employer's termination decision* and not some other basis for decision that the employer theoretically *could have* invoked but chose not to invoke. The role of the Union is not to be an even tougher cop than the employer, whose power its purpose is to check, but in essence that is what the Union did when it "focused its

grievance review process on the 'findings' of the Tracey Levy investigation" even though "the Termination Letter made no mention whatsoever of either just cause or … Tracey Levy…."  FAC ¶¶ 100, 101.  The Union also betrayed its role as the protector of the worker when it entered into a non-disclosure agreement that allowed only the Union, but not Wang himself, to obtain "copies of the investigative report" (Union Br. at 3) and under which the Union received a copy of the "Executive Summary" of the report but Wang did not and was only permitted to read it, once.  FAC ¶¶ 101–103.  Moreover, the Union, in relying on the findings of the Levy Report, improperly credited its hearsay allegations, without further investigation, even though the Union knew that certain important contentions in the Levy Report were false.  For example, the Union, echoing the Levy Report in its decision, cites purported "allegations of improper conduct of Liang Wang when the musicians of the Philharmonic Symphony Society of New York (the "NY Phil") were in Vail, Colorado in 2010." Lynam Decl. Ex. D at 1.  But the Union participated *on Wang's behalf* in the arbitration concerning the Vail allegations, where the Philharmonic's counsel stated that "Mr. Lewis [Wang's counsel then and now] is right.  *We don't say that [Wang] engaged in misconduct in Vail*."  Plainly, the Executive Committee did not care about the facts as they pertain to Wang.  *See also* FAC ¶ 104 (the "false statement that Wang had been terminated in 2018 in part *because of Kizer's allegations*").  Perhaps most

egregious, the Union Decision, which claims not to be based on the 2020

Arbitration Award and the Article critiquing it, went out of its way to disparage

the conclusions *its own expert drew* in that arbitration regarding the very real

condition called alcoholic blackout that involves, not a loss of consciousness and

volition, but a loss of memory.  Union Decision at 1, n.1. *See also, supra* at 19–

20.

Although the Union had no basis to focus its dismissal review on the Levy

investigation, once it did so it then failed its resulting obligation to conduct its

own careful reading and investigation into the Levy Report's findings.  In

violation of basic principles of due process, it impermissibly just adopted the

employer's allegations, hook line and sinker.  *See Driver v. US Postal Service,*

*Inc.*, 328 F. 3d 863, 869 (6th Cir. 2003) (holding that a union may not properly

"give up on an employee's grievance solely because [of] the employer's

evidence"); *Gold v. Loc. Union No. 888 U.F.C.W., AFL-CIO*, 758 F. Supp. 205,

208 (S.D.N.Y. 1991) (breach of DFR plausibly stated where employee alleged

union representative "did not conduct any investigation" beyond reading the file).

*See, e.g.*, United Electrical, Radio & Machine Workers of America, "The Seven

Tests of Just Cause," UE Steward, November 2021 ("Seven Tests") (advising

unions faced with a grievance to investigate rather than accept the employer's word without question).[11]

Further undermining its discharge of fair representation to Wang, the Union did not contact Wang, much less interview him or hear his version of events, or undertake any rudimentary investigation beyond reading the employer's report. FAC ¶ 109. And while the Union pats itself on the back for giving Wang an opportunity to submit a written and oral statement (*see* Union Br. at 19; Phil Br. at 9), that opportunity was hollow in a number of respects, given the predetermined outcome. Wang was not permitted to address the Dismissal Review Committee, so that body never heard Wang's side of the story, even though the Union provided the DRC members with the Levy Executive Summary. FAC ¶¶ 102, 110, 112. Moreover, Levy did not tell Wang exactly what he was being investigated for, especially with regard to what wound up being the most serious accusation, making his opportunity to address the allegations inadequate, if not illusory. *See, e.g.*, FAC ¶¶ 70–79,105; *see also* FAC ¶ 80. Given this, it is unsurprising that the Dismissal Review Committee voted unanimously against Wang, a fact that the Union improperly seeks to take advantage of. *See* ECF No. 114, Declaration of Susan Davis ("Davis Decl."), Ex. H at 3, 6–7; FAC ¶¶ 102, 110–112.

---

[11] Available at https://www.ueunion.org/stwd_jstcause.html.

Furthermore, the Union knew that, even if true, nearly all of the allegations in the Levy Executive Summary—most of which are of merely boorish but non-criminal conduct of long ago outside of the workplace—were not just cause for *termination*, especially twelve or so years later during what by all accounts was a multi-year period of stability for Wang at the Philharmonic.  FAC ¶¶ 105, 122, 125.  Moreover, the Union Decision does not identify any policy in place at the time that Wang violated.  *See, e.g., Johnson v. USPS*, 756 F.2d 1461, 1465–66 (9th Cir. 1985) ("[t]he union should be held to a higher standard of care in discharge cases involving off-duty conduct because the sanction is severe and the nexus between job performance and the alleged misconduct is more attenuated"). *See also Seven Tests* (advising unions to consider whether employees had notice that conduct that led to discipline was prohibited and actionable).  Even if there *had* been such policies, and these allegations *were* true, the vast majority[12] would have resulted in no more than a trip to the human resources office for a warning, mandatory workplace behavior training or a temporary dock in pay.

---

[12] The Levy Report references one allegation of sexual assault that Wang categorically denies; his relationship with that complainant was consensual.  Absurdly, and reflecting her bias to provide the fig leaf Levy understood the Philharmonic wanted, she counted *three* such allegations against Wang, but the other two she was counting do not count as such.  One involved the arbitrated allegation, and the other involved a contention Wang had pushed someone, seventeen years ago, with whom there was no sexual contact.

