Q3P1MUCC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
MATTHEW MUCKEY,

                    Plaintiff,

            v.                          24 Civ. 3348 (AS)

ASSOCIATED MUSICIANS OF
GREATER NEW YORK, LOCAL 802,
AMERICAN FEDERATION OF
MUSICIANS, *et al.*,

                    Defendants.
-------------------------------x
LIANG WANG,


                    Plaintiff,

            v.                          24 Civ. 3356 (AS)

THE PHILHARMONIC-SYMPHONY
SOCIETY OF NEW YORK, INC., *et
al.*,

                    Defendants.          Conference (Remote)
-------------------------------x
                                        New York, N.Y.
                                        March 25, 2026
                                        4:37 p.m.

Before:

                    HON. ARUN SUBRAMANIAN,
                                        District Judge

                          APPEARANCES

McLAUGHLIN AND STERN, LLP
     Attorneys for Plaintiff Matthew Muckey
BY:  STEVEN J. HYMAN, ESQ.
     PAUL H. LEVINSON, ESQ.
     JACQUELINE C. GERRALD, ESQ.

CARTER LEDYARD & MILBURN LLP
     Attorneys for Plaintiff Liang Wang
BY:  ALAN S. LEWIS, ESQ.
     KAREN E. MEARA, ESQ.

Q3P1MUCC

                              APPEARANCES
                             (Continued)

COHEN, WEISS AND SIMON LLP
     Attorneys for Defendant Local 802
BY:  SUSAN DAVIS, ESQ.
     OLIVIA R. SINGER, ESQ.

MORGAN LEWIS & BOCKIUS LLP
     Attorneys for Defendant NY Philharmonic
BY:  ASHLEY R. LYNAM, ESQ.
     JACOB SAND, ESQ.

Q3P1MUCC

(Case called)

THE COURT:  Let's have appearances, starting with the plaintiffs.

MR. HYMAN:  For Mr. Muckey, Steven Hyman, Jacqueline Gerrald, and Paul Levinson.

THE COURT:  Good afternoon.

And do we have counsel for Mr. Wang?

Someone may be on mute?

MR. HYMAN:  He was on the call just a little while ago.

THE COURT:  All right.  Let's wait for a second.

MR. HYMAN:  I'm texting him now.  This is Steve Hyman.

THE COURT:  Okay.

MR. HYMAN:  They're coming back on, advised by text.

MR. LEWIS:  We're back on.  Apologies.  I accidentally ended the call.

THE COURT:  All right.  That's okay.  So we just had the appearance of Mr. Muckey's counsel, and so now, for Mr. Wang?

MR. LEWIS:  Yes.  Good afternoon, your Honor.  From Carter Ledyard & Milburn, this is Alan Lewis and Karen Meara.

THE COURT:  All right.  And for Local 802?

MS. DAVIS:  Good afternoon, your Honor.  This is Susan Davis and Olivia Singer from Cohen, Weiss & Simon.

THE COURT:  All right.  Good afternoon.

Q3P1MUCC

And for the Philharmonic?

MS. LYNAM:  Good afternoon, your Honor.  This is Ashley Lynam with Jacob Sand, from Morgan Lewis.

THE COURT:  All right.  Good afternoon, everyone.  And thank you for joining this conference on such short notice.  I really appreciate it.

What I will do is give the parties the decision on the pending motions to dismiss and then we can discuss next steps here.

So as the parties know, Muckey and Wang were terminated from the Philharmonic after allegations surfaced concerning instances of sexual misconduct.  Following an arbitration decision reinstating them, an article was published in *Vulture* that addressed the alleged misconduct, the arbitration, and the aftermath.  After that all happened, the Philharmonic decided to look further into Muckey and Wang's conduct, and they placed them on paid leave while that was all happening.  Shortly after this, Local 802's president observed "that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being "are good first steps but they can't be the last," and that "As a woman, a musician, and a new union president, I am horrified by what was in the story and we are committing the full resources of Local 802 to erase the culture of complicity that has raged at the New York Philharmonic for too long."