The Union Decision also leans heavily on what was essentially a highly charged opinion poll.  FAC ¶¶ 82–83.  According to the Levy Executive Summary, Levy asked all musicians to come speak with her, and 67 of approximately 100 did.  Lynam Decl. Ex. F at 23; FAC ¶ 131.  She purportedly asked them about their "reaction[s] to Mr. Wang and Mr. Muckey being placed on leave" and also asked each "[w]ould you have a concern with either of them coming back/resuming rehearsal and performing with the Orchestra?"  Lynam Decl. Ex. F at 23.  According to Levy, "25 members expressed they were personally concerned with Mr. Wang and Mr. Muckey returning," with some subset of that group stating, "they can't imagine sharing the stage."  "[A]nother 16 members … were less concerned about themselves … but they were concerned for their peers and wanted to support colleagues[;] … eight orchestra members framed their concerns in terms of the negative public reaction"; and one final member "framed a concern around recruitment."  Lynam Decl. Ex. F at 23; *see also* FAC ¶ 83.

The Union Decision knowingly overstates these statistics as the "sobering fact that 2/3 of the Orchestra members interviewed will not take the stage, or will feel unsafe or uncomfortable, if Muckey and Wang return."  Davis Decl. Ex. H at 8.  The Levy Executive Summary does not actually state that any orchestra member said they would refuse to take the stage, referring instead to people's

"concerns."  Lynam Decl. Ex. F at 23.  Rather than trying to assuage these

concerns, or look behind them to determine whether they are based in actual

threats to orchestra members' safety or false perceptions created by the Article

and otherwise, the Union not only accepted the validity of the employer's findings

without question but actually inflated them to achieve the Union's longstanding

goal of getting rid of Wang and Muckey.  *Ramey v. Dist. 141, Int'l Ass'n of*

*Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004) ("a union is

not permitted to ignore its own policies" and disparately strip members of rights

out of animus); *Linton*, 15 F. 3d at 1373 (6th Cir. 1994); *Biberaj*, 2009 WL

10738222, at *7.

 Notably, "most, if not all, of the 67 orchestra members polled regarding

Wang's future had no first-hand information regarding Wang's purported

improper behavior" but were nevertheless "asked to form opinions" based only on

"the contents of the Article" and "rumor and speculation."  FAC ¶ 83.  And as the

Union was well aware, the Article contained significant errors and its report was

inconsistent with the arbitral findings. *Buczakowski v. 1199SEIU*, No. 518-CV-

0812, 2019 WL 5697899, at *5 (N.D.N.Y. Nov. 4, 2019) (denying dismissal of

DFR claim where plaintiff alleged union misrepresented facts surrounding its

acquiescence to employer's elimination of plaintiffs and only plaintiff's

43

position).  Moreover, the CBA does not authorize termination of tenured members of the orchestra based on opinion polls.

Defendants protest that they purportedly adhered to the Article XIV(A) procedures.  That is not only beside the point, but it is also not accurate.  One of the procedures that Article XV mandates is that the Union meet with the Philharmonic "to settle the dispute."  Lynam Decl. Ex. C, Article XV.  The Executive Board's Report, in describing the so-called settlement effort, reveals that it was nothing of the kind.  At the settlement meeting, Union representatives told the Philharmonic "how unsafe and/or unsettled they and their colleagues would feel if Muckey and Wang returned."  Davis Decl. Ex. H at 3.  That was not an effort to settle the dispute for Wang, as Article XV requires, but a choice to pile on.  The Union, by throwing Wang under the bus at the meeting, did not try to *settle* the dispute for Wang, as it was required to do.  It could have and should have called out the Philharmonic for breaching Article XV and/or Article VII (*see supra* at I.A and I.B)).  Instead, the Union, at best, did no more than go through the motions of complying with Article XV's procedural requirements, as described above and in Wang's amended complaint.  A "perfunctory" or bad faith review of a grievance violates a union's duty, *Vaca*, 38 U.S. at 191 and Wang more than plausibly plead both.  FAC ¶¶ 97–115.

In sum, Wang has plausibly pled, in extraordinary detail and on multiple independent bases, that the Union breached its duty to fairly represent him both when it refused to grieve his suspension and when it refused to advance his termination to arbitration.

### C.    Wang Has Plausibly Alleged Both that the April 2024 Suspension Violated His Contractual Rights and that the Union Therefore Breached Its Duty of Fair Representation When It Refused to Grieve the Suspension

As Wang argued in opposition to Defendants' motions to dismiss Wang's original complaint, the Philharmonic's decision to indefinitely suspend Wang and Muckey one day after publication of the Article violated Article XV's requirement that the parties treat the arbitration decision as "final and binding" and Article VII's prohibition on imposing discipline without just cause. *See* ECF No. 40 at 11–23.  Because of these breaches, Wang immediately asked the Union to grieve the suspension.  The Union refused, arguing that (a) the Arbitration Award imposed no continuing obligations on the Philharmonic, contrary to controlling case law, *see, e.g., Luppo v. Waldbaum*, 131 A.D. 2d 443 at 445 (2d Dept 1987) (arbitration decisions have the same res judicata and collateral estoppel effect as court decisions); (b) its members do not have any right to be placed on the performance and rehearsal schedule, and (c) it would await the findings of a newly announced investigation that was not described as focused on Wang or on any

specific new allegations and thus bore no resemblance to a typical "administrative leave pending investigation."  ECF No. 40 at 14–18; *see also* Singer Decl. Ex. F.