Ultimately, the Philharmonic ended their relationship with Muckey and Wang, invoking a provision of the Collective Bargaining Agreement that permits the orchestra to not renew the engagements of certain members.  Local 802 did not grieve any of those determinations, and Muckey and Wang filed suit. Now for context, the Court observes that the investigation leading up to the nonrenewals, according to defendants, revealed, in their view, troubling facts.

As to Wang, the Philharmonic argues that "[a]n independent investigator, after interviewing 92 witnesses, concluded that Wang had 'engaged in a persistent pattern of sexual harassment toward women, ranging from offensive comments to rape and a range of abusive behaviors in between those extremes, over the course of more than a ten-year period while he was employed by the Philharmonic," and that "[a]pproximately half of the Philharmonic's members have objected to taking the stage with Wang again and many have said that they would refuse to play with him."

As to Muckey, the Philharmonic said that "three different women reported that Muckey sexually assaulted them after they had withdrawn consent or blacked out," and "a fourth reported a 'physical interaction' with Muckey 'involving alcohol' during which 'she had to push him off her after he sought to progress from making out to trying to get his hands up her dress and have sex with her.'"  (Two of those sexual

Q3P1MUCC

assault allegations were arbitrated in the prior arbitration.) "Many of the Philharmonic's members who spoke with the Investigator expressed the view that Muckey should not be permitted to return to the Philharmonic.  Of the 67 members interviewed, 50 (a majority of the Philharmonic's total members) 'said they would be concerned' if Muckey returned, for various reasons, and 25 expressed that they would not retake the stage with Muckey or that Muckey should not be allowed to return.'"

Now this case focuses on the nature of the defendants' investigation of Muckey and Wang, and the terms of the applicable collective bargaining agreement.  Now the collective bargaining agreement (CBA) contains three provisions central to this case:

First, in Article VII, the CBA notes that "orchestra members shall agree to abide by all reasonable rules and regulations of the Society" and that the "Society may take disciplinary measures in the event of a violation of these rules or for other just cause."  Now the Philharmonic did *not* invoke Article VII either in placing Muckey and Wang on paid leave or in terms of their nonrenewal.

Second, a separate provision, Article XIV, states that "[i]f the Society desires not to engage a member of the Orchestra for the following year (years computed from September 21 to September 20), it must give written notice to

Q3P1MUCC

that effect to said member by February 15th prior to the beginning of the year in question; otherwise, said member shall be deemed automatically re-engaged for the following year." Now this is the provision that the Philharmonic relied on in not renewing Muckey and Wang's engagements.  They did not rely on any other provision of the contract (such as Article VII) in placing Muckey and Wang on paid leave, because their position is that that action, placing them on paid leave, was not disciplinary in nature and didn't harm Muckey and Wang in any way.

Finally, Article XV provides for the dispute resolution procedures that apply in terms of a nonrenewal under Article XIV and further provides that in the event of any disagreement, after the outcome of those discussions and any other process, as provided in Article XV, the union can take any dispute to arbitration under the rules of the AAA.

Now Muckey and Wang argue that the Union and the Orchestra conspired against them in this whole process, running roughshod over the CBA's requirements, Wang's (unsigned) agreements with the Orchestra, which he argues were in effect, applying normal common law principles, despite the fact that they were unsigned, and federal and state antidiscrimination laws.  For the following reasons, the motions to dismiss filed by Local 802 and the Philharmonic are denied.

Now Muckey and Wang plausibly allege Section 301

"hybrid" claims.  A "pure" Section 301 claim is asserted by a union against an employer alleging a breach of a collective bargaining agreement.  That's from Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 34 (2d Cir. 2000).  Where the union does not act, an employee may assert a claim against the employer if it establishes that the union breached its duty of fair representation.  In order to make out a hybrid claim, which can be asserted against the union, the employer, or both, an employee must establish "(1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation in redressing her grievance against the employer."  That's from *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 113 (2d Cir. 1997).  A claim for breach of a union's duty of fair representation has two parts.  That's from *White* as well.  A plaintiff must first show union "conduct toward a member of the bargaining unit [that was] arbitrary, discriminatory, or in bad faith."  Then the plaintiff must make out "a causal connection between the union's wrongful conduct and [plaintiff's] injuries."