Notwithstanding Defendants' attempts at revisionist history regarding the timeline of events leading up to Wang's suspension (compare, e.g., FAC ¶¶ 26–66 with Union Br. at 5–7,18–20 and Phil Br. at 4–5, 14–16); *see also* ECF No. 60 at 4 (noting that the first time Wang was told by the Philharmonic that his vague and indefinite suspension was being characterized as a paid leave pending investigation was May 21, 2024)), Wang more than adequately pleads that his April suspension violated the CBA.  And because the suspension breached the CBA and the Union was complicit in that breach and dishonest about both the reasons for it and the Union's bases for refusing to challenge it, Wang has also plausibly pled that the Union's actions breached its duty of fair representation. While the suspension was merely one of the early steps in Defendants' comprehensive scheme to banish Wang and Muckey from the orchestra, it inflicted damages that are distinct from those Wang incurred in connection with the termination, including legal expenses incurred because of the Union's refusal to press Wang's meritorious grievance in relation to the suspension.  FAC 140-41, 164-65, 176.  For a complete recitation of the reasons Wang's suspension is actionable, Wang refers the Court to his Memorandums of Law in opposition to

Defendants' first motion to dismiss and in support of Wang's motion for summary judgment.  ECF No. 40; ECF No. 60.

Defendants continue to claim that Wang's unsigned individual agreement for the 2023–2024 season had no force and effect.  His individual contract, if in place, is significant, because it very clearly gives Wang a right not just to receive compensation, but also to perform.  The Philharmonic's argument that Wang's placement on indefinite leave is not disciplinary, since he continued to be paid, is entirely dubious based on the CBA, but that argument would instantly collapse if the Court concludes that Wang's individual agreement was in place at the time of his suspension.  It was, because, as the Amended Complaint pleads, the Philharmonic had not only performed all obligations and accepted Wang's performance under the 2023/2024 individual agreement for its entire term, but had extended its terms into the present contract period.  Specifically, the Amended Complaint alleges that:

> On September 23, 2024, Wang received an email from Deborah Borda advising that the new contract had been ratified, and that Wang's base pay and longevity would be increased, but overscale pay would be held to the 2023/2024 levels

> Although still suspended, Wang continued to be paid base, longevity and overscale, adjusted to reflect the new contractual rates

FAC ¶¶ 86–87.  Wang's "overscale pay" that Borda referenced in her email to Wang is *not sourced in the CBA*, but instead derives entirely from the individual

agreement between Wang and the Philharmonic—the same agreement that expressly gives Wang a right to perform. *See, e.g.*, Lynam Decl. Ex. C (CBA), Article XI (referencing "overscale" as subject to "individual … discussion" rather than collectively bargained). Thus, Borda's specific reference to overscale pay being "held at 2023/2024 levels" is an acknowledgment that even in September of 2024, the Philharmonic was continuing to treat Wang's individual agreement as fully in place even if Wang had not signed it.[13]

"When a party with full knowledge … of his [or her] rights … freely does what amounts to a recognition or adoption of a contract … or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, [that party] acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Bernard v. Citibank, N.A.*, 151 N.Y.S.3d 87, 93, (2d Dept. 2021) (quoting *Rothschild v. Title Guar. & Trust Co.*, 204 N.Y. 458 (1912) and finding mortgage agreement enforceable under estoppel principles even though otherwise void).

Finally, *Sanchez v. S&P Global, Inc.*, 2023 WL 8372990, at *2 (S.D.N.Y. Dec. 4, 2023), does not support a contrary conclusion about Wang's individual

---

[13] Moreover, the Borda email references a "memo" that would later be provided. The memo showed that Wang was paid overscale of $4,132.80 during the first month of the new contract period, the same amount as Wang's 2023/2024 overscale rate (Wang Decl. Exs. A and B.)

agreement.  There, this Court refused to enforce a contract unsigned by the party

against whom enforcement was sought in connection with an agreement that

would have waived legal claims, whereas here, the contract's enforcement is

sought against the party that did sign it (the Philharmonic), and that enforcement

is sought in the context of the parties having mutually and fully performed the

partially unsigned contract for over a year.

In sum, Wang has more than plausibly alleged that the Union breached its

duty of fair representation.

## II.    WANG HAS ADEQUATELY PLED THAT DEFENDANTS DISCRIMINATED AGAINST HIM BASED ON HIS SEX IN VIOLATION OF TITLE VII

Wang has plausibly plead violations of Title VII of the Civil Rights Act of

1964 (42 U.S.C. § 2000e, *et seq*.) by both the Philharmonic and the Union.

### A.    The Philharmonic Violated Title VII When It Terminated Wang's Employment Because of Public Criticism Over the Philharmonic's Past Handling of Allegations of Misconduct by Men Against Women

Title VII prohibits an employer from "discharg[ing] any individual, or

otherwise [] discriminat[ing] against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–

2(a)(1).  "The requirements of a prima facie case for a plaintiff alleging

employment discrimination change as the case progresses [:] in the first phase of

49

the case, the *prima facie* requirements are relaxed." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). "[A]bsent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* At the motion to dismiss stage, a plaintiff's burden "is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Littlejohn*, 795 F.3d at 311).

Wang has adequately alleged that he: (1) suffered an adverse employment action by being terminated, *see Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (finding "termination of employment" is an example of a "materially adverse" employment action); (2) is a member of a protected class (male); and (3) was more than qualified for the position he held as Principal Oboe. FAC ¶¶ 14, 57–58. Defendants only challenge whether Wang "can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311.