Muckey and Wang have plausibly alleged both prongs. As to the Philharmonic's breach, they make two basic points: first, they say that "paid administrative leave" was clearly a "disciplinary measure" that required a showing of just cause. The Court agrees, at least at this stage of the proceedings.

Q3P1MUCC

And while there *might* have been just cause for this measure having been taken under Article VII, the defendants here don't try to justify the action on those grounds.  They just say that paid leave is not a disciplinary measure.  Under these circumstances, that argument doesn't fly, for the reasons stated in Muckey and Wang's pleadings and on their pleadings on the motions to dismiss.

Turning to Muckey and Wang's nonrenewal of their agreements, the defendants are correct that the letter of Article XIV may have been followed; however, that does not address a basic factual point: allegations that Local 802 and the Philharmonic had already reached some sort of behind-the-scenes side deal that in exchange for Local 802 not contesting the Philharmonic's using that provision in this case, the Philharmonic would essentially agree not to use it in any other case of a tenured musician.  This suggests that there may be a plausible ambiguity in the agreement, or a plausible breach of the implied covenant of good faith and fair dealing, that Local 802 should have, but didn't complain about.

Defendants admit that using Article XIV to get rid of tenured musicians with no showing of just cause has never been done, and likely will never be done ever again.  Indeed, in explaining the Union's decision not to contest the Philharmonic's determination to its members, the Union emphasized that they need not fear that the Philharmonic would

Q3P1MUCC

use Article XIV as an end-run around the "just cause"

requirement in Article VII.  From the Union:

"We are not aware of any other instances where the NY Phil has used Article XIV to terminate a musician.  However, the NY Phil confirmed that it is only relying on Article XIV here due to the exceptional circumstances at issue, including the fact that 2/3 of the Orchestra who spoke to the investigator either will not take the stage or will feel extremely uncomfortable or unsafe if Muckey and Wang return. It also confirmed that it will not use Article XIV to do an end-run around Article VII to avoid its burden of showing 'just cause.'"

It is unclear exactly what is going on here, or why the defendants acted in the way they did.  Putting aside the facts turned up in the investigation, the Philharmonic could have avoided these headaches——this lawsuit——by simply invoking the "just cause" standard, which they plainly believe would have been satisfied here.  But taking the position that tenured musicians can be separated under Article XIV with no showing of just cause, while at the same time working out a side deal with the contracting party that in the future the Philharmonic would not take the same position, raises questions that at least warrant discovery.

As to the Union's violation of its duty of fair representation, this raises deeply fact-intensive questions

Q3P1MUCC

about the nature of the Union's representation of Muckey and Wang.  But here are some reasons why, at the pleadings stage, enough has been alleged.  First, the Union's president, even before seeing any of the facts coming out of the investigation, seemed to have decided that Muckey and Wang were in the wrong and that their suspension was a "good first step," something, from Muckey and Wang's pleadings, a Union president should never say publicly about two of its members that it is representing.  That at least plausibly suggests that the fix was in for Muckey and Wang at the jump.  Then, Muckey and Wang say that the nature of the investigation and the ultimate disposition of their cases by the Philharmonic were also a sham for reasons set forth in their complaints.  And finally, there's the Union's stance on the interpretation of the contract.  Putting aside whether the Union was dead set against Muckey and Wang or not, they did not put up a fight in terms of the Philharmonic not at least justifying its positions on paid leave and nonrenewal in terms of the just cause standard in Article VII, which, as reflected in the Union's postmortem on the whole affair, is what the Union thinks is the right approach to the contract in most situations.

Now will discovery bear Muckey and Wang's allegations out?  Maybe so, maybe not.  But they are entitled to pursue these claims in discovery.  And just like the Philharmonic, the Union could have avoided all of this headache by simply

Q3P1MUCC

pursuing an arbitration, so that the facts could be determined in that setting.  If the Union itself did not want to advocate for Muckey and Wang, it could have simply hired separate counsel for them for that purpose.  It did not.  Whatever determination the arbitrator made, both the Union and the orchestra would be insulated from lawsuits like this one.  That is not what happened in this case.