In *Littlejohn*, the Second Circuit provided a non-exhaustive list of alternative ways a plaintiff can plead facts supporting an inference of

discrimination, including, but not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 312.

Thus, Defendant's assertion that a Title VII claim at the motion to dismiss stage must include facts to show that Wang was "'similarly situated in all material respects' to comparators who 'engaged in comparable conduct and received comparatively preferential treatment,'" (Phil Br. at 21), is a misstatement of the law in this Circuit. *See Littlejohn*, 795 F.3d at 312 (listing comparator evidence as just one of several, non-exhaustive, examples of how an inference of discrimination may be pled). For this same reason, the Philharmonic's citation to *Roenick v. Flood, et al.*, 20-CV-7213, 2021 WL 2355108 (S.D.N.Y. Jun. 9, 2021), and *Novick v. Vill. of Wappingers Falls, New York*, 376 F. Supp. 3d 318 (S.D.N.Y. Mar. 27, 2019), and the Union's citation to *Von Maack v. 1199SEIU United Healthcare Workers E.*, No. 14-CV-4360, 2014 WL 5801349, at *5 (S.D.N.Y. Nov. 7, 2014) (listing plaintiff's failure to identify comparators as just one example of a failure to plead discriminatory intent, also noting that plaintiff did not "give any examples of discriminatory comments or innuendo by union officials"), *aff'd but criticized*, 638 F. App'x 66 (2d Cir. 2016). and *Jenkins v.*

*Arcade Bldg. Maint.*, No. 98 CIV. 3133 (RWS), 1999 WL 1051105, at *7 (S.D.N.Y. Nov. 19, 1999), lend them no aid, as these cases stand only for the proposition that the existence of comparators is one way, among others, to support an inference of discriminatory intent in the absence of direct evidence of discrimination.  As *Littlejohn* makes clear, a plaintiff may use other avenues to prove intent, like "the sequence of events leading to the plaintiff's discharge." 795 F.3d at 312.

A plausible inference of discriminatory intent on the basis of sex may be found where, as here, an adverse action is taken against an employee in connection with allegations of sexual misconduct after a "clearly irregular investigative or adjudicative process," that was conducted "amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019).  In *Menaker* the Second Circuit clarified its holding in *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016),[14] and in so doing, confirmed that allegations such as Wang's state a claim for sex discrimination under Title VII.  For the courts in both *Menaker* and *Doe*, the combination of procedural irregularities in the investigation and adjudication of complaints against the plaintiffs, and the substantial public pressure that the

---

[14] The Second Circuit has "long interpreted Title IX by looking to the caselaw interpreting Title VII." *Menaker*, 935 F.3d at 31.  *See also Doe v. Columbia*, 831 F.3d at 55-56 ("Title VII cases provide the proper framework for analyzing Title IX discrimination claims.").

universities faced to take "seriously complaints of female students alleging sexual assault by male students," were more than enough to conclude that it was plausible "that the university was motivated to favor the accusing female over the accused male in order to demonstrate its commitment to protecting female students from male sexual assailants." *Menaker*, 935 F.3d at 31.

The circumstances here closely parallel those in *Menaker* and *Doe*. The Article prompted a swift and strong public reaction critical of the Union and the Philharmonic for their purported past failures to take seriously women's allegations of sexual misconduct. FAC ¶¶ 29, 32, 34. *See also* Singer Decl. Ex. E. The responses of the Union and the Philharmonic to that reaction ignored— and even worse, criticized—a binding arbitral finding, did not allow Wang to fully defend against the subsequent "new" accusations that related back to encounters in his private life that had occurred over a decade or more earlier, sidestepped Wang and Muckey's incident-free conduct since their reinstatements, ignored the procedural protections of the CBA and, ultimately, yielded a preordained result that was inconsistent with the CBA, the arbitration, and certain facts the Defendants did not like. The Union and the Philharmonic were swept up by public outcry over the Article, and their actions reflected gender-based discrimination against the accused.

These facts stand in sharp contrast to those in *Doe v. New York Univ.*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020).  The court there found the plaintiff's allegations to be insufficient because "he neither establishe[d] that NYU was under public criticism during the pendency of the underlying investigations and proceedings nor d[id] he establish Defendants' knowledge of the purported criticisms."  Wang, by contrast, has alleged that the Philharmonic and the Union were under intense public scrutiny at all relevant times after the Vulture Article was published.  *See*, *e.g.*, FAC ¶¶ 31, 40, 41.  That scrutiny focused on whether the Philharmonic and the Union had adequately responded in the past to women's allegations of sexual misconduct by male musicians.  And in contrast to NYU in *Doe*, both the Union and the Philharmonic were well aware of that scrutiny; they immediately ran to the press to acknowledge the "strong feelings" prompted by the Article, to express their purported shock and horror, and otherwise try to redeem themselves in the eyes of the Philharmonic community by showing that they supported and believed women and would take harsher action against men accused of misconduct.  FAC ¶¶ 38, 40, 41.

The Union President when asked by the *New York Times* about Wang's (and Muckey's) suspension very shortly after it was imposed, described it as a "good first step," completely abandoning any pretense of fairness and equal treatment of Wang as a union member.  FAC ¶ 43. Similarly, the Orchestra

Committee issued a statement claiming to "believe" Cara Kizer, and smeared Wang (and Muckey) with the unsupported statement that "we don't believe these are isolated incidents involving ... Liang Wang."  FAC ¶ 41.  The Philharmonic's CEO soon after publicly suggested that Wang (and Muckey's) future with the Orchestra was in doubt.  FAC ¶ 47.  In other words, Defendants abandoned any sense of fealty to their obligations not to discriminate in favor of persuading the critical public that they believed women over men and that men would be punished harshly in response to allegations made by women (FAC ¶¶ 40–41, 43).