Now the one aspect of Muckey and Wang's claims that will not proceed is the argument that somehow the prior arbitration award insulated Muckey and Wang from any subsequent termination from the Philharmonic.  This is meritless.  Nothing in the arbitration award said anything about what would happen in the future based on further information and investigation. So that prong of Muckey and Wang's case is out.

Now as to the federal, state, and local antidiscrimination claims, these claims are thin, and plaintiffs' complaints suggest that what happened to them had nothing to do with their gender, as opposed to the allegations of extreme sexual misconduct.  However, the Second Circuit has held that at the motion to dismiss stage, a plaintiff's burden "is 'minimal'—-he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).  And in the context of cases where actions have been taken upon

Q3P1MUCC

allegations of sexual misconduct, the Second Circuit has further held in the university context that the Second Circuit's decision in "*Doe v. Columbia* stands for the general principle that where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019). That is to say, the defendants' lead argument, that a female comparator is required under these circumstances, is not the law, according to the *Menaker* case, and no Second Circuit case, to this Court's knowledge, limits the factors outlined in *Menaker* to the context of an academic institution. Just the opposite. The Court in *Menaker* took pains to emphasize that its principles broadly reflected its application of Title VII's governing principles. The Court has reviewed all the cases citing to *Menaker*, and while it agrees that it likely represents an edge case in terms of the scope of Title VII liability, it is the law that this Court is required to follow.

Now to be very clear, discovery may not bear out these factors. Indeed, this seems like one of those cases that the Supreme Court in *Twombly* was talking about, where a

Q3P1MUCC

"well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." But Muckey and Wang's complaints contain allegations matching the factors outlined in *Menaker*.

Which leaves three technical issues to sort out: (1) whether the state and local discrimination claims are properly asserted against the Union; (2) whether the federal Title VII claims run into any exhaustion problems; and (3) whether the state and local law claims are preempted by Section 301 based on the parties' collective bargaining agreements. Taking those issues in reverse order, at least as presented at the pleading stage, there is no present preemption. *See Prudenti v. Daily News, L.P.*, 2011 WL 2899226, at *3 (S.D.N.Y. July 11, 2011), where the Court stated that "[E]mployment discrimination claims brought under state and city human rights laws involve precisely the type of nonnegotiable rights conferred on individual employees as a matter of state law that are not preempted by § 301 of the LMRA." While it is true that there is factual overlap, the discrimination claims don't turn on whether the Philharmonic properly discharged Muckey and Wang under the CBA's explicit terms. Instead, they turn on the nature of the defendants' actions, the substance of the investigation, alleged collusion between the union and the orchestra, statements by the union's president, and a side deal

that resulted in the union not contesting the orchestra's interpretation of the CBA.  *See Wilds v. United Parcel Service, Inc.*, 262 F.Supp.2d 163 (S.D.N.Y. 2003) (addressing the scope of Section 301 preemption in the context of New York discrimination claims) (and noting that "District courts within the Second Circuit have repeatedly come to the conclusion that NYHRL claims are not preempted by § 301 of the LMRA.").

Moving to the second issue, there is no exhaustion issue, given that it's undisputed that Muckey and Wang did in fact receive a right to sue letter, for each of them, from the EEOC prior to filing these cases.  Defendants cite no authority requiring courts to probe into whether the EEOC conducted an honest investigation before issuing such a letter; Muckey and Wang went to the EEOC, they were issued a right to sue letter, and in the year since this case has been on file, nothing from the EEOC suggests there was any further action they would take.

Finally, as to the state and local claims against the union, the Court agrees with Muckey and Wang that for the reasons set forth in *Ramroop v. Communications Workers of America Local 1182*, 2022 WL 17574009 (N.Y. Sup. Ct. 2022), the principle of *Martin v. Curran* (which itself has been subject to some raised eyebrows by the New York Court of Appeals in *Palladino*) does not apply to statutory claims such as those asserted here.

For those reasons, the Court denies defendants'

Q3P1MUCC

motions to dismiss.

So in terms of the next steps, the Court will order the parties to meet and confer on a case management plan that will be due within three weeks. That's 21 days. We'll put in an appropriate order reflecting that determination so the parties have the date in front of them in writing.