The subsequent internal investigation was an overtly biased exercise that further reflected the discriminatory nature of Wang's termination.  Though ostensibly directed at all members of the Philharmonic, it functionally targeted only Wang and Muckey, who as men who had previously defeated allegations of sexual misconduct made by women, had for that reason become public relations liabilities for the Philharmonic.  Only *their* pasts were put under a microscope.  And not just for their conduct in the workplace, but also for their private, out-of-work conduct that no Philharmonic employee had any reason to believe might (a) become the Philharmonic's concern and (b) lead to their termination.  Wang was never provided even minimal notice of what exactly he was being investigated for.  That was particularly true with respect to the most serious allegation against Wang, which he and his lawyers did not even realize had been leveled against him

until after he had been fired and was shown the Levy Executive Summary.  FAC ¶ 73.  The overt bias toward Wang (and Muckey) of the Levy investigation raises an inference of discrimination.  *Menaker*, 935 F.3d at 34 (by "choos[ing] to accept an unsupported accusatory version over [that of the accused], and declin[ing] even to explore the testimony of [the accused's] witnesses, this too gives plausible support to the proposition that they were motivated by bias") (internal quotations omitted).

The fact that the CBA's procedural protections were ignored lends further support to an inference of bias.  *See Menaker*, 935 F.3d at 33 ("once a university has promised procedural protections to employees, the disregard or abuse of those procedures may raise an inference of bias"); *see also id.* ("When combined with clear procedural irregularities in a[n employer's] response to allegations of sexual misconduct, even *minimal* evidence of pressure on the [employer] to act based on invidious stereotypes will permit a plausible inference of sex discrimination.").

### B.    Wang States a Sex Discrimination Claim Against the Union

A union violates Title VII when it breaches its duty of fair representation and is motivated by a discriminatory purpose on the basis of race, color, religion, sex, or national origin.  *Agosto v. Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2000); *see also Roach v. New York City Hous. Auth.*, No. 23-CV-08135, 2025 WL 1769845, at *3 (S.D.N.Y. May 6, 2025) ("To allege a Title VII claim against a union, the plaintiff must allege (1) that the union breached its

duty of fair representation and (2) that the union's actions were motivated by discriminatory animus.")

Wang has plausibly alleged that the Union breached its duty of fair representation and did so with "discriminatory animus." *Id*. As described above, Section I.B and C *supra*, the Union breached its duty of fair representation to Wang by failing to grieve his suspension and termination. The context surrounding the actions of both Defendants supports an inference of the Union's discriminatory intent in failing to fairly represent Wang. As an initial matter, the Union admitted that the Philharmonic's method of ridding itself of Wang had never been applied to any other union member. Such was its concern that the Union went so far as to demand a written commitment from the Philharmonic that it would never again use this method for any other employee. FAC ¶ 120. But once the Union secured the Philharmonic's written commitment that this aberrational method of termination would only be applied to Wang (and Muckey) and then safely tucked away again, the Union refused to grieve Wang's termination. FAC ¶ 120. And the Union didn't merely acquiesce to the Philharmonic; it aided and abetted the termination by considering reasons that the Philharmonic did not itself proffer when it fired Wang, and did not even speak to Wang after either his suspension or his termination, let alone advocate for him. For this, and myriad other examples of the Union's duplicitous action and inaction

described in Section I.B and C *supra*, the Union clearly breached its duty of fair representation to Wang.

The Union made these highly unusual decisions about how to represent Wang within a climate of intense public scrutiny based on accusations that Defendants were "reacting inadequately to allegations of sexual misconduct by members of one sex." *Menaker*, 935 F.3d at 33. If there was any doubt about the Union's discriminatory motivation, its President made it clear when she spoke out against Wang publicly after the publication of the Article (which, among other things, questioned whether women in the orchestra were safe) and referencing both her horror and her own gender in doing so. FAC ¶¶ 43, 57, 226, 257. Moreover, the same body that had represented Wang in the 2019 arbitration— raised the final and binding 2020 arbitration decision in its purportedly unrelated written decision not to grieve Wang's 2024 termination, and specifically and "vociferously" disavowed the testimony and credibility of its own expert based on nothing, except its clear intent to cast aspersions on Wang. Singer Decl., Ex. D at 1, n.1.

The Union's claim that its president's statement was simply an acknowledgment of her status as a woman is disingenuous. When placed back into the context in which the statement was made, the statement is not a "stray statement" that can be dismissed as harmless. Gendered statements made by high-

ranking members of the Philharmonic or Union "cannot be discounted as simply 'stray remarks,' particularly on a motion to dismiss." *Santiago v. ACACIA Network, Inc.*, 634 F. Supp. 3d 143, 153 (S.D.N.Y. 2022) "Four factors are considered to determine whether a statement was simply a stray remark: (1) who made the remark; (2) when the remark was made; (3) the content of the remark; and (4) the context in which the remark was made." *Id.* (citing *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019)). The statements, some of which were made publicly, came from the highest authorities at the defendant organizations, immediately following Wang's suspension and within close temporal and contextual proximity to the decisions Defendants made with respect to the adverse employment actions. *Santiago*, 634 F. Supp. 3d at 153.