The issue that I'd like to talk to you about—and then I'll certainly hear from both sides on any additional matters that they would wish to address—is the issue of mediation. Now for the reasons that I've indicated in this ruling, this seems like the type of case where what the plaintiffs are asking, in one regard, at least, for the facts that they say are the right ones, which they say are different than those that came out of the investigation, be determined by a neutral decision-maker. And I think it's in both sides' interests for that to happen in a setting like an arbitration, where they can present their positions to an arbitrator, and if the plaintiffs get a win, then they can have that award and consider themselves vindicated and do whatever they'd like with that. From the defendants' perspective, if they win, same thing; they can free themselves of this litigation and these ongoing issues. From the plaintiffs' perspective, even if they lose the proceedings before the arbitrator, you can have an agreement with the defendants that those would, at least in the context of the arbitration, remain sealed and confidential, and

so there's no further impact to the plaintiffs' reputations or anything in terms of their forward-looking careers, because they'd be handling those issues in the context of an arbitration as opposed to discovery in federal court followed by summary judgment proceedings and trial, all of which will be out in the open.  And so there might be a mutual interest in having these issues handled in arbitration.  And there might be some argument from the plaintiffs that, well, maybe that would have worked back then but now we have a lot of attorneys' fees that we've incurred in this case, things of that nature.  That seems like things that can get worked out in the context of a settlement leading to an arbitration or in the arbitration itself.  That's something that the parties can either agree to here in the context of a mediation and then subsequently resolve those issues in the context of an arbitration.  That's probably where this case should have been at the outset, right?  That's what the CBA provides for in most cases, if the union grieves a dispute.  It's just not what happened here.  And so that's just my suggestion.  And I'm happy to refer the parties to a mediation session with the magistrate judge assigned to this case, where they can see if there's a way to resolve it.  If they can't resolve it, then we'll go to the next stage of litigation.  But if you can, then—everyone knows that that's the best way to resolve disputes, by agreement and not by full-scale litigation.  So I'll offer that thought for the

Q3P1MUCC

parties to consider.

Let's first hear from the plaintiffs on anything else they'd like to discuss, and then I'll turn to the defendants.

So Mr. Hyman, maybe you can start us off, and then we'll turn to Mr. Wang's counsel.

MR. HYMAN:  I think the Court has suggested an interesting approach.  I don't know whether it will work, but I never turn down the opportunity to talk, so if the other side is willing for mediation, we can go to it and see if we can work out a methodology to this.

The one problem, your Honor, that may prevent all that is that I believe both Mr. Wang and certainly Mr. Muckey's careers have been completely demolished.  Mr. Muckey cannot get any work.  So I don't know how that will play out in the arbitration issue that you raise.  But I'm happy to discuss it and not, at this point, make a final decision.

THE COURT:  Yes, and that's fair, and I didn't expect that people would have an immediate reaction.  So again, I appreciate your considering it.

All right.  Mr. Lewis.

MR. LEWIS:  Thank you, your Honor.

We'll certainly discuss what you suggested with our client.  But because it's important to do that before commenting further, for today's purposes, I'd like to leave it at that.

THE COURT:  All right.  And let me turn to the defendants.  If there's anything that you'd like to raise or that the Court can help you with, I'm all ears.

MS. DAVIS:  This is Susan Davis for Local 802.  I mean, this is the first time I agree with Mr. Lewis.  I think we need to take this back to the client and find out how they'd like to proceed.

THE COURT:  Okay.  And do we have unanimity, the Philharmonic?

MS. LYNAM:  Yes, your Honor.  Ashley Lynam on behalf of the Philharmonic, and we'd need to speak to our clients as well.

THE COURT:  Okay.  So we'll put in an order for the parties to meet and confer on a case management plan.  We have those available on our website so you have the form.  You can have those discussions and just get that in within 21 days.  And we'll put in an order so you have that date on your calendar.

Anything else that anyone would like to address before we adjourn?

All right.  So hearing nothing, I'll ask the parties to order a copy of the transcript so that there will be a transcript, and then otherwise, thank you so much for joining this afternoon.  If there's anything else that we can help you with, please let us know.

Q3P1MUCC

         If there's nothing else, we are adjourned.  Thank you

very much.

         ALL COUNSEL:  Thank you, your Honor.

                              o0o