## III.    THE EEOC MAY ISSUE A RIGHT TO SUE LETTER BEFORE 180 DAYS EXPIRES

The Philharmonic contends its motion should be granted on the theory that Wang has not exhausted administrative remedies, but he has. [15] Wang received his right-to-sue letters from the EEOC before the 180-day time period expired.

---

[15] Where a claim is dismissed for failure to exhaust administrative remedies, the dismissal should be without prejudice. *Holt v. Town of Stonington*, 765 F.3d 127, 133 (2d Cir. 2014) ("Because a failure to exhaust can be remedied through the pursuit of administrative process, 'a dismissal for failure to exhaust available administrative remedies should be without prejudice.'" (quoting *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 560 F.3d 118, 124 (2d Cir. 2009)).

"Although the Second Circuit has not weighed in on this precise issue, many other Circuits have, the majority of which 'agree that the EEOC appropriately adopted the regulation allowing it to issue right to sue letters *prior* to the expiration of 180 days on the basis of administrative convenience.'" *Huerta v. J.D. Workforce, Inc.*, No. 23-CV-5382, 2025 US Dist. LEXIS 40517, at *32 (S.D.N.Y. Mar. 3, 2025) (quoting *Mwangi v. Passbase, Inc.*, No. 21-CV-6728, 2022 U.S. Dist. LEXIS 106103, 2022 WL 2133734, at *4 (S.D.N.Y. June 14, 2022) (collecting cases)); *see also Hernandez v. Premium Merch. Funding One, LLC*, No. 19-CV-1727, 2020 U.S. Dist. LEXIS 122643, at *14 (S.D.N.Y. July 13, 2020) (finding that "nothing in the statute [42 U.S.C. § 2000e-5(f)(1)] mandates that the EEOC wait 180 days before issuing a right-to-sue letter").  While district court decisions within the Second Circuit have not been uniform, "the majority have upheld the validity of early right-to-sue letters." *Huerta*, 2025 US Dist. LEXIS 40517, at *32–33 (citing, *inter alia*, *Germain v. Nielsen Consumer, LLC*, 655 F. Supp. 3d 164, 179 (S.D.N.Y. 2023) (holding that the issuance of an early right-to-sue letter does not bar a Title VII suit); *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593, 2021 U.S. Dist. LEXIS 171219, 2021 WL 4124616, at *13 (S.D.N.Y. Sept. 9, 2021) (same); *Areu v. Fox News Network, LLC*, No. 20-CV-8678, 2021 U.S. Dist. LEXIS 171332, 2021 WL 4124226, at *7–8 (S.D.N.Y. Sept. 9, 2021)

(same); *Hussein v. Pierre Hotel*, No. 99-CV-2715, 2000 U.S. Dist. LEXIS 8225, 2000 WL 776920, at *3–4 (S.D.N.Y. June 14, 2000) (same)).

Contrary to the Philharmonic's argument, there is nothing about the early issuance of a right-to-sue letter that contravenes Title VII. Courts specifically have noted that "Title VII, on its face, does not prohibit the EEOC from issuing a notice of right to sue before the 180-day period expires." *Hernandez*, 2020 U.S. Dist. LEXIS 122643 at *14 (quoting *Figueira v. Black Entertainment TV*, 944 F. Supp. 299, 305 (S.D.N.Y. 1996)); and *Huerta*, 2025 US Dist. LEXIS 40517, at *33–34. Wang properly filed a charge of sex-based discrimination against the Philharmonic and the Union and was issued early right-to-sue letters for both charges by the EEOC. He thus exhausted his administrative remedies. In any event, the Union does not raise the argument and has thus forfeited it.

## IV.    WANG HAS ADEQUATELY PLED HIS STATE LAW DISCRIMINATION CLAIMS

Just as Wang has plausibly alleged claims under Title VII, he has also alleged claims under both the City's and the State's Human Rights Laws.

The New York State Human Rights Law ("NYSHRL") prohibits discrimination in employment on the basis of sex. NYSHRL, NYS Exec. L. § 296. That prohibition extends to labor organizations. *Id.* § 296(1)(c) (unions are prohibited from "discriminating in any way against its members"). To plead a claim of employment discrimination under NYSHRL, a plaintiff must allege that

(1) he is a member of a protected class, (2) he was qualified to hold the position, (3) he suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Ayers v. Bloomberg, L.P.*, 203 A.D.3d 872 (2022). The New York City Human Rights Law, Section 8–107(1)(a) of the NYC Administrative Code, makes it "an unlawful discriminatory practice … [f]or an employer or an employee or agent thereof, because of the … gender … of any person, … to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin. Code § 8–107(1)(a). Similarly, subsection (c) makes it unlawful for "labor organizations" like the Union "to discriminate in any way against any of its members." Claims brought under the NYCHRL must be reviewed "independently from and 'more liberally' than their federal and state counterparts." *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *6 (S.D.N.Y. Aug. 29, 2019) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).

The NYSHRL was amended in 2019 to clarify that it is intended to be construed more "liberally" than similarly worded federal civil rights laws like Title VII, thereby aligning the standard with one closer to that of the NYCHRL (NYS Exec. L. § 300). *See, e.g., Cooper*, 2023 WL 3882977 (quoting § 300). As described in Section II.A *supra*, Wang has met the pleading standards for his Title

VII claims against both the Philharmonic and the Union at the motion to dismiss stage and has thus met the more liberal standards of the NYSHRL and NYCHRL. *See Farah v. Emirates and Emirates Severance Plan*, 2024 WL 1374762, at *5 (S.D.N.Y. Mar. 31, 2024) (finding plaintiff met Title VII's pleading requirements and therefore also met requirement for NYSHRL and NYCHRL, which are less stringent). Much like his Title VII claim, Wang must "plausibly allege that (1) the employer took adverse action against him and (2) his … sex, … was a motivating factor in the employment decision." *Roenick v. Flood, et al.,* 2021 WL 2355108 (S.D.N.Y. June 9, 2021). Wang has satisfied this standard.

### A.    Wang's State Law Claims Are Not Preempted

Defendants' argument that Wang's State and City discrimination claims are preempted because they are inextricably intertwined with an analysis of the CBA and determination of whether Defendants complied with its terms, is misguided. Wang's right to be free from discrimination in the workplace arises separate and apart from the rights that flow from the agreements with his employer and union, and these rights cannot be avoided through contract. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) ("Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law."). In other words, the source of the rights that Wang seeks to enforce are the NYSHRL and NYCHRL, not the rights granted to him under the CBA.

*See*, *Cruz v. SEIU Loc. 32BJ*, No. 19-CV-11836, 2021 WL 3604661, at *5

(S.D.N.Y. Aug. 12, 2021) ("proof of Plaintiff's NYSHRL and NYCHRL

discrimination claims will depend upon the actions, statements and motivations of

the Union, not upon the terms of the CBA.  Consequently, those claims are not

preempted."); and *Bryant v. Verizon Communications, Inc*., 550 F. Supp. 2d 513,

529 (S.D.N.Y. 2008) ("[t]he right to be free from such discrimination arises from

state law, not from the CBA, and it is a non-negotiable right.") (internal citation

omitted).

Pursuant to the NYSHRL and NYCHRL, Wang must allege that (1) he is a

member of a protected class, (2) he was qualified to hold his position, (3) he

suffered an adverse employment action, and (4) the adverse action occurred under

circumstances giving rise to an inference of discrimination.  *Ayers*, 203 A.D.3d

872.  None of these factors requires an interpretation of the CBA[16]:  Wang is

asserting his right, *arising under state law and existing independently of the CBA*,

to be free from sex-based discrimination in the workplace. *See Caterpillar Inc. v.*

*Williams*, 482 U.S. 386, 396 (1987) (when a plaintiff covered by a CBA asserts

---

[16] The Philharmonic cites extensively to *Whitehurst* to support its preemption argument, but the facts render it inapposite.  *Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201, 207 (2d Cir. 2019).  In *Whitehurst*, the plaintiff only alleged discriminatory treatment occurring *after* her termination. Her allegations unquestionably required the court to interpret the terms of the CBA and determine whether plaintiff had "a right to avail herself of the grievance process," or whether she was entitled to reinstatement or not, given her status as a probationary employee. *Id*.  In short, unlike Wang, Whitehurst's claims were inextricably linked to the specific rights granted to her (or not) by her CBA.

"legal rights independent of that agreement," preemption does not occur); *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994) (Section 301 is not intended to be "read broadly to preempt nonnegotiable rights conferred on individual employees as a matter of state law" and "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.").

A review of the ways in which Defendants operated outside of the CBA's intended protections helps to provide a more complete picture of the circumstances in which Defendants' discriminatory actions took place, but Wang's discrimination claims do not turn on an analysis of the CBA. Indeed, the parties all agree that the CBA makes an arbitration decision final and binding, and that it requires just cause for any discipline. Defendants' arguments that Wang was not disciplined when the Philharmonic fired him after the conclusion of a five-month investigation culminating in investigatory accusation of misconduct, just because the Philharmonic chose not to *call* it discipline, is entirely conclusory, and absurd—and the making of that argument does not preempt Wang's statutory rights to recover damages for discrimination by both defendants.

In any event, that Wang has adequately pled the first three prongs of his discrimination claims is not disputed by the Philharmonic. Wang's allegation that the adverse employment action he suffered occurred under circumstances giving

rise to an inference of discrimination is supported by many factors, which do not require more than a passing reference to the CBA. For example, Wang points to circumstances including: (1) defendants' own statements, that the Philharmonic invoked, and the Union went along with, use of a provision of the CBA for the limited purpose of removing Wang (and Muckey) from the orchestra, and Defendants made clear in writing that they would return to the CBA's normal application afterwards, FAC ¶ 121; (2) the fact that Defendants were making decisions about Wang's employment in the context of consistent and loud public outcry, demanding action to punish men and protect and believe women, FAC ¶¶ 82, 114, 116; (3) the gendered public statements by Defendants; (4) the biased approach of the Levy investigation, which automatically credited women without providing a fair opportunity for Wang to defend himself; (5) the explicit disrespect by Defendants (in the Levy Report and the Union Decision) of the binding arbitration ruling in the immediate aftermath of the Article; (6) the lack of any action, investigation, reports, or discipline before the public outcry related to the Article; and (7) the Union's reliance on facts beyond those implicated by the Philharmonic's own statement of reasons for terminating Wang (or lack thereof). FAC ¶¶ 122–23, 127–28.

    An in-depth, or even cursory, analysis of the provisions of the CBA and a final determination about whether the Defendants breached that agreement are not

relevant to determining whether the above allegations create an inference of discriminatory intent, particularly at the motion to dismiss stage.  As noted *supra* at Section I.A.3, the operative provisions of the CBA, including Article VII's requirement that the Philharmonic have just cause before terminating a tenured musician for disciplinary reasons, Article XV's requirement that arbitration decisions be treated as final and binding, and Article XV's separate requirement that terminations pursuant to XIV meet some standard of propriety are all both unambiguous and not subject to dispute by Wang.  It is of no moment that the meaning of "propriety" is facially ambiguous, because here, the Philharmonic did not claim that its termination of Wang met that standard, and instead argued, and the Union agreed, that it need not meet any standard without ever grappling with the tension between that position and the provisions of Article XIV(A).  There can be no dispute that, regardless of what "propriety" might mean, a termination that gives no reasons at all cannot meet that or any standard.

**B.    Plaintiff's State Law Claims Are Not Barred by *Martin v. Curran***

Defendant Local 802's argument that Plaintiff's state law claims must be dismissed under *Martin v. Curran*, 303 N.Y. 276 (1951) is misplaced. *Martin*'s narrow rule, which requires a plaintiff to plead and prove that every individual member of an unincorporated association authorized or ratified the challenged conduct, is rooted in common-law doctrines. It does not and should not apply to

67

statutory causes of actions such as those brought under the New York State and City Human Rights Laws, as the legislatures have clearly manifested their intent to statutorily create a right that supersedes the common law.

In *Martin*, the New York Court of Appeals held that the General Associations Law §13 did not modify the common law requirement that common law claims against a voluntary unincorporated membership corporation required allegations of individual liability of every single member, "whether for breaches of agreements or for tortious wrongs." *Id.* at 282. This was because, at common law, an unincorporated association "has no existence independent of its members." *Id.* at 280. The court emphasized that it was the legislative intent to not modify the common law requirement, and it was not up to the court to revise statutes. *Id*. The *Martin* court did not consider whether the common law requirement would govern substantive law claims arising through legislative enactment, for example the NYSHRL or NYCHRL—statutes that were enacted with the explicit aim of holding labor organizations accountable for discriminatory practices.

While the Court of Appeals reaffirmed *Martin* in *Palladino v. CNY Centro, Inc.*, 23 N.Y.3d 140 (2014), it did not expand *Martin* to statutory claims. Indeed, the Court specifically mentioned that *Martin* does not limit statutory actions by union members under the Taylor Law, which statutorily provides that it shall be

an improper practice for an employee organization to breach its duty of fair representation to public employees. *Id.* at 152; *see also Kitani v. NYC Transit Auth.*, No. 19-CV-1043, 2022 WL 874781, at *13 (S.D.N.Y. Mar. 24, 2022).

Both federal and state trial courts have recently recognized that *Martin*'s rationale does not extend to statutory claims. I n *Langford v. International Union of Operating Engineers, Local 30*, 765 F. Supp. 2d 486, 509–11 (S.D.N.Y. 2011), the court expressly rejected the application of *Martin* to NYSHRL and NYCHRL claims, noting that the legislature's decision to specifically include labor organizations within the scope of these statutes reveals an intent to treat unions as entities independent of their membership, and therefore a claim against them under those statutes does not need to include allegations against each member. *See also Kitani*, 2022 WL 874781, at *13 (rejecting *Martin* in state statutory DFR context).

Likewise, in *Ramroop v. Commc'ns Workers of Am. Local 1182*, 2022 WL 17574009, at *3 (N.Y. Sup. Ct. Dec. 8, 2022), the court declined to extend *Martin* to NYSHRL/NYCHRL claims, reasoning that those statutes specifically charge labor organizations (not their individual members) with discriminatory practices, which demonstrate the legislative intent to treat the existence of the labor organizations as independent of its members. *See also People v. Newspaper and*

*Mail Deliverers' Union of New York and Vicinity*, 250 A.D.2d 207, 214 (1st Dep't 1998) (stating that *Martin* does not apply to criminal enterprise corruption).

Defendants cite *Girolamo v. Teamsters Local 72*, 1998 WL 889039 (S.D.N.Y. Dec. 21, 1998), and *McIntyre v. Longwood Cent. Sch. Dist.*, 2008 WL 850263 (E.D.N.Y. Mar. 27, 2008), for the proposition that *Martin* applies to NYSHRL claims. But both cases predate *Langford, Ramroop*, and *Kitani*, and do not engage with the distinctions between common law and statutory causes of action. As *Langford* points out, these cases apply *Martin* too broadly. *See Langford*, 765 F. Supp. 2d at 510. ("*McIntyre* and *Girolamo,* however, are based on an apparently overbroad reading of *Martin's* holding.").

Here, when the Legislature enacted the NYSHRL and NYCHRL, it explicitly provided for liability against "labor organizations" for discriminatory conduct. *Martin*'s rule does not apply, and Plaintiff is not subject to a requirement to prove that every member of Local 802 authorized or ratified the Union's discriminatory misconduct.

## **<u>CONCLUSION</u>**

For all of the reasons stated, Defendants' motions to dismiss should be

denied.

Dated:  July 29, 2025
        New York, New York

Respectfully submitted,

CARTER LEDYARD & MILBURN LLP

By:  _____/s/ Alan S. Lewis_____
    Alan S. Lewis
    Karen E. Meara
    28 Liberty Street, 41st Floor
    New York, NY 10005
    (917) 544-2524
    lewis@clm.com
    meara@clm.com

*Attorneys for Plaintiff Liang Wang*

## <u>WORD COUNT CERTIFICATION</u>

The undersigned attorney hereby certifies that this document complies with the word count limitation of Local Rule 7.1 and the Order Granting Leave to File Excess Pages (Dkt. No. 116) because it contains 17,399 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and certificates.

Dated:  July 29, 2025
         New York, New York


                              */s/ Alan S. Lewis*
                              Alan S. Lewis